Ex. A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

Badar KHAN SURI,

     *Petitioner-Plaintiff,*

v.

Donald J. TRUMP, in his official capacity
as President of the United States;

Russell HOTT, in his official capacity as
Field Office Director of Washington,
Immigration and Customs Enforcement;

Jeffrey CRAWFORD, in his official
capacity as Warden of Farmville Detention
Center;

Todd LYONS, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement;

Kristi NOEM, in her official capacity as
Secretary of the United States Department
of Homeland Security;

Marco RUBIO, in his official capacity as
Secretary of State; and

Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

     *Respondents-Defendants.*

Case No. 1:25-cv-480

## AMENDED[1] PETITION FOR WRIT OF HABEAS CORPUS
## AND COMPLAINT

---

[1] Petitioner-Plaintiff files this Amended Petition and Complaint as a matter of course pursuant to
Fed. R. Civ. P 15(a)(1).

## INTRODUCTION

1.      This case concerns the government's targeted, retaliatory apprehension, detention, transfer, and attempted deportation of a postdoctoral fellow at Georgetown University based on his family connections, constitutionally protected speech, imputed speech, religion, and national origin. Petitioner-Plaintiff Dr. Badar Khan Suri ("Dr. Khan Suri") is a citizen and national of India and is in the United States in lawful status as a visiting scholar. The Trump administration has openly expressed its intention to weaponize immigration authorities to punish noncitizens whose views are deemed critical of U.S. policy as it relates to Israel. In this case, Respondents-Defendants are targeting Dr. Khan Suri due in part to his protected speech on this issue, but also because of his U.S. citizen wife's Palestinian origins, her constitutionally protected speech, her father's former employment, and his and his wife's Muslim religion, culminating, without reason or process, in Dr. Khan Suri's apprehension, arrest, and detention.

2.      On March 17, 2025, Dr. Khan Suri, a J-1 visa holder, was arrested, detained, and charged with removability under 8 U.S.C. §1227(a)(4)(C), a rarely-used provision of immigration law that allows the government to seek the deportation of an individual "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."

3.      This was done pursuant to a federal government policy ("the Policy") to retaliate against and punish noncitizens like Dr. Khan Suri who Respondents perceive to be supportive of Palestinian rights or critical of Israel because of their actual or imputed protected speech, viewpoint, religion, national origin, or associations—including associations with Palestinians.

4.      Under the Policy, Respondents, including Respondent Marco Rubio, the Secretary of State, identify such noncitizens. Once identified, the Department of Homeland Security

("DHS") apprehends and detains them, then transfers them to immigration jails far away from their families and attorneys to jurisdictions that Respondents perceive to be more favorable to them, and seeks to deport them from the United States.

5.      In this instance, pursuant to the Policy, Respondent Rubio identified Dr. Khan Suri and sought to apprehend, detain, transfer, and deport him. Respondent Rubio purportedly made a determination (the "Rubio Determination") that Dr. Khan Suri's presence or activities in the United States would compromise a compelling United States foreign policy interest ("Foreign Policy Ground"). Upon information and belief, Respondent Rubio made this purported determination based on Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, or protected associations, as well as his wife's protected speech, familial relationships, religion, and national origin. Based on the purported Rubio Determination, DHS agents arrested and detained Dr. Khan Suri, although not required to under immigration law. They then almost immediately transferred him to far-away immigration jails, and placed him in removal proceedings.

6.      The purported Rubio Determination and the government's subsequent actions, including its ongoing detention of Dr. Khan Suri 1,300 miles away from his home, in the same manner as the government did in the cases of Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk, isolating him from his wife, children, community, and legal team, are plainly intended as retaliation and punishment for Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, and associations, all in violation of the First and Fifth Amendments. Indeed, contemporaneous and subsequent statements by administration officials expressly confirm that Respondents targeted Dr. Khan Suri on these unlawful bases. The purported Rubio Determination and Dr. Khan Suri's unjustified detention and transfer also violate his due process

rights by targeting him pursuant to an unduly vague Policy and Determination and subjecting him to unlawfully punitive civil detention. Respondents' targeting of Dr. Khan Suri based on their discriminatory animus towards his wife's national origin constitutes intentional discrimination in violation of the Equal Protection guarantee of the Fifth Amendment. Finally, the government's unlawful Policy of targeting noncitizens, including Dr. Khan Suri, is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and carried out in violation of DHS's own policies in violation of the *Accardi* doctrine. Accordingly, this Court should enjoin the government's implementation of its unlawful Policy and order Dr. Khan Suri's immediate release.

## <u>PARTIES</u>

7.      Petitioner Badar Khan Suri is a citizen and national of India, and is in the United States in J-1 status as a visiting scholar and postdoctoral fellow. He was duly admitted to the United States on this visa in December 2022. He is married to a U.S. citizen, with whom he has three children: a nine-year-old son and five-year-old twins—a boy and a girl. He and his wife are practicing Muslims. At the time of his arrest, he was teaching a course as an adjunct professor on Majoritarianism & Minority Rights in South Asia at Georgetown University. He hopes to become a university professor and embark on a career in academia and teaching.

8.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, DC 20500.

9.      Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the

administration of immigration laws and the execution of detention and removal determinations within the Washington Field Office's area of responsibility, including overseeing decisions to apprehend, detain, release, and transfer individuals in ICE custody. Respondent Hott was, upon information and belief, Petitioner's custodian at the time he filed his original habeas petition. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

10.     Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner was detained when Petitioner's initial Petition for Writ of Habeas Corpus and Complaint was filed. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

11.     Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

12.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S.

Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

13.    Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i). In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, DC 20520.

14.    Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA; and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

16.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id*. §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

17.    Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. The Washington Field Office directed Dr. Khan Suri's arrest and detention in Rosslyn, Virginia; told Dr. Khan Suri and his wife that he was being taken to the ICE Washington Field Office located in Chantilly, Virginia and then told Dr. Khan Suri that he was being taken to the Farmville Detention Center in Farmville, Virginia. Farmville Detention Center is Dr. Khan Suri's "original place of incarceration," *see United States v. Poole*, 531 F.3d 263, 275 (4th Cir. 2008), and his last known location at the time this habeas action was filed. To the extent the Washington Field Office and Respondents moved Dr. Khan Suri to Richmond, Virginia, and then to an airport and across the country to Louisiana around the time the original petition was filed, the Washington Field Office prevented Dr. Khan Suri from communicating this information to his wife and counsel.

## FACTS

### *Dr. Khan Suri's Background*

18.    Dr. Khan Suri is an Indian national who grew up in Uttar Pradesh, India. He obtained his undergraduate degree in Humanities, Geography, History and English from Jamia Millia Islamia in New Delhi, India, and his master's degree in Peace and Conflict Studies from the same university. In 2020, he completed his Ph.D. in Peace and Conflict Studies at the Nelson Mandela Center for Peace and Conflict Resolution at the same university.

19.    During the time he was in his master's program, Dr. Khan Suri traveled with a group of fellow students and prominent members of civil society to Gaza in 2011 as a humanitarian aid convoy. There, he met his future wife, Mapheze Saleh, who was volunteering along with other

college students as a translator for foreign delegations. Dr. Khan Suri returned to India after this trip, but continued to communicate with Ms. Saleh.

20.     Ms. Saleh is a United States citizen of Palestinian descent who was born in Missouri. She lived in the United States until she was five years old. At that time, she moved to Gaza with her mother, but returned to the United States every summer to visit her father, who continued to reside in the United States.

21.     Ms. Saleh's father is Ahmed Yousef, who is the director of the House of Wisdom and is a Professor of International Relations at the Islamic University of Gaza. Mr. Ahmed Yousef is an academic. Between 2006 and until he retired from civil service in 2010, he worked as a political advisor to the Prime Minister of Gaza and as deputy foreign minister in Gaza. The House of Wisdom works towards peace and conflict resolution in Gaza.

22.     In 2013, Dr. Khan Suri returned to Gaza to ask for Ms. Saleh's hand in marriage. At that time, Dr. Khan Suri met Ms. Saleh's father for the first time, and asked for his blessing to marry Ms. Saleh. The couple became engaged, and Dr. Khan Suri again returned to India. He has not traveled to Gaza since, or seen his father-in-law in person since.

23.     Since marrying Ms. Saleh, Dr. Khan Suri would speak by phone with his father-in-law every once in a while about family matters and his academic pursuits. They would usually speak annually on Eid—the two main annual Islamic holidays—to exchange pleasantries. Since Dr. Khan Suri's wife and children arrived in the United States in 2023, he has not spoken directly with his father-in-law.

24.     In 2013, Ms. Saleh moved to New Delhi, India and she and Dr. Khan Suri were married. They remained in New Delhi, where they had three children, until Dr. Khan Suri moved to the United States in late 2022, and his wife and children reunited with him there in 2023.

25.     After completing his Ph.D., Dr. Khan Suri applied for and received a postdoctoral fellowship at Georgetown University at the Alwaleed Bin Talal Center for Muslim-Christian Understanding. Dr. Khan Suri and his wife wished to move to the United States because it ensures religious freedom for all, and they wanted to raise their children in a society that values religious tolerance.

26.     On December 10, 2022, Dr. Khan Suri arrived in the United States on a J-1 exchange visa to begin his fellowship at Georgetown, which began in January 2023. His wife and children arrived in the United States in November 2023. His children were admitted to the United States on derivative J-2 visas, and thus are dependent on their father's status to enter and remain in the country. He fears that his detention and threatened removal could put them at risk as well. The family lived together in Rosslyn, Virginia until Dr. Khan Suri's arrest.

27.     After the war in Gaza began in October 2023, Ms. Saleh lost several family members and friends and she began posting on social media, sharing information about the events occurring in Gaza.

28.     On not more than a handful of occasions, Dr. Khan Suri also made social media posts expressing support for the Palestinian people, criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's war in Gaza.

29.     Because of Ms. Saleh's identity as a Palestinian, her father's former role in the Gazan government, and the couple's social media posts, both Dr. Khan Suri and his wife have recently been doxxed. In February, Dr. Khan Suri and Ms. Saleh began seeing smear campaigns by Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a lobbying and media monitoring group that spreads misinformation and seeks to discredit American

Muslims. Social media users have made comments on CAMERA's posts tagging federal agencies and law enforcement accounts.

30.     The couple have also been smeared by the Canary Mission, which runs an anonymous blacklisting website that creates profiles of individuals perceived to support Palestinian rights. This website is infamous for bullying, slandering, and defaming academics and students. Ms. Saleh is featured on the Canary Mission website with her photograph, academic affiliation, and former volunteer work. The Canary Mission page dedicated to Ms. Saleh identifies Dr. Khan Suri as her husband. The couple has also been the subject of several articles by Middle East Forum's Campus Watch project, an extremist, American conservative think tank.

***The Trump Administration's Hostile Campaign Against Noncitizens It Perceives as Supporting Palestinian Rights***

31.     Respondents' retaliation against Dr. Khan Suri is one application of Respondents' Policy to apprehend, detain, transfer, and deport noncitizens whom Respondents perceive are supportive of Palestinian rights or critical of Israel, because of their actual or imputed speech, viewpoint, religion, national origin, or protected associations, including associations with Palestinians.

32.     In the fall of 2023, thousands of students across the United States from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the U.S. government for Israel's policies in Gaza. Like Dr. Khan Suri and Ms. Saleh, these students expressed concern about the death toll in Gaza as a result of Israel's military operations.

33.     These campus protests resulted in opponents of these students' messages— including President Donald J. Trump—mischaracterizing campus speech in favor of Palestinian rights or critical of Israel as inherently supportive of Hamas and antisemitic. For example, in

several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime
Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using
"Palestinian" as a slur.[2]

34.    During his campaign for re-election, President Trump repeatedly vowed to use visa
revocations as a tactic to pursue his policy of silencing activities on university campuses that were
supportive of Palestinian rights or critical of Israel.

35.    For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to
"terminate the visas of all of those Hamas sympathizers, and we'll get them off our college
campuses, out of our cities, and get them the hell out of our country."[3]

36.    In the spring of 2024, Trump promised campaign donors that he would deport
students advocating for Palestinian rights to get them to "behave." Upon information and belief,
at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw
them out of the country. You know, there are a lot of foreign students. As soon as they hear that,
they're going to behave."[4]

37.    Similarly, in a social media post on his official X account on October 15, 2023,
then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

---

[2] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*,
Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-
schumer-palestinian-slur/.
[3] Andrea Shalal & Susan Heavey, *Trump administration to cancel student visas of pro-
Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-
administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.
[4] Josh Dawsey, Karen DeYoung and Marianne LeVine, *Trump told donors he will crush pro-
Palestinian protestors*, Washington Post (May 27, 2024),
https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[5]

***Respondents Adopt Unlawful Policy to Apprehend, Detain, Transfer, and Deport Noncitizens Whose Speech and Associations It Finds Objectionable***

38.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

39.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

40.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the

---

[5] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), *available at* https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Israeli government and its policies.[6] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you." The fact sheet did not clarify what would result in a noncitizen being categorized as a "Hamas sympathizer." In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

41.    For example, organizations like the Middle East Forum, a rightwing, extremist American conservative think tank, have indicated that they are sharing information with the government based on their investigations into "national security issues."

42.    Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" at U.S. universities that it would like to see deported.

---

[6] Executive Order 14188 refers to Executive Order 13899 for "interpretative assistance" regarding antisemitism. That Executive Order was issued by President Trump in 2019, 84 Fed. Reg. 68779 (Dec. 11, 2019), and it refers to the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism. The IHRA definition of antisemitism includes criticism of Israel that is clearly protected under the First Amendment, such as "drawing comparisons of contemporary Israeli policy to that of the Nazis" or "claiming that the existence of a State of Israel is a racist endeavor." International Holocaust Remembrance Alliance, *Working definition of antisemitism*, available at: https://holocaustremembrance.com/resources/working-definition-antisemitism.

43.     Betar USA, an extremist rightwing group who has claimed credit for sharing information that led to the arrest by ICE of a Columbia student who had engaged in protected expression related to Palestine, has said that it has submitted to the Trump Administration a list of "thousands of names" of students and faculty from various universities whom they believe to be on visas, seeking to target them for detention and deportation.[7]

44.     In March 2025, media reports described widespread fear of retaliation for speech supportive of Palestinian rights among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."[8]

45.     On or before March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Dr. Khan Suri.

46.     On March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups."[9] Respondents would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[10] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

---

[7] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (Mar. 14, 2025), https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump.

[8] Ray Sanchez, CNN, *'Rules aren't clear anymore': Trump crackdown on student protestors send shock waves across US universities* (Mar. 18, 2025) available at https://www.cnn.com/2025/03/16/us/mahmoud-khalil-columbia-protests-free-speech/index.html.

[9] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[10] *Id.*

47.     Under the Policy, the Trump Administration, including Respondent Rubio, would identify noncitizen students or faculty who they perceived were supportive of Palestinian rights or critical of Israel, based on their speech, imputed viewpoint, religion, or protected associations. Once identified, Respondent Rubio would purportedly make a determination, under 8 U.S.C. § 1227(a)(4)(C)(i), that he had "reasonable grounds to believe" that a noncitizen's presence or activities in the United States "would have potentially serious foreign policy consequences for the United States" ("Foreign Policy Ground"). Although not required under the Immigration and Nationality Act, e.g., 8 U.S.C. § 1226(c), DHS would apprehend and detain such individuals and transfer them in violation of ICE Policy 11022.1, in an effort to deport them quickly and thwart jurisdiction in states perceived to be less desirable in defending against challenges to the Policy. Under 8 U.S.C. § 1182(a)(3)(C)(iii), the Secretary of State's decision to refuse entry or deport a noncitizen on this ground cannot be based on the noncitizens "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless he "personally determines that" the noncitizens admission or continued presence in the United States "would compromise a compelling United States foreign policy interest."  He then has to notify certain members of Congress regarding this determination. 8 U.S.C. § 1182(a)(3)(C)(iv).[11]

***Application of the Policy and the Foreign Policy Ground to Noncitizens Whose Views the Trump Administration Finds Objectionable***

48.     On the evening of March 8, 2025, DHS agents first implemented the Policy when they arrested Mahmoud Khalil in New York under the Foreign Policy Ground and transferred him

---

[11] These requirements, which appear under the INA section on grounds of inadmissibility, are incorporated into the INA's foreign policy deportability ground by reference. *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

to New Jersey and then to an immigration jail in Louisiana. Khalil is a student at Columbia University in New York who had been involved in the protests at the University against Israel's military actions in Gaza.

49.    The next day, on March 9, Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

50.    On March 10, President Trump issued a social media statement confirming that Khalil was targeted for his activism and vowed that other student protesters would be targeted as well: "ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the Campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."

51.    On March 12, Secretary of State Rubio stated at a press conference, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities . . . we're gonna kick you out."

52.    In the days since Mr. Khalil's arrest, there have been reports of other instances of application of the apprehend, detain, transfer, and deport Policy.

53.    On March 13, Secretary of Homeland Security Kristi Noem announced that Leqaa Kordia, who had also participated in student protests and had been arrested on Columbia's campus in April 2024, was arrested by ICE in New Jersey and transferred to the same immigration jail in Alvarado, Texas where Dr. Khan Suri is being held.

54.     On March 26, 2025, six plainclothes ICE officers arrested Rumeysa Ozturk, a Turkish Ph.D. student at Tufts University, who DHS alleges, "engaged in activities in support of Hamas." Ms. Ozturk co-authored an op-ed in her university's newspaper criticizing the university's response to students' call to divest from companies with ties to Israel's military action in Gaza. She was transferred to an immigration jail in Louisiana.

55.     On March 27, in response to a question about Rumeysa Ozturk, Respondent Rubio said that the State Department may have revoked more than 300 visas, saying "Every time I find one of these lunatics, I take away their visas."

### Dr. Khan Suri's Retaliatory Apprehension, Detention, and Transfer

56.     On the evening of March 17, 2025, Dr. Khan Suri was coming back home from teaching and attending iftar (the evening meal eaten to break the daily fast during the holy month of Ramadan). He noticed a dark-colored vehicle that appeared to be following him and several other black, unmarked cars near his apartment building. As he was about to enter the building, a man wearing a face covering and dark military-like clothing approached him and asked if he was Badar. Dr. Khan Suri answered that he was. He noticed that several other officers were present nearby.

57.     Dr. Khan Suri called his wife and asked her to come downstairs because he was being detained. After his wife arrived and asked the officers who they were, they responded they were from "Homeland Security." When he was in the car, Dr. Khan Suri asked that his wife be allowed to bring his passport and documents from inside the home. Ms. Saleh brought the documents, but the officers did not allow her to hand them to Dr. Khan Suri. Instead, the officers took Dr. Suri's passport and DS-2019 form.

58.     The officers then handcuffed Dr. Khan Suri in front of his wife and put him into one of the unmarked vehicles.

59.     Dr. Khan Suri repeatedly asked why he was being arrested. An officer told him that his student visa had been revoked. Dr. Khan Suri clarified that he had an exchange visa, not a student visa. The officer told him it was the same thing, and that it was also revoked. Once he was in the car, one of the officers stated to Dr. Khan Suri that he was being arrested because of his "social media," and that someone at a very high level at the Secretary of State's office does not want him there. One of the officers told him that he was going to be deported to his country. When Dr. Khan Suri asked when he would be deported, the officer responded: "today."

60.     Dr. Khan Suri was first taken to the ICE Washington Field Office in Chantilly, Virginia, where officers took his fingerprints and DNA swabs and completed paperwork. The ICE officers told Dr. Khan Suri that they were aware that he was not a criminal and had not done anything bad. They informed him that he would be transferred to the detention center in Farmville, Virginia, where he would be held, and that he had a hearing in immigration court in Texas on May 6. They allowed him to call his wife to relay this information.

61.     Dr. Khan Suri was then driven to the Farmville Detention Center, where he arrived in the middle of the night. He was under the impression that he would remain there until he was either deported or released.

62.     He was then moved to the ICE office in Richmond, Virginia, where he arrived around 6:00 a.m. on March 18. There, he was put in a cell and made to sit on a small bench, shackled, and was refused food and water, despite his repeated requests. He was also denied permission to call his wife.

63.     Later that day, Dr. Khan Suri was transported to an airport and loaded on an airplane. He was kept shackled at the hands, waist and ankles. The plane was old, and the flight turbulent. When using the bathroom on the plane, he was not permitted to close the door or remove his shackles. He was distressed and confused, and terrified that the plane might crash. He was not told where he was being flown, and feared he was being deported.

64.     The plane landed in Louisiana, and he was taken to the Alexandria, Louisiana Staging Facility, where he was held for three days. While in Louisiana, he expected to be deported soon, as multiple deportation flights were departing daily from Alexandria. One officer referred to the facility as a "super deportation center" and said that he should expect to be deported at any time.

65.     On the evening of March 20, an officer told Dr. Khan Suri that he would be sent to New York the next day.

66.     On March 21, he was then driven from Alexandria, Louisiana to Texas. He arrived at Prairieland Detention Center in Alvarado, Texas at around 8:00 p.m. Because he had fasted throughout the day in observance of Ramadan, he asked for food, but was denied.

67.     When he arrived in Texas, Dr. Khan Suri was not assigned to a bed in a dorm. Instead, he was housed in the "TV room," a common room where the television is on every day from 5:00 a.m. to 2:00 a.m. He was given a plastic frame that rests on the floor with a thin plastic mattress to sleep on, called a "boat bed," and no pillow. Due to these conditions, Dr. Khan Suri had pain in his ribs and was unable to sleep.

68.     Dr. Khan Suri requested religious accommodations, including Halal food, Ramadan fasting accommodations, a Quran, and a prayer mat. The only book available to him was the Bible. After approximately five days, he finally received Halal food. On April 2, officers came and told

him that he had complained through his lawyer about his religious accommodations and asked him for more details. After Dr. Khan Suri reaffirmed his needs, he was given a prayer mat, a Quran, and provided a space on a bed in the dorm, outside of the TV room.

69.    Dr. Khan Suri was issued a bright red uniform, usually reserved for detained individuals classified as high security based on their criminal history, alleged affiliations to criminal organizations, or institutional record. When he inquired about the reason for this, he was informed that he is classified as high-security based on his association with a known criminal group—presumably based on Respondents' unfounded claims of his connections to Hamas.

70.    Due to his classification and security protocols at the facility, Dr. Khan Suri is only permitted two hours per week of recreation. His movement within the facility is severely limited— he is not permitted to work or spend more time outside his dorm.

71.    Dr. Khan Suri and other individuals detained in Prairieland Detention Center are given used, dirty underclothing to wear and fed inadequate, unhealthy food.

72.    Dr. Khan Suri's detention has had profound negative impacts on his family. His wife and children miss him dearly and suffer every day that he is absent from their home. His children keep asking their mother when their father will come home. Dr. Khan Suri normally holds his older son every night at bedtime, helping him fall asleep. Lately, his son has been crying uncontrollably and has stopped speaking. He is worried especially about his older son.

73.    As a result of his detention, Dr. Khan Suri has been unable to speak freely about matters of public importance, including about Palestinians in Gaza and the federal government's targeting of noncitizens associated with Palestinian advocacy. He has also been prevented from freely associating with his wife and family.

*DHS's Apprehension of Dr. Khan Suri is Part of a Campaign to Suppress Protected Speech Through Arrest, Detention, Transfer, and Deportation*

74.    On March 19, Tricia McLaughlin, the DHS Assistant Secretary for Public Affairs, misleadingly posted on X that "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i)."

75.    She did not specify what social media posts she was referring to; what "close connection" she was referring to; or who the "known or suspected terrorist" was.

76.    The purported Rubio Determination was exclusively motivated by Dr. Khan Suri's protected and imputed speech, viewpoint, religion, national origin, and protected associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. 1227(a)(4)(C)(i), establish that Respondents are punishing and attempting to silence Dr. Khan Suri by apprehending, transferring, and detaining him.

77.    When Dr. Khan Suri was booked at Chantilly, an ICE officer who was involved in his booking informed him that they knew he was not a criminal and did not do anything bad. He was also told by the arresting officer that someone at a very high level at the Secretary of State's office "does not want you here," confirming that Dr. Khan Suri was being targeted in a retaliatory manner pursuant to the Policy. The Foreign Policy Ground expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the

21

individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Dr. Khan Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

78.    Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

79.    Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794). As an example, the same House Report on the amendment shared the case of the Shah of Iran as an illustration of where his "mere entry into the United States could [have resulted] in imminent harm

to lives or property of United States persons abroad or to property of the United States government abroad." *Id.*

80.     Respondents' failure to follow the procedures specified in the law they relied on to arrest Dr. Khan Suri, along with the statements by Respondents and other government officials, clearly demonstrate that the sole reason for Dr. Khan Suri's apprehension, transfer, and detention is his actual and imputed protected speech, viewpoint, religion, national origin, and protected associations.

***DHS Policies Related to First Amendment Activity and Transfers***

81.     DHS has issued a number of directives and policies that relate to First Amendment-protected activity and to transfers. Upon information and belief, these directives and policies were still operative when Dr. Khan Suri was detained and transferred.

82.     On May 17, 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

83.     On September 30, 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."

84.     ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, inter alia, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

85.    The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

86.    The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours after the transfer occurs."

87.    Additionally, ICE Directive 11064.3, "Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults" requires the Field Office Director to refrain from transferring detained noncitizens outside of the Field Office's area of responsibility where their child or children are located unless dictated by exceptional circumstances or court order. Even when transfer is dictated, the Field Office Director must place the noncitizen as close as practicable to the minor child or children.

88.    At the time of his transfer to Louisiana and then Texas, Dr. Khan Suri had a wife and three young children, and an attorney of record, in Virginia.

89.    Upon information and belief, there was no justification provided for the transfers to Louisiana and Texas, and the transfers were not necessary. Virginia has two large, dedicated ICE facilities, Farmville Detention Center[12] and Caroline Detention Facility,[13] with collectively over 900 beds.

---

[12] ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-content/uploads/2022/06/2021-Annual-Review.pdf. ("The facility has 732 general population housing unit beds").
[13] Caroline Detention Facility, *Home* (2025), https://carolinedf.org/#:~:text=The%20Caroline%20Detention%20Facility%20(CDF,a%20part%

90.     Both facilities were operating nowhere near capacity at the time of Petitioner's apprehension. On March 17, 2025, the day of Dr. Khan Suri's arrest, ICE's bimonthly report to Congress demonstrates that the average daily population at Farmville Detention Center and Caroline Detention Facility was 488 and 284,[14] with capacities of 732 and 336, respectively. Farmville was only using 66% of its capacity and Caroline was only using 84% of its capacity.

91.     Upon information and belief, and contrary to the above directives and policies, DHS has issued a directive that all individuals who are subject to the Policy be transferred to detention centers in the south of the United States to jurisdictions that Respondents perceive will be more favorable to them, and where they will be far away from their families and attorneys, and therefore unable to promptly challenge their detention. Consistent with such a directive, three other individuals – Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk – were transferred under similar rushed circumstances from New York, New Jersey, and Massachusetts, respectively, to Louisiana and Texas.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the First Amendment to the United States Constitution**
***Freedom of Speech and Religious Exercise***

92.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition-Complaint as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . prohibiting the

---

20of%20the%20installation. ("The Caroline Detention Facility (CDF) is a 336-bed correctional facility").
[14] TRAC Reporting, (March 17, 2025)
https://tracreports.org/immigration/detentionstats/facilities.html.

free exercise [of religion] . . . or abridging the freedom of speech . . . or the right of the people . . .

to petition the Government for a redress of grievances." U.S. Const. Amend. I.

93.     The First Amendment protects past, present, and future speech, including speech

by noncitizens. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). "Speech critical of the exercise of the

State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501

U.S. 1030, 1034 (1991). Government discrimination against a particular viewpoint on a given

subject matter is an "egregious" First Amendment violation that "is presumptively

unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (cleaned up). "The First Amendment

right of free speech includes not only the affirmative right to speak, but also the right to be free

from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors

of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). As noted *infra*, the First Amendment,

along with the Fifth Amendment, also protects the right to expressive and intimate association.

94.     The purported Rubio Determination and Policy and Dr. Khan Suri's targeting,

apprehension, transfer, and ongoing detention violate the First Amendment because they: retaliate

against and punish Dr. Khan Suri for his or his wife's past protected speech, or speech imputed to

him or his wife as a result of his family relationship, and for his religious exercise as a practicing

Muslim; prevent him from freely speaking and exercising his religion now (through detention);

attempt to chill (through past punishment and ongoing threat) or prevent (through eventual

removal) his future speech in the United States; deprive audiences of his present and future speech

on matters of public concern; and chill other individuals who express support for Palestinian rights.

95.     These speech-related consequences are not side effects of an action with some other

purpose; they are, instead, the point of the purported Determination and the government's

subsequent actions against Dr. Khan Suri and those similarly situated, in government officials'

own telling, the result of their disagreement with his religious exercise and his protected speech and the viewpoint it expresses.

## SECOND CLAIM

### Violation of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution
### *Freedom of Association*

96. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

97. The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This means "[i]n our jurisprudence guilt is personal" such that "when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct… that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Scales v. United States*, 367 U.S. 203, 224–25 (1961). Simply put, "guilt by association is a philosophy alien to the traditions of a free society." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

98. Respondents' invocation of the Foreign Policy Ground to apprehend, transfer, and continue detaining Dr. Khan Suri rests largely—and impermissibly—on his association with his wife, her protected speech, her national origin, and her familial background. Respondents are retaliating against and punishing Dr. Khan Suri based on an attenuated chain of familial associations: his marital tie to his wife, her familial tie to her father, and her father's former role in the government of Gaza.

99.     Mere association is insufficient grounds to impart liability precisely because the Fifth Amendment's Due Process clause mandates a deprivation of liberty must be premised on a finding of "personal guilt." *Scales v. United States*, 367 U.S. at 224; *see also United States v. Hammoud*, 381 F.3d 316, 328 (4th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1097 (2005).

100.     The Constitution protects both expressive association—the "right to associate for the purpose of engaging in those activities protected by the First Amendment"—and intimate association—*i.e.*, one's "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Freedom of intimate association is a "fundamental element of personal liberty" guaranteed by the Due Process Clause. *Id.* It also stems from the First Amendment right to freedom of association. *See Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 282 (4th Cir. 1991). Marriage is the paradigmatic example of intimate association. *Obergefell v. Hodges*, 576 U.S. 644, 646 (2015) ("Decisions about marriage are among the most intimate that an individual can make").

101.     DHS' allegation that Dr. Khan Suri maintains "close connections with... Hamas" is premised, if on any facts at all, solely on his intimate association—his marriage—with his wife, and her national origin and parentage. Thus Dr. Khan Suri has no "personal guilt" necessary to deprive him of his rights under the Due Process Clause. To determine that Dr. Khan Suri's fact of marriage establishes a "sufficiently substantial" relationship to his wife's *constitutionally protected* speech—or *any* of his father-in-law's alleged beliefs, statements, activities, or associations—to manifest "personal guilt" justifying his deportation is guilt by association in direct contravention of the First and Fifth Amendments.

### THIRD CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Unlawful Civil Detention*

102.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

103.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

104.    The government's detention of Dr. Khan Suri is wholly unjustified. The government has not demonstrated that Dr. Khan Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Dr. Khan Suri cannot be safely released back to his family.

105.    Moreover, Dr. Khan Suri's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention— the Foreign Policy Ground and the purported Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

106.    The punitive nature of Dr. Khan Suri's detention is compounded by the degrading and harmful conditions in which he is being confined: he has extremely limited access to recreation

and contact with the outside world; he was initially denied the ability to practice his faith; until recently, he was forced to sleep on the floor of an overcrowded TV room, deprived of all but a few hours of sleep; he is being denied clean undergarments and adequate nutrition; and he is being subjected, with no valid basis whatsoever, to more severe restrictions and treatment than other detained individuals despite posing no danger to others.

## FOURTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Void for Vagueness*

107.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

108.    The Policy and the purported Rubio Determination violate Dr. Khan Suri's right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

109.    The government's policy of detaining, transferring to immigration jails in the South, and seeking to deport noncitizens who they perceive to hold views supportive of Palestinian rights or critical of Israeli or U.S. government policy based on those noncitizens' protected speech, imputed viewpoint, religion, or protected association is unconstitutionally vague.

## FIFTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States
### Constitution
### *Equal Protection*

110.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

111.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Federal Government from denying equal protection of the laws to all persons within its jurisdiction, to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 201 (1995).

112.    Respondents targeted Dr. Khan Suri for apprehension, detention, transfer, and deportation in part because of their discriminatory animus towards his wife's Palestinian origin and her connection to Palestine.

113.    Respondents thereby intentionally discriminated against Dr. Khan Suri on account of the national origin of his wife, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## SIXTH CLAIM

### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

114.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for apprehension, detention, transfer, and removal based on First Amendment-protected speech advocating for Palestinian rights, imputed viewpoint, national origin, religion, and protected association. This policy, and its application to Dr. Khan Suri, is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, including its rules related to First Amendment protected activity and its rules related to transfers. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

115.    In addition, the purported Rubio Determination that Dr. Khan Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United

States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## SEVENTH CLAIM

### Release on Bail Pending Adjudication

116.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

117.    Under 28 U.S.C. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010).

118.    This petition raises numerous substantial constitutional and statutory claims challenging Dr. Khan Suri's retaliatory detention. Extraordinary circumstances exist that make Dr. Khan Suri's release essential for the remedy to be effective. His detention prevents him from adequately litigating his removal proceedings.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

a.    Assume jurisdiction over this matter;

b.    Enjoin Respondents from applying the unlawful Policy of targeting noncitizens for apprehension, detention, and transfer based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations to Petitioner;

c.      Declare the Respondents' Policy of targeting noncitizens for apprehension, detention, and transfer based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations is unlawful;

d.      Order Respondents to transfer Petitioner back to the jurisdiction of this District pending these proceedings;

e.      Order the immediate release of Petitioner pending these proceedings;

f.      Order the release of Petitioner;

g.      Declare that Respondents' actions to apprehend and detain Petitioner violate the First Amendment, the Due Process Clause of the Fifth Amendment, the Equal Protection protections of the Fifth Amendment, and the APA;

h.      Award reasonable attorneys' fees and costs for this action; and

i.      Grant such further relief as the Court deems just and proper.

Dated: April 8, 2025               Respectfully submitted,

s/*Eden B. Heilman*
Eden B. Heilman, VSB No. 93554
Sophia Leticia Gregg, VSB No. 91582
Vishal Agraharkar, VSB No. 93265
Geri Greenspan, VSB No. 76786
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
Tel: (804) 523-2152
eheilman@acluva.org
sgregg@acluva.org
vagraharkar@acluva.org
ggreenspan@acluva.org

33

Hassan Ahmad (VSB #83428)
THE HMA LAW FIRM, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com

Nermeen Saba Arastu*
THE IMMIGRANT & NON-CITIZEN RIGHTS
CLINIC
MAIN STREET LEGAL SERVICES, INC.
CUNY SCHOOL OF LAW
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel: (202) 246-0124
nermeen.arastu@law.cuny.edu

Diala Shamas**
Astha Sharma Pokharel**
Samah Sisay**
Baher Azmy**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, NY 10012
Tel: (212) 614-6464
dshamas@ccrjustice.org
ssisay@ccrjustice.org
asharmapokharel@ccrjustice.org
bazmy@ccrjustice.org

Jessica Myers Vosburgh**
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 486
Birmingham, AL 35201
Tel: (212) 614-6492
jvosburgh@ccrjustice.org


* admitted *pro hac vice*
** *pro hac vice* application forthcoming

*Counsel for Petitioner*

## **VERIFICATION**

Undersigned counsel submits this verification pursuant to 28 U.S.C. § 2242 on behalf of the Petitioner. Undersigned counsel has discussed with Petitioner the events described in this Amended Petition for Writ of Habeas Corpus and Complaint and, on the basis of those discussions, verifies that the statements in the Amended Petition and Complaint are true and correct to the best of our knowledge.

Dated: April 8, 2025                                    *s/ Eden B. Heilman*

                                                        Eden Heilman

                                                        *Counsel for Petitioner Badar Suri Khan*

# Ex. B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINA**
**Alexandria Division**

| | | |
|---|---|---|
| BADAR KHAN SURI | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 1:25-cv-480 |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

## <u>DECLARATION OF JOSEPH SIMON</u>

I, Joseph Simon, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Field Office Director ("DFOD") in the Chantilly, Virginia Field Office of Enforcement and Removal Operations ("ERO Virginia") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). I have been employed with ERO since September 2009 as an Immigration Enforcement Agent. In September 2012, I was promoted to Deportation Officer. In March 2020, I was promoted to Assistant Field Office Director. In October 2022, I was promoted to my current role as DFOD.

2.      As the DFOD, I oversee the intake and removals portfolios, meaning I am responsible for the officers that process incoming detainees, and the decisions made in the intake process including custody determinations and detention decisions. I am also responsible for efforts to execute final orders of removal. In my role as the DFOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO Virginia and the alien detainees who fall within its responsibility.

3.      I am aware that Badar Khan Suri ("Suri") has filed a Petition for a Writ for Habeas Corpus before this Court.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, and other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      Suri is a native and citizen of India who was admitted to the United States under a non-immigrant J-1 Exchange Visitor Visa, on or about December 10, 2022, to enroll as a postdoctoral fellow at Georgetown University. Suri is not a lawful permanent resident of the United States.

6.      On March 15, 2025, Secretary of State Marco Rubio issued a memorandum finding that Suri's presence and activities in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. This finding subjected Suri to removability under INA § 237(a)(4)(C)(i). Suri was also issued a custody determination indicating that he would be detained pursuant to INA § 236(a).

7.      On March 17, 2025, Homeland Security Investigations Special Agents arrested Suri at approximately 9:30 p.m. in Arlington, Virginia pursuant to a Warrant for Arrest of Alien, Form I-200. The arresting agents transported Suri to the ERO Washington office in Chantilly, Virginia for the purpose of initial processing. While at the ERO Washington office, Suri was issued a Notice to Appear ("NTA") (attached as Exhibit 1), which charged him as removable pursuant to INA § 237(a)(4)(C)(i) and detained him after processing.

8.      Due to potential overcrowding in Virginia detention facilities, ICE determined that Suri would not be detained in Virginia at the Farmville Detention Center or the Caroline Detention Facility. Overcrowding is a concern because, on top of routine enforcement operations that often

result in dozens of arrests a day, from March 1, 2025, to March 13, 2025, ICE, in conjunction with other federal, state, and local partners conducted a surge of targeted enforcement actions within the Northern Virginia and Washington D.C. region which resulted in an additional 214 arrests beyond its daily operations. As a result of this operation, ICE was operating its Virginia detention facilities at a high capacity at the time the Suri came into ICE custody.

9.      At the time of Suri's arrest on March 17, 2025, detention facilities in Texas and Louisiana had sufficient capacity to house Suri. Based on the aforementioned operational reasons, ERO Washington determined that Suri would be detained at the Prairieland Detention Facility, 1209 Sunflower Lane, Alvarado, Texas 76009 after receiving confirmation of availability on its bedspace request from ERO Dallas.

10.     Upon completion of his initial processing on March 17, ICE transported Suri to the Farmville Detention Center in Farmville, Virginia pending transit to the Prairieland Detention Facility. He arrived at the Farmville Detention Center at approximately 2:35 a.m. on March 18.

11.     On March 18, 2025, Suri was transported from the Farmville Detention Center to the ERO Washington office in Chesterfield, Virginia. He arrived at the office at approximately 7:50 a.m. Suri was brought to the airport in Richmond, Virgina to be transported to Alexandria, Louisiana. The flight departed Richmond, Virginia at 2:47 p.m. on Tuesday, March 18, 2025. He arrived in Alexandria, Louisiana at approximately 5:03 p.m. Eastern Daylight Time (4:03 p.m. Central Daylight Time) on March 18, 2025.

12.     Suri spent three nights at the Alexandria Staging Facility in Alexandria, Louisiana pending transit to the Prairieland Detention Facility in Alvarado, Texas. Suri spent transit time at the Alexandria facility because it is on the standard flight path of the transporting aircraft. From Alexandria he was transported by ground transport to the Prairieland Detention Facility.

13.     On March 21, 2025, Suri was transported to the Prairieland Detention Facility where he will remain for removal proceedings.

14.     Per his Notice to Appear, Suri is scheduled to appear virtually in the Port Isabel Immigration Court on May 6, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

_____
Joseph Simon
Deputy Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Exh. 1

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: 12/03/1983

Event No: XDC2503000008

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: 398210373

In the Matter of:

File No: 240 400 077

Respondent: BADAR KHAN SURI

1209 Sunflower Ln Alvarado, TEXAS 760092810 _____ currently residing at:

(Number, street, city, state and ZIP code)

(817) 409-3995

(Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of INDIA and a citizen of INDIA;

3. You were admitted to the United States at Dulles, VA, on December 10, 2022 as a Exchange Visitor;

4. On March 15, 2025, The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:  ☐ 8CFR 208.30  ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD, LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on May 6, 2025 at 8:30 am to show why you should not be removed from the United States based on the

(Date)      (Time)

charge(s) set forth above.

CHRISTOPHER R HECK
Digitally signed by CHRISTOPHER R HECK
Date: 2025.03.17 21:47:14 -04'00'

(A) SAC Christopher Heck

Date: March 17, 2025 _____ (Signature and Title of Issuing Officer)

Chantilly, VA

(City and State)

EOIR — 1 of 3

DHS Form I-862 (6/22)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the Internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

_____
*(Signature and Title of Immigration Officer)*

Date: _____

## Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 17, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] In person  [ ] by certified mail, returned receipt # _____ requested  [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the <u>ENGLISH</u> language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

REFUSED
_____
*(Signature of Respondent if Personally Served)*

Special Agent
_____
*(Signature and Title of officer)*

DHS Form I-862 (6/22)

Page 2 of 3

**Privacy Act Statement**

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

# Ex. C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

---

BADAR KHAN SURI,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States;

Russell HOTT, in his official capacity as Field
Office Director of Washington, Immigration and
Customs Enforcement;

Jeffrey CRAWFORD, in his official capacity as
Warden of Farmville Detention Center;

Todd LYONS, Acting Director,
U.S. Immigration and Customs Enforcement;

Kristi NOEM, in her official capacity as Secretary
of the United States Department of Homeland
Security;

Marco RUBIO, in his official capacity as Secretary
of State; and

Pamela BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

        *Respondents*.

---

Case No. 1:25-cv-480

**PETITION FOR**
**WRIT OF HABEAS CORPUS**
**AND COMPLAINT**

## INTRODUCTION

1.    This case concerns the government's targeted, retaliatory detention and attempted removal of a postdoctoral fellow at Georgetown University based on his family connections and constitutionally protected free speech. Petitioner Badar Khan Suri is a citizen and national of India, and is in the United States in lawful status as a visiting scholar pursuant to lawful admission. The Trump administration has openly expressed its intention to weaponize immigration law to punish noncitizens whose views are

deemed critical of U.S. policy as it relates to Israel. In this case, the government appears to be targeting Mr. Suri, a noncitizen, due to his U.S. citizen wife's identity as a Palestinian and her constitutionally protected speech.

2.  On March 17, 2025, Badar Khan Suri, a J-1 visa holder, was arrested and charged with removability under 8 U.S.C. §1227(a)(4)(C) and detained. This was done pursuant to a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Suri solely for their family ties to those who may have either expressed criticism of U.S. foreign policy as it relates to Israel, or who are perceived to hold such critical views imputed to them due to familial relationship. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that such individuals' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and remove such individuals from the United States.

3.  Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Suri (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Suri's lawful activity protected by the First Amendment, his wife's lawful activity protected by the First Amendment, and his wife's familial relationship. Neither Secretary Rubio nor any other government official has alleged that Mr. Suri has committed any crime or, indeed, broken any law whatsoever.

4.  Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Suri, detain him, and place him in removal proceedings. On the evening of March 17, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Suri with no prior notice at his home and initiated proceedings to remove him from

this country.

5.  Mr. Suri is, upon information and belief, detained at Farmville Detention Center in Farmville, VA, Prince Edward County. He is at imminent risk of being moved to a detention facility in Los Fresnos, Texas, on the Mexican border.

6.  Mr. Suri lives in Rosslyn, Virginia. On March 17, 2025, he was coming back home from iftar. Law enforcement agents surrounded him outside of his building.  Mr. Suri called his wife, Mapheze Saleh, immediately. The agents identified themselves as members of the Department of Homeland Security and stated that the government had revoked his visa.

7.  Mr. Suri asked that his wife be allowed to bring his passport and documents from inside the home. Ms. Saleh brought the documents and stood with Mr. Suri and multiple agents outside for about 10 minutes. The agents had face coverings, and Ms. Saleh could only see their eyes. The officers took Mr. Suri's passport and DS-2019 form, but they did not permit his wife to hand over the passport or other documents directly to Petitioner. Approximately two hours later, Mr. Suri called Ms. Saleh to state he was being transferred to a detention center in Farmville, VA. Mr. Suri and Ms. Saleh have three children.

8.  Mr. Suri and his U.S. Citizen wife, Mapheze Saleh, have long been doxxed and smeared. Ms. Saleh is featured with her photograph and academic affiliation on the anonymously-run blacklisting site, The Canary Mission, which includes her former employment at Al Jazeera and her city of birth, Gaza City, as support for her alleged ties with Hamas. The Canary Mission website maintains a blacklist of individuals perceived to support Palestinian rights and is infamous for bullying, slandering, and defaming academics and students. In addition, Mr. Suri and Ms. Saleh have been smeared by Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a

lobbying and media monitoring group that spreads misinformation and seeks to discredit American Muslims.

9.    The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Suri, and plans to whisk him 1,600 miles away in the same manner as the government did in the case of Mr. Mahmoud Khalil, isolating him from his wife, children, community, and legal team, are plainly intended as retaliation and punishment for Mr. Suri's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Suri's lawful and protected speech. The Rubio Determination and Mr. Suri's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious, contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Suri's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

10.    Petitioner Badar Khan Suri is a citizen and national of India. He is married to a U.S. citizen, and is in the United States in J-1 status as a visiting scholar after having been duly admitted. He is currently teaching a course on Majoritarianism & Minority Rights in South Asia and as a postdoctoral fellow.  He hopes to become a university professor and embark on a career in academia and teaching.  Petitioner has no criminal record and is not being charged with any crime.

11.    Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

12.    Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

13.    Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner is detained. In this capacity, he is responsible for the immediate execution of detention over Petitioner and is the immediate custodian of Petitioner.  Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

14.    Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

15.    Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland

Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

16. Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

17. Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

**JURISDICTION & VENUE**

18. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

19. An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

20. Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Suri was being held in Farmville, VA, when this habeas was initiated. At the time of filing, the detainee locator failed to update Mr. Suri's location. However, upon information and belief, Mr. Suri is, at the moment of this filing, physically within the Commonwealth of Virginia.

## FACTS

### *The Trump Administration's Hostile Campaign Against Palestinians and Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech*

21. In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. These campus protests resulted in opponents of these students' messages—including President Donald J. Trump—to characterize campus speech in favor of Palestinian rights as inherently supportive of

Hamas and antisemitic. For example, in several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

22. During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestine activities on university campuses.

23. For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

24. In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[1]

25. Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

---

[1] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump- schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis")

*President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors*

26.    Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

27.    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

28.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [*sic*] who participated in pro-jihadist protests" that the federal government "will find you… and

deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

29.     In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

30.     Earlier this month, media reports described widespread fear of retaliation for pro-Palestine speech among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."

31.     On or before March 7, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Suri for his family relationship and constitutionally protected free speech. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that such individuals' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport such individuals.

32.     In the days since Mr. Khalil's arrest, there have been reports of other instances of visa revocations of individuals purportedly based on their participation in Palestine-related speech. On March 13, Secretary of Homeland Security Kristi Noem announced that another Columbia student, Ranjani Srinivasan, who had participated in student protests on Columbia University's campus had her student visa revoked, and a third individual,

Leqaa Kordia, who had been arrested on Columbia's campus in April 2024, was arrested by ICE.

33.    Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

34.    The Rubio Determination was exclusively motivated by Mr. Suri's family relationship and constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. 1227(a)(4)(C)(i), establish that Respondents are punishing, detaining, and attempting to silence Mr. Suri.

35.    The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

36.    Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years,

the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

37.    Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of the First Amendment to the United States Constitution**

38.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

39.   The Rubio Determination and Policy Mr. Suri's targeting, arrest, transfer, and ongoing

detention violate the First Amendment because they:

- retaliate against and punish Mr. Suri for his or his wife's past protected

  speech, or speech imputed to him or his wife as a result of his family

  relationship;

- prevent him from speaking now (through detention);

- attempt to chill (through past punishment and ongoing threat) or prevent

  (through eventual removal) his future speech in the United States;

- deprive audiences of his present and future speech on matters of public

  concern; and

- chill other individuals who express support for Palestinian rights.

40.   These speech-related consequences are not side effects of an action with some other

purpose; they are, instead, the point of the Determination and the government's

subsequent actions against Mr. Suri and those similarly situated, in government officials'

own telling, the result of their disagreement with his protected speech and the viewpoint

it expresses.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the
### United States Constitution

41.   Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs

of this Complaint-Petition as if fully set forth herein.

42.   The Constitution establishes due process rights for "all 'persons' within the United

States, including [noncitizens], whether their presence here is lawful, unlawful,

temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

43.   The government's detention of Mr. Suri is wholly unjustified. The government has

not demonstrated that Mr. Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Suri cannot be safely released back to his family.

44.    Moreover, Mr. Suri's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

45.    The Policy and the Rubio Determination also violate Mr. Suri's right to due process. The government's policy of Foreign Policy Ground making such determinations concerning people like Mr. Suri—who is in valid J-1 status, living peacefully in the country is unconstitutionally vague where it is due to perceived or actual constitutionally protected free speech and familial relationships.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

46.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment-protected

speech advocating for Palestinian rights, including the speech of close family members. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM

### Release on Bail Pending Adjudication

47. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

48. Under 28 U.S.C.A. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C.A. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010)

49. This petition raises numerous substantial constitutional and statutory claims challenging Mr. Suri's retaliatory detention. Extraordinary circumstances exist that make Mr. Suri's release essential for the remedy to be effective. His detention prevents him from adequately litigating his removal proceedings.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1)      Assume jurisdiction over this matter;

2)      Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment-protected speech advocating for Palestinian rights and/or their family relationships;

3)      Vacate and set aside the Rubio Determination;

4)      Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5)      Order the immediate release of Petitioner pending these proceedings;

6)      Order the release of Petitioner;

7)      Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8)      Award reasonable attorneys' fees and costs for this action; and

9)      Grant such further relief as the Court deems just and proper.


Dated: March 18, 2025

Sterling, Virginia

/s/*Hassan Ahmad*
Hassan Ahmad (VSB #83428)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com
*Counsel for Petitioner*

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that on this date, I filed this Petition for Writ of Habeas Corpus and all attachments using the CM/ECF system. I will furthermore mail a copy by USPS Certified Priority Mail with Return Receipts to each of the following individuals:

Jeffrey Crawford, Warden
Farmville Detention Center
P.O. Drawer N
508 Waterworks Road
Farmville, VA 23901

Russell Hott, Field Office Director
U.S. Immigration and Customs Enforcement, Washington Field Office
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Kristi Noem, Secretary
U.S. Department of Homeland Security
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Todd Lyons, ICE Director
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Jessica D. Aber, U.S. Attorney
c/o Civil Process Clerk
Eastern District of Virginia, Alexandria Division
2100 Jamieson Avenue
Alexandria, VA 22314

Dated: March 18, 2025          /s/*Hassan Ahmad*
                               Hassan Ahmad (VSB #83428)
                               The HMA Law Firm, PLLC
                               6 Pidgeon Hill Dr, Suite 330
                               Sterling, VA 20165
                               T: 703.964.0245
                               hma@hmalegal.com
                               *Counsel for Petitioner*

# Ex. D

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BADAR KHAN SURI, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-480 (PTG/WBP) |
| | ) | |
| DONALD TRUMP, *et al.,* | ) | |
| | ) | |
| *Respondents*. | ) | |

## ORDER

This matter comes before the Court on Petitioner Badar Khan Suri's Petition for Writ of Habeas Corpus (Dkt. 1), which was filed on March 18, 2025. Dkt. 1. According to the Petition, on March 17, 2025, the Department of Homeland Security arrested and charged Petitioner with removability, pursuant to 8 U.S.C. § 1227(a)(4)(C). *Id.* At the time of filing, Petitioner alleged that he was presently being detained at the Farmville Detention Center in Farmville, Virginia. *Id.*

Pursuant to the Court's authority to preserve its jurisdiction under the All Writs Act, pending a ruling on the Petition, it is hereby

**ORDERED** that Petitioner shall not be removed from the United States unless and until the Court issues a contrary order. 28 U.S.C. § 1651; *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 603 (1966) ("The All Writs Act, 28 U.S.C. § 1651(a), empowers the federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'").

Entered this 20th day of March, 2025
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

# Ex. E

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI, | ) |
| | ) |
| *Petitioner,* | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD TRUMP, *in his official capacity* | ) |
| *as President of the United States;* RUSSELL | )    Case No. 1:25-cv-480 (PTG/WBP) |
| HOTT, *in his official capacity as Field* | ) |
| *Office Director of Washington, Immigration* | ) |
| *and Customs Enforcement;* JEFFREY | ) |
| CRAWFORD, *in his official capacity as* | ) |
| *Warden of Farmville Detention Center;* | ) |
| TODD LYONS, *Acting Director, U.S.* | ) |
| *Immigration and Customs Enforcement*; | ) |
| KRISTI NOEM, *in her official capacity as* | ) |
| *Secretary of the United States Department of* | ) |
| *Homeland Security;* MARCO RUBIO, *in his* | ) |
| *official capacity as Secretary of State*; | ) |
| PAMELA BONDI, *in her official capacity* | ) |
| *as Attorney General, U.S. Department of* | ) |
| *Justice,* | ) |
| | ) |
| *Respondents.* | ) |
| | ) |

## **MEMORANDUM OPINION**

This matter comes before the Court on Petitioner Dr. Badar Khan Suri's Motion to Compel

Respondents to Return Petitioner to this District (Dkt. 5), Petitioner's Motion for Release on Bond

(Dkt. 20), and Respondents' Motion to Dismiss or in the Alternative, Motion to Transfer Venue

(Dkts. 24, 25). On March 18, 2025, the Petition for Writ of Habeas Corpus and Complaint was

filed. Dkt. 1. On April 8, 2025, Petitioner filed an Amended Petition for Writ of Habeas Corpus

and Complaint ("Amended Petition"). Dkt. 34. On May 1, 2025, the Court heard oral argument

primarily focused on the issue of jurisdiction, which must be resolved before reaching the other

motions.[1] At the conclusion of the hearing, the Court directed the parties to submit supplemental filings. Dkt. 55.

Petitioner, an Indian national, is a postdoctoral fellow at Georgetown University and resides in Rosslyn, Virginia, within the Eastern District of Virginia. On March 17, 2025, Department of Homeland Security ("DHS") agents arrested Petitioner outside of his apartment building. Within hours of his arrest, Petitioner was moved four times within the District. On March 18, 2025—less than twenty-four hours after his arrest—Petitioner filed his habeas petition against Donald J. Trump, President of the United States; Russell Hott, Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE"); Jeffrey Crawford, Warden of the Farmville Detention Center; Todd Lyons, Acting Director of ICE; Kristi Noem, Secretary of DHS; Marco Rubio, United States Secretary of State; and Pamela Bondi, Attorney General of the United States (collectively, "Respondents" or "Government"). The Petition alleges that Dr. Khan Suri was arrested and detained in violation of his First Amendment and Fifth Amendment rights and the Administrative Procedure Act ("APA"). At the time of filing, Petitioner was in Alexandria, Louisiana, purportedly en route to Texas. Petitioner is currently detained in the Prairieland Detention Center in Alvarado, Texas.

The parties dispute whether this Court has proper habeas jurisdiction to review Petitioner's claims. For the reasons that follow, the Court finds that it has proper habeas jurisdiction to consider the Petition. Accordingly, Respondents' Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are denied.

---

[1] Typically, the filing of an amended complaint moots a pending motion to dismiss. Because the Amended Petition would not change the jurisdictional arguments advanced in the pending motion to dismiss, the Court construes the motion as applying to the Amended Petition.

**Factual Background**

The parties dispute some aspects of the factual record. The following facts are taken from declarations filed on the docket and attached to the parties' pleadings as well as admissions made during oral argument.[2]

Petitioner Badar Khan Suri is an Indian national, who was raised in Uttar Pradesh, India. Dkt. 1 ("Pet.") ¶ 10; Dkt. 6, Ex. 1, Declaration of Mapheze Saleh ("Saleh Decl.") ¶ 6. Dr. Khan Suri earned his Ph.D. in Peace and Conflict Studies from the Nelson Mandela Center for Peace and Conflict Resolution at Jamia Millia Islamia. Saleh Decl. ¶ 8. In December 2022, Dr. Khan Suri came to the United States after receiving a J-1 exchange visa to participate in a fellowship at Georgetown University. Pet. ¶¶ 2, 10; Saleh Decl. ¶ 10. As part of the fellowship, Dr. Khan Suri teaches a class on "Majoritarianism & Minority Rights in South Asia" at Georgetown. Pet. ¶ 10; Saleh Decl. ¶ 10. Dr. Khan Suri is married to Mapheze Saleh, a United States citizen, whom he met in Gaza as part of a humanitarian convoy. Saleh Decl. ¶¶ 2, 6. Ms. Saleh lived in the United States until she was five years old, at which point, her family moved to Gaza. *Id.* ¶ 3. Ms. Saleh's father is a former deputy of foreign affairs in Gaza. *Id.* ¶ 4. In November 2023, Ms. Saleh returned to the United States with her three young children whom she shares with Dr. Khan Suri. *Id.* ¶ 10.

In October 2023, Ms. Saleh began sharing posts online detailing events in Gaza and "express[ing] sorrow for the deaths of Gazan people." *Id.* ¶ 11. By February 2025, Ms. Saleh learned that she was being targeted by certain websites because of her posts and her father's former

---

[2] Absent an evidentiary hearing, the Court accepts the non-movants factual assertions. *See Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) ("When determining whether a plaintiff has made the requisite *prima facie* showing [of personal jurisdiction], the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff.").

position in the government of Gaza. *Id.* ¶ 12. Ms. Saleh and Dr. Khan Suri's family were the

subject of multiple articles, and the pair were accused of having "ties to Hamas." *Id.*

"On March 15, 2025, Secretary of State Marco Rubio issued a memorandum finding that

[Dr. Khan] Suri's presence and activities in the United States would have potentially serious

adverse foreign policy consequences and would compromise a compelling U.S. foreign policy

interest." Dkt. 26, Ex. 1, Declaration of Joseph Simon ("First Simon Decl.") ¶ 6. On that same

day, a "custody determination [was issued] indicating that [Dr. Khan Suri] would be detained

pursuant to" 8 U.S.C. § 1226(a). *Id.*

On March 17, 2025, between 9:20 and 9:30 p.m., Dr. Khan Suri was returning to his home

in Rosslyn, Virginia after breaking his fast at iftar.[3] Dkt. 47, Ex. 1, Declaration of Badar Khan

Suri ("Khan Suri Decl.") ¶ 2; Saleh Decl. ¶ 13. Several unmarked cars drove up to Dr. Khan Suri's

apartment building. Khan Suri Decl. ¶ 3. A man emerged from one of the vehicles dressed in grey

clothes and wearing a mask. *Id.* He proceeded to prevent Dr. Khan Suri from entering his building.

*Id.* The officers told Ms. Saleh that they were from Homeland Security and proceeded to arrest

Dr. Khan Suri. Saleh Decl. ¶ 13; Khan Suri Decl. ¶¶ 4-6; First Simon Decl. ¶ 7.

At the time of Dr. Khan Suri's arrest, the officers confiscated Dr. Khan Suri's passport and

immigration documents. Saleh Decl. ¶ 13. The arresting officers told Ms. Saleh and Dr. Khan

Suri that he would be taken to Chantilly, Virginia. *Id.*; Khan Suri Decl. ¶ 6. The arresting officers

also told Dr. Khan Suri that his "student visa" had been revoked, that he was being arrested because

of social media, and that he would be deported to his country that day.[4] Khan Suri Decl. ¶¶ 7-8.

---

[3] Unless otherwise specified, all references to time are in E.D.T. ("Eastern Daylight Time").

[4] As stated above, the Court notes that Dr. Khan Suri had a J-1 exchange visa, not a student visa.
Khan Suri Decl. ¶ 4; Saleh Decl. ¶ 10.

Specifically, Dr. Khan Suri was taken to ICE's Enforcement and Removal Operations ("ERO") Washington Field Office in Chantilly, Virginia. *Id.* ¶ 9; First Simon Decl. ¶ 7.

While at the Chantilly Office, officers told Dr. Khan Suri that he was being transferred to the Farmville Detention Center in Virginia, where he believed he would be held for a longer term and was permitted to tell his wife this information. Khan Suri Decl. ¶¶ 12-14. Dr. Khan Suri called his wife to tell her that he was being transferred to Farmville. *Id.* ¶ 13. Officers showed Dr. Khan Suri the Notice to Appear ("NTA"), which listed a Texas address as his current residence and specified that he had a May 6, 2025 hearing date in immigration court in Texas. *Id.* ¶ 9; Dkt. 26, Ex. 1 at 6 ("NTA"). When Dr. Khan Suri asked about the Texas address and why his hearing was in May, an officer responded that "it was just computer generated, and it might be changed later on." Khan Suri Decl. ¶ 9.

ICE represents that it determined that Dr. Khan Suri would not be detained in Farmville or Caroline Detention Centers in Virginia because they were concerned about "potential overcrowding." First Simon Decl. ¶ 8. ICE also represents that from March 1, 2025 to March 13, 2025, it had "conducted a surge of targeted enforcement actions within the Northern Virginia and Washington D.C. region which resulted in an additional 214 arrests." *Id.* Because ICE detention centers in Virginia were operating at a "high capacity" at the time of Dr. Khan Suri's arrest, and because "detention facilities in Texas and Louisiana had sufficient capacity to house [Dr. Khan] Suri[,]" "ERO Washington determined that [he] would be detained at Prairieland Detention Facility." *Id.* ¶¶ 8-9. ICE also represents it made the decision to detain Dr. Khan Suri at the Prairieland Detention Center at approximately 10:00 p.m. on March 17, 2025. Dkt. 57-1, Declaration of Mark Graham ("Graham Decl.") ¶ 9.

At approximately 10:42 p.m., on March 17, 2025, Dr. Khan Suri's counsel, Hassan Ahmad, learned of Dr. Khan Suri's arrest. Dkt. 21, Ex. 1, Declaration of Hassan Ahmad ("Ahmad Decl.")

¶¶ 1, 3. Meanwhile, Dr. Khan Suri was being processed at the ERO Office in Chantilly. First Simon Decl. ¶ 7; Khan Suri Decl. ¶ 9. Overnight Dr. Khan Suri was driven to the Farmville Detention Center arriving around 2:35 a.m. on March 18, 2025. First Simon Decl. ¶ 11; Khan Suri Decl. ¶¶ 12-14. Later that morning, ICE transferred Dr. Khan Suri to another ERO Washington office in Richmond, Virginia, where he arrived at approximately 7:50 a.m. First Simon Decl. ¶ 11; Khan Suri Decl. ¶ 15. Around 8:34 a.m., other attorneys in North Carolina provided more information to Mr. Ahmad about Dr. Khan Suri and his family. Ahmad Decl. ¶ 5. Shortly thereafter, Mr. Ahmad agreed to help Dr. Khan Suri. *Id.* ¶ 6. Between 9:00 a.m. and 11:00 a.m., Mr. Ahmad and Mr. Ashraf Nubani, a friend of Dr. Khan Suri's family, discussed Dr. Khan Suri and his arrest. *Id.* At 1:52 p.m., Mr. Ahmad spoke to Ms. Saleh, who believed that Dr. Khan Suri would be in the Farmville Detention Center since that was the last thing Dr. Khan Suri shared with her about his location. Ahmad Decl. ¶¶ 6, 8; Saleh Decl. ¶ 14. At 2:11 p.m., Mr. Ahmad formally entered his appearance in Dr. Khan Suri's immigration case. Ahmad Decl. ¶ 7.

After entering his appearance, Mr. Ahmad was able to view Dr. Khan Suri's NTA at 2:11 p.m. *Id.* The NTA indicates that Dr. Khan Suri *currently resides* at "1209 Sunflower Ln, Alvarado, Texas, 760092810." NTA at 1. While not explicitly stated on the NTA, this is the address of the Prairieland Detention Center, which is located in the Northern District of Texas. First Simon Decl. ¶ 9. Based on the electronic signature block of the issuing officer, it appears that the NTA was issued around 9:47 p.m. on March 17, 2025—while Dr. Khan Suri was still in Chantilly, Virginia. NTA at 1; First Simon Decl. ¶ 7; Khan Suri Decl. ¶ 9. Up to that time, Dr. Khan Suri had never been to 1209 Sunflower Lane, Alvarado, Texas. The NTA also ordered Dr. Khan Suri to appear before an immigration judge on May 6, 2025, at a different Texas address: "27991 Buena Vista Blvd, Los Fresnos, Texas, 78566." NTA. This is the address of the Port

Isabel Detention Center, which is located in the Southern District of Texas and approximately 500 miles away from the Prairieland Detention Center. First Simon Decl. ¶ 14.

Unbeknownst to anyone, on the afternoon of March 18, 2025, Dr. Khan Suri was taken to an airport in Richmond, Virginia and placed on a flight that departed at 2:47 p.m. *Id.* ¶ 11; Khan Suri Decl. ¶¶ 16-17; Ahmad Decl. ¶ 8. Still, Dr. Khan Suri did not know where he was headed, nor was he permitted to further communicate his whereabouts to his wife or to his counsel, if he had known he had counsel. Khan Suri Decl. ¶¶ 16-17. He boarded a flight with over 300 other people. *Id.* ¶ 17; First Simon Decl. ¶ 11. At this time, Mr. Ahmad was working diligently to file Dr. Khan Suri's habeas petition. Ahmad Decl. ¶¶ 7-8. Around 5:03 p.m. on March 18, 2025, Dr. Khan Suri arrived in Alexandria, Louisiana. Khan Suri Decl. ¶ 18; First Simon Decl. ¶ 11. At 5:59 p.m. on March 18, 2025, Dr. Khan Suri filed his original habeas petition in this Court. Pet.; Ahmad Decl. ¶ 8. Dr. Khan Suri was booked into the Alexandria Staging Facility ("ASF") at 6:42 p.m. (5:42 p.m. Central Daylight Time). Dkt. 49, Ex. 1, Second Declaration of Joseph Simon ("Second Simon Decl.") ¶ 3; Graham Decl. ¶ 15.

Dr. Khan Suri was then detained in the ASF in Alexandria, Louisiana for three nights. Khan Suri Decl. ¶¶ 18-22; First Simon Decl. ¶ 12. On March 19, Dr. Khan Suri attempted to make a free call to his wife, but he was not able to directly communicate with her.[5] Khan Suri Decl. ¶¶ 19-20; Saleh Decl. ¶ 15. On March 20, 2025, Dr. Khan Suri was told he would be transferred to New York the following day, presumably to be deported. Khan Suri Decl. ¶ 21. On the same day, this Court also entered its Order directing that Petitioner not be removed from the United States. Dkt. 7. On the morning of March 21, 2025, Dr. Khan Suri was told that he was no longer going

---

[5] Ms. Saleh's declaration seems to say that she received a call with a recording from Dr. Khan Suri on March 18, but this appears to the Court to be an error. Saleh Decl. ¶ 15.

to New York and would instead be driven to Texas. Khan Suri Decl. ¶ 22. ICE drove Dr. Khan Suri by bus from the ASF to the Prairieland Detention Center in Texas arriving at 7:30 p.m. on March 21, 2025, where he remains detained. Second Simon Decl. ¶ 3; Graham Decl. ¶ 16; Khan Suri Decl. ¶ 22.

Upon his arrival in Prairieland, Dr. Khan Suri was forced to sleep on the floor because there were not enough beds available. Khan Suri Decl. ¶ 22. As of April 9, 2025, Dr. Khan Suri had a bed and a pillow, but his requests for religious accommodation had largely been denied. *Id.* ¶¶ 23-24.

## Procedural History

On March 18, 2025, at approximately 5:59 p.m., Petitioner filed his habeas petition pursuant to 28 U.S.C. § 2241. Dkt. 1. On March 20, 2025, Petitioner filed a Motion to Compel Respondents to Return Petitioner to this District. Dkt. 5. On March 27, 2025, Petitioner filed a Motion for Release on Bond. Dkt. 20. The Court initially set the motions for hearing on April 11, 2025. Dkt. 23. On April 1, 2025, Respondents filed a Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25), which were noticed for May 1, 2025. Dkt. 27. On April 4, 2025, this Court entered an Order directing Petitioner to address Respondents' jurisdictional arguments in his reply to Respondents' oppositions. Dkt. 31. At Petitioner's request, the Court reset the hearing on all motions for May 1, 2025. Dkt. 33. On April 8, 2025, Petitioner filed the Amended Petition. Dkt. 34.

## Discussion

Section 2241 "broadly grants federal courts the power to award habeas corpus relief to petitioners who are in custody in violation of federal law." *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 669 (E.D. Va. 2020). "[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004)

8

(citing U.S. Const., Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it")). The Great Writ is "a vital instrument for the protection of individual liberty" and "freedom from unlawful restraint." *Boumediene v. Bush*, 553 U.S. 723, 739, 743 (2008). Specifically, the writ is "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi*, 542 U.S. at 525. In the United States, "there is no gap in the fabric of habeas --- no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it." *Khalil v. Joyce et al.*, 2025 WL 972959, at *37 (D.N.J. Apr. 1, 2025) ("*Khalil II*"), *mot. to certify appeal granted*, 2025 WL 1019658 (D.N.J. Apr. 4, 2025).

This Court must decide which court has jurisdiction to hear and decide Dr. Khan Suri's habeas petition. Respondents argue that this Court is not the proper venue for Dr. Khan Suri's habeas petition and does not have jurisdiction to hear his claims because Dr. Khan Suri was not in the Eastern District of Virginia at the time his petition was filed. Dkt. 26 at 4. Instead, Respondents argue that Petitioner's claims can only be heard in the Northern District of Texas—despite the fact that Dr. Khan Suri was not in Texas at the time the petition was filed. *Id.*; Dkt. 49 at 19-20. To come to this conclusion, Respondents purport to rely on the default rules of habeas jurisdiction. Dkt. 26 at 5. In response, Petitioner contends that this case involves extraordinary circumstances that require departure from the default rules of habeas jurisdiction. Dkt. 47 at 11. Based on noted exceptions to the rules of habeas jurisdiction, Petitioner argues that this Court maintains jurisdiction over his claims despite his removal from this District. *Id.* at 9. The Court agrees with Petitioner.

## I. Habeas Corpus Jurisdiction

Section 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective

jurisdictions." In *Rumsfeld v. Padilla*, the Supreme Court described the contours of habeas jurisdiction. 542 U.S. 426 (2004). Generally, a habeas petition seeking to challenge present physical custody should be filed "in the district of confinement" and "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Padilla*, 542 U.S. at 434, 447 (alteration in original) (quoting 28 U.S.C. § 2242); *see also Kanai v. McHugh,* 638 F.3d 251, 255 (4th Cir. 2011) ("When a petitioner is physically detained . . . the 'district of confinement' necessarily is the location of both the habeas petitioner and the immediate custodian."). These default rules are known as the district of confinement and immediate custodian rules. When applying these rules, courts look to the place where the petitioner was confined when the petition was filed. *See United States v. Little*, 392 F.3d 671, 680 (4th Cir. 2004) (noting that because petitioner was confined in Texas when his petition was filed, the Western District of North Carolina was an improper venue).[6]

When the default rules of habeas jurisdiction have proved untenable, the Supreme Court and Fourth Circuit have recognized exceptions to these default rules. *See Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 499 (1973) (allowing petitioner confined in Alabama to file habeas petition challenging Kentucky indictment in Kentucky); *Strait v. Laird*, 406 U.S. 341, 344-346 (1972) (allowing conscientious objector petitioner to name his ultimate custodian in habeas

---

[6] The *Padilla* Court expressly declined to decide whether the default rules of habeas jurisdiction apply to immigration detention. 542 U.S. 426, 435 n.8 (2004). The Fourth Circuit, however, has applied *Padilla*'s rules to instances of confinement unrelated to incarceration. *See e.g.*, *Kanai v. McHugh*, 638 F.3d 251, 255 (4th Cir. 2011) (applying *Padilla* to a conscientious objector's habeas petition). Further, district courts within the Fourth Circuit have applied *Padilla*'s rules to the immigration context. *See e.g.*, *Ming Hui Lu v. Lynch*, No. 1:15-cv-1100, 2015 WL 8482748, at *3 (E.D. Va. Dec. 7, 2015) (applying *Padilla* to individual detained during immigration proceedings); *Deng v. Crawford*, No. 2:20-cv-199, 2020 WL 6387010, at *3 (E.D. Va. Sept. 30, 2020), *report and recommendation adopted*, No. 2:20-cv-199, 2020 WL 6387326 (E.D. Va. Oct. 30, 2020) (same). Accordingly, this Court is persuaded that the default rules of habeas jurisdiction can apply to the immigration context.

petition); *Ex parte Endo*, 323 U.S. 283, 304-307 (1944) (finding a district court retains jurisdiction over properly filed habeas petition if petitioner is removed from district after filing); *U.S. v. Moussaoui*, 382 F.3d 453, 465 (4th Cir. 2004) (adopting exception to immediate custodian rule allowing petitioner to name ultimate custodian). The Court must consider whether, in line with the Fourth Circuit and Supreme Court's precedent, the context of Dr. Khan Suri's petition warrants exception from the default rules.

In addition to known exceptions to the default jurisdictional rules, Justice Kennedy, in his *Padilla* concurrence, proposed an additional exception. Justice Kennedy noted that

> if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention . . . habeas jurisdiction would be in the district court from whose territory the petitioner had been removed."

*Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

The Court acknowledges Justice Kennedy's concurrence is not the holding of the *Padilla* Court. However, "because Justice Kennedy and Justice O'Connor's votes were 'necessary to the formation of a majority,' Justice Kennedy's opinion is at least 'given particular weight.'" *Ozturk v. Trump et al.*, 2025 WL 1009445, at *6 (D. Mass. Apr. 4, 2025) ("*Ozturk I*") (quoting *Schmitz v. Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994)). In *Vasquez v. Reno*, the First Circuit forecasted the logic of Justice Kennedy's concurrence, explaining that under "extraordinary circumstances," the "normal" rules of habeas jurisdiction may not apply. 233 F.3d 688, 696 (1st Cir. 2000). The First Circuit noted that such extraordinary circumstances may exist if the government "spirited an alien from one site to another in an attempt to manipulate jurisdiction." *Id.*

It is a foundational principle that in all cases "courts take care not to exceed their 'respective jurisdictions' established by Congress." *Padilla*, 542 U.S. at 451. Nevertheless, "the very nature of the writ [of habeas corpus] demands that it be administered with the initiative and flexibility

11

essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Cherrix v. True,* 177 F. Supp. 2d 485, 495 (E.D. Va. 2001) (alteration in original) (quoting *Harris v. Nelson,* 394 U.S. 286, 291 (1969)).

## II.    Jurisdiction is Improper in the Northern District of Texas

Respondents contend that under *Padilla*'s default district of confinement and immediate custodian rules, jurisdiction is only proper in the Northern District of Texas. Dkt. 49 at 17-18. However, a straightforward application of the default rules shows that jurisdiction is not proper in the Northern District of Texas.

The default district of confinement rule instructs the Court to look to the place the individual was confined at the time the petition was filed. *Padilla*, 542 U.S. at 447; *Little*, 392 F.3d at 680. Here, the petition was filed at 5:59 p.m. on the evening of March 18, 2025. Petitioner did not arrive in the Northern District of Texas until March 21, 2025. Despite this, Respondents contend that because Petitioner was served with an NTA that listed his "current" residence address as the Prairieland Detention Facility, the Northern District of Texas is the only appropriate district in which Petitioner's claims can be heard. Dkt. 49 at 18-19. This argument is not persuasive. Any address listed on the NTA is irrelevant because at the time the petition was filed, Petitioner was not in the Northern District of Texas and did not arrive there until three days later.

To avoid this inconvenient outcome, Respondents argue that Petitioner was "in transit" when he was confined in Virginia and Louisiana, vesting jurisdiction in the Northern District of Texas because that is the only district in which Petitioner was "non-transitorily confined." Dkt. 26 at 12. In support, Respondents rely on *United States v. Poole*. 531 F.3d 263 (4th Cir. 2008). That reliance, however, is misplaced. In that case, the Fourth Circuit did not address where jurisdiction lies when a petitioner files their habeas petition while they are being repeatedly moved from one location to the next. Those facts were very different.

12

Poole was convicted in Maryland federal court and incarcerated, "at *his* request," in Kentucky. 531 F.3d at 265-66 (emphasis added). Poole was detained in Kentucky for approximately *nine years*. *Id.* at 265-67 (noting that he was sentenced in 1997 and filed his first § 2241 motion in 2006). While incarcerated in Kentucky, Poole filed multiple habeas petitions in Maryland and Kentucky federal courts and then filed a motion to amend the judgment against him in the Maryland court. *Id.* at 266-67. In order to permit Poole to attend this hearing, the Maryland court issued a writ of habeas corpus *ad testificandum*, which ordered the warden of the Kentucky facility to bring Poole to Maryland. *Id.* at 267-68. Then, during this hearing, Poole's counsel asked the Maryland court to allow Poole to be detained in Maryland "solely to enable the Maryland federal district court to assert jurisdiction" over a future habeas petition. *Id.* at 268. The Fourth Circuit found this contravened the Supreme Court's explanation "that the immediate custodian rule 'serves the important purpose of preventing forum shopping by habeas petitioners.'" *Id.* at 273 (quoting *Padilla*, 42 U.S. at 447). Accordingly, the Fourth Circuit held that "neither the issuance of the writ of habeas corpus *ad testificandum* nor the retention of [the petitioner in Maryland] conferred jurisdiction on the Maryland federal district court." *Id.* at 274. Instead, Poole should have filed his habeas petition in Kentucky, which was Poole's "original place of incarceration" where he was "permanently confined." *Id.* at 271, 275.

Here, unlike in *Poole*, the Northern District of Texas was not Petitioner's "original place of incarceration" nor is it the district in which Petitioner was permanently confined at the time his habeas petition was filed. When his habeas petition was filed, Petitioner was not and had never been in the Northern District of Texas. Thus, Petitioner's original place of confinement and permanent place of confinement could not have been the Northern District of Texas. On the other hand, Petitioner's original place of detention was Virginia—where he was arrested and taken to

13

the Farmville Detention Center. *Poole* does not help Respondents; indeed, *Poole* supports a finding that jurisdiction is proper in this District.

At the time of filing his petition, Petitioner did not have a permanent place of detention. Moreover, the Court questions whether an inquiry into an immigration detainee's permanent place of confinement is prudent because, as evidenced by the facts of this case and others like it, non-citizen detainees may be moved more frequently than those who are criminally incarcerated. Nevertheless, *Poole* does not place jurisdiction in the Northern District of Texas nor the Western District of Louisiana for that matter—which would neither be Petitioner's original nor permanent place of confinement. If *Poole* were to apply, it would place jurisdiction in this District—the original place of Petitioner's detention. Accordingly, the Northern District of Texas does not have jurisdiction to hear Dr. Khan Suri's habeas petition based on the default rules of habeas jurisdiction or after applying *Poole*.

### III.    This Court Has Proper Habeas Corpus Jurisdiction

Absent suspension, the writ of habeas corpus must be available to every detainee. The question here is where Dr. Khan Suri's counsel could have filed. Petitioner argues that the Court should apply the unknown custodian exception because at the time his petition was filed, Petitioner's counsel could not have known who Petitioner's immediate custodian was or where he was confined. Dkt. 47 at 16. Respondents claim that because Petitioner's counsel had access to his NTA approximately three hours before the petition was filed, Petitioner's counsel should have known that the proper jurisdiction in which to file the petition was the Northern District of Texas. Dkt. 49 at 6-7. Based on the NTA, Respondents argue that Petitioner's immediate custodian and district of confinement were known at the time the petition was filed and are known today. *Id.* For all of the reasons stated above, neither Petitioner nor his immediate custodian was in Texas.

14

*A. The Unknown Custodian Exception Applies*

Petitioner landed in the Western District of Louisiana at 5:03 p.m. on March 18, only fifty-six minutes before his counsel filed his petition. Although the default rules may appear to place jurisdiction in the Western District of Louisiana, neither party contends that the Western District of Louisiana is the proper jurisdiction to hear the petition. The Court agrees that this case should not be transferred to the Western District of Louisiana. At the time the petition was filed, neither Petitioner's presence in Louisiana nor movement through Louisiana was ever disclosed. Further, because Petitioner was not booked into the facility in Louisiana until 6:42 p.m., it is not clear who Petitioner's immediate custodian was at the time his petition was filed, if he had an immediate custodian at all.

When a petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." *Padilla*, 542 U.S. at 450 n.18. In this situation, the unknown custodian exception applies. The unknown custodian exception provides that a habeas writ does not need to be served on "'the individual with day-to-day control over' the prisoner and instead, "the writ is properly served on the prisoner's ultimate custodian." *Moussaoui*, 382 F.3d at 464-65 (quoting *Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998); and then citing *Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986)) (finding that Secretary of Defense is ultimate custodian, and proper respondent, of individuals in military custody). Here, Petitioner's ultimate custodian is the Secretary of the Department of Homeland Security.[7]

---

[7] During the hearing on this motion, Respondents argued in passing that this Court does not have *in personam* jurisdiction over the Secretary of Homeland Security. This argument was not made in Respondents' Motion to Dismiss. Accordingly, the Secretary of Homeland Security's objection to personal jurisdiction was waived, as would be any similar objection from any Respondent other than Warden Crawford. Fed. R. Civ. P. 12(h) ("A party waives any defense listed in Rule 12(b)(2)-(5) by: . . . (B) failing to . . . make it by motion under this rule."). Moreover, even if this objection

At the time the habeas petition was filed, Petitioner's immediate custodian was unknown. On the evening of March 17, Petitioner was arrested and taken from Rosslyn, Virginia to Chantilly, Virginia. While there, ICE officers told Petitioner that he would be taken to Farmville, Virginia.[8] Petitioner conveyed this information to his wife in the only phone call he was allowed prior to being moved. After being detained in Farmville for only a few hours—in the early morning—Petitioner was taken to a location in or around Richmond, Virginia. ICE officers refused Petitioner's request to call his wife to update her on his location. Then, he was placed on a plane. No official ever informed Petitioner of his imminent movement or that he would be in transit through Louisiana. Nor was Petitioner given the opportunity to update his wife so that she could inform attorneys working on his behalf. Indeed, it is now clear that at 5:59 p.m. on March 18, Petitioner did not have an immediate custodian because he was not yet booked into any detention facility.

Throughout the morning of March 18, Petitioner's counsel worked to understand the circumstances of Petitioner's arrest. At 2:11 p.m., Petitioner's counsel entered his appearance in Petitioner's immigration case and gained access to Petitioner's NTA. In that time, all Dr. Khan Suri's counsel could discover was that Dr. Khan Suri would be taken to the Farmville Detention

---

had not been waived, the Court finds that it can exercise *in personam* jurisdiction over the Secretary of Homeland Security because she regularly transacts business in this district. *See So v. Reno*, 251 F. Supp. 2d 1112, 1128 (E.D.N.Y. 2003) (finding in an immigration habeas case that "[t]here is personal jurisdiction over the Attorney General in New York, since he or she regularly transacts business in New York in an official capacity." (citing *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 495 (1973))).

[8] Respondents contend that statements of officers to Petitioner are inadmissible hearsay. Dkt. 49 at 12. They are not. Statements of ICE Officers are opposing party statements and are therefore excluded from the rule against hearsay. Fed. R. Evid. 801(d)(2). Further, it is not clear to the Court that these statements are being offered for the truth of the matter asserted. To the extent these statements are being offered to show the effect they had on Petitioner, and not for the truth of the matter asserted these statements are not hearsay. Fed. R. Evid. 801(c).

Center, and that he had a hearing in Texas on May 6. In a little over three hours, and while checking the ICE Online Detainee Locator that provided no new information, Dr. Khan Suri's counsel drafted and filed a habeas petition in this Court. In this timeframe, it is not clear how any other diligent attorney could have known that Petitioner was in Louisiana at the time he filed the petition.

At 5:59 p.m. on March 18, Petitioner's counsel, the individual tasked with filing the petition in the proper jurisdiction and naming the proper respondents, had no indication that Petitioner had been moved to Louisiana. The NTA does not reference Louisiana. Petitioner was not told by any officer that he was going to Louisiana. Even if ICE officers provided Petitioner with accurate updates of where he was being moved, Petitioner was not permitted to contact his wife until the evening of March 19, after his petition was already filed. Effectively, at the time the petition was filed, Petitioner was detained in an unknown location by an unknown custodian.

Moreover, even if it were possible for Petitioner's counsel to have discovered he was in Louisiana at 5:59 p.m., Petitioner's counsel would not have known who to identify as Petitioner's immediate custodian. Petitioner was not booked into the ASF until 6:42 p.m. on March 18—almost an hour after the petition was filed. It is ironic that the Government's first declaration specifically described Petitioner's movements in Eastern Daylight Time. The Second Simon Declaration which indicated when Petitioner was booked into the ASF, was silent as to the time zone. This omission led Petitioner, and initially the Court, to believe that Petitioner was booked into the ASF seventeen minutes *before* his petition was filed. However, only in response to questions from the Court was it made clear that the times referenced in the Second Simon Declaration were in Central Time. Thus, the habeas petition was actually filed forty-three minutes *before* Petitioner was booked into the ASF.

17

To date, Respondents have not identified who Petitioner's immediate custodian was while he was on a plane to Louisiana or while he was in Louisiana before he was booked into the ASF. It is logical to assume that if Respondents could identify the individual Petitioner should have named as his immediate custodian, they would have.  Not only was Petitioner's immediate custodian unknown to his counsel at the time of filing his petition, it appears that his immediate custodian at 5:59 p.m. remains unknowable to all, including the Government.  In accordance with the unknown custodian exception and ultimate custodian rule, Petitioner named the Secretary of Homeland Security as a respondent in his original and amended petitions.  Dkts. 1, 34.

In *Demjanjuk v. Meese*, the D.C. Circuit applied the unknown custodian exception when the petitioner, a suspected war criminal, was held "in a confidential location."  784 F.2d 1114, 1115-16 (D.C. Cir. 1986) (Bork, C.J.).[9]  Judge Bork thought "it [wa]s appropriate, in these very limited and special circumstances, to treat the Attorney General of the United States as the custodian" and apply the unknown custodian exception.  *Id.* at 1116.  The Court recognizes that these are different facts.  But what is similar is that the custodian and place of confinement were unknown at the time of filing.

Respondents claim that the Supreme Court in *Padilla* distinguished *Demjanjuk* when the Court declined to apply the unknown custodian exception.  Dkt. 49 at 4 (citing *Padilla*, 542 U.S. at 450 n.18).  However, in *Padilla*—unlike in *Demjanjuk*—"counsel was well aware of Padilla's presence in South Carolina when she filed the habeas petition."  *Id.* at 449 n.17.  Further, the Court in *Padilla* found there were no indications of secrecy on behalf of the Government.  *Id.*  The *Padilla*

---

[9] The Court observes that only Judge Bork heard and decided this case because he "decline[d] to transfer this application" to the district court given that "it [was] absolutely clear from the application that the applicant [was] not entitled to . . . the writ" which obviated the need for hearing and transfer.  *Demjanjuk v. Meese*, 784 F.2d 1114, 1115 (D.C. Cir. 1986).  In addition, Judge Bork felt transfer was inappropriate "given the imminence of petitioner's extradition to Israel."  *Id.*

18

Court did not reject the unknown custodian exception but merely found that it was inapplicable on the facts before the Court at that time. *Id.* Here, at the time Petitioner's counsel filed his habeas petition, Petitioner's location was unknown, and it appears Petitioner did not have an immediate custodian who could have been named.[10] Accordingly, the Court will apply the unknown custodian exception.

Next, Respondents seize on certain language in the *Demjanjuk* opinion to argue that this Court has been divested of jurisdiction over Dr. Khan Suri's habeas petition because he has been removed from this District. Dkt. 49 at 6. In particular, Judge Bork wrote in *dicta* that if it becomes "known that petitioner is held in a jurisdiction other than this one, a judge of this circuit would be divested of jurisdiction." *Demjanjuk*, 784 F.2d at 1116. Judge Bork provides no analysis explaining how he reaches that proposition. Moreover, as Petitioner argues, this language would permit the government to circumvent *Ex parte Endo*, which "stands for the . . . proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Padilla,* 542 U.S. at 441; *see* Dkt. 47 at 15-16. Then, the Government could withhold the location of an individual, wait to see if and where a petition is filed, then disclose their custodian or location, and claim the court in which the petition was filed is divested of jurisdiction. This result would defeat the purpose of the great writ.

---

[10] Respondents try to avoid the application of the unknown custodian exception by arguing that it is clear that Petitioner is held in the Northern District of Texas, so jurisdiction must only be proper there. Dkt. 49 at 6. As discussed *supra*, jurisdiction is not proper in the Northern District of Texas because Petitioner was not and had never been present in the Northern District of Texas at the time the petition was filed. Therefore, this case should not be transferred to the Northern District of Texas.

### B.  An Exception to the District of Confinement Rule Applies

Just as the unknown custodian exception provides an alternative to default habeas rules when a petitioner's immediate custodian cannot be ascertained, there must also be an exception when the petitioner's location cannot be determined.  In *Padilla*, the Supreme Court forecasted as much when it noted that when a petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." 542 U.S. at 450 n.18.

An exception to the district of confinement rule must apply when, after reasonably diligent effort, the district in which the petitioner was confined could not have been determined. Respondents claim that *Padilla* rejected the argument that "the facts available to counsel at the time of filing should govern and the facts as they actually existed at the time of filing should not matter."  Dkt. 49 at 6 (citing *Padilla*, 542 U.S. at 449 n.17) (internal quotations omitted).  But the Supreme Court never opined either way.  *Padilla*, 542 U.S. at 449 n.17.  Instead, the Court simply noted that the dissent's reasoning was based on its concern about "Government secrecy," despite there being no such allegation.  *Id.*  In fact, when Padilla's attorney filed the habeas petition, she identified Padilla's location, stating that he was being held "in segregation at the high-security Consolidated Naval Brig in Charleston, South Carolina."  *Id.* (quoting Padilla's habeas petition). Thus, Respondents mischaracterize *Padilla*'s reasoning on this point.

The *Padilla* majority does not address whether it would be proper to find jurisdiction based on the facts available to diligent counsel through reasonable effort under the circumstances.  Often, as in the situation before the Court, counsel files a habeas petition on behalf of their client.  In those situations, counsel is tasked with determining the district in which the petition should be filed and who is the proper respondent to be named.  Consequently, habeas jurisdictional rules must be based on discoverable facts regarding where a petitioner was and who was confining him.

20

Otherwise, courts are left to grapple with jurisdictional questions, manufactured or not, instead of focusing on the merits of the petition.  Moreover, limiting the facts to those that could be discovered by diligent counsel constrains the ability of either side to engage in impermissible forum shopping.

To be clear, habeas petitioners do not have a right to be held in a specific place.  It strains credulity, however, that a habeas petition that properly named the petitioner's ultimate custodian and was filed in the district where the petitioner resides, was arrested, and was detained cannot be heard in that same district. *See Harris,* 394 U.S. at 291 (emphasizing the importance of flexibility in habeas adjudication).  In this case, Petitioner resides in this District, he was arrested in this District, and he was originally detained in this District.  The last time Petitioner was permitted to speak to his wife, the only information he had was that he would be detained in this District.  Petitioner's counsel worked diligently in less than twenty hours and filed the petition in this District based on the only information that was available to him—that his client was detained in this District.  And as stated above, the NTA did not reference Louisiana, nor did the ICE Online Detainee Locator provide information about Petitioner's whereabouts until after the petition was filed.  At no point after entering his appearance did Petitioner's counsel receive any notification that Petitioner had been transferred.  Although the NTA listed a Texas address as his current residence, it is clear and undisputed that Petitioner was not there and did not arrive there until days later.  This is not the forum shopping that habeas jurisprudence seeks to prevent.

The facts before the Court today demand an exception to the district of confinement rule.  Justice Kennedy, in his concurrence in *Padilla,* predicted the problem that now faces the Court.  There, Justice Kennedy, joined by Justice O'Connor, noted that there should be an exception "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed" or "if the Government

21

did inform the lawyer where a prisoner was being taken but kept moving him so filing could not catch up to the prisoner." *Padilla*, 542 U.S. at 454 (Kennedy, J. concurring).  In these situations, Justice Kennedy believed that "habeas jurisdiction would lie in the district or districts from which [the petitioner] had been removed." *Id.*

At the hearing, the Court posed several questions to Respondents seeking to better understand the circumstances of Petitioner's arrest and detention and clarify the Government's purpose in transporting Petitioner to Texas.  The Court asked Respondents: (1) whether it is normal for NTAs to list the address of a detention facility as where the non-citizen currently resides; (2) when the custody determination was made that Dr. Khan Suri would be detained in Texas and which records reflect those facts; (3) how many beds were available in Farmville at the time of Dr. Khan Suri's arrest and how many people were removed from Farmville when Dr. Khan Suri was removed; (4) how and when people are typically moved from Farmville; and (5) to provide any additional information on the decision to move Dr. Khan Suri to Texas—specifically, to explain why Dr. Khan Suri was moved from a facility that had bedspace to a facility that did not. Transcript of May 1 Hearing ("Tr.") at 7:13-14, 8:4-6, 9:13-18, 15:17-21, 16:7-12, 16:17-22, 17:15-16, 17:24-18:3.

Respondents' answers to these questions are either non-responsive or riddled with inconsistencies.  First, Respondents appear to make post hoc rationalizations regarding available bedspace in Caroline and Farmville.  Respondents originally contended that Petitioner was moved from this District because of "potential overcrowding in Virginia detention facilities." First Simon Decl. ¶ 8.[11]  In their supplemental declaration, Respondents represent that there were, in fact, no

---

[11] In response, Petitioner advanced evidence that there was ample bedspace at immigration facilities in Virginia.  TRAC Reporting, (March 17, 2025) https://tracreports.org/immigration/detentionstats/facilities.html; ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-

beds for Petitioner in this District because the available beds were either reserved for other arrests, as with Farmville, or only available for emergencies, as with Caroline. Graham Decl. ¶ 8. Was the reason the potential overcrowding or no beds? These representations are plainly inconsistent and are further undermined by the fact that Prairieland Detention Center, where Petitioner is currently held, is overcrowded. Khan Suri Decl. ¶ 22. Moreover, neither representation satisfactorily explains why Dr. Khan Suri would be transferred from a place with, concededly, some bedspace at the time of Petitioner's arrest to a facility that did not have bedspace. It is uncontroverted that Dr. Khan Suri was placed in a dormitory that has a 36-person capacity but has been filled with at least 50 people since he arrived. *Id.* Indeed, Dr. Khan Suri slept on a plastic cot on the floor for two weeks before being moved to a bed. *Id.*

Drawing all inferences in favor of Petitioner, the Court infers that Petitioner's transfer to Texas was not about bedspace. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (acknowledging that a Court is required to make all inferences in favor of a plaintiff when deciding a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing). Indeed, given Respondents' apparent post hoc rationalization that bedspace concerns motivated Petitioner's removal from the District, it appears that Respondents' goal in moving Petitioner was to make it difficult for Petitioner's counsel to file the petition and to transfer him to the Government's chosen forum.

The second issue—Petitioner's NTA—also suggests that Respondents' design was to forum shop and spirit Petitioner away from this District before his counsel could file a petition. The Court asked Respondents whether it was normal for the NTA to list a detention facility as a

---

content/uploads/2022/06/2021-Annual-Review.pdf.; Caroline Detention Facility, *Home* (2025), https://carolinedf.org/. The Court need not rely on this.

non-citizen's current residence. Respondents assert that NTAs "issued for aliens who will be detained are issued listing the detention facility as the current address" because the non-citizen's location determines the "court and docket, as well as the date and time for initial appearances." Graham Decl. ¶ 10. As Petitioner notes, however, an NTA, like an indictment or complaint, is designed to "supply an affected party with a single document highlighting certain salient features of the proceedings against him." Dkt. 58 at 3 (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 163-64 (2021)). By statute, an NTA is sufficient if it includes the non-citizen's "most-recent address." 8 U.S.C §§ 1229(a)(1), 1229a(b)(5)(A). Respondents' statements suggest they were fully aware that listing Petitioner's current residence or place of detention would determine which immigration court would have jurisdiction over his proceedings.[12] *See* U.S. Dep't. of Just., Imm. Ct. Pract. Man. § 4.2 (2022); 8 C.F.R. § 1003.11; U.S. Dep't. of Just., Immigration Court List – Administrative Control, https://www.justice.gov/eoir/immigration-courtadministrative-control-list (last visited May 3, 2025). Respondents also knew that the Prairieland Detention Center was not his most recent residence.

Respondents' assertions with respect to the NTA's listed address also appear to be post hoc rationalizations because Respondents provide inconsistent statements on when the decision to detain Petitioner in Texas was made. The supplemental declaration states that the decision to detain Petitioner was made while he was at the Chantilly Field Office, and that the NTA was issued after the detention facility was decided. Graham Decl. ¶ 6 (stating that Dr. Khan Suri was transported "to the ERO Washington Office in Chantilly for the purpose of . . . making a decision on a detention location"); *id.* ¶ 9 (stating that "the decision to detain Suri at the Prairieland

---

[12] It is worth noting that ICE failed to notify Dr. Khan Suri's counsel of his transfer despite ICE's policy suggesting that notice to counsel in the event of transfer is standard practice. *See* ICE Policy 11022.1, § 5.3 Notifications in the Event of a Detainee Transfer (Jan. 4, 2012).

Detention Facility was made at approximately 10:00 pm on March 17, 2025"); *id.* ¶ 11 (stating that the NTA was issued "after the detention facility was decided"). This conflicts with Respondents' statement at the hearing that the custody determination to detain Petitioner in Texas was made before the NTA was issued. Tr. 9:7-12.

Here, the undisputed facts show that Petitioner was arrested around 9:30 p.m. outside his home in Rosslyn, Virginia. The Chantilly Field Office is at least a 30-minute drive from Petitioner's apartment building. Therefore, Petitioner could not have been at the Chantilly Field Office at 9:47 p.m. when the NTA, stating he currently resides in Texas, was digitally signed. It appears that, despite Respondents' representation that Petitioner was transported to Chantilly *to* determine his detention location, the decision to detain Petitioner in Texas was actually made *before* 10:00 p.m. and before Petitioner arrived at and was processed in the Chantilly Field Office. Graham Decl. ¶ 6. With these inconsistencies, it is still unclear when the decision to detain Petitioner outside of this District was made. Nonetheless, as stated above, the detention decision appears to have little to no relationship to whether there was available bedspace in Farmville or Caroline.

Lastly, such rapid transfers do not appear to be part of the normal course of operations in this jurisdiction. While rapid transfer of immigration detainees may be typical in some jurisdictions, Petitioner's movement across state lines appears atypical for immigration detainees in this jurisdiction. *Cf. Khalil v. Joyce et al.*, 2025 WL 849803, at *9-*10 (S.D.N.Y. Mar. 19, 2025) ("*Khalil I*") (noting that rapid transfer of Manhattan immigration detainees to New Jersey is routine). A qualified immigration attorney with extensive practice experience in Virginia stated that she has "never seen ICE arrest someone in Virginia and move them as far away as Texas in less than 24 hours." Dkt. 47-2, Declaration of Elizabeth Schmelzel, Esq. ("Schmelzel Decl.") ¶ 5. Although Respondents assert that forty-four people were moved from Farmville with Dr. Khan

Suri, they offer no clarifying information to indicate whether they were similarly situated—i.e., whether they were recently arrested like Dr. Khan Suri or whether they had been there for some time and had final orders of removal. Respondents also fail to provide the Court with any additional information regarding the regularity of transfers or the transfer process. Moreover, ICE's own guidance and policies with respect to transfers suggest that Petitioner's movement and Respondents' actions in this case do not conform to the normal course. *See* ICE Directive 11064.3 (2022), available at: https://www.ice.gov/doclib/news/releases/2022/11064.3.pdf; ICE Policy No. 11022.1, §§ 5.2, 5.3 (Jan. 4, 2012).

Accordingly, the fashion in which Petitioner was transferred appears exceptional for immigration detainees who are arrested in Virginia, if not in general. This atypical movement would make it difficult for any diligent lawyer's filings to "catch up" to their client's location. Indeed, it took Petitioner's counsel only three-hours and forty-eight minutes to file the original habeas petition, and yet, he was too slow. Ahmad Decl. ¶¶ 7-8. No diligent lawyer who routinely practices immigration law in this District could have predicted the shepherding of Petitioner from Virginia to Louisiana.[13] The facts at hand demand that the default habeas jurisdictional rules adjust accordingly.

Respondents claim that Petitioner was only in Louisiana transitorily and on his way to his ultimate destination of Texas. Dkt. 26 at 12. It is not readily apparent to the Court that the Government intended to take Petitioner to Texas to be held there awaiting his May 6 hearing. Petitioner was in Louisiana from the evening of March 18 until the evening of March 21. Second

---

[13] Additionally, the Court does not premise its jurisdictional finding on this hypothetical but queries the application of habeas jurisdictional rules if Petitioner's counsel filed the petition just fifty-seven minutes earlier—at 5:02 p.m. on March 18. At that point, Petitioner's plane was in the air. First Simon Decl. ¶ 11.

Simon Decl. ¶ 3. Petitioner stated that on the evening of March 20, two days after his habeas petition was filed in this District, he was told he would be leaving Louisiana to be transferred to New York to be deported. Khan Suri Decl. ¶ 21. Notably, on the same day, the Court entered its order that Petitioner not be removed from the United States until the Court issues a contrary order. Dkt. 7. Only on the following day was Petitioner transferred to Texas.

The Court notes that there has been a pattern of similar movement of immigration detainees in similar cases. *Mahdawi v. Trump et. al.*, 2025 WL 1243135, at *3 (D. Vt. Apr. 30, 2025) (recounting that on the same day he was arrested and served with an NTA, Homeland Security Investigations agents attempted to put Mr. Mahdawi on a plane bound for Louisiana); *Ozturk v., Trump, et al.*, 2025 WL 1145250, at *2-*3 (D. Vt. Apr. 18, 2025) ("*Ozturk II*"), *appeal filed, Ozturk v. Hyde et al.*, No. 25-1019 (2nd Cir. Apr. 24, 2025) (detailing that within 24 hours of her arrest, Ms. Ozturk was taken to Methuen, Massachusetts, then to Lebanon, New Hampshire, then to St. Albans, Vermont, then to Burlington, Vermont, and then put on a plane to Louisiana); *Khalil I*, 2025 WL 849803, at *3-*4 (describing that within 48 hours of his arrest, Mr. Khalil was taken to another facility in Manhattan, before being transported to Elizabeth, New Jersey, and then flown to Dallas, Texas, before finally reaching Jena, Louisiana). Each petitioner was arrested on different days and in different regions. What is similar? Each was charged with removability under 8 U.S.C. §1227(a)(4)(C), and the Government attempted to move each outside of their jurisdictions to Louisiana or Texas.

Based on these facts the Court adopts the reasoning of Justice Kennedy's concurring opinion in *Padilla*. Respondents' myriad contradictory explanations combined with the inability for Petitioner's exceptionally diligent counsel to keep up with Petitioner's abnormal and rapid movement across state lines demands more flexible jurisdictional rules. *See Harris,* 394 U.S. at 291. Therefore, the Court finds that jurisdiction should lie in the district from which Petitioner

27

was removed—the Eastern District of Virginia. *See Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

The Court declines to transfer Dr. Khan Suri's petition to the Western District of Louisiana for the additional reason that doing so would ratify an attempt at forum shopping. When it is possible to apply the immediate custodian rule, that rule "serves the important purpose of preventing forum shopping by a habeas petitioner." *Poole*, 531 F.3d at 273 (quoting *Padilla*, 542 U.S. at 447). Just as a habeas petitioner should not be permitted to forum shop, neither should the United States Government. *See Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1258 (D.C. Cir. 1973) (warning against "the Kafkaesque specter of supplicants wandering endlessly from one jurisdiction to another in search of a proper forum"). In fact, the D.C. Circuit's warning in *Eisel v. Secretary of the Army* is particularly prescient considering the United States Government continues to dispute the jurisdictional findings of other district courts in an attempt to force the petitioners to re-file habeas petitions in new jurisdictions. *See Ozturk II*, 2025 WL 1145250; *Khalil II*, 2025 WL 972959. It is not an exercise in forum shopping for Petitioner to file and seek review of his habeas claims in this District—the jurisdiction in which he resides, was arrested, and was originally detained. Instead, forcing Petitioner to litigate his case in Louisiana or Texas for that matter, many states away from his lawyers and family, would meaningfully deprive him of their ability to aid in his representation for the duration of these habeas proceedings.

Moreover, because Petitioner has strong connections to this District, this District has an interest in the adjudication of Petitioner's habeas claims, whereas the Northern District of Texas and the Western District of Louisiana do not. Although it involved different circumstances than the ones before this Court, the Supreme Court's reasoning in *Braden v. 30th Judicial Circuit Court of Kentucky* supports this conclusion. 410 U.S. at 499. There, the Supreme Court found that the default rules of habeas jurisdiction were unworkable for a petitioner who was presently confined

in Alabama but seeking to challenge a detainer lodged against him by the Commonwealth of Kentucky. *Id.* The *Braden* Court made an exception and allowed the petitioner to sue the individual with legal control over his future confinement in Kentucky. *Padilla*, 542 U.S. at 438 (describing the holding of *Braden*). The Court reasoned that "the Western District of Kentucky is almost surely the most desirable forum for the adjudication of [the petitioner's claim]" because the relevant events occurred there, and it would be "no less convenient for the respondent and the Commonwealth of Kentucky" to litigate the petitioner's claims in Kentucky. *Braden*, 410 U.S. at 493-94.

Just as the Court in *Braden* applied "traditional venue considerations" when the default rules became untenable, so too does this Court. *Id.* at 493. First, the Eastern District of Virginia is where Petitioner resides with his wife and children, it is where Petitioner was arrested, and it was where Petitioner was detained from the evening of March 17 until the evening of March 18. *See Poole*, 531 F.3d at 271 (holding that habeas jurisdiction remains in the "original place of incarceration" despite temporary movement to another district). Therefore, the Eastern District of Virginia has a strong interest in hearing Petitioner's claims. Additionally, it works no prejudice to Respondents to litigate in the Eastern District of Virginia. For these reasons, the Court declines to transfer the instant habeas petition to the Western District of Louisiana.

Accordingly, for the foregoing reasons, the Court finds that this Court has jurisdiction to hear Dr. Khan Suri's habeas petition. Respondents' Motion to Dismiss or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are denied.

A separate Order will issue.

Entered this 6th day of May, 2025
Alexandria, Virginia

/s/
Patricia Tolliver Giles
United States District Judge

29

Ex. F

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI,            ) | |

<table>
<tr><td>BADAR KHAN SURI,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><i>Petitioner,</i></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>DONALD TRUMP, <i>in his official capacity</i></td><td>)</td><td>Case No. 1:25-cv-480 (PTG/WBP)</td></tr>
<tr><td><i>as President of the United States;</i> RUSSELL</td><td>)</td><td></td></tr>
<tr><td>HOTT, <i>in his official capacity as Field</i></td><td>)</td><td></td></tr>
<tr><td><i>Office Director of Washington, Immigration</i></td><td>)</td><td></td></tr>
<tr><td><i>and Customs Enforcement;</i> JEFFREY</td><td>)</td><td></td></tr>
<tr><td>CRAWFORD, <i>in his official capacity as</i></td><td>)</td><td></td></tr>
<tr><td><i>Warden of Farmville Detention Center;</i></td><td>)</td><td></td></tr>
<tr><td>TODD LYONS, <i>Acting Director, U.S.</i></td><td>)</td><td></td></tr>
<tr><td><i>Immigration and Customs Enforcement</i>;</td><td>)</td><td></td></tr>
<tr><td>KRISTI NOEM, <i>in her official capacity as</i></td><td>)</td><td></td></tr>
<tr><td><i>Secretary of the United States Department of</i></td><td>)</td><td></td></tr>
<tr><td><i>Homeland Security;</i> MARCO RUBIO, <i>in his</i></td><td>)</td><td></td></tr>
<tr><td><i>official capacity as Secretary of State</i>;</td><td>)</td><td></td></tr>
<tr><td>PAMELA BONDI, <i>in her official capacity</i></td><td>)</td><td></td></tr>
<tr><td><i>as Attorney General, U.S. Department of</i></td><td>)</td><td></td></tr>
<tr><td><i>Justice,</i></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><i>Respondents.</i></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Respondents' Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are **DENIED**; it is further

**ORDERED** that the Court will set a hearing on Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20) for May 14, 2025, at 10:00 a.m.; and it is further

**ORDERED** that the parties shall file any supplemental filings related to Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20) to the extent necessary to address any additional claims in the Amended Petition and Complaint (Dkt. 34) on or before May 12, 2025, at 12:00 p.m.

Entered this 6th day of May, 2025
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

2

# Ex. G

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| BADAR KHAN SURI, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, *in his official capacity* | ) | Case No. 1:25-cv-480 (PTG/WBP) |
| *as President of the United States;* RUSSELL | ) | |
| HOTT, *in his official capacity as Field* | ) | |
| *Office Director of Washington, Immigration* | ) | |
| *and Customs Enforcement;* JEFFREY | ) | |
| CRAWFORD, *in his official capacity as* | ) | |
| *Warden of Farmville Detention Center;* | ) | |
| TODD LYONS, *Acting Director, U.S.* | ) | |
| *Immigration and Customs Enforcement;* | ) | |
| KRISTI NOEM, *in her official capacity as* | ) | |
| *Secretary of the United States Department of* | ) | |
| *Homeland Security;* MARCO RUBIO, *in his* | ) | |
| *official capacity as Secretary of State;* | ) | |
| PAMELA BONDI, *in her official capacity* | ) | |
| *as Attorney General, U.S. Department of* | ) | |
| *Justice,* | ) | |
| | ) | |
| *Respondents.* | ) | |
| | ) | |

## ORDER

This matter comes before the Court on Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20). On May 14, 2025, the Court heard argument.   For the reasons stated in open court, it is hereby

**ORDERED** that Petitioner's Motion for Release on Bond (Dkt. 20) is **GRANTED** and Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) is **DENIED** as moot; it is further

**ORDERED** that Petitioner Dr. Khan Suri is to be immediately released on his personal recognizance during the pendency of his habeas proceedings subject to the following conditions: (1) Petitioner will reside in Virginia; (2) Petitioner will attend all court hearings in this case in person unless excused by order of the Court; and (3) Petitioner will participate in his removal proceedings. Petitioner is **not** required to submit to any GPS monitoring; it is further

**ORDERED** that Respondents shall not attempt to re-detain Petitioner without providing 48-hours notice to the Court and Petitioner's counsel; and it is further

**ORDERED** that Respondents' request to stay this Court's decision pending appeal is **DENIED**.

Entered this 14th day of May, 2025
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

2

Ex. H

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA


|  |  |  |
|---|---|---|
| | : | |
| BADAR KHAN SURI, | : | |
| | : | |
| | : | |
| Petitioner, | : | Civil Action |
| | : | No. 1:25-cv-00480-PTG-WBP |
| v. | : | |
| | : | |
| DONALD TRUMP, | : | May 14, 2025 |
| | : | 10:04 a.m. |
| Respondent. | : | |
| | : | |
| | : | |
| | : | |
| ........................... | : | |

**TRANSCRIPT OF BOND HEARING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Petitioner:     **Sophia Leticia Gregg, Trial**
                        **Attorney**
                        American Civil Liberties Union of
                        Virginia
                        P.O. Box 26464
                        Richmond, VA 23261
                        804-774-8242
                        Email: Sgregg@acluva.org

                        **Eden Brooke Heilman, Trial**
                        **Attorney**
                        ACLU of Virginia
                        701 E. Franklin Street
                        Suite 1412
                        Richmond, VA 23219
                        (804) 523-2152
                        Fax: (804) 649-2733
                        Email: Eheilman@acluva.org

APPEARANCES: (Cont.)

For the Petitioner:

**Astha S. Pokharel, Trial Attorney**
Center for Constitutional Rights
666 Broadway
7th Flloor
New York, NY 10012
212-614-6464
Email:
Asharmapokharel@ccrjustice.org

**Hassan Minhaj Ahmad, Trial Attorney**
The HMA Law Firm PLLC
6 Pidgeon Hill Drive
Ste 330
Sterling, VA 20165
703-659-0632
Fax: 703-997-8556
Email: Hma@hmalegal.com

**Geri Greenspan, Trial Attorney**
ACLU of Virginia
P.O. Box 26464
Richmond, VA 23261
804-491-8584
Email: Ggreenspan@acluva.org

**Nermeen Saba Arastu, Trial Attorney**
Main Street legal, Inc.
CUNY School of Law
2 Court Square
Long Island, NY 11101
202-246-0124
Email: Nermeen.arastu@law.cuny.edu

For Respondent:

**David J. Byerley, Assistant United States Attorney**
Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
202-532-4523
Email: David.byerley@usdoj.gov

APPEARANCES:   (Cont.)

For Respondent:                **Elizabeth Anne Spavins, Assistant**
                               **United States Attorney**
                               United States Attorney's Office
                               (Alexandria)
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                               703-299-3785
                               Email: Lizzie.spavins@usdoj.gov

                               **Tom Benjamin Scott-Sharoni**
                               **DOJ-CIV, Assistant U.S. Attorney**
                               Office of Immigration Litigation
                               P.O. Box 868 Ben Franklin Station
                               Washington, DC 20044
                               202-538-3554
                               Email:
                               Tom.scott-sharoni2@usdoj.gov

Court Reporter:                **Scott L. Wallace, RDR, RMR, CRR**
                               Official Court Reporter
                               United States District Court
                               401 Courthouse Square
                               Alexandria, VA 22314-5798
                               Cell: 443-584-6558
                               Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1    **<u>MORNING SESSION, MAY 14, 2025</u>**

2    (10:04 a.m.)

3         THE COURTROOM CLERK:  The Court calls *Badar Khan Suri*

4    *versus Donald Trump*, et al., Case Number 1:25-cv-480.

5         May I have appearances, please, first for the Petitioner?

6         MS. GREGG:  Good morning, Your Honor.  Sophia Gregg from

7    the ACLU of Virginia on behalf of Petitioner.  I'm here with Eden

8    Heilman, Astha Sharma Pokharel, Hassan Ahmad, Naureen Arastu,

9    Geri Greenspan, Vishal Agraharkar, and Celine Zhu.

10        THE COURT:  Good morning to all of you.

11        MS. SPAVINS:  Good morning, Your Honor.  Elizabeth

12   Spavins, Assistant United States Attorney.  With me at counsel's

13   table is my colleague, Christian Cooper, and then presenting for

14   the Respondents today will be David Byerley of the Office of

15   Immigration Litigation at Main Justice, and next to him is Tom

16   Scott-Sharoni, also from OIL.  Thank you.

17        THE COURT:  Good morning to all of you.  So, we are on

18   today on Petitioner's pending motions, the motion for return, as

19   well as the motion for bail.

20        MS. GREGG:  That's correct, Your Honor.

21        THE COURT:  So I'll hear from you first.

22        MS. GREGG:  Yes, Your Honor.  If there's no preliminary

23   matters, we'll start with our motion for bail.

24        We're here today because Dr. Khan Suri is being unlawfully

25   detained for his wife -- his and his wife's lawful expression in

support of Palestinian rights and his ties through their marriage
to her father.

About two months ago, after celebrating Ramadan with his
Georgetown community, Dr. Khan Suri came home to armed masked men
who handcuffed him and drove him away from his wife, children,
and the life he had.  He is now over a thousand miles away from
his home, the people he cherishes most, his lawyers, and this
court, packed into an overcrowded detention center and subjected
to the most severe restrictions usually reserved for people
convicted of violent crimes awaiting deportation.

The impact of the unlawful actions on Dr. Khan Suri and on
the millions of lawful residents, students, professors, and visa
holders of all kinds is hard to overstate.  Their speech isn't
just chilled.  They are afraid.  They are afraid to exercise
their core constitutional rights to write an op-ed, to post on
social media, and to dare to criticize the government.

This fear is profound.  And what is shocking is that the
government doesn't deny it.  The government announced it would do
this in advance, and they have doubled down at every opportunity,
and they've had ample opportunity to respond to Dr. Khan Suri's
claims in this case before this hearing.

In response that he is being imprisoned and retaliated
against for speech, the government says nothing.  In response to
the claim that the government targeted Dr. Khan Suri because of
his wife's speech, her Palestinian origin, or family ties, the

1  government says nothing.

2       In response to the claim that the government targeted

3  Dr. Khan Suri because of his wife -- I'm sorry.  The government

4  does not claim that Dr. Khan Suri was imprisoned due to any

5  illegal conduct or for any other constitutionally sound basis.

6       We're asking this Court to release Dr. Khan Suri pending

7  his habeas petition, after which this Court can fully examine the

8  constitutional violations of the government's actions.

9       THE COURT:  Do we even know the exact statements that are

10  at issue?  Have they identified the alleged statements that he

11  made?

12       MS. GREGG:  The government has not put forth any evidence

13  so far in this case regarding any statements or any other reason

14  for his detention.

15       THE COURT:  Okay.

16       MS. GREGG:  Courts considering bond pending immigration

17  habeas petitions use the *Mapp* -- use the *Mapp v. Reno* standard,

18  which requires a court to evaluate two things:  Whether or not

19  there are substantial claims in the case and whether or not there

20  are extraordinary circumstances.  There are both here.

21       While the government argues that Petitioner must meet a

22  heightened standard in *Eliely*, which requires both a substantial

23  constitutional claim upon which he has a high likelihood of

24  success, and extraordinary circumstances, that standard is for

25  habeas petitioners already tried and convicted by a court of law.

1    Here, Dr. Suri is being detained on unproven civil

2    immigration charges challenging the unconstitutionality of his

3    detention.

4    Release on bail here under the standard articulated in

5    *Mapp* is reasonably similar to pretrial release in a criminal

6    case.

7    Dr. Khan Suri brings several substantial claims, but most

8    predominantly is the claim that he has been detained solely for

9    the content of his speech, which must be afforded the highest

10   protection under the First Amendment.

11   The government doesn't deny this.  The government has

12   targeted him in retaliation for exercising his right to free

13   speech under the First Amendment.  And, again, the government

14   doesn't deny this.

15   That must be a substantial claim.  Likewise, there is no

16   evidence that the government has targeted and detained Dr. Khan

17   Suri except in retaliation for exercising his lawful speech and

18   associations.

19   The evidence submitted by Petitioner, namely the

20   government's own statements, supports the fact that the

21   government's objectives in detaining Dr. Khan Suri is punitive in

22   purpose and violates the due process.

23   In considering exceptional circumstances, the

24   courts consider what *Mapp* calls unusual cases.  Except for the

25   handful of current cases that we've brought to the attention of

1    the Court and the Court is aware, in nearly identical

2    circumstances there have been no cases in which the government

3    has used this particular provision to detain someone for lawful

4    speech.

5         That is exceptional.  What is also exceptional is the fact

6    that there is no evidence that Dr. Khan Suri is a danger or a

7    flight risk.  The government was given ample opportunity by this

8    Court in advance of this hearing to present any evidence in

9    opposition to this motion for release, and it provided none.

10        Dr. Khan Suri, however, has demonstrated through an

11   abundance of letters of support from people who know him that he

12   is a kind, caring friend and colleague who leads with a

13   commitment to peace.

14        He's supplemented with even more letters that pour in

15   every day from people of the Georgetown community and people who

16   have known him --

17        THE COURT:  I've read them all.

18        MS. GREGG:  Yes.  If released, he would return to his home

19   in Roslyn, Virginia where he lives with his wife and children.

20        If he's able to, his Georgetown dean and director fully

21   support Dr. Khan Suri's return to work and teaching.

22        The director of the Alleywood Center is here today in

23   support of Dr. Khan Suri's release as well, as are many members

24   of his community.

25        Finally, release is necessary to make the habeas remedy

1  effective because Dr. Khan Suri's attention necessarily

2  constitutes a continued infringement on his First Amendment and

3  due process rights.

4      An infringement on those rights may be justified if the

5  government had presented a legitimate case, but it has not done

6  so.

7      In the meantime, with every passing day, his detention

8  chills the speech of millions and millions of noncitizens who may

9  now not exercise their First Amendment rights for fear of being

10 whisked away to a detention center thousands of meals away from

11 their home.

12     For these reasons and the many other reasons articulated

13 in our motions and supplemental briefing, we ask this Court to

14 release Dr. Khan Suri so that his habeas remedy can be effective.

15     THE COURT:  One issue that they raised in their

16 supplemental, and I don't know if it's necessary for me to reach

17 it in order to rule today, is with regard to your void for

18 vagueness challenge.  Do you have any authority where a void for

19 vagueness challenge has been made as to a policy or regulation?

20     MS. GREGG:  Well, Your Honor, the -- I think the cases

21 that, first, that the government cited don't necessarily say that

22 it doesn't apply to a policy, per se, but here the issue is that

23 there is not just the law that he's being charged under that is

24 void for vagueness, but it's implementation through the executive

25 orders themselves.  That, as a whole, would -- are void because

1  the void of vagueness standard basically requires that due

2  process make the policy or the law clearly defined.

3       And if it doesn't provide the kind of notice that will

4  enable a person or people to understand what the conduct

5  prohibits, it would be -- or if it would authorize or even

6  encourage arbitrary discrimination or enforcement, as it has done

7  here, it would -- it would not satisfy the void for vagueness

8  standards that are articulated in the cases.

9       We don't have -- even if the Court is not inclined to

10  consider the void for vagueness argument or claims in this case

11  as being a substantial claim, there are many substantial claims

12  in this case that would be sufficient for the standard under

13  *Mapp*.  It doesn't say that all the claims must be substantial so

14  much that a substantial claim would be sufficient.

15       THE COURT:  Okay.  So it's your position that, either

16  under your First Amendment claim or under your Fifth Amendment

17  claim, either of those would be sufficient?

18       MS. GREGG:  Correct, Your Honor.

19       THE COURT:  Thank you.

20       MR. BYERLEY:  Good morning, Your Honor.

21       THE COURT:  Good morning.

22       MR. BYERLEY:  As the Court's opinions have shown, ample

23  attention has been paid to the brief, so I'm not going to repeat

24  a lot of what's been said in the brief.

25       THE COURT:  Thank you.

1    MR. BYERLEY:  But, briefly, the Court should deny the

2    pending motions because the standards set by the *United States*

3    *verus Eliely*, which is the Fourth Circuit's, granted it's

4    unpublished, but it's the Fourth Circuit's equivalence of whether

5    habeas release pending a determination on an ultimate habeas

6    petition should be granted, is pretty high.  It requires

7    substantial constitutional claims on which he has a high

8    probability of success.

9    THE COURT:  Haven't they created sustained claims, though?

10    MR. BYERLEY:  Your Honor, the Government does not believe

11    that they have because of many of the jurisdictional bars that we

12    talked about in our briefing, including 1252(a)(5) and (g).

13    Those jurisdictional issues, even maybe not, perhaps, directly at

14    issue, even in the context of determining whether *Eliely* release

15    is appropriate, but it does present an obstacle to their claims

16    on the merits.  And then furthermore --

17    THE COURT:  How so?

18    MR. BYERLEY:  So, what Mr. Suri is challenging in his

19    petition is the decision to institute removal proceedings against

20    him.

21    THE COURT:  That's not what he's challenged.

22    MR. BYERLEY:  Yes, Your Honor.

23    THE COURT:  He's challenged specifically his detention and

24    his transfer.  I agree, like, there was a shift from the original

25    petition and what we have clearly stated in the amended petition,

1   and they're clear.  It's very focused.  It's only -- the removal

2   proceedings can continue.  Those are separate.  But what they're

3   speaking to now, what they are challenging and the prayer for

4   relief that they are seeking directly addresses detention,

5   detention/transfer.

6        MR. BYERLEY:  Yes, Your Honor.  The government agrees that

7   this petition challenges detention, but the decision regarding

8   detention is inextricably bound up in the decision to institute

9   removal proceedings in the first place.

10       So, here we have a case that's somewhat similar to AADC,

11  the anti- -- the anti-Arabic discrimination -- I'm sorry.  It's a

12  mouthful.

13       THE COURT:  That's okay.

14       MR. BYERLEY:  Where they were challenging their removal --

15  the basis of their removal proceedings.  And while some of them

16  may have been detained and some of them may not have been, what

17  we're dealing with here is Mr. Suri's challenging his detention,

18  which is attendant to and directly tied into the decision to

19  institute removal proceedings in the first place.

20       THE COURT:  No court -- I mean -- and this is not on

21  you -- but the government has consistently made the same argument

22  in several jurisdictions at this stage in similar -- similarly

23  situated cases, and no one has adopted that reading.

24       MR. BYERLEY:  So, granted, Your Honor, many of those cases

25  are out of circuit and are not binding.  At least one court did

1  find our way.  That was *Taal versus Trump* out of the Northern

2  District of New York earlier this year.  But, granted, courts --

3  there are reasonable grounds to disagree, and we understand that

4  there are decisions disagreeing with those positions.

5      The government disagrees with those decisions and is

6  considering or actively pursuing appellate recourse.  But,

7  granted, yes, I acknowledge that there are other decisions that

8  do not go our way, but what I want to emphasize here is that

9  under *Jennings* and under *AADC*, the government disagrees with

10  those conclusions because what it did --

11      THE COURT:  But *AADC* was -- you know, it only reaches --

12  1252(g) only reaches three discrete actions:  The decision to

13  commence proceedings, adjudicate cases, or execute removal

14  orders.

15      MR. BYERLEY:  Yes, Your Honor, but under 1252(a)(5) and

16  (b)(9), what we also have is review of questions that arise in

17  removal proceedings.  Here, Mr. Suri is challenging the basis of

18  his detention, the basis of the determination under 12.7.

19      THE COURT:  But the detention decision was made prior to

20  the NTA, right, and removal proceedings actually initiating?

21      MR. BYERLEY:  No, Your Honor.  The deportability

22  determination was made prior to the decision to -- the issuance

23  of the NTA, but it forms the basis of the NTA, and so they're

24  inextricably tied up with one another such that (a)(5) and (b)(9)

25  apply, as well as 1252(g).

1    THE COURT:  But even if those were to -- you know, even

2  with those statutes, the courts are clear that they do not

3  preclude challenges to the extent of the government's authority.

4    MR. BYERLEY:  Your Honor, I think you may be referring to

5  *Demore versus Kim*, which held that 1226(e) did not prohibit

6  constitutional challenges to the legislation.  I don't think

7  that --

8    THE COURT:  I'm looking at *Miranda v. Garland*, the Fourth

9  Circuit case.

10   MR. BYERLEY:  I'm sorry?

11   THE COURT:  Miranda --

12   MR. BYERLEY:  Miranda.

13   THE COURT:  -- v. Garden, the Fourth Circuit case.

14   MR. BYERLEY:  Yes, Your Honor.  But the government's

15  position here is that (a)(5) and (b)(9), it applies here because

16  he is challenging his detention, which is inextricably bound up

17  with the 1227(a)(4)(C) determination.

18   And so the government believes that those provisions apply

19  to bar review in this case and that the proper forum for which

20  Dr. Suri to bring his challenges is an immigration court before

21  an immigration judge, and then appeal to the BIA, if necessary,

22  and then appeal to the Fourth Circuit as necessary -- or Fifth

23  Circuit.  I'm sorry.

24   THE COURT:  I understand your argument.  I'm not saying I

25  agree with it, but I understand.

1        MR. BYERLEY:  Yes, Your Honor.

2        THE COURT:  You can move on.

3        MR. BYERLEY:  So, furthermore, under the *Eliely* standard,

4   I think, as Your Honor correctly identified, the void for

5   vagueness challenge suffers from fatal flaws.  First is that the

6   Fourth Circuit says that the void for vagueness doctrine focuses

7   on legislation, not policies or actions.

8        THE COURT:  But I don't even have to reach that.

9        MR. BYERLEY:  Yes, Your Honor, that's correct.  We also

10  agree with that proposition as well.  Because, under the *Eliely*

11  standard, it's only constitutional claims which are at issue on

12  these sorts of motions.

13        Furthermore, the government posits that, to the extent

14  that the Court is considering granting interim release, the Court

15  also has to look at whether the interim release is necessary to

16  render the habeas -- render the habeas remedy effective, to the

17  extent the Court grants the habeas petition in his favor.

18        Over the 17 years since *Eliely* was decided, not a single

19  court on an opposed motion has granted release pending a

20  determination of habeas -- on a habeas petition.

21        The two cases on which Petitioners rely, *Brooks versus*

22  *Wilson* and *Young versus Antonelli*, Eastern District of Virginia,

23  2018; District of South Carolina, 2021, respectively; both of

24  those decisions came on unopposed motions.  And in that context,

25  what the Court was looking at was that in each of those cases the

Fourth Circuit had recently adopted the petitioner's argument in terms of improper -- improperly elevated mandatory minimums.

And so, if the habeas would have been granted in their favor on the merits, then they would have served the full time that they wouldn't have needed to serve had the Court been able to rule on the habeas petition instantaneously. So that's not a similar situation to what we have here. The court's habeas remedy would still be effective even if --

THE COURT: How so?

MR. BYERLEY: Because the Court is -- because it's, one, again going back to the jurisdictional issues; but, two, if the Court grants the habeas petition on the merits, there's -- he's -- the authority exists for his detention. It's not a similar situation in *Young* and *Brooks* where the sentence was invalid -- would have been found invalid if -- the elevated sentence would have been found invalid if the Court had -- if he had needed to await the entire resolution of the habeas proceedings.

But, again, bringing this back to 1252(a)(5), (b)(9), and g), he's challenging underlying decisions which are inextricably tied up with the --

THE COURT: I don't accept that reading. I don't think it's inextricably intertwined. I don't.

MR. BYERLEY: Yes, Your Honor. Well, that's the government's primary argument on this. And then, to the extent

1    that the Court is inclined to grant the motion, the government

2    requests that the conditions set out in our supplemental briefing

3    filed on Monday be imposed on any release that the Court may

4    provide.  And, as well, we would ask for a stay of seven days

5    pending the government's determination on appellate recourse..

6        THE COURT:  Let's go through those.  In your supplemental,

7    you indicate that the Court should treat this as -- or approach

8    this as it does with respect to a preliminary injunction and

9    impose a bond.  That -- you rely on a Third Circuit case.  You

10   don't have any Fourth Circuit case that's done that, right?

11       MR. BYERLEY:  So, Your Honor, the -- it's widely

12   recognized, and I think, even in the recent *Ozturk* opinion from

13   the Second Circuit, recognized that granting this sort of release

14   early is tantamount to a preliminary injunction reviewable order,

15   as well as there's a recent Supreme Court case, I think,

16   recognizing that as well.

17       THE COURT:  But bond in a preliminary injunction context

18   is, you put -- you impose a bond so the person who the

19   injunction -- who has been enjoined, that there is something in

20   place that would make them whole if it was found out that the

21   injunction was issued in error.

22       But here, there is nothing that would be needed,

23   necessarily, to make the government whole, is there?

24       MR. BYERLEY:  Well, there would be the cost of redetaining

25   him.  The conditions that the government proposes in our --

1      THE COURT:  The cost of what?

2      MR. BYERLEY:  The cost of sort of redetaining him and

3   making a rearrest, in the event that that becomes necessary.

4      But, in any event, the Court can tailor its remedy to

5   adequately balance the needs of both sides, and we believe that

6   these conditions as we've suggested are reasonable, to the extent

7   the Court is inclined to grant release on Petitioner's motion.

8      THE COURT:  Many of the conditions that you would seek

9   seem to go to a risk of flight or they would be ones that the

10  Court would impose if there was a risk of flight.  What evidence

11  do you have that he poses a risk of flight?

12     MR. BYERLEY:  So, Your Honor, these are just generic --

13  these are just generic conditions that would be imposed by an

14  immigration judge if -- in the event that the immigration judge

15  was deciding this issue.

16     In terms of -- in terms of flight risk and danger to the

17  community, those things are not in the record.  But what we --

18  what the government would say is that Secretary Rubio made this

19  determination under 1227(a)(4)(C)(1), and so there is a

20  consideration about whether his -- whether his presence in the

21  community does cause potential serious foreign affairs

22  consequences that should also be considered kind of separate and

23  apart from flight risk and danger to the community.

24     THE COURT:  That determination has never been really

25  presented to this Court.  I haven't seen that memorandum.

MR. BYERLEY:  Yes, Your Honor, that's correct.  It's not in the record yet, and I do not believe it's been filed in the immigration court yet either at this point.

THE COURT:  Okay.  Do you have more?

MR. BYERLEY:  Your Honor, no.  Your Honor's reviewed the briefing.  For the reasons stated in the government's briefing and also as presented here today, the Government requests that the Court deny the pending motions.  Thank you.

MS. GREGG:  Thank you, Your Honor.  As the Court already addressed, I won't go through all the issues with the government's argument as to the INA bars in this case, but it's just notable that the *AADC* case is speaking to one provision in the INA, and the government is using it to show that there's some bar through 1252(b)(9), which Miranda clearly says that the government does not have discretion to violate the Constitution -- its discretion to detain does not include the discretion to violate the Constitution, which is exactly what's at issue here.

And, as the Court already adequately addressed, all the other cases have gone the other way, cases that are dealing specifically with students who are being targeted for their speech under the same foreign policy bar.

The government brought up the case of Mr. Tall.  However, Mr. Taal was not challenging his detention because he was not detained at the time that he brought his case.  He was seeking an

1   injunction from being detained and, therefore, challenging the

2   underlying immigration charges, and so we would put that forth,

3   but all the other courts in this country that have looked at

4   these cases and situations identical to the one here for --

5   impacting Dr. Suri, they've all said that the INA doesn't -- no

6   provision of the INA bars consideration of their claims.

7        We've already gone over why habeas remedy is effective,

8   and I think that that's been sufficient, but for the *Eliely*

9   cases, the government talks about how we've cited other -- no

10  other case has been decided in this manner in the Fourth Circuit,

11  and that is specifically because this type of remedy is for

12  unusual cases.  There hasn't been a situation that has risen to

13  this level, and the government's conduct has not been so

14  egregious as it has in this case, but that shouldn't preclude the

15  Court from considering the same standard under *Mapp* that all the

16  other circuits -- or that many other circuits consider to be the

17  standard for immigration habeas cases.

18       Likewise, the government's contention that he should have

19  conditions placed on him, if he is to be released, we think that

20  that is inappropriate, since they have conceded that he is not a

21  flight risk or a danger to the community.

22       We have presented ample evidence that he is neither of

23  those things.  In fact, he is a well-respected and well-loved

24  member of his community with very strong ties to this Northern

25  Virginia area.

1   If the Court would like further assurances, we are happy

2   to consider any sort of location specific restrictions in the DMV

3   area, but we would ask that the Court not subject him to any

4   body-worn GPS because we find that is inappropriate, and the

5   government has not presented any reason that that should be the

6   case.

7   Additionally, Your Honor, we ask that, although -- we ask

8   that if the government seeks a stay on any potential grant of

9   release in Dr. Khan Suri's case, we ask that we be allowed to

10  address that as well.  We think that's not appropriate.

11  THE COURT:  Well, I think you should address that now,

12  their arguments with respect to the stay, because there's a

13  certain -- there's a test that must be satisfied before the Court

14  would grant a stay.

15  MS. GREGG:  Right.

16  THE COURT:  And the first is whether there would be

17  a -- is whether the applicant has shown a likelihood or strong

18  likelihood of succeeding on the merits.

19  MS. GREGG:  Correct, Your Honor.  And I think, by virtue

20  of a grant on this motion, we would have shown that they do

21  not -- they are not likely to succeed on the merits because of

22  the substantial claims in this case.

23  We don't believe that the -- the government hasn't

24  presented any evidence here for any lawful authority in detaining

25  Dr. Khan Suri.  We've demonstrated, on the other hand, that there

1  is evidence, sufficient evidence that his detention is currently

2  unlawful and violates his First Amendment and Fifth Amendment

3  rights.

4      Therefore, we would say that they would not likely succeed

5  on the merits.  They also cannot demonstrate any irreparable

6  harm, because, again, he is neither a flight risk or danger to

7  the community, and release will not interfere with his removal

8  proceedings.

9      As we've laid out in other motions, his removal

10  proceedings are remote, so even if he's in a detention center or

11  he's out free in the world, his immigration removal proceedings

12  are not impeded in any way.

13      He, however, will suffer irreparable harm.  The separation

14  from his family, from his community, from his studies, all

15  suggest -- all go to show that he would suffer if he is -- if a

16  stay was put in place.  Every day that he is detained, his rights

17  are being violated.

18      And also, his release will enable him to participate

19  meaningfully in the rest of these proceedings.

20      A stay would preclude that and continue to harm him in

21  that way.  The third factor relates to other parties' interests.

22  There are no other parties in this case.

23      And fourth is in public interest, and we would argue that

24  Dr. Khan Suri's release is very much in the public interest.  His

25  continued detention would likely continue to have a chilling

effect on protected speech, which is squarely in the public interest because, you know, his release would signal to the rest of the country, to noncitizens, that they will not be impacted for exercising their First Amendment rights as well.

The community will benefit, and those who deeply care and value him will benefit from his release as well.

And for all those reasons, Your Honor, we would say that the government cannot prove any one of those factors that are required for a stay.  Thank you.

THE COURT:  Anything else from either side?  I'm going to take a brief recess, and then I'm going to come back.  I'll take 15 minutes.

(Thereupon, a recess in the proceedings occurred from 10:34 a.m. until 11:28 a.m.)

THE COURT:  Okay.  When there was a government's motion to dismiss, I issued a memorandum opinion.  I'm not going to do that in this case.  I plan on ruling from the bench.

In this case, Petitioner has moved for two forms of relief:  One, to be returned to the Eastern District of Virginia, and two, to be released on bond pending adjudication of his habeas petition.

For the purposes of my ruling, I adopt the facts that I laid out in my memorandum opinion that I previously issued, and I'm first going to turn to the jurisdictional arguments raised by the Respondents before I turn to the merits of Petitioner's

motion.

And first, Respondents argue that since Petitioner is discretionarily detained under Section 1226(a) and 1226(e), that restricts judicial review because the Secretary's discretionary decisions or actions regarding the detention of alien or revocation or denial of bond or parole, that, essentially, this Court has no authority to review ICE's decision to detain the Petitioner in Texas.

The Supreme Court clearly stated in the case of *Demore versus Kim* that any provision said to bar review in habeas requires a particularly clear statement of Congressional intent, and that Section 1226(e) contains no explicit provision barring habeas review.

And then, in *Miranda v. Garland,* the Fourth Circuit further concluded that Section 1226(e) only forbids review of the Attorney General's actions and decisions in individual proceedings.

And with respect to the Petitioner's challenge to his detention, the *Miranda* court also observed that, in *Jennings v. Rodriguez*, the Supreme Court concluded that "the extent of the government's detention authority is not a matter of discretionary judgment, action, or decision, and is thus outside the scope of 1226(e)."

And, indeed, many circuits have reasoned that 1226(e) does not limit habeas jurisdiction over constitutional claims or

questions of law or challenges to officials' statutory authority.

And so I find that here 1226(e) does not bar this Court's review because this Petitioner does not challenge a specific decision or action of the Attorney General regarding bond or parole, and because he raises a constitutional challenge to the secretary's authority, which is not a discretionary judgment.

Now, with respect to the claims that they -- or the bar that they allege exists under 1252(g), in the *AADC* case, the *Reno versus AADC*, the Supreme Court was clear that 1252(g) is to be narrowly construed, and it only reaches three discrete actions of the Attorney General, and that is the decision or action to commence proceedings, adjudicate cases, or to execute removal orders.

And, you know, there is a circuit split on whether 1252(b)(9) can even apply before a final order of removal is issued, but -- and the Fourth Circuit hasn't definitively answered the question.

But in looking at the cases in the Fourth Circuit, it's clear that those rulings indicate that 1252(b)(9) would not bar review here, because in *Miranda*, as I just stated -- well, there, the Court found that, to the extent that it's a challenge to the government's authority, then 1252(b)(9) does not bar the Court's review. And Respondents have relied on the case of *Johnson v. Whitehead*. That's another Fourth Circuit case to support their position that review here would be precluded, but that case is

very different than the case before me, because there the

Petitioner was trying to, in the habeas case, was trying to

relitigate claims that he had made in his removal proceedings,

and that's not the case here.  The proceedings before me are

totally separate from the removal proceedings.

And finally, I turn to their allegation of the

jurisdictional bar because of 1252(a)(2)(B)(ii).  That statute

does not deprive this Court of jurisdiction because the statute

that they point to, 1231(g), is not a specified grant of

discretionary authority for the Attorney General to authorize

transfers.  It's just not, and that's clear when looking at the

*Reno* case, which is a Fourth Circuit case, 2019.

And so, for these reasons, I find that there is no

jurisdictional bar to the Court reaching or deciding this habeas

petition, and, therefore, I turn to the merits of the

Petitioner's motion, and I'm going to start with the motion for

bond release.

And here, the parties don't agree whether or not *Mapp v.*

*Reno* or *Eliely* provide the standard, and I don't think this Court

definitively has to decide that because, under *Mapp*, it requires

that the Petitioners raise substantial constitutional claims and

that there are exceptional circumstances that exist that makes

the grant of bail necessary to make the habeas remedy effective.

And in *Eliely*, the standard is very similar.  The only exception

is that it requires the prisoner to show substantial

constitutional claims on which he has a high probability of
success.  And the reason why I say it's not necessary for the
Court to reach that is because I find here that Dr. Khan Suri
would meet either.

And I also would like to point out, I'm not entirely sure
that *Eliely* does apply, because in that context it was a
petitioner who had been held mandatorily after having committed a
crime, and that's not the case here.

And so now I'm going to turn to those constitutional
claims.  And I don't think I need to reach all of it.  Petitioner
raises first a Fifth Amendment challenge to the lawfulness of his
detention, the Rubio determination, and their policy.

And, essentially, he alleges that he's being retaliated
against for his religious exercise, his speech, and for his
association.  Essentially, he alleges that he was targeted,
apprehended, and detained in order to retaliate against him and
punish him based on his or his wife's protected speech and his
association with his wife and his father-in-law.  And here, the
First Amendment extends to noncitizens, as it makes no
distinction between citizens and noncitizens.

Now, in order to make out a First Amendment retaliation
claim, a plaintiff or petitioner must show that he has a right
protected by the First Amendment; the Defendant's or Respondent's
actions were motivated or substantially caused by the exercise of
that right; and that the Defendant's actions caused the Plaintiff

1  some injury. Now, what's uncontroverted before me in this

2  record, because I gave the government multiple opportunities to

3  submit any type of filing to controvert these claims or to

4  support their opposition to this motion, and they have declined.

5      And so what I have before me as uncontroverted is that the

6  plaintiff made posts, and these allegations are -- these

7  statements that I am outlining come from both the amended

8  petition, which was verified, as well as the declaration of his

9  wife, and that is that he made posts expressing support for the

10 Palestinian people criticizing the death toll in Gaza, affirming

11 international law principles, and criticizing U.S. support for

12 Israel's support in Gaza.

13      Additionally, his wife began posting on social media about

14 the war in Gaza, after losing family and friends in the war, and

15 she shared information about developments in Gaza.

16      Statements expressing support for the Palestinian people

17 criticizing the death toll in Gaza, affirming international law

18 principles, and criticizing U.S. support do not appear to qualify

19 as incitement, defamation, obscenity, or true threats of

20 violence, and thus they are unlikely to fall into any exceptions

21 for protected speech.

22      Indeed, I join several other courts that have found on

23 similar facts that speech regarding the conflict there and

24 opposing Israel's military campaign is likely protected political

25 speech.

1    Thus, the Court finds that Petitioner was likely engaging

2    in protected speech.

3    Now, with respect to his freedom of association claim that

4    is part of his First Amendment claim, he alleges that he is being

5    punished for his wife's Palestinian origin or speech or her

6    father's past as an advisor in the government in Gaza.

7    The First Amendment similarly restricts the ability of the

8    state to impose liability on an individual solely because of his

9    association with another.  That's the *Clayborne* case from the

10   Supreme Court.

11   Courts recognize a First Amendment freedom of intimate

12   association.  That's the *Roberts versus USJCs* case, also from the

13   Supreme Court.

14   And here, again uncontroverted, Petitioner has offered

15   evidence that he is being retaliated against and punished for his

16   marital relationship and his wife's familial relationship.  And

17   these concern his freedom of intimate association.  Relationships

18   such as family and marriage often want First Amendment protection

19   because of -- because such protections safeguard the ability

20   independently to define one's identity that is essential to any

21   concept of liberty.  That's the *Roberts* case.

22   And so I find that the Petitioner has satisfied the first

23   element as to his freedom of association claim because

24   Petitioner's marriage to his wife and association with her and

25   her father is protected by the First Amendment.

Now, with respect to the second element, Petitioner has offered evidence sufficient for this Court to infer that Respondent's detention and apprehension of Petitioner was caused by his speech, his wife's speech, or his association with his wife and his wife's father.

As evidence of the respondent's retaliatory motive, Petitioner points to several statements of Respondents' or their representatives. First, he identifies statements made by Secretary of State Marco Rubio on Twitter calling student protesters Hamas supporters and indicating that "the United States should cancel the visa of every foreign national out there supporting Hamas and get them out of America."

Also, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." These are the statements that I am quoting -- I am referencing based on the allegations in the petition. I'm not indicating that Dr. Khan Suri is a Hamas supporter. Let me be clear about that. I'm recounting the statements here.

There was also a statement that they referenced by President Trump, and it is, "We will terminate the visas of all those Hamas sympathizers and will get them off our college campuses, out of our cities, and get them the hell out of our country". And there was another statement. "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear

1  that, they're going to behave."

2      Additionally, the petition, as well as the -- it's docket

3  number 62, I believe, that was the supplemental filing by

4  Petitioner in this case, attaches additional statements or

5  postings made by DHS officials that specifically appear to

6  reference Dr. Khan Suri because he's referred to as a Georgetown

7  scholar, a Georgetown foreign exchange student.

8      I note for the record that, although officials -- and

9  these posts, I believe, were all after the filing of this

10  petition, and those statements were made publicly on Twitter or

11  in other forms.  There was no evidence submitted to this Court

12  regarding statements that he made.  The government did not submit

13  any statements to this Court in this regard, but yet these

14  statements were made out on social media.

15      So, Respondents have declined to dispute the merits of

16  Petitioner's claims that he is being retaliated against for his

17  speech or his association.  Essentially, in the opposition, they

18  rest on three propositions, and, one, that the challenges to

19  Petitioner's removability are more appropriately channeled to his

20  removal proceedings.  But, as I said earlier, this habeas

21  petition is not about the removal proceedings.  Those are

22  separate.  They are not being challenged here.

23      So I reject that argument.

24      They also argue that Respondents do not have to disclose

25  their reasons in cases concerning foreign affairs, which are

1    committed to the Secretary's discretion, and that the Secretary's

2    determination is a facially legitimate justification for his

3    determination and removal, and thus they are not required to show

4    or prove anymore.

5         As I noted earlier, I haven't even received evidence of

6    his determination because that memorandum was never submitted to

7    this Court, although it could have been.

8         But in any event, those arguments appear to rest on the

9    notions of deference and a presumption of regularity on the part

10   of the executive.

11        While there are many contentions in which courts should

12   take care to respect the prerogatives of the political branches,

13   whatever deference may be appropriate, concerns of national

14   security and foreign relations do not warrant abdication of the

15   judicial role.  That's the *Holder* case, *Holder v. Humanitarian*

16   *Law Project,* another Supreme Court case from 2010.

17        So, in no case do courts simply accept without more

18   government handwaving at deference and discretion.

19        And so, even in *Holder*, because Respondents rely on that

20   case, too, the *Holder v. Humanitarian Law Project* case, it

21   discusses the need for caution when faced with substitute courts

22   substituting their judgment for those of the political branches.

23        It also stated that, even when national security and

24   foreign relations are at stake, the Court does not defer to the

25   government's reading of the First Amendment.

1    Also, at no point is the government relieved of any duty

2    to adequately substantiate its determination.  And even in the

3    *Humanitarian Law Practice* case, the Court noted that, "the

4    judgment of Congress and the executive is entitled to significant

5    weight," but that statement alone, that concept alone does not

6    mean that it predetermines the outcome.

7    And finally, as to the First Amendment claim, the

8    Plaintiff or Petitioner has sufficiently demonstrated an injury

9    in terms of his continued detention.

10    Now, moving to the Fifth Amendment claim, under the due

11    process clause of the Fifth Amendment, "No person shall be

12    deprived of life liberty or process without due process of law."

13    And freedom from imprisonment, from government custody,

14    detention, or other forms of physical restraint lies at the heart

15    of liberty the clause protects."  That's *Zadvydas*, a Supreme

16    Court case.

17    Under *Zadvydas*, subsequent due process claims are

18    cognizable in civil immigration cases, and detention is not

19    designed to be punitive.  That's the *Demore* case and the *AADC*

20    case, both from the Supreme Court.

21    Now, detention is permissible to ensure the appearance of

22    noncitizens at future immigration proceedings and preventing

23    danger to the community, and I agree with other courts in

24    immigration-related cases who have found the Fifth Amendment due

25    process challenges to the detention to be substantial.  Here,

1    Petitioner alleges that his detention is unjustified because it

2    serves no lawful purpose and may be punitive.  And at this time

3    Respondents offer no other lawful purpose for Petitioner's

4    detention, nor directly refute that Petitioner's detention is

5    punitive.

6        In addition, Respondents have provided no other evidence

7    of Petitioner's activities, actions, or statement regarding

8    any -- that would consist of any Hamas propaganda or demonstrate

9    that he has done anything in support of Hamas.

10       To the extent Petitioner's apprehension and detention is

11   based on a chain of familial association, his marital tie to his

12   wife, and his familial tie to her father, these actions would

13   violate the due process clause in the Fifth Amendment as well as

14   the First Amendment.

15       And given Petitioner's uncontroverted evidence, I find

16   that he has shown a substantial likelihood -- or a likelihood, a

17   high probability of prevailing on those substantial

18   constitutional claims he has raised.

19       Now I'll turn to the second requirement, and that is the

20   exceptional circumstances that exist that would grant -- which

21   would make the grant of bail necessary to make the habeas remedy

22   effective.

23       Okay.  Now, considering the traditional bail factors, we

24   look to the risk of flight or danger to society.  And here,

25   there's no evidence to suggest that Petitioner is a flight risk

or poses a danger to society.  He is a professor at Georgetown University.  He is married to an American citizen.  He has three young children, all who reside in Virginia.  Respondents have offered no reason to suggest that he would have any incentive to flee.

In addition, I received letters from many colleagues, community members, and even family written on Dr. Khan Suri's behalf, emphasizing his personal and scholarly commitments to peace and conflict resolution.

What those letters also evidence, though, are very strong ties to community here.  And so, additionally, the Court has seen no credible evidence supporting that he is a danger to the community.  He has not been accused of any crime, and he's not been convicted of any crime.  No criminal record was presented to this Court or any facts from which this Court could conclude that he would be any sort of danger.

I also find that his release is necessary to make habeas remedy effective.  It's the only remedy that could make habeas remedy effective, and that's for many reasons.  One is that it would disrupt the chilling effect of retaliation for protected political speech or intimate associations, but, more importantly for him, having been confined for this amount of time for what the record before this Court is punitive reasons.

As the Supreme Court explained, the loss of First Amendment rights for even minimal periods of time unquestionably

1  constitutes irreparable harm.

2      And so, because I find that Petitioner has raised

3  substantial constitutional claims for which he has a high

4  probability of success and that extraordinary circumstances exist

5  which make the grant of bail necessary to make the habeas remedy

6  effective, this Court grants Petitioner's motion for bond

7  release, and so I will deny the motion for return as moot.

8      In terms of conditions, I'm going to impose the following:

9  And that is that he reside in the -- in Virginia; that he attend

10 all court hearings in this case in person, unless excused by

11 order of the Court; and that he participate in his -- the

12 separate removal proceedings.

13     I'm not going to impose any of the other suggested

14 conditions proposed by the government because I don't find that

15 they are necessary in this case because they typically speak to

16 situations where there is the concern about flight, and I just

17 don't find that here.

18     I also do not think it is necessary to impose any bond in

19 this case, because that's also not necessary to assure his

20 appearance.  Your exceptions are preserved.

21     Mr. Byerley, did you want to be heard separately as to

22 your motion to stay, or did you already raise everything that you

23 wanted to raise?

24     MR. BYERLEY:  No, Your Honor.  The only -- the only basis

25 for our request for a stay is to allow the government to seek

1    appellate recourse -- to consider seeking appellate course, which

2    involves consultation with multiple agencies, as well as OC, a

3    process that takes time.  A week to seven days is an appropriate

4    amount of time, but the reason for that is stated in our papers.

5    Thank you.

6         THE COURT:  Okay.  I understand.  Okay.  And so, in order

7    to determine whether a grant of stay is appropriate, and I listed

8    this out earlier when I gave Petitioner's counsel the opportunity

9    to respond or to address it in advance, the first prong is

10   whether there has been a strong showing of likelihood to succeed

11   on the merits, and based on my ruling in regards to Petitioner's

12   high probability of succeeding on the merits, you have not met --

13   or the government has not met the first prong.

14        Additionally, I find that there isn't any irreparable harm

15   here by me ordering release.  In making that finding, I'm

16   saying -- because there -- there's no showing that he's a risk of

17   flight or danger to the community, so he will be here and

18   available to still continue his participation in his removal

19   proceedings, which, from what I understand, are remote anyway.

20        Third, there does not appear to be any other parties

21   interested in the proceedings that would be injured by the stay.

22        And fourth and finally, I find that his release is in the

23   public interest in order to disrupt the chilling effect on

24   protected speech.

25        And so I'm going to decline to stay my ruling pending

1  appeal.  Exceptions are preserved.  Is there anything further?

2      MS. GREGG:  Yes, Your Honor.  We would just like to

3  discuss a little bit of the logistics, since this is an oral

4  order given.

5      THE COURT:  Well, I'll have a -- I'm going to issue an

6  order, a written order granting your motion.

7      MS. GREGG:  I appreciate that, Your Honor.

8      THE COURT:  Okay.

9      MS. GREGG:  And I would just draw the Court's attention to

10  issues that were presented in Ms. Ozturk's case when she was

11  given an order that didn't specify exactly the conditions.

12      THE COURT:  Okay.

13      MS. GREGG:  Namely, that ICE -- there was a large lag time

14  between the ordering of her release and her actually being

15  released because ICE attempted to put GPS monitoring on her.

16      THE COURT:  Well, I've already --

17      MS. GREGG:  Outside of --

18      THE COURT:  Said that I was not going to -- one of their

19  requests here was the GPS monitoring, and I have refused that,

20  because I said that it is not necessary here.  You usually put

21  that on when there's a flight risk, and I said there's no flight

22  risk.

23      MS. GREGG:  Of course, Your Honor.  I agree with that, as

24  well.  I just wanted to make it clear that that is something that

25  has come up in another case, and so that it -- if the Court would

1    be willing to make that explicit in the written order, in case

2    there are any issues in Prairieland, we have an attorney there

3    waiting for the Court's decision here.

4            THE COURT:  Okay.

5            MS. GREGG:  And if the Court is amenable to any other

6    clarifications to the order, we would ask that it make clear that

7    he cannot be redetained or that he shouldn't be redetained by ICE

8    without giving sufficient notice to the Court and to counsel so

9    that we can look into the basis for redetention, given that he

10   needs to travel from Prairieland to here, which would require him

11   to go through TSA or make a long drive.  Redetention under the

12   current environment in this country is of concern for us, as well

13   as to the issues that -- redetention, which the government

14   alluded to, and so we would just, you know, ask the Court --

15           THE COURT:  Okay.  You said could not be redetained

16   without giving sufficient notice to the Court and counsel; 48

17   hours?

18           MS. GREGG:  Yes, Your Honor, so that we can appear before

19   the Court and have an opportunity to hear the government's

20   reasoning.

21           THE COURT:  Okay.  Anything else?

22           MS. GREGG:  That's all, Your Honor.

23           THE COURT:  So no -- explicitly state "no GPS monitoring,"

24   and then include this -- you're requesting that the Court include

25   this requirement that he not be redetained without notice to the

1   Court and counsel.

2       Mr. Byerley, do you want to be heard on these?

3       MR. BYERLEY:  Your Honor, I would need to confer with my

4   client based on the order.  I don't want to say anything out of

5   turn at this point without --

6       THE COURT:  I understand that.  I understand that.  Okay.

7   But just know I'm going to enter this order as requested.  I find

8   that reasonable, and so I am, but -- I know you all will be

9   taking all steps as soon as I leave the bench.  So, if there's

10  nothing -- if there's nothing further, then we are adjourned.

11      (Proceedings adjourned at 12:07 p.m.)

12

13                  **C E R T I F I C A T E**

14

15          I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
16      proceedings in the above-entitled matter.

17      /s/ Scott L. Wallace                    5/15/25
        ----------------------------       ----------------
18      **Scott L. Wallace, RDR, CRR**             **Date**
            **Official Court Reporter**

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25