# JOINT

# APPENDIX

# Table of Contents

| 1 | Docket Report in Case No. 1:25-cv-00480-PTG-WBP (E.D. Va.) | JA001 |
|---|---|---|
| 2 | Petition for Writ of Habeas Corpus and Complaint | JA010 |
| 3 | Petitioner's Motion to Compel Respondents to Return Petition to This District | JA026 |
| 4 | Memorandum of Law in Support of Petitioner's Motion to Compel Respondents to Return Petitioner to This District | JA031 |
| 5 | Declaration of Mapheze Saleh | JA043 |
| 6 | Order dated March 20, 2025 | JA048 |
| 7 | Motion for Release on Bond | JA049 |
| 8 | Declaration of Hassan Ahmad | JA052 |
| 9 | Letters of Support | JA055 |
| 10 | Search Results from ICE Detainee Locator dated March 19, 2025 | JA078 |
| 11 | Federal Respondents' Motion to Dismiss | JA079 |
| 12 | Federal Respondents' Motion to Transfer Venue | JA081 |
| 13 | Declaration of Joseph Simon dated April 1, 2025 | JA083 |
| 14 | Declaration of Yousuf Khan dated April 1, 2025 | JA091 |
| 15 | Declaration of Yousuf Khan dated April 3, 2025 | JA094 |
| 16 | Amended Petition for Writ of Habeas Corpus and Complaint | JA097 |
| 17 | Declaration of Badar Khan Suri | JA134 |
| 18 | Declaration of Elizabeth Schmelzel, Esq. | JA140 |
| 19 | Declaration of Joseph Simon dated April 21, 2025 | JA143 |
| 20 | Transcript of Motion Hearing Proceedings dated May 1, 2025 | JA145 |
| 21 | Declaration of Mark Graham | JA200 |
| 22 | Memorandum Opinion dated May 6, 2025 | JA206 |
| 23 | Order dated May 6, 2025 | JA235 |
| 24 | Order dated May 14, 2025 | JA237 |
| 25 | Transcript of Bond Hearing Proceedings dated May 14, 2025 | JA239 |
| 26 | Notice of Appeal | JA280 |

| 27 | Second Amended Petition for Writ of Habeas Corpus and Complaint | JA282 |
|---|---|---|

# U.S. District Court
# Eastern District of Virginia − (Alexandria)
# CIVIL DOCKET FOR CASE #: 1:25−cv−00480−PTG−WBP

Suri v. Trump et al
Assigned to: District Judge Patricia Tolliver Giles
Referred to: US Magistrate Judge William B. Porter
Case in other court:  4th Circuit, 25−01560
Cause: 28:2241 Petition for Writ of Habeas Corpus (Federal)

Date Filed: 03/18/2025
Jury Demand: None
Nature of Suit: 463 Habeas Corpus − Alien Detainee
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2025 | 1 | PETITION for Writ of Habeas Corpus ( Filing fee $ 5 receipt number AVAEDC−10069292.), filed by Badar Khan Suri. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Order)(Ahmad, Hassan) (Additional attachment(s) added on 3/20/2025: # 3 Prisoner Data Sheet) (swil, ). (Entered: 03/18/2025) |
| 03/18/2025 | | Initial Case Assignment to District Judge Patricia Tolliver Giles and US Magistrate Judge William B. Porter. (swil) (Entered: 03/20/2025) |
| 03/20/2025 | 2 | NOTICE of Appearance by Sophia Leticia Gregg on behalf of Badar Khan Suri (Gregg, Sophia) (Entered: 03/20/2025) |
| 03/20/2025 | 3 | NOTICE of Appearance by Vishal Mahendra Agraharkar on behalf of Badar Khan Suri (Agraharkar, Vishal) (Entered: 03/20/2025) |
| 03/20/2025 | 4 | NOTICE of Appearance by Eden Brooke Heilman on behalf of Badar Khan Suri (Heilman, Eden) (Entered: 03/20/2025) |
| 03/20/2025 | 5 | MOTION to compel respondents to return petitioner to this district by Badar Khan Suri. (Attachments: # 1 Proposed Order)(Heilman, Eden) (Entered: 03/20/2025) |
| 03/20/2025 | 6 | Memorandum in Support re 5 MOTION to compel respondents to return petitioner to this district filed by Badar Khan Suri. (Attachments: # 1 Exhibit 1)(Heilman, Eden) (Entered: 03/20/2025) |
| 03/20/2025 | 7 | ORDER that Petitioner shall not be removed from the United States unless and until the Court issues a contrary order. 28 U.S.C. § 1651; F.T.C. v. Dean Foods Co., 384 U.S. 597, 603 (1966) ("The All Writs Act, 28 U.S.C. § 1651(a), empowers the federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.") (see Order for details). Signed by District Judge Patricia Tolliver Giles on 03/20/25. (pmil, ) (Entered: 03/20/2025) |
| 03/20/2025 | 8 | NOTICE of Appearance by Yamileth Davila on behalf of Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump (Davila, Yamileth) (Entered: 03/20/2025) |
| 03/20/2025 | 9 | NOTICE of Appearance by David J. Byerley on behalf of Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump (Byerley, David) (Entered: 03/20/2025) |
| 03/20/2025 | 10 | NOTICE of Appearance by Elizabeth Anne Spavins on behalf of Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump (Spavins, Elizabeth) (Entered: 03/20/2025) |
| 03/21/2025 | 11 | NOTICE of Appearance by Christian James Cooper on behalf of Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump (Cooper, Christian) (Entered: 03/21/2025) |
| 03/22/2025 | 12 | Proposed Summons re 1 Petition for Writ of Habeas Corpus (2241), by Badar Khan Suri (Gregg, Sophia) (Entered: 03/22/2025) |
| 03/24/2025 | 13 | Motion to appear Pro Hac Vice by Nermeen Saba Arastu and Certification of Local Counsel Sophia Leticia Gregg Filing fee $ 75, receipt number AVAEDC−10078310. by Badar Khan Suri. (Gregg, Sophia) (Entered: 03/24/2025) |

| 03/24/2025 | 14 | ORDERED that Petitioner's Motion to appear pro hac vice (Dkt. 13) is DENIED without prejudice to allow Petitioner's counsel time to submit a completed form (see Order for further details). Signed by District Judge Patricia Tolliver Giles on 3/24/2025. (swil) (Entered: 03/24/2025) |
|---|---|---|
| 03/25/2025 | 15 | Motion to appear Pro Hac Vice by Nermeen Saba Arastu and Certification of Local Counsel Sophia Leticia Gregg by Badar Khan Suri. (Gregg, Sophia) (Entered: 03/25/2025) |
| 03/25/2025 | 16 | ORDER that Respondent's are **DIRECTED** to file a response to Petitioner's 5 MOTION to compel respondents to return petitioner to this district on or before close of business on 04/01/2025. Signed by District Judge Patricia Tolliver Giles on 03/25/25. (pmil, ) (Entered: 03/25/2025) |
| 03/25/2025 | 17 | ORDER granting 15 Motion for Pro hac vice Appointed Nermeen Saba Arastu for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 3/25/2025. (swil) (Entered: 03/25/2025) |
| 03/27/2025 | 18 | NOTICE of Appearance by Geri Greenspan on behalf of Badar Khan Suri (Greenspan, Geri) (Entered: 03/27/2025) |
| 03/27/2025 | 19 | Notice of Hearing Date re 5 MOTION to compel respondents to return petitioner to this district (Gregg, Sophia) (Entered: 03/27/2025) |
| 03/27/2025 | | Notice of Correction in re 19 Notice of Hearing Date. The filing user has been notified to refile the notice of hearing which requests a Thursday date. (triv) (Entered: 03/27/2025) |
| 03/27/2025 | 20 | MOTION for Release on Bond by Badar Khan Suri. (Attachments: # 1 Proposed Order)(Heilman, Eden) (Entered: 03/27/2025) |
| 03/27/2025 | 21 | Memorandum in Support re 20 MOTION for Release on Bond filed by Badar Khan Suri. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Heilman, Eden) (Entered: 03/27/2025) |
| 03/28/2025 | 22 | Consent MOTION to Expedite *Briefing and Consideration* by Badar Khan Suri. (Attachments: # 1 Proposed Order)(Heilman, Eden) (Entered: 03/28/2025) |
| 03/31/2025 | 23 | ORDER that the parties' 22 Consent Motion for Expedited Briefing and Consideration is **GRANTED** in part and **DENIED** in part; Respondents file their responsive filing to Petitioner's 20 Motion for Release on Bond on or before the close of business on 04/03/2025; Petitioner file his reply briefs to Respondent's filings to Petitioner's 20 Motion for Release on Bond and Petitioner's 5 Motion to Compel Respondents to Return Petitioner to this District on or before the close of business on 04/08/2025; the Court will conduct a hearing on Petitioner's 20 Motion for Release on Bond and Petitioner's 5 Motion to Compel Respondents to Return Petitioner to this District on 04/11/2025, at 11:00 a.m. Signed by District Judge Patricia Tolliver Giles on 03/31/25. (pmil, ) (Entered: 03/31/2025) |
| 03/31/2025 | | Set Deadlines as to 20 MOTION for Release on Bond, 5 MOTION to compel respondents to return petitioner to this district. Motion Hearing set for 4/11/2025 at 11:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles. (pmil, ) (Entered: 03/31/2025) |
| 04/01/2025 | 24 | MOTION to Dismiss by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Spavins, Elizabeth) (Entered: 04/01/2025) |
| 04/01/2025 | 25 | MOTION to Transfer Case by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Spavins, Elizabeth) (Entered: 04/01/2025) |
| 04/01/2025 | 26 | Memorandum in Support re 24 MOTION to Dismiss , 25 MOTION to Transfer Case filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Attachments: # 1 Exhibit 1)(Spavins, Elizabeth) (Entered: 04/01/2025) |
| 04/01/2025 | 27 | Notice of Hearing Date set for May 1, 2025 re 24 MOTION to Dismiss , 25 MOTION to Transfer Case (Spavins, Elizabeth) (Entered: 04/01/2025) |
| 04/01/2025 | 28 | Opposition to 5 MOTION to compel respondents to return petitioner to this district filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald |

| | | |
|---|---|---|
| | | Trump. (Attachments: # 1 Exhibit)(Spavins, Elizabeth) (Entered: 04/01/2025) |
| 04/03/2025 | | Motion Hearing set for 5/1/2025 at 10:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles as to 24 MOTION to Dismiss and 25 MOTION to Transfer Case. (jlan) (Entered: 04/03/2025) |
| 04/03/2025 | 29 | RESPONSE in Opposition re 20 MOTION for Release on Bond filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Spavins, Elizabeth) (Entered: 04/03/2025) |
| 04/03/2025 | 30 | Declaration re 29 Response in Opposition to Motion *of Yousuf Khan (April 3, 2025)* by Pamela Bondi, Jeffrey Crawford, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Byerley, David) (Entered: 04/03/2025) |
| 04/04/2025 | 31 | ORDERED that Petitioners are DIRECTED to address Respondents' jurisdictional arguments in their replies to Respondents' oppositions (see Order for further details). Signed by District Judge Patricia Tolliver Giles on 4/4/2025. (swil) (Entered: 04/04/2025) |
| 04/07/2025 | 32 | MOTION To Modify Briefing and Hearing Schedule re 31 Order by Badar Khan Suri. (Attachments: # 1 Proposed Order)(Greenspan, Geri) (Entered: 04/07/2025) |
| 04/07/2025 | 33 | ORDERED that Petitioner's Motion to Amend Briefing and Hearing Schedule (Dkt. 32) is GRANTED in part and DENIED in part; it is further ORDERED that Petitioner will respond to Respondents' Motion to Dismiss (Dkt. 24) and Motion to Transfer (Dkt. 25) on or before the close of business on April 15, 2025, and Respondents will file any reply on or before the close of business on April 21, 2025; it is further ORDERED that the hearing on Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 28) and Motion for Release on Bond (Dkt. 29) currently scheduled for April 11, 2025, is TERMINATED; and it is further ORDERED that the Court will conduct a hearing on Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5), Petitioner's Motion for Release on Bond (Dkt. 20), Respondents' Motion to Dismiss (Dkt. 24), and Respondents' Motion to Transfer (Dkt. 25) on May 1, 2025, at 1:00 p.m. Signed by District Judge Patricia Tolliver Giles on 04/07/2025. (jlan) (Entered: 04/07/2025) |
| 04/07/2025 | | Motion Hearing set for 5/1/2025 at 01:00 PM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles as to 5 MOTION to compel respondents to return petitioner to this district, 20 MOTION for Release on Bond, 24 MOTION to Dismiss and 25 MOTION to Transfer Case. (jlan) (Entered: 04/07/2025) |
| 04/08/2025 | 34 | AMENDED Petition *for Writ of Habeas Corpus and Complaint* against Pamela Bondi, Jeffrey Crawford, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump, filed by Badar Khan Suri.(Heilman, Eden) (Entered: 04/08/2025) |
| 04/08/2025 | 35 | Reply to 28 Opposition, 5 MOTION to compel respondents to return petitioner to this district filed by Badar Khan Suri. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Heilman, Eden) (Entered: 04/08/2025) |
| 04/08/2025 | 36 | Reply to 29 Response in Opposition to Motion *to Release on Bond* filed by Badar Khan Suri. (Heilman, Eden) (Entered: 04/08/2025) |
| 04/10/2025 | 37 | Motion to appear Pro Hac Vice by Diala Shamas and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10116003. by Badar Khan Suri. (Heilman, Eden) (Entered: 04/10/2025) |
| 04/10/2025 | 38 | MOTION to Amend/Correct 37 Motion to appear Pro Hac Vice by Diala Shamas and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10116003. by Badar Khan Suri. (Heilman, Eden) (Entered: 04/10/2025) |
| 04/10/2025 | 39 | Motion to appear Pro Hac Vice by Astha Sharma Pokharel and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10116053. by Badar Khan Suri. (Heilman, Eden) (Entered: 04/10/2025) |
| 04/10/2025 | 40 | Motion to appear Pro Hac Vice by Baher Azmy and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10116061. by Badar Khan Suri. (Heilman, Eden) (Entered: 04/10/2025) |

| | | |
|---|---|---|
| 04/10/2025 | 41 | Motion to appear Pro Hac Vice by Jessica Myers Vosburgh and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10116068. by Badar Khan Suri. (Heilman, Eden) (Entered: 04/10/2025) |
| 04/11/2025 | 42 | ORDER granting 38 Motion for Pro hac vice. Appointed Diana Shamas for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 4/11/2025. (kgall) (Entered: 04/11/2025) |
| 04/11/2025 | 43 | ORDER granting 39 Motion for Pro hac vice. Appointed Astha S Pokharel for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 4/11/2025. (kgall) (Entered: 04/11/2025) |
| 04/11/2025 | 44 | ORDER granting 40 Motion for Pro hac vice. Appointed Baher Azmy for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 4/11/2025. (kgall) (Entered: 04/11/2025) |
| 04/11/2025 | 45 | ORDER granting 41 Motion for Pro hac vice. Appointed Jessica M Vosburgh for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 4/11/2025. (kgall) (Entered: 04/11/2025) |
| 04/14/2025 | 46 | Motion to appear Pro Hac Vice by Samah Sisay and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10120606. by Badar Khan Suri. (Heilman, Eden) (Entered: 04/14/2025) |
| 04/15/2025 | 47 | Memorandum in Opposition re 24 MOTION to Dismiss , 25 MOTION to Transfer Case filed by Badar Khan Suri. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Heilman, Eden) (Entered: 04/15/2025) |
| 04/21/2025 | 48 | ORDER granting 46 Motion for Pro hac vice Appointed Samah Sissay for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 4/21/2025. (swil) (Entered: 04/21/2025) |
| 04/21/2025 | 49 | REPLY to Response to Motion re 24 MOTION to Dismiss , 25 MOTION to Transfer Case filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Attachments: # 1 Exhibit)(Spavins, Elizabeth) (Entered: 04/21/2025) |
| 04/22/2025 | 50 | NOTICE by Badar Khan Suri *of Supplemental Authority* (Attachments: # 1 Exhibit Ozturk Order 4.18.2025)(Heilman, Eden) (Entered: 04/22/2025) |
| 04/30/2025 | 51 | NOTICE by Badar Khan Suri *of Supplemental Authority* (Attachments: # 1 Exhibit Mahdawi v. Trump 4.30.25 Order, # 2 Exhibit Khalil v. Joyce 4.29.25 Order, # 3 Exhibit AAUP v. Rubio 4.29.25 Order)(Heilman, Eden) (Entered: 04/30/2025) |
| 04/30/2025 | 52 | Letter *Request to Lift the Limitations on Electronic Filings*. (Heilman, Eden) (Entered: 04/30/2025) |
| 04/30/2025 | 53 | MOTION Provide Telephonic Access by Badar Khan Suri. (Greenspan, Geri) (Entered: 04/30/2025) |
| 05/01/2025 | 54 | Minute Entry for proceedings held before District Judge Patricia Tolliver Giles: Motions Hearing held on 5/1/2025.<br>Appearances of Counsel for Petitioner and Counsel for Respondents.<br>RE: 5 MOTION to compel respondents to return petitioner to this district filed by Badar Khan Suri, 20 MOTION for Release on Bond filed by Badar Khan Suri, 24 MOTION to Dismiss filed by Kristi Noem, Donald Trump, Russell Hott, Marco Rubio, Todd Lyons, Pamela Bondi, 25 MOTION to Transfer Case filed by Kristi Noem, Donald Trump, Russell Hott, Marco Rubio, Todd Lyons, Pamela Bondi. Arguments heard on pending motions and the Court DIRECTS counsel for Respondents to file Answers to the questions posed by the Court by 5:00 p.m. Friday, May 2, 2025. Petitioners counsel may file any Response by 5:00 p.m. Saturday, May 3, 2025.<br>Court Reporter: S. Wallace (pmil, ) (Entered: 05/01/2025) |
| 05/01/2025 | 55 | ORDER, as stated from the bench, Respondents are **DIRECTED** to submit a supplemental filing addressing the questions the Court raised at the hearing no later than 5:00 p.m. on 05/02/2025; Petitioner may file any response to the supplemental filing no later than 5:00 p.m. on 05/03/2025 (see Order for details). Signed by District Judge Patricia Tolliver Giles on 05/01/25. (pmil, ) (Entered: 05/01/2025) |

| | | |
|---|---|---|
| 05/02/2025 | 56 | NOTICE of Appearance by Tom Benjamin Scott−Sharoni on behalf of Pamela Bondi, Jeffrey Crawford, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump (Scott−Sharoni, Tom) (Entered: 05/02/2025) |
| 05/02/2025 | 57 | NOTICE by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump re 55 Order, *of Submission* (Attachments: # 1 Exhibit Declaration)(Cooper, Christian) (Entered: 05/02/2025) |
| 05/03/2025 | 58 | Response to 57 NOTICE, 55 Order, filed by Badar Khan Suri. (Agraharkar, Vishal) (Entered: 05/03/2025) |
| 05/06/2025 | 59 | MEMORANDUM OPINION in re 24 MOTION to Dismiss and 25 MOTION to Transfer Case. Signed by District Judge Patricia Tolliver Giles on 05/06/2025. (jlan) (Entered: 05/06/2025) |
| 05/06/2025 | 60 | ORDERED that Respondents' Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are DENIED; it is further ORDERED that the Court will set a hearing on Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20) for May 14, 2025, at 10:00 a.m.; and it is further ORDERED that the parties shall file any supplemental filings related to Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20) to the extent necessary to address any additional claims in the Amended Petition and Complaint (Dkt. 34) on or before May 12, 2025, at 12:00 p.m. Signed by District Judge Patricia Tolliver Giles on 05/06/2025. (jlan) (Entered: 05/06/2025) |
| 05/06/2025 | | Motion Hearing set for 5/14/2025 at 10:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles as to 5 MOTION to compel respondents to return petitioner to this district and 20 MOTION for Release on Bond. (jlan) (Entered: 05/06/2025) |
| 05/09/2025 | 61 | MOTION for Telephonic Access to Hearing by Badar Khan Suri. (Greenspan, Geri) (Entered: 05/09/2025) |
| 05/12/2025 | 62 | NOTICE by Badar Khan Suri re 60 Order on Motion to Dismiss,,,, Order on Motion to Transfer Case,,, *Supplemental Filing* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Heilman, Eden) (Entered: 05/12/2025) |
| 05/12/2025 | 63 | Response to 60 Order on Motion to Dismiss,,,, Order on Motion to Transfer Case,,, filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Spavins, Elizabeth) (Entered: 05/12/2025) |
| 05/14/2025 | 64 | Minute Entry for proceedings held before District Judge Patricia Tolliver Giles: Motions Hearing held on 5/14/2025.<br>Appearances of Counsel for Petitioner and Counsel for Respondents.<br>RE: 20 MOTION for Release on Bond filed by Badar Khan Suri − MATTER ARGUED AND GRANTED; 5 MOTION to compel respondents to return petitioner to this district filed by Badar Khan Suri − DENIED AS MOOT; Respondents Oral Motion to Stay Release DENIED. ORDER TO FOLLOW.<br>Court Reporter: S. Wallace (pmil, ) (Entered: 05/14/2025) |
| 05/14/2025 | 65 | ORDER, for the reasons stated in open court, Petitioner's 20 Motion for Release on Bond is **GRANTED** and Petitioner's 5 Motion to Compel Respondents to Return Petitioner to this District is **DENIED** as moot; Petitioner Dr. Khan Suri is to be immediately released on his personal recognizance during the pendency of his habeas proceedings subject to the following conditions: (see Order for details); Respondents shall not attempt to re−detain Petitioner without providing 48−hours notice to the Court and Petitioner's counsel; Respondent's request to stay this Court's decision pending appeal is **DENIED**. Signed by District Judge Patricia Tolliver Giles on 05/14/25. (pmil, ) (Entered: 05/14/2025) |
| 05/15/2025 | 66 | NOTICE OF APPEAL as to 7 Order,, 65 Order on Motion for Miscellaneous Relief,,,,, by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Spavins, Elizabeth) (Entered: 05/15/2025) |
| 05/16/2025 | 68 | Letter to the Court by Jonah Valdez. (Attachments: # 1 Envelope)(swil) (Entered: 05/19/2025) |

| 05/19/2025 | 67 | Transmission of Notice of Appeal to US Court of Appeals re 66 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (swil) (Entered: 05/19/2025) |
|---|---|---|
| 05/19/2025 | 69 | USCA Case Number 25−1560, case manager Kirsten Hancock 4th Circuit for 66 Notice of Appeal filed by Kristi Noem, Donald Trump, Russell Hott, Marco Rubio, Todd Lyons, Pamela Bondi. (swil) (Entered: 05/19/2025) |
| 06/03/2025 | 70 | TRANSCRIPT of proceedings for dates of 5−1−25, before Judge Patricia Tolliver Giles, re 66 Notice of Appeal Court Reporter/Transcriber Scott Wallace, Telephone number 202 277−3739. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/3/2025. Redacted Transcript Deadline set for 8/4/2025. Release of Transcript Restriction set for 9/1/2025.(wallace, scott) (Entered: 06/03/2025)** |
| 06/03/2025 | 71 | TRANSCRIPT of proceedings for dates of 5−14−25, before Judge Patricia Tolliver Giles, re 66 Notice of Appeal Court Reporter/Transcriber Scott Wallace, Telephone number 202 277−3739. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/3/2025. Redacted Transcript Deadline set for 8/4/2025. Release of Transcript Restriction set for 9/1/2025.(wallace, scott) (Entered: 06/03/2025)** |
| 06/10/2025 | 72 | MOTION for Leave to File *Second Amended Complaint* by Badar Khan Suri. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order)(Heilman, Eden) (Entered: 06/10/2025) |
| 06/17/2025 | 73 | Withdrawal of Motion by Badar Khan Suri re 72 MOTION for Leave to File *Second Amended Complaint* (Heilman, Eden) (Entered: 06/17/2025) |
| 06/23/2025 | 74 | Motion to appear Pro Hac Vice by Brian Hauss and Certification of Local Counsel Sophia Leticia Gregg Filing fee $ 75, receipt number AVAEDC−10251008. by Badar Khan Suri. (Gregg, Sophia) (Entered: 06/23/2025) |
| 06/23/2025 | 75 | Motion to appear Pro Hac Vice by Michael King Thomas Tan and Certification of Local Counsel Sophia Leticia Gregg Filing fee $ 75, receipt number AVAEDC−10251047. by Badar Khan Suri. (Gregg, Sophia) (Entered: 06/23/2025) |
| 06/23/2025 | 76 | Motion to appear Pro Hac Vice by Brett Max Kaufman and Certification of Local Counsel Sophia Leticia Gregg Filing fee $ 75, receipt number AVAEDC−10251073. by Badar Khan Suri. (Gregg, Sophia) (Entered: 06/23/2025) |
| 06/23/2025 | 77 | Motion to appear Pro Hac Vice by Scarlet Kim and Certification of Local Counsel Sophia Leticia Gregg Filing fee $ 75, receipt number AVAEDC−10251081. by Badar Khan Suri. (Gregg, Sophia) (Entered: 06/23/2025) |
| 06/23/2025 | 78 | MOTION for Leave to File *Second Amended Petition for Writ of Habeas Corpus and Complaint* by Badar Khan Suri. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order)(Heilman, Eden) (Entered: 06/23/2025) |
| 06/23/2025 | 79 | MOTION for Preliminary Injunction by Badar Khan Suri. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Proposed Order)(Heilman, Eden) (Entered: 06/23/2025) |

| | | |
|---|---|---|
| 06/23/2025 | 80 | MOTION to Expedite *Briefing on Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint and Motion for Preliminary Injunction* by Badar Khan Suri. (Attachments: # 1 Proposed Order)(Heilman, Eden) (Entered: 06/23/2025) |
| 06/24/2025 | | Notice of Correction re 80 MOTION to Expedite *Briefing on Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint and Motion for Preliminary Injunction*, 78 MOTION for Leave to File *Second Amended Petition for Writ of Habeas Corpus and Complaint*, 79 MOTION for Preliminary Injunction. The filing user has been notified to file a Notice of Hearing or Notice of Waiver of Oral Argument. (swil) (Entered: 06/24/2025) |
| 06/24/2025 | 81 | NOTICE by Badar Khan Suri re 78 MOTION for Leave to File *Second Amended Petition for Writ of Habeas Corpus and Complaint Waiver of Oral Argument* (Heilman, Eden) (Entered: 06/24/2025) |
| 06/24/2025 | 82 | Notice of Hearing Date re 79 MOTION for Preliminary Injunction (Heilman, Eden) (Entered: 06/24/2025) |
| 06/24/2025 | 83 | NOTICE by Badar Khan Suri re 80 MOTION to Expedite *Briefing on Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint and Motion for Preliminary Injunction − Waiver of Oral Argument* (Heilman, Eden) (Entered: 06/24/2025) |
| 06/24/2025 | 84 | ORDER granting in part 80 MOTION to Expedite *Briefing on Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint and Motion for Preliminary Injunction*, filed by Badar Khan Suri. ORDERED as follow. 1. Respondents must file a response to the Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint by June 27, 2025. 2. Petitioner may file a reply to Respondents response on or before June 30, 2025. 3. Oral argument on the Motion will take place in Courtroom 400 at 10:00 a.m., on July 2, 2025. The district judge will set a briefing schedule on Petitioners Motion for Preliminary Injunction later. Signed by US Magistrate Judge William B. Porter on 6/24/2025. (Dest) (Entered: 06/24/2025) |
| 06/24/2025 | | Set Deadlines as to 80 MOTION to Expedite *Briefing on Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint and Motion for Preliminary Injunction*. Motion Hearing set for 7/2/2025 at 10:00 AM in Alexandria Courtroom 400 before US Magistrate Judge William B. Porter. (Dest) (Entered: 06/24/2025) |
| 06/25/2025 | 85 | ORDERED that Petitioner's Motion for Expedited Briefing on his Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Complaint and Motion for Preliminary Injunction (Dkt. 80) is DENIED as to the Motion for Preliminary Injunction (Dkt. 79). The parties may brief the motion in accordance with Local Rule 7(F); it is further ORDERED that the hearing currently scheduled for Wednesday, July 16, 2025, at 10:00 a.m. will be RESET to Wednesday, August 6, 2025, at 9:00 a.m. Signed by District Judge Patricia Tolliver Giles on 06/25/2025. (jlan) (Entered: 06/25/2025) |
| 06/25/2025 | | Motion Hearing set for 8/6/2025 at 09:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles as to 79 MOTION for Preliminary Injunction. (jlan) (Entered: 06/25/2025) |
| 06/26/2025 | 86 | RESPONSE to Motion re 78 MOTION for Leave to File *Second Amended Petition for Writ of Habeas Corpus and Complaint* filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Byerley, David) (Entered: 06/26/2025) |
| 06/30/2025 | 87 | ORDER granting 74 Motion for Pro hac vice Appointed Brian Matthew Hauss for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 6/30/2025. (swil) (Entered: 06/30/2025) |
| 06/30/2025 | 88 | ORDER granting 75 Motion for Pro hac vice Appointed Michael King Thomas Tan for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 6/30/2025. (swil) (Entered: 06/30/2025) |

| 06/30/2025 | 89 | ORDER granting 76 Motion for Pro hac vice Appointed Brett Max Kaufman for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 6/30/2025. (swil) (Entered: 06/30/2025) |
|---|---|---|
| 06/30/2025 | 90 | ORDER granting 77 Motion for Pro hac vice Appointed Scarlet Kim for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 6/30/2025. (swil) (Entered: 06/30/2025) |
| 06/30/2025 | 91 | ORDERED that the 78 Motion is GRANTED; and it is further ORDERED that Petitioner must file his Second Amended Petition for Writ of Habeas Corpus and Complaint (ECF No. 78−1) on the docket as a new entry; and it is further ORDERED that the July 2, 2025, hearing on the Motion is cancelled. Signed by US Magistrate Judge William B. Porter on 6/30/2025. (Dcrow, ) (Entered: 06/30/2025) |
| 06/30/2025 | 92 | AMENDED Petition *and Complaint* against Pamela Bondi, Jeffrey Crawford, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump, filed by Badar Khan Suri.(Greenspan, Geri) (Entered: 06/30/2025) |
| 07/07/2025 | 93 | MOTION for Extension of Time to File Response/Reply as to 79 MOTION for Preliminary Injunction by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Byerley, David) (Entered: 07/07/2025) |
| 07/08/2025 | 94 | ORDERED that Respondents' motion (Dkt. 93) is GRANTED in part and DENIED in part. Respondents' deadline to respond to the Motion for a Preliminary Injunction is extended to July 14, 2025. Signed by District Judge Patricia Tolliver Giles on 7/8/2025. (kgall) (Entered: 07/08/2025) |
| 07/10/2025 | 95 | MOTION to Withdraw as Attorney by Pamela Bondi, Jeffrey Crawford, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Attachments: # 1 Proposed Order)(Scott−Sharoni, Tom) (Entered: 07/10/2025) |
| 07/11/2025 | 96 | ORDERED that the Motion is GRANTED; and it is further ORDERED that Tom B. Scott−Sharoni is granted leave to withdraw as counsel for Respondents re 95 Motion to Withdraw as Attorney. Attorney Tom Benjamin Scott−Sharoni terminated. Signed by US Magistrate Judge William B. Porter on 7/11/2025. (Sbro, ) (Entered: 07/11/2025) |
| 07/11/2025 | 97 | ORDER of USCA as to 66 Notice of Appeal filed by Kristi Noem, Donald Trump, Russell Hott, Marco Rubio, Todd Lyons, Pamela Bondi. The court grants the motion to withdraw from further representation on appeal. (Sbro, ) (Entered: 07/11/2025) |
| 07/14/2025 | 98 | RESPONSE in Opposition re 79 MOTION for Preliminary Injunction filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Cooper, Christian) (Entered: 07/14/2025) |
| 07/15/2025 | 99 | RESPONSE in Opposition re 79 MOTION for Preliminary Injunction *(Corrected with Declarations Attached)* filed by Pamela Bondi, Russell Hott, Todd Lyons, Kristi Noem, Marco Rubio, Donald Trump. (Attachments: # 1 Exhibit Declaration of Rebecca Pasini, # 2 Exhibit Declaration of Stuart R. Wilson)(Cooper, Christian) (Entered: 07/15/2025) |
| 07/16/2025 | 100 | Motion to appear Pro Hac Vice by Noor Zafar and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10292034. by Badar Khan Suri. (Heilman, Eden) (Entered: 07/16/2025) |
| 07/16/2025 | 101 | Motion to appear Pro Hac Vice by Sidra Mahfooz and Certification of Local Counsel Eden Heilman Filing fee $ 75, receipt number AVAEDC−10292045. by Badar Khan Suri. (Heilman, Eden) (Entered: 07/16/2025) |
| 07/17/2025 | 102 | ORDER granting 100 Motion for Pro hac vice Appointed Noor Zafar for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 7/17/2025. (swil) (Entered: 07/17/2025) |
| 07/17/2025 | 103 | ORDER granting 101 Motion for Pro hac vice Appointed Sidra Mahfooz for Badar Khan Suri. Signed by District Judge Patricia Tolliver Giles on 7/17/2025. (swil) (Entered: 07/17/2025) |

| | | |
|---|---|---|
| 07/21/2025 | 104 | ORDERED that the hearing on Petitioner's Motion for Preliminary Injunction (Dkt. 79) currently scheduled for Wednesday, August 6, 2025, at 9:00 a.m. will be RESET to Friday, August 8, 2025, at 11:00 a.m. Signed by District Judge Patricia Tolliver Giles on 7/21/2025. (kgall) (Entered: 07/21/2025) |
| 07/21/2025 | | Reset Deadlines as to 79 MOTION for Preliminary Injunction. Motion Hearing set for 8/8/2025 at 11:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles. (kgall) (Entered: 07/21/2025) |
| 07/21/2025 | 105 | Reply to 99 Response in Opposition to Motion, filed by Badar Khan Suri. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Heilman, Eden) (Entered: 07/21/2025) |
| 07/31/2025 | 106 | STIPULATION re 79 MOTION for Preliminary Injunction by Badar Khan Suri. (Heilman, Eden) (Entered: 07/31/2025) |
| 08/05/2025 | 107 | STIPULATION OF SETTLEMENT AND ORDER as to the terms and conditions to which the parties have stipulated and the Motion Hearing on Petitioner's 79 Motion for Preliminary Injunction previously set for 08/08/2025, is **CANCELLED** (see Stipulation and Order for details). Signed by District Judge Patricia Tolliver Giles on 08/05/25. (pmil, ) (Entered: 08/05/2025) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI, | |
| *Petitioner*, | Case No. 1:25-cv-480 |
| v. | |
| Donald J. TRUMP, in his official capacity as President of the United States; | **PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT** |
| Russell HOTT, in his official capacity as Field Office Director of Washington, Immigration and Customs Enforcement; | |
| Jeffrey CRAWFORD, in his official capacity as Warden of Farmville Detention Center; | |
| Todd LYONS, Acting Director, U.S. Immigration and Customs Enforcement; | |
| Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; | |
| Marco RUBIO, in his official capacity as Secretary of State; and | |
| Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | |
| *Respondents*. | |

## INTRODUCTION

1.    This case concerns the government's targeted, retaliatory detention and attempted removal of a postdoctoral fellow at Georgetown University based on his family connections and constitutionally protected free speech. Petitioner Badar Khan Suri is a citizen and national of India, and is in the United States in lawful status as a visiting scholar pursuant to lawful admission. The Trump administration has openly expressed its intention to weaponize immigration law to punish noncitizens whose views are

deemed critical of U.S. policy as it relates to Israel. In this case, the government appears to be targeting Mr. Suri, a noncitizen, due to his U.S. citizen wife's identity as a Palestinian and her constitutionally protected speech.

2.     On March 17, 2025, Badar Khan Suri, a J-1 visa holder, was arrested and charged with removability under 8 U.S.C. §1227(a)(4)(C) and detained. This was done pursuant to a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Suri solely for their family ties to those who may have either expressed criticism of U.S. foreign policy as it relates to Israel, or who are perceived to hold such critical views imputed to them due to familial relationship. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that such individuals' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and remove such individuals from the United States.

3.     Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Suri (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Suri's lawful activity protected by the First Amendment, his wife's lawful activity protected by the First Amendment, and his wife's familial relationship. Neither Secretary Rubio nor any other government official has alleged that Mr. Suri has committed any crime or, indeed, broken any law whatsoever.

4.     Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Suri, detain him, and place him in removal proceedings. On the evening of March 17, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Suri with no prior notice at his home and initiated proceedings to remove him from

this country.

5.  Mr. Suri is, upon information and belief, detained at Farmville Detention Center in Farmville, VA, Prince Edward County. He is at imminent risk of being moved to a detention facility in Los Fresnos, Texas, on the Mexican border.

6.  Mr. Suri lives in Rosslyn, Virginia. On March 17, 2025, he was coming back home from iftar. Law enforcement agents surrounded him outside of his building.  Mr. Suri called his wife, Mapheze Saleh, immediately. The agents identified themselves as members of the Department of Homeland Security and stated that the government had revoked his visa.

7.  Mr. Suri asked that his wife be allowed to bring his passport and documents from inside the home. Ms. Saleh brought the documents and stood with Mr. Suri and multiple agents outside for about 10 minutes. The agents had face coverings, and Ms. Saleh could only see their eyes. The officers took Mr. Suri's passport and DS-2019 form, but they did not permit his wife to hand over the passport or other documents directly to Petitioner. Approximately two hours later, Mr. Suri called Ms. Saleh to state he was being transferred to a detention center in Farmville, VA. Mr. Suri and Ms. Saleh have three children.

8.  Mr. Suri and his U.S. Citizen wife, Mapheze Saleh, have long been doxxed and smeared. Ms. Saleh is featured with her photograph and academic affiliation on the anonymously-run blacklisting site, The Canary Mission, which includes her former employment at Al Jazeera and her city of birth, Gaza City, as support for her alleged ties with Hamas. The Canary Mission website maintains a blacklist of individuals perceived to support Palestinian rights and is infamous for bullying, slandering, and defaming academics and students. In addition, Mr. Suri and Ms. Saleh have been smeared by Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a

lobbying and media monitoring group that spreads misinformation and seeks to discredit American Muslims.

9. The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Suri, and plans to whisk him 1,600 miles away in the same manner as the government did in the case of Mr. Mahmoud Khalil, isolating him from his wife, children, community, and legal team, are plainly intended as retaliation and punishment for Mr. Suri's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Suri's lawful and protected speech. The Rubio Determination and Mr. Suri's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious, contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Suri's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

10. Petitioner Badar Khan Suri is a citizen and national of India. He is married to a U.S. citizen, and is in the United States in J-1 status as a visiting scholar after having been duly admitted. He is currently teaching a course on Majoritarianism & Minority Rights in South Asia and as a postdoctoral fellow. He hopes to become a university professor and embark on a career in academia and teaching. Petitioner has no criminal record and is not being charged with any crime.

11.     Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

12.     Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

13.     Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner is detained. In this capacity, he is responsible for the immediate execution of detention over Petitioner and is the immediate custodian of Petitioner. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

14.     Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

15.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland

Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

16.   Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

17.   Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

**JURISDICTION & VENUE**

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

19.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

20.     Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Suri was being held in Farmville, VA, when this habeas was initiated. At the time of filing, the detainee locator failed to update Mr. Suri's location. However, upon information and belief, Mr. Suri is, at the moment of this filing, physically within the Commonwealth of Virginia.

## FACTS

### *The Trump Administration's Hostile Campaign Against Palestinians and Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech*

21.     In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. These campus protests resulted in opponents of these students' messages—including President Donald J. Trump—to characterize campus speech in favor of Palestinian rights as inherently supportive of

Hamas and antisemitic. For example, in several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

22.    During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestine activities on university campuses.

23.    For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

24.    In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[1]

25.    Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

---

[1] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis")

*President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors*

26.    Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

27.    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

28.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [*sic*] who participated in pro-jihadist protests" that the federal government "will find you… and

deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

29.    In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

30.    Earlier this month, media reports described widespread fear of retaliation for pro-Palestine speech among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."

31.    On or before March 7, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Suri for his family relationship and constitutionally protected free speech. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that such individuals' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport such individuals.

32.    In the days since Mr. Khalil's arrest, there have been reports of other instances of visa revocations of individuals purportedly based on their participation in Palestine-related speech. On March 13, Secretary of Homeland Security Kristi Noem announced that another Columbia student, Ranjani Srinivasan, who had participated in student protests on Columbia University's campus had her student visa revoked, and a third individual,

JA019

Leqaa Kordia, who had been arrested on Columbia's campus in April 2024, was arrested by ICE.

33. Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

34. The Rubio Determination was exclusively motivated by Mr. Suri's family relationship and constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. 1227(a)(4)(C)(i), establish that Respondents are punishing, detaining, and attempting to silence Mr. Suri.

35. The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

36. Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years,

the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

37.    Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of the First Amendment to the United States Constitution**

38.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

JA021

39.    The Rubio Determination and Policy Mr. Suri's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

- retaliate against and punish Mr. Suri for his or his wife's past protected speech, or speech imputed to him or his wife as a result of his family relationship;

- prevent him from speaking now (through detention);

- attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

- deprive audiences of his present and future speech on matters of public concern; and

- chill other individuals who express support for Palestinian rights.

40.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Suri and those similarly situated, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

**SECOND CLAIM**
**Violation of the Due Process Clause of the Fifth Amendment to the**
**United States Constitution**

41.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

42.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

43.    The government's detention of Mr. Suri is wholly unjustified. The government has

not demonstrated that Mr. Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Suri cannot be safely released back to his family.

44.    Moreover, Mr. Suri's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

45.    The Policy and the Rubio Determination also violate Mr. Suri's right to due process. The government's policy of Foreign Policy Ground making such determinations concerning people like Mr. Suri—who is in valid J-1 status, living peacefully in the country is unconstitutionally vague where it is due to perceived or actual constitutionally protected free speech and familial relationships.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

46.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment-protected

speech advocating for Palestinian rights, including the speech of close family members. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM

### Release on Bail Pending Adjudication

47. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

48. Under 28 U.S.C.A. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C.A. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010)

49. This petition raises numerous substantial constitutional and statutory claims challenging Mr. Suri's retaliatory detention. Extraordinary circumstances exist that make Mr. Suri's release essential for the remedy to be effective. His detention prevents him from adequately litigating his removal proceedings.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1)      Assume jurisdiction over this matter;

2)      Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment-protected speech advocating for Palestinian rights and/or their family relationships;

3)      Vacate and set aside the Rubio Determination;

4)      Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5)      Order the immediate release of Petitioner pending these proceedings;

6)      Order the release of Petitioner;

7)      Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8)      Award reasonable attorneys' fees and costs for this action; and

9)      Grant such further relief as the Court deems just and proper.

Dated: March 18, 2025

Sterling, Virginia

/s/ *Hassan Ahmad*
Hassan Ahmad (VSB #83428)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com
*Counsel for Petitioner*

JA025

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that on this date, I filed this Petition for Writ of Habeas Corpus and all attachments using the CM/ECF system. I will furthermore mail a copy by USPS Certified Priority Mail with Return Receipts to each of the following individuals:

Jeffrey Crawford, Warden
Farmville Detention Center
P.O. Drawer N
508 Waterworks Road
Farmville, VA 23901

Russell Hott, Field Office Director
U.S. Immigration and Customs Enforcement, Washington Field Office
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Kristi Noem, Secretary
U.S. Department of Homeland Security
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Todd Lyons, ICE Director
c/o DHS Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Jessica D. Aber, U.S. Attorney
c/o Civil Process Clerk
Eastern District of Virginia, Alexandria Division
2100 Jamieson Avenue
Alexandria, VA 22314

Dated: March 18, 2025          /s/*Hassan Ahmad*
                               Hassan Ahmad (VSB #83428)
                               The HMA Law Firm, PLLC
                               6 Pidgeon Hill Dr, Suite 330
                               Sterling, VA 20165
                               T: 703.964.0245
                               hma@hmalegal.com
                               *Counsel for Petitioner*

JA026

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| BADAR KHAN SURI<br><br>      *Petitioner*,<br><br>v.<br><br>DONALD TRUMP, *et al.,*<br><br>      *Respondents.* | Case No. 1:25-cv-480<br><br>**ORAL ARGUMENT REQUESTED** |

**PETITIONER'S MOTION TO COMPEL RESPONDENTS
TO RETURN PETITIONER TO THIS DISTRICT**

Petitioner Badar Khan Suri moves this court to order Respondents to return Petitioner to this District and prohibit Respondents from removing Petitioner from the United States pending these proceedings or until the Court issues a contrary order pursuant to the All Writs Act, 28 U.S.C. §1691. In support of this motion, Petitioner submits a memorandum of law, associated exhibits, and a proposed order.

Date: March 20, 2025

Respectfully submitted,

/s/ *Eden B. Heilman*
Eden Heilman, VSB No. 93554
Sophia Leticia Gregg, VSB No. 91582
Vishal Agraharkar, VSB No. 93265
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
Tel: (804) 774-8242
sgregg@acluva.org
vagraharkar@acluva.org

*Counsel for Petitioner*

<u>/s/*Hassan Ahmad*</u>
Hassan Ahmad (VSB #83428)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com

*Counsel for Petitioner*

*Counsel for Petitioner*

<u>/s/*Hassan Ahmad*</u>
Hassan Ahmad (VSB #83428)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com

*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I, Eden Heilman, hereby certify that on this date, I uploaded a copy of Petitioner's Motion to Compel Respondents to Return Petitioner to this District, the accompanying memorandum of law, and any attachments using the CM/ECF system, which will cause notice to be served electronically to all parties.

Date: March 20, 2025                    Respectfully submitted,

<u>/s/ Eden B. Heilman</u>
Eden B. Heilman, VSB No. 93554
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
Tel: (804) 523-2152
eheilman@acluva.org
*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| BADAR KHAN SURI<br><br>     *Petitioner*,<br><br>v.<br><br>DONALD TRUMP, *et al.,*<br><br>     *Respondents.* | Case No. 1:25-cv-480<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO COMPEL
RESPONDENTS TO RETURN PETITIONER TO THIS DISTRICT**

Petitioner Badar Khan Suri brings this motion pursuant to the All Writs Act, 28 U.S.C. §1691, and the Court's inherent equitable authority for an order requiring Respondents to (1) return the Petitioner to Virginia and (2) prohibit his removal from the United States pending resolution of his habeas petition. Respondents transferred Petitioner to Louisiana without notice to his to counsel in an effort to deny him meaningful access to the judicial system. The limited relief he now seeks, which does not require consideration of the merits of his petition, is necessary to preserve the integrity of this Court's jurisdiction over his pending habeas corpus petition challenging the legality of his detention.

**INTRODUCTION**

Dr. Badar Khan Suri is a post-doctorate fellow and professor on a J-1 Exchange Visitor Visa as a research scholar at Georgetown University. He lives in Arlington, Virginia, with his U.S. citizen wife and three young children, ages five and nine. On March 17, 2025, at approximately 9:30 pm, masked agents ostensibly from the Department of Homeland Security ("DHS") and

Homeland Security Investigations ("HSI") arrested Dr. Suri with no apparent basis in law and detained him in Chantilly, Virginia.

When they arrested Dr. Suri outside of his apartment complex, the agents refused to tell him the basis for the arrest, handcuffed him, and forced him into an unmarked black SUV. Dr. Suri's wife quickly arrived on the scene and begged for answers; the agents only disclosed that they were from Homeland Security, the government was revoking Dr. Suri's visa, and he would be detained in Chantilly.

Two hours after his arrest, Dr. Suri was able to call his wife from the Immigration and Customs Enforcement ("ICE") Washington Field Office. He relayed to her that he was going to be moved to Farmville Detention Center in Farmville, Virginia. The next day, immigration counsel for Dr. Suri filed a habeas corpus petition challenging the legality of his detention on First Amendment and due process grounds, among others. Immigration counsel also submitted Form E-28 (notice of representation) to ICE counsel on Dr. Suri's behalf.

Unbeknownst to counsel, ICE had surreptitiously begun moving Dr. Suri out of the region and to an ICE staging facility in Louisiana, over a thousand miles away, without providing him any access to counsel and without providing counsel of record any notice of transfer or any information regarding any justification for his detention. Dr. Suri's expedited relocation to Louisiana is particularly troubling given that a central basis for Dr. Suri's claim for habeas relief is that his very arrest and detention was in retaliation for Dr. Suri's constitutionally protected speech and the constitutionally protected speech of his wife on behalf of Palestinian human rights. Respondents' retaliatory and punitive motives have since been confirmed.[1]

---

[1]    According to Tricia McLaughlin, a DHS spokesperson: "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close connections to a known or suspected terrorist, who is

Dr. Suri, therefore, moves this Court under the All Writs Act ("AWA") and its inherent authority for an order returning him to the Virginia area and restoring the status quo as of the filing of his petition for habeas corpus—a status quo ante Respondents intentionally sought to disrupt by transferring him a thousand miles away. This Court has ample power conferred to it by the All Writs Act and this Court's inherent equitable power to issue an order that reverses ICE's post-habeas transfer of Dr. Suri so that he may retain access to his family and counsel, ensure that he is not summarily removed from the U.S., and so that this Court may proceed unimpeded in the exercise of its jurisdiction over his underlying case challenging the legality of his detention.

Dr. Suri's last confirmed location was an ICE Staging Facility in Alexandria, Louisiana, where detainees are only permitted to be held for 72 hours pending flights, including deportation flights out of the country. The facility also does not permit access to visitors or even legal counsel. All of Dr. Suri's legal counsel, including his immigration counsel, is based in Virginia. The relief requested does not seek to adjudicate the merits of the underlying habeas petition, and Respondents face no conceivable prejudice from returning him. An order reversing Dr. Suri's seemingly retaliatory transfer is essential to preserve the integrity of this Court's proceedings, that Respondents intentionally sought to disrupt, as well as his access to counsel and to his family, and it will cause no undue prejudice to Respondents.

---

a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i). The legality of detention because of speech supporting Palestinian human rights but which Respondents believe is "Hamas propaganda" will ultimately be at issue in Dr. Suri's habeas petition but need not be adjudicated in the context of the limited relief sought by this motion. This statement makes clear that the role of this Court in protecting Petitioner from unlawful detention is paramount.

## FACTUAL BACKGROUND

### A.  Background

Dr. Suri is an Indian national who grew up in Uttar Pradesh, India. He has spent much of his life studying peace and conflict resolution in the Middle East and Asia. He has a master's degree and Ph.D. in Peace and Conflict Studies from the Nelson Mandela Center for Peace and Conflict Resolution from Jamia Millia Islamia in New Delhi. *See* Ex. 1, Declaration of Mapheze Saleh ("Saleh Decl.") at ¶¶ 6, 8.

In 2022, Dr. Suri entered the United States as a research scholar on an exchange visitor visa to pursue his post-doctorate fellowship at Georgetown University at the Alwaleed Bid Talal Center for Muslim-Christian Understanding. *Id*. at ¶ 10. As part of his fellowship, Dr. Suri teaches classes at Georgetown on Majoritarianism and Minority Rights in South Asia. *Id.*

Dr. Suri met his U.S. citizen wife, Mapheze Saleh, in 2011 in Gaza while traveling there as part of his master's degree program. *Id*. at ¶ 6. Ms. Saleh, although born in Missouri, spent much of her life in Gaza after age five. Her father was a political advisor to the Prime Minister of Gaza and a deputy of foreign affairs until 2011, when he left the government. In 2013, Dr. Suri and Ms. Saleh married in New Delhi and lived there with their three children until moving to the U.S. *Id*. at ¶¶ 3-8.

### B.  Speech on Matters of Public Concern

Dr. Suri is an academic, not an activist. But he spoke out on social media about his views on the Israel-Gaza war. Even more so, his wife is an outspoken critic of the Israeli government and the violence it has perpetrated against Palestinians. Since October 2023, Ms. Saleh estimates that she has shared stories about the war daily on her social media. She attributes her desire to do so to her Palestinian heritage and background in journalism. *Id*. at ¶ 11.

About a month ago, Ms. Saleh's social media posts got the attention of digital advocacy groups like Canary Mission, which campaigns to expose Israel's critics on college campuses.[2] These groups posted her name, picture, where she lives, and links to her social media accounts.[3] Shortly after, Dr. Suri also became a target of these groups. *Id*. at ¶ 11.[4]

Expressive activities on social media regarding international law, the human rights of the Palestinian people, and related matters are all topics of public concern clearly protected by the First Amendment.

## C.  Unlawful Arrest by the Department of Homeland Security

On the evening of Monday, March 17, 2025, at approximately 9:20 p.m., Dr. Suri was returning home after teaching at Georgetown University and then attending Iftar. *Id.* at ¶ 13. When he arrived at his apartment building, Dr. Suri was approached by three masked men in uniforms. He managed to call his wife to come downstairs from their apartment, and when she arrived, Dr. Suri was in handcuffs and being placed in an unmarked black SUV. *Id.* During the arrest, Dr. Suri pleaded to know why he was being arrested but was ignored before being placed in the car. Ms. Saleh then asked the agents to identify themselves and the basis for Dr. Suri's arrest. They stated that they were from Homeland Security and the government was revoking Dr. Suri's visa and taking him to Chantilly. *Id*. at ¶ 11.

---

[2] Gabriella Borter, Joseph Ax & Andrew Hay, Name and shame: Pro-Isreal website ramps up attacks on pro-Palestinian student protestors, Reuters (May 11, 2024), https://www.reuters.com/world/name-shame-pro-israel-website-ramps-up-attacks-pro-palestinian-student-2024-05-11/

[3] Mapheze Saleh, Canary Mission (last updated: Mar. 10, 2025), https://canarymission.org/individual/Mapheze_Saleh.

[4] Anna Stanley, *For Georgetown University Couple, Terror Ties are a Family Affair*, Campus Watch (February 24, 2025), https://www.meforum.org/campus-watch/for-georgetown-univ-couple-terror-ties-are-a-family-affair

Two hours after Dr. Suri's arrest, he called his wife from an officer's phone while detained at the Chantilly ICE office. He told her he would be taken to Farmville Detention Center and had a court date scheduled for May 6th in Texas. *Id*. at ¶ 13. Neither Ms. Saleh nor his counsel were able to speak to Dr. Suri until the evening of March 19, 2025. Even then, the call was cut short and his counsel was unable to ascertain all the relevant facts to adequately litigate his underlying habeas.

### D. The Habeas Corpus Petition Filed in this Court Challenging the Legality of Detention

Under the law of this Circuit, it would be unconstitutional for Respondents to have imposed punitive immigration consequences on Dr. Suri, such as detention and removal, as they appear to have done, in retaliation for Dr. Suri's constitutionally protected speech. *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (citing *Homans v. Albuquerque,* 264 F.3d 1240, 1244 (10th Cir.2001) ("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression.")). Counsel filed the instant habeas corpus petition on Dr. Suri's behalf on March 18, 2025, at 5:59 p.m. ECF No. 1. The urgently filed petition challenged his detention as unlawful and sought an order from this Court for his release. The petition lodged jurisdiction with this Court.[5] Throughout the day on March 18, counsel checked the ICE detainee locator, and it did not show that Dr. Suri was in the system. It wasn't until March 19, 2025, that the ICE online detainee locator indicated that Dr. Suri was in the Alexandria Staging Facility in Louisiana. This

---

[5] Dr. Suri's habeas petition was filed urgently, and counsel plan to amend it in due time. The instant motion is respectfully submitted without prejudice to Dr. Suri's ability to amend the underlying petition seeking relief from his unlawful detention as needed.

facility holds detainees for no more than 72 hours pending flights and is often the last stop for many detainees before they are removed from the country permanently.

Immediately upon filing Dr. Suri's habeas petition, counsel emailed the U.S. Attorney's Office for the Eastern District of Virginia a file-stamped copy. Thus, despite obviously being on notice that Dr. Suri's habeas petition challenged the legality of Respondent's retaliatory detention of Dr. Suri, Respondent nevertheless attempted to disrupt the course of this litigation and of Dr. Suri's access to his counsel by sending him into detention a thousand miles away.

## ARGUMENT

I. **THE COURT SHOULD ORDER RESPONDENTS TO RETURN PETITIONER TO THIS DISTRICT SO HE CAN LITIGATE HIS PENDING HABEAS CASE**

A. **The Court Enjoys Broad Authority to Issue an Injunction under the All Writs Act**

The All Writs Act ("AWA") provides federal courts with a powerful tool to preserve the integrity of their jurisdiction to adjudicate claims before them. *See* 28 U.S.C. § 1651(a) (authorizing federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"); *TBG v. Bendis*, 36 F.3d 916, 925 (10th Cir. 1994). The Act encompasses a federal court's power to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and courts have found that the Act should be broadly construed to "achieve all rational ends of law," *California v. M&P Investments*, 46 F. App'x 876, 878 (9th Cir. 2002) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).

Whereas a traditional preliminary injunction requires a party to state a claim and show injury to the moving party, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective court proceeding, or of a past order or judgment.

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004) (a court may enjoin almost any conduct "which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"). Thus, to issue an injunction pursuant to the AWA, this Court need not find that there is a likelihood of success on the merits of the underlying claims. *See Arctic Zero, Inc. v. Aspen Hills, Inc.*, No. 17-CV-00459-AJB-JMA, 2018 WL 2018115, at *5 (S.D. Cal. May 1, 2018) (distinguishing AWA injunction from traditional preliminary injunction). Rather, it is sufficient for the Court to find that a party has identified a threat to the integrity of or "natural conclusion" of an ongoing proceeding such as the instant habeas action.

Courts likewise retain comparable, inherent equitable authority to enjoin transfers pending a habeas petition, *see* 28 U.S.C. § 2243 (habeas courts authorized to order relief "as law and justice require"), and courts regularly exercise that authority. *See, e.g.*, Order, *Khalil v. Joyce*, No. 25-cv-01963 (D.N.J. March 19, 2025), ECF No. 81 (prohibiting the removal of detained Columbia student activist moved to Louisiana after his arrest under 8 U.S.C.§1227(a)(4)(C)(i)); Mem. Op. & Order, *Perez Parra v. Castro*, No. 24-cv-912 (D.N.M. Feb. 9, 2025) (granting TRO preventing transfer of detained immigrant to U.S. military base at Guantánamo Bay, Cuba) ("Considering the uncertainty surrounding jurisdiction, the Court determines it is necessary to enjoin the transfer of Petitioners to Guantanamo Bay. At this time, the Court cannot say that without this injunction it would not be jurisdictionally deprived to preside over the original writ of habeas corpus should petitioners be transferred. Thus, an injunction is necessary to achieve the ends of justice entrusted to this Court."); *see also, e.g.*, Order, *Westley v. Harper*, No. 2:25-cv-00229 (E.D. La. Feb. 2, 2025), ECF No. 7; *Santos Garcia v. Wolf*, No. 1:20-cv-821 (LMB/JFA), 2020 WL 4668189 (E.D. Va. Aug. 11, 2020); Order, *Campbell v. U.S. Immigr. & Customs Enf't*, No. 1:20-cv-22999-MGC (S.D. Fl. July 26, 2020), ECF No. 13; Order, *Sillah v. Barr*, No. 19-cv-1747 (S.D.N.Y. Feb. 25,

2019), ECF No. 3; *see also Zepeda Rivas v. Davis*, 504 F. Supp. 3d 1060, 1077 (N.D. Cal. 2020); *Dorce v. Wolf*, No. 20-CV-11306, 2020 WL 7264869 (D. Mass. Dec. 10, 2020).

**B.    The Court Should Order Respondents to Return Petitioner to this District**

Dr. Suri does not concede that this Court would not continue to have jurisdiction under controlling law. *See Ex parte Mitsuye Endo*, 323 U.S. 283 (1944) (affirming that district court retained jurisdiction over habeas corpus petition despite Petitioner's transfer to a different site). Nor, for the purposes of the limited relief sought herein, does the Court need to address that question (or even the merits of the underlying habeas petition). Nevertheless, Respondents in this pending action have chosen to attempt to interfere with the jurisdiction of this Court over pending proceedings challenging the very legality of Dr. Suri's detention, and to undermine Dr. Suri's ability to access his immigration counsel, his counsel of record in his pending habeas, and his wife and children. Respondents' seemingly retaliatory decision to undermine the natural course of these proceedings is all the more troubling given that his habeas petition itself challenged his detention as an unconstitutional form of government retaliation for his constitutionally protected speech. *See Am. Civil Liberties Union of Maryland, Inc. v. Wicomico Cnty.*, Md., 999 F.2d 780, 785 (4th Cir. 1993) ("The filing of a lawsuit carries significant constitutional protections, implicating the First Amendment right to petition the government for redress of grievances, and the right of access to courts." (quoting *Hoeber on Behalf of NLRB v. Local 30,* 939 F.2d 118, 126 (3d Cir.1991))). The Court need not accept such brazen interference with its role in assessing the legality of government action.

Courts have explicitly relied upon the AWA to enjoin proceedings commenced after the Court's assertion of jurisdiction in order to prevent even a risk that a respondent's actions will diminish the Court's capacity to adjudicate claims before it. In *Michael v. INS*, 48 F.3d 657, 664

(2d Cir. 1995), after the government moved a habeas appellant to the Fifth Circuit, the court of appeals observed that the petitioner "specifically invoked this Court's jurisdiction via an appeal of his habeas petition," and demonstrated "his desire to have this Court review his deportation appeal." Thus, given that the court's jurisdiction "[was] at issue and at risk," the court ordered the petitioner returned to its jurisdiction under the AWA "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by petitioner.

Moreover, just last month, a district court issued an order under the AWA enjoining the government from transferring three immigration detainees to Guantánamo Bay, Cuba, given the potential loss of access to counsel and the mere possibility that the government would question the ongoing jurisdiction of the court. *Perez-Parra v. Castro*, No. 24-cv-00912, Dkt. 47 ("Mem. Op. and Order") (D.N.M. Feb. 9, 2025) (granting injunction under AWA and court's inherent authority as "necessary to achieve the ends of justice entrusted to this Court").

Other courts have done the same. *See Kurnaz v. Bush*, No. 04-cv-1135, 2005 WL 839542, *1–2 (D.D.C. Apr. 12, 2005) (enjoining Defense Department from transferring Guantánamo detainee with pending habeas petition, absent notice, outside jurisdiction of court); *SEC v. Vision Communs.*, 315 U.S. App. D.C. 384, 74 F.3d 287, 291 (D.C. Cir. 1996) (All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties" of their right to sue in federal court) (internal citation omitted); *Lindstrom v. Graber*, 203 F.3d 470, 474–76 (7th Cir. 2000) (All Writs Act permits court to stay extradition pending appeal of habeas corpus petition).  At a minimum, the AWA authorizes the Court to ensure that the litigant is not put in a worse legal position by virtue of the transfer. *See Al Otro Lado v. McAleenan*, 423 F. Supp. 3d 848, 874–78 (S.D. Cal. 2019)  (enjoining application of Trump administration "transit ban" which would categorically bar consideration of class members'

asylum claims who would only be subject to that categorical ban because of the alleged unlawful delays created by the government and subject to adjudication before the court); *N.Y. Tel. Co.*, 434 U.S. at 173 (holding that AWA allows a federal court to "avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it").

In seeming retaliation for a habeas corpus challenge to the legality of an already-retaliatory detention, Respondents appear to have interfered both with the Court's ability to exercise its jurisdiction over this habeas petition and with Dr. Suri's ability to access this Court and his counsel, including his immigration counsel. They did so by transporting him a thousand miles away from the Court hearing his habeas corpus petition, to a staging facility that is commonly the last stop for many detainees before they are removed from the country permanently, leading undersigned counsel to believe that Dr. Suri is in imminent danger of being removed from the country prior to his May 6 hearing before an immigration judge unless this Court issues an order prohibiting such removal. The All Writs Act and the Court's inherent equitable powers provide this Court ample authority to issue the modest relief that Petitioner seeks: restoration of the status quo ante so as to preserve the Court's ability to exercise its jurisdiction over Dr. Suri's pending habeas petition until the litigation completes its natural course. This relief is all the more appropriate given the absence of any meaningful or undue prejudice to Respondents. At the least, this Court should issue an order prohibiting Dr. Suri's removal from the United States while his habeas petition is pending. In sum, this Court should not permit the executive to so cavalierly disrupt its ability to review a case that was properly brought before it.

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court issue an order under the All Writs Act and/or the Court's inherent equitable authority to reverse Petitioner's transfer and return him to Virginia and to the status quo at the commencement of this litigation, and to prohibiting Respondents from removing Petitioner from the country pending resolution of the habeas petition or until the Court issues a contrary order.

Date: March 20, 2025                            Respectfully submitted,

                                                /s/*Eden B. Heilman*
                                                Eden B. Heilman, VSB No. 93554
                                                Sophia Leticia Gregg, VSB No. 91582
                                                Vishal Agraharkar, VSB No. 93265
                                                AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF VIRGINIA
                                                P.O. Box 26464
                                                Richmond, VA 23261
                                                Tel: (804) 774-8242
                                                eheilman@acluva.org
                                                sgregg@acluva.org
                                                vagraharkar@acluva.org
                                                *Counsel for Petitioner*

                                                /s/*HassanAhmad*
                                                Hassan Ahmad (VSB #83428)
                                                The HMA Law Firm, PLLC
                                                6 Pidgeon Hill Dr, Suite 330
                                                Sterling, VA 20165
                                                T: 703.964.0245
                                                hma@hmalegal.com
                                                *Counsel for Petitioner*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**BADAR KHAN SURI**

    **Petitioner,**

    **v.**

**DONALD TRUMP,** *et al.*,

    **Defendants.**

                                             **Case No. 1:25-cv-480**

<u>**DECLARATION OF MAPHEZE SALEH**</u>

1.      My name is Mapheze Saleh. I am more than 18 years old, am competent to be a witness, and testify from my own personal knowledge regarding the facts in this Declaration.

2.      I am a United States citizen, and I am Badar Khan Suri's wife.

3.      I was born in Missouri in 1990 and lived in the United States as a young child. I moved to Gaza when I was five years old, and that is where I was primarily raised. However, I returned to the United States every summer to see my father until I was approximately 13.

4.      My father lived in the United States for approximately 20 years while pursuing a master's and Ph.D. Afterward, he served as political advisor to the Prime Minister of Gaza and as the deputy of foreign affairs in Gaza. He left the Gaza government in 2010 and started the House of Wisdom in 2011 to encourage peace and conflict resolution in Gaza. He has been at the House of Wisdom since then and is also a professor of International Relations at the Islamic University of Gaza.

5.      I completed my undergraduate studies at the Islamic University of Gaza, where I studied journalism. I received my first master's degree in Peace and Conflict Resolution at Jamia Millie Islamia University in New Delhi. I am currently enrolled in a master's program in Arab

1

JA043

studies at Georgetown University in Washington, DC. Prior to the war in Gaza, I often worked as a freelance journalist for Middle Eastern newspapers and media outlets, reporting on politics in Palestine and India.

6.      My husband, Badar, is an Indian national who grew up in Uttar Pradesh, India. I met Badar around 2011, when he was visiting Gaza with an international humanitarian convoy to Gaza. Badar was a master's student in Peace and Conflict Studies at the Nelson Mandela Center for Peace and Conflict Resolution from Jamia Millia Islamia in New Delhi. He was to travel to a conflict area as part of that program. At the time, I was working in the Foreign Ministry of Gaza as a translator for foreign delegations that visited Gaza, and I served as a translator for his convoy. During that trip, his convoy met with my father, who was the head of an institute called the House of Wisdom that worked on peace and conflict resolution.

7.      Around 2012 or 2013, Badar returned to Gaza to ask for my hand in marriage and to seek my father's blessings to do so.  Badar has only met my father on those two occasions and hasn't seen him since.

8.      I moved to New Delhi in 2013, and Badar and I got married and started our family. We had three children while we were living in New Delhi and remained there while Badar completed his Ph.D. in Peace and Conflict Studies from the Nelson Mandela Center for Peace and Conflict Resolution at Jamia Millia Islamia. From there, we moved to the U.S.  Badar never returned to Gaza.

9.      Life was difficult in New Delhi. I felt that job opportunities were limited for Palestinians and particularly for women who wore hijab. As a result, we wanted to come to the United States because of its reputation for free speech and religious freedom.

10.     Badar applied for and received a postdoctoral fellowship at Georgetown University at the Alwaleed Bin Talal Center for Muslim-Christian Understanding. In late 2022, he came to the United States on a J-1 visa to start his fellowship, for which he is researching obstacles to cooperation among religiously diverse societies and ways to overcome those obstacles. This semester, he is teaching a class on majoritarianism and minority rights in South Asia. I came with the children the following year, in November 2023.

11.     When Israel began its genocide in Gaza in October 2023, I felt like I had an obligation to share information about what was happening and to speak out, including because of my background in journalism and my Palestinian heritage. As a result, I shared posts on a daily basis about things I had seen that were happening in Gaza, including posts that expressed sorrow for the deaths of Gazan people.

12.     In February of this year, I learned that certain websites online had targeted me personally because of my father's former role in the Gaza government, and because of my social media posts. Multiple articles were published about me and my family, and eventually about my husband. A website claimed falsely that my husband and I have "ties to Hamas." People began attacking us online, and I began receiving threatening messages on social media indicating that people were going to target me, including in person at my campus. I began to feel unsafe after this and asked other students to escort me when I walked around campus, especially after hours.

13.     On Monday, March 17, I waited for Badar to return home from teaching courses and attending iftar at Georgetown. At approximately 9:20 pm, I received a call from Badar saying that police were arresting him outside our apartment and to come fast. When I came downstairs, I saw three uniformed, masked agents who were in the process of handcuffing Badar and placing him in a large black SUV. Badar told them he had done nothing and asked why they were taking

3

JA045

him away. They did not answer any of his questions and placed him in their car. I also asked them who they were, and they responded that they were from Homeland Security. I asked why they were taking him, and they said that the government was revoking his visa and that they would be taking him to Chantilly. Badar asked me to get his passports and immigration documents, and I asked them to wait while I did so. When I returned and tried to hand him his documents, they would not let me do so, and instead took them from me themselves. I watched him being driven away with no idea why he had been arrested.

14.    Two hours later, I received a call from Badar from one of the agents' phones. He told me he was going to be transferred to a detention center three hours away, and that he had a hearing scheduled in Texas on May 6. He informed me that he was being held under Section 237 (a)(4)(C) of the Immigration and Nationality Act.

15.    On the night of March 18, 2025, I received a call that turned out to be a recording from Badar that lasted only a few seconds. In the recording, he told me only that he was in Louisiana. I heard from him again in the early morning of March 20, 2025, when he asked me to call him every day because he worried about me and our children. He told me he wished he was with me and our family during the holy month. He also said that he hasn't been able to get his meals in accordance with his fasting schedule for Ramadan.

16.    I am worried for him and his health. He occasionally takes medications for gastroesophageal reflux disease, and the lack of medications during an episode of reflux can cause him to experience severe pain throughout his body.

17.    Since his arrest, I have been under extreme stress. I miss and worry for him dearly. I have not been able to sleep. We are fasting for Ramadan, so I was already feeling weak, and this

4

JA046

made me feel even worse. I feel completely unsafe and can't stop looking at the door, terrified that someone else will come and take me and the children away as well.

18.     Our children are in desperate need of their father and miss him dearly. They keep asking about him and when he will come back. I cannot bring myself to tell them what has really happened to him, although my eldest child understands he is in some kind of trouble.

19.     As a mother of three children, I desperately need his support to take care of them and me. We are almost entirely dependent on Badar for our income. I can no longer attend my classes at Georgetown because I do not have Badar here to help care for our family.  I cannot even go to the grocery store because I cannot leave the children by themselves. This experience has completely upended our lives. I implore this Court to permit him to return home to me and his three children.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on: March 20, 2025        By: _____

                                                        Mapheze Saleh

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI, | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| v. | )     Case No. 1:25-cv-480 (PTG/WBP) |
| | ) |
| DONALD TRUMP, *et al.*, | ) |
| | ) |
| *Respondents*. | ) |

## ORDER

     This matter comes before the Court on Petitioner Badar Khan Suri's Petition for Writ of Habeas Corpus (Dkt. 1), which was filed on March 18, 2025. Dkt. 1. According to the Petition, on March 17, 2025, the Department of Homeland Security arrested and charged Petitioner with removability, pursuant to 8 U.S.C. § 1227(a)(4)(C). *Id.* At the time of filing, Petitioner alleged that he was presently being detained at the Farmville Detention Center in Farmville, Virginia. *Id.*

     Pursuant to the Court's authority to preserve its jurisdiction under the All Writs Act, pending a ruling on the Petition, it is hereby

     **ORDERED** that Petitioner shall not be removed from the United States unless and until the Court issues a contrary order. 28 U.S.C. § 1651; *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 603 (1966) ("The All Writs Act, 28 U.S.C. § 1651(a), empowers the federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'").

Entered this 20th day of March, 2025
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

JA048

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| BADAR KHAN SURI<br><br>   *Petitioner,*<br><br>v.<br><br>DONALD TRUMP, *et al.,*<br><br>   *Respondents.* | Case No. 1:25-cv-480<br><br><br>**ORAL ARGUMENT<br>REQUESTED** |

## MOTION FOR RELEASE ON BOND

   Petitioner Badar Khan Suri, through counsel, moves this Court for an order of immediate release pending the adjudication of his habeas petition under the Court's inherent authority to grant release on bond to a habeas petitioner who warrants immediate relief and release. In support of this motion, Petitioner submits the accompanying memorandum of law, associated exhibits, and a proposed order.

Date: March 27, 2025

Respectfully submitted,

/s/ *Eden B. Heilman*
Eden B. Heilman, VSB No. 93554
Sophia Leticia Gregg, VSB No. 91582
Vishal Agraharkar, VSB No. 93265
Geri Greenspan, VSB 76786
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
Tel: (804) 523-2152
eheilman@acluva.org
sgregg@acluva.org

vagraharkar@acluva.org
ggreenspan@acluva.org


Hassan Ahmad (VSB #83428)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com


Nermeen Saba Arastu (admitted *pro hac vice*)
The Immigrant & Non-Citizen Rights Clinic
Main Street Legal Services, Inc.
CUNY School of Law
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel: (202) 246-0124
Nermeen.arastu@law.cuny.edu


*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I, Eden B. Heilman, hereby certify that on this date, I uploaded a copy of Petitioner's

Motion for Release on Bond and any attachments using the CM/ECF system, which will cause

notice to be served electronically to all parties.

Date: March 27, 2025                    Respectfully submitted,


                                        /s/*Eden B. Heilman*
                                        Eden B. Heilman, VSB No. 93554
                                        AMERICAN CIVIL LIBERTIES
                                        UNION FOUNDATION OF VIRGINIA
                                        P.O. Box 26464
                                        Richmond, VA 23261
                                        Tel: (804) 523-2152
                                        eheilman@acluva.org

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| |
|---|
| BADAR KHAN SURI |
| *Petitioner*, |
| v. |
| DONALD TRUMP, *et al.*, |
| *Respondents.* |

Case No. 1:25-cv-480

**DECLARATION OF HASSAN AHMAD**

I, Hassan Ahmad, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true to the best of my knowledge and ability:

1.    My name is Hassan Ahmad. I am a licensed attorney in good standing in the Commonwealth of Virginia. I am an attorney of record in the above-captioned case.

2.    I represent the Petitioner, Badar Khan Suri, in this action.

3.    On March 17, 2025, at approximately 10:42 PM, I received a phone call from my former law partner, Ashraf Nubani informing me of the arrest of Dr. Badar Khan Suri less than two hours before. Mr. Nubani is very close to Mapheze Saleh, Dr. Khan Suri's wife.  At the time, I did not know Dr. Khan Suri or his family.

4.    After speaking to Mr. Nubani, I did not have enough facts about Dr. Khan Suri or his situation to take legal action on his behalf, however I agreed to be a point of contact as more information developed.

5.    The following morning, March 18, 2025, at 8:34 AM, I was contacted by Nigel Edwards, an attorney whose office is of counsel to my firm in Raleigh, NC, and he connected me

with Djaouida Siaci, an attorney in Charlotte, NC, who had also been in contact with Dr. Khan Suri's family about his arrest.

6.      Recognizing the need for immediate legal action in the jurisdiction where he was last believed to be detained, I agreed to assist in the efforts to help Dr. Khan Suri as a Virginia-barred attorney. Between 9:00 AM and 11:00 AM, I engaged in detailed discussions with Mr. Nubani to understand more about Dr. Khan Suri, his family, and the circumstances of his arrest.

At approximately 1:52 PM, I spoke directly with Mapheze Saleh, Dr. Khan Suri's spouse, gathering critical personal insights and affirmations of the events leading to Dr. Khan Suri's detention. This conversation was pivotal in shaping our legal strategy and to ensure that all factual assertions in our filings were accurate and substantiated under the circumstances.

7.      At 2:11 PM, after speaking to Ms. Saleh, I filed an EOIR-28 to formally enter my appearance in Dr. Khan Suri's immigration case, giving notice to the government that I was representing him and also enabling me to access his immigration charging document, Notice to Appear (NTA).

8.      With the help of counsel in this case, I worked quickly to draft a habeas petition for Dr. Khan Suri. The petition was filed at 5:59 PM, on March 18, 2025, in the Eastern District of Virginia, Alexandria Division. At the time of filing, I believed that Dr. Khan Suri was detained in Virginia because of the information he relayed to his wife from the ICE Washington Field Office.

9.      Despite the team's efforts to repeatedly check for Dr. Khan Suri's location through the ICE online detainee locator, he did not appear in the system until March 19, when it showed he was being held at the Alexandria Staging Facility in Alexandria, Louisiana.

Dr. Khan Suri is currently detained in Prairieland, Texas, and I am unable to travel to him.

10.     I was first granted access to speak confidentially with Dr. Khan Suri on March 25, 2025, in a virtual attorney-client meeting. We reviewed the substance of his motion for bond and confirmed the facts therein as they pertain to him.

11.     I hereby verify that the factual statements in his motion for bond (ECF No. 20) as they pertain to Dr. Khan Suri are true and correct to the best of my knowledge.


Executed on March 27, 2025

_____
Hassan Ahmad, (VSB #83428)
 The HMA Law Firm, PLLC
6 Pidgeon Hill Dr #330
Sterling, VA 20165
Tel: 703.964.0245
Fax: 703.997.8556
hma@hmalegal.com
Affiant

3



GEORGETOWN UNIVERSITY
Walsh School *of* Foreign Service
*Office of the Dean*

March 24, 2025

To Whom It May Concern:

Dr. Badar Khan Suri was accepted by the Alwaleed Center for Muslim-Christian Understanding (ACMCU) as a Post-doctoral Fellow in 2022, with his term of employment beginning 1/1/23. His initial fellowship ended on 12/31/24. Based on the successful performance of his research work, that position was renewed from 1/1/25 to 12/31/26 without possibility for further renewal. The position is fully funded through ACMCU's endowment income.

During his time at ACMCU, Dr. Khan Suri has been working on a book project on the rise of ethno-nationalism, majoritarianism, and the challenges to minority rights in South Asia. Taking into consideration the cases of India, Pakistan, and Afghanistan, the project investigates how and why ethno-religious majorities have been using political discourse against minorities in the region. Central to these discourses are radical Muslim ideologies, nationalist ideologies, and the ethnonationalist Hindutva ideology. The project examines the extent to which such exclusionary ideologies perceive minorities as a threat and explores how democracy and electoral politics interact with these dynamics—whether they mitigate or amplify tensions arising from ethno-nationalism.

Starting in Spring 2025, Dr. Khan Suri began teaching a course entitled "Majoritarianism and Minority Rights in South Asia." Dr. Khan Suri offered the course to address a lacuna in our course offerings on India and South Asia following requests from students. Based on positive student feedback to date and interest from the instructor, ACMCU was intending on offering the course again in Fall 2025.

During his time on campus, I am not aware that Dr. Suri has engaged in any illegal activity, nor has he posed a threat to the security of our campus. He has been focused on completing his research on South Asia and teaching his students.



**GEORGETOWN UNIVERSITY**
Walsh School *of* Foreign Service
*Office of the Dean*

According to this current contract, Dr. Khan Suri is expected to contribute a paper to the ACMCU Occasional Paper Series in addition to his other teaching responsibilities. ACMCU offered the renewal of the Post-Doctoral Fellow position with no possibility of extension which is standard practice for post-doctoral fellows that are intended to facilitate the transition to full- time teaching and research positions at other universities. If his visa is reinstated, ACMCU would consider resuming Dr. Khan Suri's position through the end of his original contract extension on 12/31/26.

I declare under penalty of perjury that, to the best of my knowledge and belief, the foregoing is true and correct. Executed on March 24, 2025.

Yours sincerely,

Joel S. Hellman

Dean

March 23, 2025

**Hadi Uppal**

mhu5@georgetown.edu

Washington D.C.

To Whom It May Concern,

My name is Hadi Uppal, and I am currently a Master of Business Administration (MBA) candidate at Georgetown University. I am writing to express my deep concern regarding the arrest, detainment, and potential deportation of my friend and fellow Georgetown community member, Badar Khan Suri. I had the privilege of meeting Badar in the summer of 2023, shortly after my arrival at Georgetown. At that time, Badar had already been working at the university for several months. Given the quieter atmosphere on campus during the summer, I had the opportunity to get to know Badar well, as we frequently saw each other at the Yarrow Mamout Mosque, located on the Georgetown campus. Over the course of our friendship, I have witnessed his unwavering commitment to his work, his family, and his students, all of which are values that make institutions like Georgetown thrive.

As a postdoctoral fellow at Georgetown University, Badar's research has focused on ethnic and religious violence, as well as peace processes around the world. His deep curiosity in this field is rooted in firsthand experiences as a Muslim in India where Hindu nationalist sentiment has risen in recent years. This personal connection to the topic drives his curiosity and commitment to understanding these complex issues. At Georgetown, Badar actively engages with the university's diverse community, using its rich ethnic and cultural diversity to inform his research. I have personally observed how he fosters discussions with students from various backgrounds to hear their perspectives and ultimately inform his research. His research sheds light on how political motivations, misinformation, and repression contribute to violence. It is therefore deeply troubling that he now finds himself detained and facing deportation from the United States under similar tactics, including unfounded allegations of political activism on campus and exaggerated claims about his ideological ties. Even more concerning is that his likely deportation to India could pose serious risks to his and his family's safety, given his academic work documenting violence against minorities in the country.

When I first met Badar, he was in the United States alone, working tirelessly to secure immigration sponsorship for his three children, who remained in India with his wife. Once they obtained the necessary sponsorship and arrived in the U.S., he immediately focused on integrating them into the local community. He frequently brought his wife and children to the campus mosque, where they quickly became beloved members of the community. He also enrolled his children in local schools so they could continue their education, while his wife began her own academic program at Georgetown. During this time, I saw a profound sense of relief in Badar as he could finally continue his work with confidence, knowing his family was safe and by his side. It is for this very reason that I am deeply troubled by the unnecessary, aggressive, and violent manner in which he was taken from his family, detained, and moved far away to Louisiana and now Texas. After working so hard to bring his family to safety in the U.S., he now faces the devastating reality of being separated from them once again, with their future uncertain.

This semester, Badar began teaching his first elective course at Georgetown on conflict resolution in South Asia. My last conversation with him before spring break in late February was about his experience as a first-time instructor. He was deeply committed to creating an engaging learning environment, one where students could actively participate in discussions and thoughtfully navigate the heavy realities of violence in the region. He spoke with me for over an hour, seeking advice on how to make his course more interactive, spark intellectual curiosity, and ensure that his students achieved the learning goals he had set for them. Badar's dedication to his students is a direct extension of his academic work. In speaking with those currently enrolled in his class, none mentioned any instances of political activism, one of the accusations under which he is now being detained. In my time knowing him at Georgetown, Badar has remained focused on his research and teaching. It is deeply concerning that a committed faculty member, whose work addresses critical global issues, is now unable to fulfill his teaching mission.

I hope this letter underscores Badar's unwavering commitment to his work, his family, and his students. He is a respected member of the Georgetown community, and his unjust detention has left many of us deeply troubled by the prospect of an academic facing deportation over unfounded claims. His arrest has also caused significant anxiety among Georgetown's large international student population, and likely at universities across the country, as it sets a dangerous precedent where individuals can face deportation for politically motivated reasons without committing any crimes or violating U.S. laws. Beyond the immediate impact, this case undermines confidence in the principle of academic freedom, a cornerstone of higher education in the United States. We invite the world's brightest minds to study, teach, and contribute to our institutions, yet Badar's arrest calls this promise into question on a global scale. With this in mind, I urge the courts to act swiftly in securing his release, allowing him to return to his family in Virginia and resume his vital work at Georgetown University.


Sincerely,

Hadi Uppal

 

GEORGETOWN UNIVERSITY
School of Foreign Service

Center for Contemporary Arab Studies
مركز الدراسات العربية المعاصرة

March 23, 2025

Honorable Patricia T. Giles
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria VA 22314

Dear Honorable Judge Giles,

I write in support **Dr. Badar Khan Suri**. My name is Fida Adely, and I am an Associate Professor in the School of Foreign Service at Georgetown University. I have been a professor at Georgetown for over seventeen years. I have also served as the Director of the Center for Contemporary Arab Studies since July 2023. In this capacity, I have had many occasions to interact with Badar since he came to Georgetown in 2023. In every interaction I have had with Badar he has been professional, thoughtful, and kind. He has enriched our Georgetown community in many ways and his detention is a serious affront to basic civil liberties and a tragedy for his family.

I first met Badar in the shared kitchen in the corridor that links our two centers.  After running into each other a few times at the microwave, I introduced myself and we struck up conversation. Badar was then new to the US academic system and wanted some advice on publishing. We met for coffee, and I tried to give some advice about how best to get some of his research published. While our fields of research do not overlap, as a more senior professor, I tried to share some general advice. He was keen to learn about how to succeed as a scholar.

Many visiting scholars and postdoctoral fellows come to Georgetown each year, but they don't necessarily engage in the life of the university.  Badar, however, was an active member of our community and demonstrated a keen interest in expanding his knowledge by attending faculty salons, lecture series and cultural events. In this way, he contributed to the intellectual life or our campus, enhancing the scholarly life of the university and its pedagogical mission.  He was very dedicated to his building a successful career and that's where he placed his energies.

Throughout his time at Georgetown, we continued to run into each other regularly.  I learned about his family back in India and his children. When they came to the US in 2024, I met the whole family. His spouse enrolled as a student at Georgetown and the children often joined their parents at our community events. Badar's oldest son (nine years of age now) was often with him

241 Intercultural Center    37th and O Streets N.W.    Washington, D.C. 20057    202-687-5793    ccas.georgetown.edu

JA059

on campus. In this way, I learned about another side of Badar—the patient father and supportive spouse.  His commitments to his family and his care were apparent in the ways he interacted with them.

Dr. Badar Khan Suri is an exemplary scholar and colleague. He is a kind person and a loving father and husband. His detention and the depravation of his rights are a serious affront to the civil liberties we all cherish in the United States. I urge you to undo this great injustice and to return Badar to his family, to his research, and to his scholarly community.  Our basic freedoms are at stake.

Respectfully,

Fida Adely
Associate Professor
Clovis and Hala Salam Maksoud Chair in Arab Studies
Director, Center for Contemporary Arab Studies
School of Foreign Service Georgetown
fja25@georgetown.edu
202-687-8192

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MARCH 23, 2025**

March 23, 2025

Honorable Patricia T. Giles
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 22314

To the Honorable Patricia T. Giles;

My name is Joan Mandell, and I am writing this letter in support of my lovely and esteemed Georgetown University colleague, Dr Bader Khan Suri.

I am in my seventh year of teaching at Georgetown University's School of Foreign Service, where I mentor students in "Oral History: Methods and Practice". In other words, I teach students how to listen compassionately and, in their scholarship, to represent other people's stories with dignity and respect. Whenever I've interacted with Dr Bader Khan Suri, I've considered him an inspirational role model for the kind of ethical commitment that I encourage in my students. He is a kind and patient person who truly listens to others and, with his own work, seeks to build bridges between and within diverse communities.

Through his research, writing and lecturing as a post-doctoral scholar, Dr Bader Khan Suri has shown an ongoing commitment to the tireless and difficult task of building peace and resolving conflict. I've been struck by his kindness and commitment to these ideals in everyday interactions over the past year, whether participating in our scholarly lectures, or in spontaneous hallway conversations in the office corridor where we both work.

Dr Bader Khan Suri sometimes brings his son, Arafat, to work. I've observed Bader's gentle and attentive parenting; it is clear to me that he enacts his commitment to peace not only in his research and interactions with colleagues, but also within his own family.  His son responds to adults with the calm confidence of a child who knows that he is loved and safe.

I am very disturbed that my government has flagrantly violated the rights of Dr Bader Khan Suri and, in so doing, has jeopardized the lives, livelihood and emotional stability of his whole family. I am also concerned that the government's unconstitutional action undermines the stellar work of Khan Suri's community at Georgetown's Alwaleed Bin Talal Center for Muslim Christian Understanding (ACMCU). This program is internationally recognized for its leadership in the study of Muslim-Christian dialogue, and for improving international relations based on the nurturing of deep historical and cultural understandings. These are the kinds of efforts with which Bader's work so impressively resonates.

As I write this letter, I am also reflecting on the impact of Bader's arrest and detention throughout our large community of faculty, students and staff within the School of

Foreign Service and across our campus. His unwarranted abduction has shaken us all and violated all of our own constitutional rights as well as his, including those of freedom of speech and assembly. It has denied us the opportunity to communicate with and learn from this remarkable individual, who we invited onto our campus and welcomed into our community.

I am completely perplexed why the government purposely targeted this calm, quiet peace builder, and I respectfully urge the court to grant Bader's immediate release, and rule in favor of his imminent return to his family and our university community.

If the Court requires further information, my contact information is below.


Sincerely,


Joan Mandell

Adjunct Instructor, School of Foreign Service

Georgetown University

jm3260@georgetown.edu

-----

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MARCH 23, 2025

GEORGETOWN UNIVERSITY

March 23, 2025

**Honorable Patricia T. Giles**
United States District Judge
Eastern District of Virginia
401 Court House Square
Alexandria, VA, 22314

Dear Judge Patricia Giles,

I am the Founding Director of Alwaleed Center for Muslim-Christian Understanding (ACMCU) at Georgetown University's Edmund A. Walsh School of Foreign Service and a former President of the Middle East Studies Association and of the American Academy of Religion.

I have known Dr. Badar Khan Suri for almost two and a half years. In 2022, I approved the appointment of Badar as an ACMCU Postdoctoral Fellow. I was impressed by his Ph.D. in Peace and Conflict Studies at the Nelson Mandela Centre for Peace and Conflict Resolution at Jamia Millia Islamia in India, a first-class university. Because of Badar's significant progress in his research, I renewed his appointment for a second year. His appointment was then renewed again by my successor Professor Nader Hashemi.

Since my books and scholarship deal with South Asia as well as the Middle East, I have taken particular interest in Badar's scholarship and progress as well as several of his writings including: "Challenges to Democracy in Afghanistan: How a Weak State Structure is Hurting State-Building in Afghanistan" in the *Vivekananda Journal of Research*; "Democracy Has Taken a Leap Forward in Iraq" in the *Middle East Monitor*; and his presentation and paper "Challenges for Plural India: an Emerging Trend of Intolerance" presented at a national conference on Religious Identity, Pluralism and Peaceful Coexistence in India.

In all my interactions with Badar, I have found him to be an excellent scholar. He currently teaches a class titled "Majoritarianism and Minority Rights in South Asia" as an adjunct faculty, reflecting his sincere interest in democracy as the model structure for modern societies. We dearly hope that he may be able to return to his research and teaching soon.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON MARCH 23, 2025.


Sincerely,

*John L. Esposito*

John L Esposito

Distinguished University Professor Emeritus
Founding Director, Prince Alwaleed Bin Talal Center for Muslim-Christian Understanding
Director, The Bridge Initiative: Protecting Pluralism--Ending Islamophobia
Edmund A. Walsh School of Foreign Service
Georgetown University

Office: (202) 687-8375
Email: jle2@georgetown.edu

JA064





Alwaleed Bin Talal Center for
Muslim–Christian Understanding

To the Honorable Patricia T. Giles,

I am writing because I feel compelled to speak out in defense of my colleague and friend, Dr. Badar Khan Suri, who has been taken into custody by ICE for deportation.

I am a full professor of Islamic civilization at Georgetown University's Edmund A. Walsh School of Foreign Service. I am a U.S. citizen and was formerly the director of the Alwaleed bin Talal Center for Muslim Christian Understanding, where Badar was a fellow. My office is across the hall from his.

I was beyond stunned by Badar's detention on the alleged grounds that his presence in the U.S. somehow harms our foreign policy. Badar is extremely soft-spoken and, in comparison to many other professors, nearly taciturn in sharing his political opinions publicly. I am not sure what possible argument there could be for his presence in the U.S. meaning much of anything to anyone other than his family, students and colleagues.

Badar is knowledgeable and kind, unassuming and devoted to helping his students and anyone who wants to learn.

I was asked about a month ago if the media attacks on Badar's wife might put his status in the U.S. in danger. I said, "No, that's not how the U.S. works. Here people are only blamed for their own actions." I guess I was wrong.

I testify under penalty of perjury that the forgoing is true and correct. Executed on March 23, 2025.

Sincerely,

Jonathan AC Brown

Professor & Prince Alwaleed Bin Talal Chair of Islamic Civilization
Edmund A. Walsh School of Foreign Service & Dept. of Arabic and Islamic Studies
Interim Chair, Dept. of Arabic and Islamic Studies
Georgetown University

الأمير الوليد بن طلال مركز التفاهم الإسلامي المسيحي

Edmund A. Walsh School of Foreign Service   ▪   3700 O Street, NW,  ICC 260   ▪   Washington, DC  20057
TEL 202-687-8375  FAX 202-687-8376   ▪   acmcu@georgetown.edu   ▪   acmcu.georgetown.edu

JA065

Honorable Patricia T. Giles,
United States District Judge,
Eastern District of Virginia,
401 Courthouse Square,
Alexandria VA 22314

Dear Judge Patricia T. Giles,

I am writing to you in support of Dr. Badar Khan Suri. My name is Mariam Taher. I too, am a post-doctoral fellow at Georgetown University, but my work is in the Contemporary Center for Arab Studies.

My position at Georgetown University is only for one year. I cannot offer a testimony as to Badar's character that appeals to a relation of multiple years or decades. That being said, his office is only a few doors down from mine. Soon after my arrival at the start of the current academic year, I met Badar. We soon realized that we both study minority populations in different parts of the world, but with significant geographical overlap. We agreed, we should meet sometime to talk through our varying approaches and the merits of different schools of thought when it comes to the study of minority communities, both in the region and more broadly.

Badar continued to be a welcome and calming presence across our shared working spaces. We frequently run into each other, we chat over lunchbreaks, together with other colleagues. My first impression of him was consolidated and affirmed at every subsequent interaction: that he is an accomplished scholar who is genuinely dedicated to peace, both in his work and beyond policy and scholarly domains. Far from spreading any sort of propaganda or propounding an ideologically informed agenda, I experienced his presence as welcoming and considerate, as a scholar and teacher who was patient with his students and generous with his time and knowledge to all.

The shock of his forced disappearance has not sunk in – despite the time that has passed since. His absence is felt along these hallways. He is deeply missed, not only at work but by his family. I know his wife to be a strong and capable woman, but that is no reason to put her through this. There is no telling at this point how the short-term and long-term effects of this on their children will evolve. Since this man, scholar, colleague, father was taken, we have all been thrown into disarray. His family, the university community, and people of conscience everywhere have been left to navigate feelings of confusion, disorientation, fear, anguish, pain, sadness, and anger.

I do not know if or when or under what circumstances Badar and I will sit down to chat about the overlaps and divergences in our work, when we can get back to focusing on doing our jobs in a safe – let alone conducive – environment. It is not lost on me that, he dedicated his scholarship to the study of minorities – that is, the study of the experience of groups who are marginalized, who are often cynically and unjustly deployed as mere chips in political games and competitions between the powers that be, who are systematically discriminated against, targeted, and instrumentalized as tools in the political machinations of others.

His disappearance is a grave injustice – regardless of his personal character. Nonetheless, I can attest to Dr Badar Khan Suri being an exemplary scholar and colleague, as well as a sorely missed father and community member. The enduring shock and sadness and desperation caused by his absence is testament to this.

I pray that the legal system will stand strong in the face of this and other injustices that are mounting by the day. I urge you to support his release – for the sake of his family, for sake of the scholarly community – and for the sake of all else that is at stake.

The United States is on a clear path towards doing away with free speech. Your decision in this case may or may not affect the ultimate outcome regarding our rights under the First Amendment to the United States Constitution. But it will forever be a decision that was taken at a historical crossroads—a decision that either solidified or challenged the pathway that would follow.

Sincerely,

Mariam Taher, PhD
Email: mt1627@georgetown.edu
Phone: 773-240-1225
Post-Doctoral Fellow | Center for Contemporary Arab Studies
Edmund A Walsh School of Foreign Services
Georgetown University, Washington DC

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON MARCH 23, 2025



*GEORGETOWN UNIVERSITY*

March 23, 2025

Honorable Patricia T. Giles
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria VA 22314

Dear Judge Patricia Giles,

I am the Director of the Alwaleed Center for Muslim-Christian Understanding at Georgetown University's Edmund A. Walsh School of Foreign Service. Badar Khan Suri is a postdoctoral fellow at our center. I was his direct supervisor.

Dr. Khan Suri has a PhD in Peace and Conflict Studies from the Nelson Mandela Centre for Peace and Conflict Resolution at Jamia Millia Islamia University in New Delhi, India. The title of his doctoral thesis was "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq." He arrived at Georgetown in 2022 and was granted a fellowship until 2026.

At Georgetown, Badar was also teaching a course on "Minority Rights and Majoritarianism in South Asia" during the Spring 2025 semester. This topic was the focus of his research agenda with the goal of producing a book manuscript. All the reports that I have received from his students were very positive. He is known to be an effective teacher who taught the course material in a stimulating and thoughtful way.

At our center Badar Khan has a reputation as a profoundly serious and focused young scholar. He was not politically outspoken nor was he an activist. He spent most of his time devoted to his research and his teaching. For example, since the October 7, 2023 war in Gaza, our center has organized a Gaza Lecture Series that has brought at least 12 outside speakers to campus. According to my recollection, Badar did not attend any of these events nor did he promote them. His priority was his academic work and taking care of his young family.When our paths would cross in the hallway, our conversations dealt with his research and on the politics back in his native India.



*GEORGETOWN UNIVERSITY*

Needless to say, his arrest shocked our university and unsettled our students, especially our international students. Many are wondering if they will be next in line for deportation if they exercise their First Amendment rights.

I hope Dr. Khan Suril will soon be released and reunited with his family. He should be allowed to complete the duration of his fellowship at Georgetown University. He is a promising young scholar who has committed no crime.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON MARCH 23, 2025

Sincerely,

Nader Hashemi

Associate Professor of Middle East and Islamic Politics
Director, Alwaleed Center for Muslim-Christian Understanding
Edmund A. Walsh School of Foreign Service
Georgetown University

Office: (202) 687-8213
Cell: (720) 317-1016
Email: nader.hashemi@georgetown.edu

Commonwealth of Virginia, City/County of Fairfax. Acknowledged and Sworn before me this 23 day of march 2025
Notary Public F. M.
My commission Expires 01 - 31 - 2029

Farzana Barjor Mareksha
Commonwealth of Virginia
**Notary Public**
Commission No: 7744219
My Commission Expires : Jan 31/2029

Honorable Patricia T. Giles
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandra, VA 22314


RE: Unwavering, Unconditional Letter of Support for Dr. Badar Khan Suri

To the Honorable Judge Giles,

I write this unconditional and unequivocal letter of support for Dr. Badar Khan Suri, a dear friend and respected colleague to whose character and integrity I can attest. My name is Dr. Noureddine Jebnoun, and I am currently a faculty member at Georgetown University's Center for Contemporary Arab Studies at the Edmund A. Walsh School of Foreign Service. Also, from 2013 to 2016, I held a professorship at the National Defense University's Africa Center for Strategic Studies where I designed, implemented, and led seminars for the benefit of the US government officials, African senior officers, African civilian officials, and African civil society actors, that provided them with a forum to critically evaluate Africa's evolving strategic environment.

I first met Badar in Fall 2023. Badar and I connected at the Alwaleed Bin Talal Center for Muslim-Christian Understanding (ACMCU) at the Edmund A. Walsh School of Foreign Service when he joined the ACMCU as a postdoctoral fellow. I have been able to observe his character and actions both in personal and professional contexts. It is difficult to compose a letter that fully captures Badar's character—the qualities that make him an exceptional friend, and colleague. I am confident in saying that he is one of the most genuinely caring responsible, and upstanding individuals I have ever met.

From the very first moment I met Badar, I could see his strong commitment to justice and humanism. As an interdisciplinary scholar with a compelling knowledge of his areas of interest, including religion, peace, and ethnic conflicts in the Middle East and South Asia, he showed a strong commitment to human rights, justice, peaceful resolution of conflicts and inter-faith dialogue. Badar's poise, intellect, aptitude to work with others in multicultural environments, and thoughtful leadership earned him the trust of Georgetown University that invited him to teach a very comprehensive curriculum on Majoritarianism & Minority Rights in South Asia in Spring 2025.

I can confirm with full confidence that Badar has never expressed support for nor has he ever endorsed any form of extremism. Over the course of our extensive interactions, I have had numerous conversations with him about human rights, justice and issues of democratization. I can personally attest to his commitment to nonviolence.

Badar is quiet about his passions and hopes. His careful balancing of school and family, and his determination to provide for his growing family despite financial challenges. He never burdened others with his concerns—he simply focused on what he could do to

improve his circumstances. I know that Badar's principal concern right now is the well-being of his loved ones, his wife and children who he cherishes and loves.

Badar has been a tremendous asset for his class and the Georgetown community. Everything he has ever worked on academically demonstrates his commitment to humanitarian principles including justice, peace and dialogue. Badar has committed no crime, nor ever advocated for violence or anything against the law. For that reason, I urge your Honor and this Honorable Court to release Badar and prevent the unconstitutional seizure of his rights.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
EXECUTED ON MARCH 22, 2025

Sincerely,

Noureddine Jebnoun, PhD
Adjunct Professor
Center for Contemporary Arab Studies
Edmund A. Walsh School of Foreign Service
Georgetown University
ICC 241
37th and O Sts, NW
Washington, DC 20057-1020
Email: nj64@georgetown.edu

The Honourable Patricia T. Giles,
United States District Judge,
Eastern District of Virginia,
 401 Courthouse Square,
Alexandria VA 22314

24th March 2025

Your Honour

RE: Badar Khan Suri

My name is Oliver McTernan. I am a former Catholic priest, a writer and broadcaster. From 2000 to 2003, I was a Visiting Fellow at the Weatherhead Center for International Affairs at Harvard University.  I worked alongside Sam Huntington and became extremely familiar with his work on the 'Clash of Civilizations'. My book 'Violence in God's Name' Religion in an Age of Conflict' was published in 2003 and is still on reading lists in UK universities.  In 2003, I co-founded and became the Director of Forward Thinking, a United Kingdom registered Charity that works on mediation and conflict resolution in the Middle East, North Africa and Gulf Region.  Forward Thinking is also actively engaged in dialogue with Muslim communities in the UK and the MENA region.  I believe my background and current employment is extremely relevant to the comments that I wish to make in support of Badar Khan Suri's application.

I was deeply shocked to learn that on his way home from teaching his class at Georgetown Badar Khan, was arrested and detained by officials from Homeland Security.

I have known Badar Khan Suri, since his marriage to Mapheze Yousef Salah, which took place in the Palestinian Embassy in New Delhi, India in 2014. I have known Mapheze and her family for eighteen years.  I would regard her parents and her siblings as close friends. Badar and Mapheze are both devoted and caring parents to the 9 year old son Arafat, and their 5 year old twins Elia and Watan.

Badar is a respected academic in the field of conflict resolution, and his insightfulness on the challenges of achieving peace in Iraq and Afghanistan are highly valued. It was based upon this awareness that I encouraged him to apply for a post doctoral research position at Georgetown and provided him with a reference.

In the light of these facts, I found the article by Anna Stanley that was published on the Campus Watch website deeply disturbing, and a classic example of disinformation.  I had never heard of this person until I was shown this article. I find her claim that she has worked as an intelligent analyst in the United Kingdom Foreign and Commonwealth Office troubling, if indeed it can be substantiated. Her accusation that Badar Khan "repeatedly endorsed Hamas terror and actively spreads its propaganda" is libellous, and would be laughable, if the consequences were not so serious.

**FORWARD THINKING**

1 Quality Court,
London,
WC2A 1HR
Tel+44 (0)20 8064 1396
www.forward-thinking.org
admin@forward-thinking.org

Charity No.1105206

Your honour, as I am sure you will appreciate that to explain the motivation and ideology of any resistant movement cannot be taken as an endorsement of their thinking or actions. To provide such explanations is an essential part of any process aimed at reaching an informed analysis of a particular conflict. There is, I fear, a deeply Islamaphobic undertone that runs through the whole of Stanley's article.

Mapheze Yousef's father, Dr Ahmed Yousef, is himself a highly respected academic. Ahmed lived and worked in the United States for a number of years. After Hamas won the 2006 election, he was asked to act as a political advisor to the newly elected Prime Minister, Ismail Haniyeh. He served in this post only for a short period. I understand from my frequent visits to Gaza that he was regarded as too progressive in his thinking.

In 2007 the British Prime Minister, Tony Blair, granted Dr Ahmed Yousef, a visa to visit London to participate in workshops on how to end the Israeli/Palestinian Conflict.
In 2008 President Jimmy Carter, met with Dr Yousef in Cairo for similar talks. Since I have known and worked with him, I can honestly say that Dr Ahmed has always sought to promote a political solution to the conflict and worked closely with those within Hamas and other Palestinian factions to achieve this goal.

Dr Ahmed withdrew from active politics and with the support of the Swiss Foreign Ministry set up in Gaza a center for the study of conflict resolution. We have worked closely with him over the past eighteen years and can testify that his focus has been on academic research, political science and care for the community. He has been consistent in his efforts to de-escalate tensions and promote dialogue. To claim otherwise is to misrepresent the truth.

His daughter Mapheze is a highly independent, free thinker, and has not been associated with any group in Gaza. She is a devoted mother and loving daughter. She was born in America and has always been proud of her American citizenship. Stanley's article is based on a total lack of serious research into the background of this family, and to me, therefore, clearly exposes her intention to misinform readers.

Your Honour, I am fully confident that the Court will stand firmly on the side of truth, academic freedom and our universal values.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MARCH 24th, 2025

Kind wishes,

Oliver McTernan
Director

Charity No.1105206




March 23, 2005

Honorable Patricia T. Giles,
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria VA 22314

To the Honorable Patricia T. Giles, US District Judge,

I am the Sultanate of Oman Associate Professor of Anthropology in the Walsh School of Foreign Service at Georgetown University. I am a Christian white American woman and have been faculty at the university since August 2005. I am also the Director of Graduate Studies of the MA in Arab Studies program. My office is located five doors away from the office of Dr. Badar Khan Suri.

I met Dr. Suri shortly after he arrived at Georgetown early in the spring semester of 2023. We passed in our hallway and introduced ourselves to each other. He is a polite, engaged, and curious person. Weekly or so we would talk about our research interests, given that I worked on a 6-year research study of Iraqis displaced by ISIS. I was very interested in his academic training in peace and conflict studies and his scholarship related to South Asia, Afghanistan, and Iraq. We had some very good conversations about our shared interests, the need to end wars, find just solutions to conflicts, and better the world.

Later on, I met his 9-year-old son who he would sometimes bring to the office afterschool so he could do his homework away from the younger children. My classes are in the late afternoon and evening, and so I would see them in the office and chat with the boy. We also have many events in our part of the suite with food, and we love to have our office mates help consume leftovers. So I would go down and knock on Dr. Suri's door and ask if he and his son wanted dinner.

On many evenings when I'd return to my office after teaching, I'd also see Dr. Suri with other colleagues in our suite sitting in each other's offices and talking about various academic subjects, and they would invite me to join them. It is this type of collegiality we welcome, and it was wonderful to be part of.

In March 2024 I met his wife Maphaz [Maphaze] who had applied for our MA in Arab Studies program in January (I am the Director of Graduate Studies). She was accepted and emailed me to arrange a time to come to my office and discuss the program. We met and I was struck by her respectful engagement, her happy demeanor, and intelligence.

Throughout Fall 2024 and Spring 2025, Badar and Maphaz attended a variety of events that my program (the Center for Contemporary Arab Studies) held. I found each of them always polite and engaged with other students, staff, and faculty. We also host monthly potlucks for our students and families, staff, and faculty to have social time together. Maphaz and Badar often brough their three children, who along with others' children, would play in our common areas. I know how much our students missed their own younger brothers and sisters, and I'd often find them playing hide and seek with Badar and Maphaz's kids during these potlucks. I was always secretly happy when Maphaz was at these events because she helped us all clean up with brisk efficiency.

Our students at Georgetown University are of different nationalities, religions, origins, and political persuasions. As a university, we all work really hard to create environments where we learn from each other, debate each other, and respect each other. We don't all agree, but we understand that human beings have different perspectives and experiences. Badar is a key part of who we are, helping us teach students about the human condition, what it means to live in peace and through conflict, sharing his expertise as a scholar and teacher with the university community. He belongs with us at Georgetown University.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2025.

Sincerely,

Rochelle Davis, PhD
Sultanate of Oman Associate Professor of Anthropology
Center for Contemporary Arab Studies
Walsh School of Foreign Service
Georgetown University
3700 O St NW
Washington DC 20057



GEORGETOWN UNIVERSITY
Center for Social Justice
Research, Teaching & Service

Honorable Patricia T. Giles
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 22314

March 23, 2025

      RE: Suri, Badar Khan

Dear Honorable Judge:

      We humbly submit this letter together as: Mark Lance, Ph.D., Emeritus Professor of Philosophy and Justice and Peace Studies at Georgetown University and; Andria K. Wisler, Ph.D., Executive Director, Center for Social Justice Research, Teaching, and Service, and Teaching Professor, Justice and Peace at Studies, at Georgetown University, both U.S. citizens.

      Dr. Badar Khan Suri is a post-doctoral fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service at Georgetown University in Washington, DC. Dr. Suri completed his Ph.D. in Peace and Conflict Studies at the esteemed Jamia Millia Islamia's Nelson Mandela Centre for Peace and Conflict Resolution in New Dehli, India having defended his dissertation in 2020. This dissertation – *Transitional Democracy, divided societies, and prospects for peace: A study of state building in Afghanistan and Iraq* – is a close examination of the complex phenomenon of introducing democracy in ethnically diverse societies. This university, opened in 2004, is well-known globally for its peace and conflict studies program.

      As active members of the academic field of Peace and Conflict Studies, we are aware of the timely imperative and scholarly significance of Dr. Suri's research in peacebuilding, conflict resolution, and ethnic relations at the intersection of religion. His lived experiences and fieldwork have led him to travel extensively in India, Pakistan, Iran, Turkey, Syria, Lebanon, Egypt, and Palestine. His focus on the potential causes of disruption that hinder cooperation in ethnically diverse societies and the possibilities to overcome those barriers is exactly the type of scholarship our students in the United States and beyond need to be learning in the pursuit of a more just and humane world. Notably, Dr. Suri's dissertation is about Iraq and Afghanistan, two countries that the U.S. is behooved to know as intimately and comprehensively as possible, given our histories with them.

      Moreover, Dr. Suri also is a professor at Georgetown University and is currently teaching a course on majoritarinism and minority rights in southeast Asia. He provides a perspective and response from Asia to our predominantly U.S. population of students at Georgetown, and counterbalances the current dominant approaches that they receive. His focus is on the case of India, his home country, and together with our students, he investigates how a democracy deals with ethno-nationalism and tensions between majority and minorty rights. Given his research and teaching expertise as well as his background in humanitarian aid, Dr. Suri is an excellent role model for our undergraduate students.

1421 37TH STREET, NW ● POULTON HALL, SUITE 130 ● WASHINGTON, D.C. 20057 ● 202.687.5330 TEL ● 202.687.8980 FAX ● CSJ@GEORGETOWN.EDU

JA076

Dr. Suri has an outstanding research profile, advanced knowledge in peace and conflict studies, and an excellent interdisciplinary focus that makes his research important for our field because of its direct applications to real-world challenges in the United States and worldwide. It is clear to us that Dr. Suri has and will continue to make significant contributions to the academy through the field of Peace and Conflict Studies. We appreciate your consideration of this letter and Dr. Suri's case.

We both declare under penalty of perjury that the foregoing is true and correct, as executed on March 23, 2025.

Sincerely,

Mark Lance, Ph.D.
Professor Emeritus, Philosophy
Founder, Justice & Peace Studies Program
Georgetown University
lancem@georgetown.edu

Dr. Andria Wisler, Ph.D.
Executive Director, Center for Social Justice Research, Teaching & Service
Teaching Professor, Justice & Peace Studies
Georgetown University
akw28@georgetown.edu
(202) 993-4356


Official Website of the Department of Homeland Security

Report Crimes: Email or Call 1-866-DHS-2-ICE

Main Menu

# Search Results: 1

**BADAR KHAN SURI**

**Country of Birth :** India
**A-Number:** 240400077
**Status :** In ICE Custody
**State:** LA
**Current Detention Facility**: ALEXANDRA STAGING FACILITY
*\* Click on the Detention Facility name to obtain facility contact information*

[ BACK TO SEARCH > ]

## Related Information

### Helpful Info

Status of a Case

About the Detainee Locator

Brochure

ICE ERO Field Offices

ICE Detention Facilities

Privacy Notice

### External Links

Bureau of Prisons Inmate Locator



Privacy · Terms

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

BADAR KHAN SURI,

          *Petitioner*,

      v.

DONALD J. TRUMP, *et al.*,

          *Respondents*.

Case No. 1:25-cv-00480 (PTG/WBP)

**FEDERAL RESPONDENTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, TO TRANSFER VENUE**

Respondents respectfully move to dismiss the Petition (ECF #1) pursuant to Federal Rules of Civil Procedure 12(b)(2)-(3), or in the alternative, to transfer venue. The grounds for this motion are more fully set forth in the accompanying memorandum of law.

DATE: April 1, 2025                                      Respectfully Submitted,

ERIK S. SIEBERT                                         YAAKOV M. ROTH
*United States Attorney*                                *Acting Assistant Attorney General*
                                                        Civil Division

By: _____/s/_____
ELIZABETH SPAVINS                                       DREW C. ENSIGN
*Assistant U.S. Attorney*                               *Deputy Assistant Attorney General*
CHRISTIAN COOPER
*Special Assistant U.S. Attorney*                       WILLIAM C. PEACHEY
2100 Jamieson Avenue                                    *Director*
Alexandria, VA 22314                                    Office of Immigration Litigation
Tel: (703) 299-3785                                     District Court National Security Section
Fax: (703) 299-3983
Lizzie.Spavins@usdoj.gov                                YAMILETH G. DAVILA
Christian.Cooper@usdoj.gov                              *Assistant Director*

                                                        */s/ David J. Byerley*
                                                        DAVID J. BYERLEY
                                                        *Trial Attorney* (DC Bar #1618599)
                                                        U.S. Department of Justice
                                                        Civil Division
                                                        Office of Immigration Litigation
                                                        District Court National Security Section
                                                        P.O. Box 868, Benjamin Franklin Station
                                                        Washington, D.C. 20044
                                                        202-532-4523 | David.Byerley@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

BADAR KHAN SURI,

        *Petitioner*,

        v.

DONALD J. TRUMP, *et al*.,

        *Respondents*.

Case No. 1:25-cv-00480 (PTG/WBP)

**FEDERAL RESPONDENTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, TO TRANSFER VENUE**

Respondents respectfully move to dismiss the Petition (ECF #1) pursuant to Federal Rules of Civil Procedure 12(b)(2)-(3), or in the alternative, to transfer venue. The grounds for this motion are more fully set forth in the accompanying memorandum of law.

DATE: April 1, 2025

ERIK S. SIEBERT
*United States Attorney*

By: _____/s/_____
ELIZABETH SPAVINS
*Assistant U.S. Attorney*
CHRISTIAN COOPER
*Special Assistant U.S. Attorney*
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3785
Fax: (703) 299-3983
Lizzie.Spavins@usdoj.gov
Christian.Cooper@usdoj.gov

Respectfully Submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*
Civil Division

DREW C. ENSIGN
*Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court National Security Section

YAMILETH G. DAVILA
*Assistant Director*

*/s/ David J. Byerley*
DAVID J. BYERLEY
*Trial Attorney* (DC Bar #1618599)
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court National Security Section
P.O. Box 868, Benjamin Franklin Station
Washington, D.C. 20044
202-532-4523 | David.Byerley@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINA**
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI          ) | |
| ) | |
| Petitioner,     ) | |
| ) | Civil Action No. 1:25-cv-480 |
| v.     ) | |
| ) | |
| DONALD J. TRUMP, *et al.*,   ) | |
| ) | |
| ) | |
| Respondents.   ) | |
| ) | |

## <u>DECLARATION OF JOSEPH SIMON</u>

I, Joseph Simon, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Field Office Director ("DFOD") in the Chantilly, Virginia Field Office of Enforcement and Removal Operations ("ERO Virginia") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). I have been employed with ERO since September 2009 as an Immigration Enforcement Agent. In September 2012, I was promoted to Deportation Officer. In March 2020, I was promoted to Assistant Field Office Director. In October 2022, I was promoted to my current role as DFOD.

2.      As the DFOD, I oversee the intake and removals portfolios, meaning I am responsible for the officers that process incoming detainees, and the decisions made in the intake process including custody determinations and detention decisions. I am also responsible for efforts to execute final orders of removal. In my role as the DFOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning  ERO Virginia and the alien detainees who fall within its responsibilit

3.    I am aware that Badar Khan Suri ("Suri") has filed a Petition for a Writ for Habeas Corpus before this Court.

4.    I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, and other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.    Suri is a native and citizen of India who was admitted to the United States under a non-immigrant J-1 Exchange Visitor Visa, on or about December 10, 2022, to enroll as a postdoctoral fellow at Georgetown University. Suri is not a lawful permanent resident of the United States.

6.    On March 15, 2025, Secretary of State Marco Rubio issued a memorandum finding that Suri's presence and activities in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. This finding subjected Suri to removability under INA § 237(a)(4)(C)(i). Suri was also issued a custody determination indicating that he would be detained pursuant to INA § 236(a).

7.    On March 17, 2025, Homeland Security Investigations Special Agents arrested Suri at approximately 9:30 p.m. in Arlington, Virginia pursuant to a Warrant for Arrest of Alien, Form I-200. The arresting agents transported Suri to the ERO Washington office in Chantilly, Virginia for the purpose of initial processing. While at the ERO Washington office, Suri was issued a Notice to Appear ("NTA") (attached as Exhibit 1), which charged him as removable pursuant to INA § 237(a)(4)(C)(i) and detained him after processing.

8.    Due to potential overcrowding in Virginia detention facilities, ICE determined that Suri would not be detained in Virginia at the Farmville Detention Center or the Caroline Detention Facility. Overcrowding is a concern because, on top of routine enforcement operations that often

result in dozens of arrests a day, from March 1, 2025, to March 13, 2025, ICE, in conjunction with other federal, state, and local partners conducted a surge of targeted enforcement actions within the Northern Virginia and Washington D.C. region which resulted in an additional 214 arrests beyond its daily operations. As a result of this operation, ICE was operating its Virginia detention facilities at a high capacity at the time the Suri came into ICE custody.

9.     At the time of Suri's arrest on March 17, 2025, detention facilities in Texas and Louisiana had sufficient capacity to house Suri. Based on the aforementioned operational reasons, ERO Washington determined that Suri would be detained at the Prairieland Detention Facility, 1209 Sunflower Lane, Alvarado, Texas 76009 after receiving confirmation of availability on its bedspace request from ERO Dallas.

10.     Upon completion of his initial processing on March 17, ICE transported Suri to the Farmville Detention Center in Farmville, Virginia pending transit to the Prairieland Detention Facility. He arrived at the Farmville Detention Center at approximately 2:35 a.m. on March 18.

11.     On March 18, 2025, Suri was transported from the Farmville Detention Center to the ERO Washington office in Chesterfield, Virginia. He arrived at the office at approximately 7:50 a.m. Suri was brought to the airport in Richmond, Virgina to be transported to Alexandria, Louisiana. The flight departed Richmond, Virginia at 2:47 p.m. on Tuesday, March 18, 2025. He arrived in Alexandria, Louisiana at approximately 5:03 p.m. Eastern Daylight Time (4:03 p.m. Central Daylight Time) on March 18, 2025.

12.     Suri spent three nights at the Alexandria Staging Facility in Alexandria, Louisiana pending transit to the Prairieland Detention Facility in Alvarado, Texas. Suri spent transit time at the Alexandria facility because it is on the standard flight path of the transporting aircraft. From Alexandria he was transported by ground transport to the Prairieland Detention Faci

13.     On March 21, 2025, Suri was transported to the Prairieland Detention Facility where he will remain for removal proceedings.

14.     Per his Notice to Appear, Suri is scheduled to appear virtually in the Port Isabel Immigration Court on May 6, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

_____
Joseph Simon
Deputy Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exh. 1

DEPARTMENT OF HOMELAND SECURITY

## NOTICE TO APPEAR

DOB: 12/03/1983

Event No: XDC2503000008

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 398210373

In the Matter of:

File No: 240 400 077

Respondent: BADAR KHAN SURI

1209 Sunflower Ln Alvarado, TEXAS 760092810 _____ currently residing at:

(Number, street, city, state and ZIP code)

(817) 409-3995

(Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of INDIA and a citizen of INDIA;

3. You were admitted to the United States at Dulles, VA, on December 10, 2022 as a Exchange Visitor;

4. On March 15, 2025, The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:    [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD, LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on __May 6, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the

(Date)        (Time)

charge(s) set forth above.

CHRISTOPHER R HECK    Digitally signed by CHRISTOPHER R HECK
Date: 2025.03.17 21:47:14 -04'00'

(A) SAC Christopher Heck

(Signature and Title of Issuing Officer)

Date: __March 17, 2025__

Chantilly, VA

(City and State)

EOIR — 1 of 3

DHS Form I-862 (6/22)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/I-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately when you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_____
(Signature of Respondent)

_____
(Signature and Title of Immigration Officer)

Date: _____

### Certificate of Service

This Notice To Appear was served on the respondent by me on **March 17, 2025** , in the following manner and in compliance with section 239(a)(1) of the Act.

☒ In person ☐ by certified mail, returned receipt # _____ requested ☐ by regular mail

Attached is a credible fear worksheet.

☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **ENGLISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_REFUSED_
(Signature of Respondent if Personally Served)

Special Agent
(Signature and Title of officer)

DHS Form I-862 (6/22)

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 280 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINA**
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI ) | |
| ) | |
| Petitioner, ) | |
| ) | Civil Action No. 1:25-cv-480 |
| v. ) | |
| ) | |
| DONALD J. TRUMP, *et al.*, ) | |
| ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

## DECLARATION OF YOUSUF KHAN

I, Yousuf Khan, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am an Assistant Field Office Director ("AFOD") in the Dallas, Texas Field Office of Enforcement and Removal Operations at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.     As the AFOD, I am responsible for the detained and detention portfolios, meaning I am responsible for the officers that process incoming detainees, manage the immigration cases of detainees, and oversee the detention facilities in the field office to ensure compliance with relevant standards.

3.     I am aware that Badar Khan Suri ("Suri") has filed a Petition for a Writ for Habeas Corpus before this Court.

4.     I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, and other DHS employees, and information portals maintained and relied upon by DHS in the regular course of

business.

5.      Suri is an alien who is detained by ICE at the Prairieland Detention Facility ("PDF"), 1209 Sunflower Lane, Alvarado, Texas 76009.

6.      The PDF permits legal representatives to visit their clients in-person, telephonically, and virtually. In-person visits are conducted in a confidential setting without prior arrangement on weekdays, Monday to Friday, from 8:00 a.m. to 5:00 p.m. Central Daylight Time. Visits on weekends or holidays must be scheduled ahead of time.

7.      Generally, legal representatives can utilize the Virtual Attorney Visitation ("VAV") which allows legal representatives to meet with their clients, virtually, using unrecorded video technology in confidential private rooms to ensure confidentiality of communications during remote legal visits. Both VAV and telephone calls are available to legal representatives and detainees through appointments, reserved in 45-minute blocks, and scheduled 24 hours in advance. Appointments are scheduled between the hours of 8:00 a.m. to 5:00 p.m. Central Daylight Time. VAV and telephone calls are generally limited to one per day for each detainee.  If open slots are available, the VAV appointments will be extended to accommodate longer meetings if requested.

8.      Generally, confidential electronic exchange of legal documents is permitted when timely communication through mail is not possible. There is a procedure in place to request to be allowed electronic exchange.

9.      The PDF permits Suri to communicate telephonically and virtually with family and friends. Detainees have access to telephones and tablets. The telephones can be used to make unmonitored calls to court, to legal counsel, or to obtain legal counsel, as well as non-confidential telephone calls to others. To make confidential calls, detainees request,

via tablets or paper, they are then brought to private booths to make unmonitored calls. The tablets can be used to conduct non-confidential video calls between the hours of 8:00 AM and 12:00 AM.

10.     More information on visitations is located on the ICE website at: https://www.ice.gov/detain/detention-facilities/prairieland-detention-facility.

11.     At the PDF, ERO can arrange to produce Suri virtually via WebEx for matters before the Executive Office for Immigration Review Port Isabel Immigration Court, or if necessary, Microsoft Teams, for an appearance in federal court.

12.     Per the Court's order enjoining his removal, Suri will not be removed from the United States so long as the Court's order is valid and operative.

13.     Per Suri's Notice to Appear, he is scheduled for a hearing in his immigration proceedings at Port Isabel Immigration Court on May 6, 2025.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.


_____
Yousuf Khan
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| BADAR KHAN SURI | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 1:25-cv-480 |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## DECLARATION OF YOUSUF KHAN

I, Yousuf Khan, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Assistant Field Office Director ("AFOD") in the Dallas, Texas Field Office of Enforcement and Removal Operations at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the AFOD, I am responsible for the detained and detention portfolios, meaning I am responsible for the officers that process incoming detainees, manage the immigration cases of detainees, and oversee the detention facilities in the field office to ensure compliance with relevant standards.

3.      I am providing the following declaration in support of the Government's Opposition to Petitioner's, Badar Khan Suri ("Suri"), Motion for Release on Bond. The information in this declaration is based upon my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, and other DHS employees, and information portals maintained and relied upon by DHS in the regular

course of business.

4.        Suri is an alien who is detained by ICE at the Prairieland Detention Facility ("PDF"), 1209 Sunflower Lane, Alvarado, Texas 76009. PDF is structured with multiple housing dorms. Each dorm has approximately 45 detainees who sleep in grouped bunkbeds. Each dorm has its own bathroom and leisure facilities.

5.        From March 22, 2025, to April 2, 2025, Suri was provided a temporary arrangement of a sleeping mat and movable plastic cot. For the first two nights, the cot was placed in the common room, attached to the housing dorm with the television, and  then it moved to the main dorm. Immediately upon becoming available, Suri was then moved to a permanent bunk in the housing unit. He is currently on a top bunk and was told he can move to a bottom bunk when it is available.

6.        Suri is provided clothing that is standard for detainees at PDF. Suri is provided with a red shirt and blue pants, similar to medical scrubs, with, white socks, and orange sandals.

7.        Suri is not being prevented from practicing his faith. When Suri arrived at PDF, during the month of Ramadan, he stated he was fasting during transport to PDF but since the sun had set by the time of his arrival, he needed to break his fast and eat. Suri requested food to break his fast, which was immediately provided. He was provided a sandwich and some apple at intake. The Chaplin at PDF is working to accommodate Suri's requests so that he can practice his faith. Specifically, the Chaplain is coordinating Halal meals with the local Imam at Hurst, TX.

8.        Suri was provided a copy of the Quran upon his arrival when he requested it. Suri then requested a specific non-Arabic version of the Quran. The Chaplain is working to get the specific Quran and a prayer mat. Suri was informed that a soft backed, or paperback,

version of the Quran could be sent to him from outside the facility if he wished.

9.      Suri was provided the name of the ICE officer managing his detention, DO Michael Thompson, and instructions on how to contact him via facility tablet. Suri made his first request to speak with DO Thompson, on April 2, 2025. Suri has been told he can also make requests to DO Thompson if he feels facility staff have not been sufficiently responsive. He has met DO Thompson and Acting Supervisory Detention and Deportation Officer Erich Klein, who is also involved in managing his detention, in person and is familiar with them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of April 2025.

_____
Yousuf Khan
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Badar KHAN SURI,

    *Petitioner-Plaintiff,*

v.

Donald J. TRUMP, in his official capacity
as President of the United States;

Russell HOTT, in his official capacity as
Field Office Director of Washington,
Immigration and Customs Enforcement;

Jeffrey CRAWFORD, in his official
capacity as Warden of Farmville Detention
Center;

Todd LYONS, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement;

Kristi NOEM, in her official capacity as
Secretary of the United States Department
of Homeland Security;

Marco RUBIO, in his official capacity as
Secretary of State; and

Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

    *Respondents-Defendants.*

Case No. 1:25-cv-480

**AMENDED[1] PETITION FOR WRIT OF HABEAS CORPUS
AND COMPLAINT**

---

[1] Petitioner-Plaintiff files this Amended Petition and Complaint as a matter of course pursuant to
Fed. R. Civ. P 15(a)(1).

## INTRODUCTION

1. This case concerns the government's targeted, retaliatory apprehension, detention, transfer, and attempted deportation of a postdoctoral fellow at Georgetown University based on his family connections, constitutionally protected speech, imputed speech, religion, and national origin. Petitioner-Plaintiff Dr. Badar Khan Suri ("Dr. Khan Suri") is a citizen and national of India and is in the United States in lawful status as a visiting scholar. The Trump administration has openly expressed its intention to weaponize immigration authorities to punish noncitizens whose views are deemed critical of U.S. policy as it relates to Israel. In this case, Respondents-Defendants are targeting Dr. Khan Suri due in part to his protected speech on this issue, but also because of his U.S. citizen wife's Palestinian origins, her constitutionally protected speech, her father's former employment, and his and his wife's Muslim religion, culminating, without reason or process, in Dr. Khan Suri's apprehension, arrest, and detention.

2. On March 17, 2025, Dr. Khan Suri, a J-1 visa holder, was arrested, detained, and charged with removability under 8 U.S.C. §1227(a)(4)(C), a rarely-used provision of immigration law that allows the government to seek the deportation of an individual "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."

3. This was done pursuant to a federal government policy ("the Policy") to retaliate against and punish noncitizens like Dr. Khan Suri who Respondents perceive to be supportive of Palestinian rights or critical of Israel because of their actual or imputed protected speech, viewpoint, religion, national origin, or associations—including associations with Palestinians.

4. Under the Policy, Respondents, including Respondent Marco Rubio, the Secretary of State, identify such noncitizens. Once identified, the Department of Homeland Security

("DHS") apprehends and detains them, then transfers them to immigration jails far away from their families and attorneys to jurisdictions that Respondents perceive to be more favorable to them, and seeks to deport them from the United States.

5.    In this instance, pursuant to the Policy, Respondent Rubio identified Dr. Khan Suri and sought to apprehend, detain, transfer, and deport him. Respondent Rubio purportedly made a determination (the "Rubio Determination") that Dr. Khan Suri's presence or activities in the United States would compromise a compelling United States foreign policy interest ("Foreign Policy Ground"). Upon information and belief, Respondent Rubio made this purported determination based on Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, or protected associations, as well as his wife's protected speech, familial relationships, religion, and national origin. Based on the purported Rubio Determination, DHS agents arrested and detained Dr. Khan Suri, although not required to under immigration law. They then almost immediately transferred him to far-away immigration jails, and placed him in removal proceedings.

6.    The purported Rubio Determination and the government's subsequent actions, including its ongoing detention of Dr. Khan Suri 1,300 miles away from his home, in the same manner as the government did in the cases of Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk, isolating him from his wife, children, community, and legal team, are plainly intended as retaliation and punishment for Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, and associations, all in violation of the First and Fifth Amendments. Indeed, contemporaneous and subsequent statements by administration officials expressly confirm that Respondents targeted Dr. Khan Suri on these unlawful bases. The purported Rubio Determination and Dr. Khan Suri's unjustified detention and transfer also violate his due process

rights by targeting him pursuant to an unduly vague Policy and Determination and subjecting him to unlawfully punitive civil detention. Respondents' targeting of Dr. Khan Suri based on their discriminatory animus towards his wife's national origin constitutes intentional discrimination in violation of the Equal Protection guarantee of the Fifth Amendment. Finally, the government's unlawful Policy of targeting noncitizens, including Dr. Khan Suri, is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and carried out in violation of DHS's own policies in violation of the *Accardi* doctrine. Accordingly, this Court should enjoin the government's implementation of its unlawful Policy and order Dr. Khan Suri's immediate release.

## PARTIES

7.      Petitioner Badar Khan Suri is a citizen and national of India, and is in the United States in J-1 status as a visiting scholar and postdoctoral fellow. He was duly admitted to the United States on this visa in December 2022. He is married to a U.S. citizen, with whom he has three children: a nine-year-old son and five-year-old twins—a boy and a girl. He and his wife are practicing Muslims. At the time of his arrest, he was teaching a course as an adjunct professor on Majoritarianism & Minority Rights in South Asia at Georgetown University. He hopes to become a university professor and embark on a career in academia and teaching.

8.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, DC 20500.

9.      Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the

administration of immigration laws and the execution of detention and removal determinations within the Washington Field Office's area of responsibility, including overseeing decisions to apprehend, detain, release, and transfer individuals in ICE custody. Respondent Hott was, upon information and belief, Petitioner's custodian at the time he filed his original habeas petition. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

10.      Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner was detained when Petitioner's initial Petition for Writ of Habeas Corpus and Complaint was filed. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

11.      Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

12.      Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S.

Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

13.    Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i). In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, DC 20520.

14.    Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA; and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

**JURISDICTION AND VENUE**

15.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

16.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id*. §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

17.    Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. The Washington Field Office directed Dr. Khan Suri's arrest and detention in Rosslyn, Virginia; told Dr. Khan Suri and his wife that he was being taken to the ICE Washington Field Office located in Chantilly, Virginia and then told Dr. Khan Suri that he was being taken to the Farmville Detention Center in Farmville, Virginia. Farmville Detention Center is Dr. Khan Suri's "original place of incarceration," *see United States v. Poole*, 531 F.3d 263, 275 (4th Cir. 2008), and his last known location at the time this habeas action was filed. To the extent the Washington Field Office and Respondents moved Dr. Khan Suri to Richmond, Virginia, and then to an airport and across the country to Louisiana around the time the original petition was filed, the Washington Field Office prevented Dr. Khan Suri from communicating this information to his wife and counsel.

## FACTS

### *Dr. Khan Suri's Background*

18.    Dr. Khan Suri is an Indian national who grew up in Uttar Pradesh, India. He obtained his undergraduate degree in Humanities, Geography, History and English from Jamia Millia Islamia in New Delhi, India, and his master's degree in Peace and Conflict Studies from the same university. In 2020, he completed his Ph.D. in Peace and Conflict Studies at the Nelson Mandela Center for Peace and Conflict Resolution at the same university.

19.    During the time he was in his master's program, Dr. Khan Suri traveled with a group of fellow students and prominent members of civil society to Gaza in 2011 as a humanitarian aid convoy. There, he met his future wife, Mapheze Saleh, who was volunteering along with other

7

college students as a translator for foreign delegations. Dr. Khan Suri returned to India after this trip, but continued to communicate with Ms. Saleh.

20.    Ms. Saleh is a United States citizen of Palestinian descent who was born in Missouri. She lived in the United States until she was five years old. At that time, she moved to Gaza with her mother, but returned to the United States every summer to visit her father, who continued to reside in the United States.

21.    Ms. Saleh's father is Ahmed Yousef, who is the director of the House of Wisdom and is a Professor of International Relations at the Islamic University of Gaza. Mr. Ahmed Yousef is an academic. Between 2006 and until he retired from civil service in 2010, he worked as a political advisor to the Prime Minister of Gaza and as deputy foreign minister in Gaza. The House of Wisdom works towards peace and conflict resolution in Gaza.

22.    In 2013, Dr. Khan Suri returned to Gaza to ask for Ms. Saleh's hand in marriage. At that time, Dr. Khan Suri met Ms. Saleh's father for the first time, and asked for his blessing to marry Ms. Saleh. The couple became engaged, and Dr. Khan Suri again returned to India. He has not traveled to Gaza since, or seen his father-in-law in person since.

23.    Since marrying Ms. Saleh, Dr. Khan Suri would speak by phone with his father-in-law every once in a while about family matters and his academic pursuits. They would usually speak annually on Eid—the two main annual Islamic holidays—to exchange pleasantries. Since Dr. Khan Suri's wife and children arrived in the United States in 2023, he has not spoken directly with his father-in-law.

24.    In 2013, Ms. Saleh moved to New Delhi, India and she and Dr. Khan Suri were married. They remained in New Delhi, where they had three children, until Dr. Khan Suri moved to the United States in late 2022, and his wife and children reunited with him there in 2023.

25.     After completing his Ph.D., Dr. Khan Suri applied for and received a postdoctoral fellowship at Georgetown University at the Alwaleed Bin Talal Center for Muslim-Christian Understanding. Dr. Khan Suri and his wife wished to move to the United States because it ensures religious freedom for all, and they wanted to raise their children in a society that values religious tolerance.

26.     On December 10, 2022, Dr. Khan Suri arrived in the United States on a J-1 exchange visa to begin his fellowship at Georgetown, which began in January 2023. His wife and children arrived in the United States in November 2023. His children were admitted to the United States on derivative J-2 visas, and thus are dependent on their father's status to enter and remain in the country. He fears that his detention and threatened removal could put them at risk as well. The family lived together in Rosslyn, Virginia until Dr. Khan Suri's arrest.

27.     After the war in Gaza began in October 2023, Ms. Saleh lost several family members and friends and she began posting on social media, sharing information about the events occurring in Gaza.

28.     On not more than a handful of occasions, Dr. Khan Suri also made social media posts expressing support for the Palestinian people, criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's war in Gaza.

29.     Because of Ms. Saleh's identity as a Palestinian, her father's former role in the Gazan government, and the couple's social media posts, both Dr. Khan Suri and his wife have recently been doxxed. In February, Dr. Khan Suri and Ms. Saleh began seeing smear campaigns by Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a lobbying and media monitoring group that spreads misinformation and seeks to discredit American

Muslims. Social media users have made comments on CAMERA's posts tagging federal agencies and law enforcement accounts.

30.     The couple have also been smeared by the Canary Mission, which runs an anonymous blacklisting website that creates profiles of individuals perceived to support Palestinian rights. This website is infamous for bullying, slandering, and defaming academics and students. Ms. Saleh is featured on the Canary Mission website with her photograph, academic affiliation, and former volunteer work. The Canary Mission page dedicated to Ms. Saleh identifies Dr. Khan Suri as her husband. The couple has also been the subject of several articles by Middle East Forum's Campus Watch project, an extremist, American conservative think tank.

***The Trump Administration's Hostile Campaign Against Noncitizens It Perceives as Supporting Palestinian Rights***

31.     Respondents' retaliation against Dr. Khan Suri is one application of Respondents' Policy to apprehend, detain, transfer, and deport noncitizens whom Respondents perceive are supportive of Palestinian rights or critical of Israel, because of their actual or imputed speech, viewpoint, religion, national origin, or protected associations, including associations with Palestinians.

32.     In the fall of 2023, thousands of students across the United States from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the U.S. government for Israel's policies in Gaza. Like Dr. Khan Suri and Ms. Saleh, these students expressed concern about the death toll in Gaza as a result of Israel's military operations.

33.     These campus protests resulted in opponents of these students' messages— including President Donald J. Trump—mischaracterizing campus speech in favor of Palestinian rights or critical of Israel as inherently supportive of Hamas and antisemitic. For example, in

several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[2]

34.    During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing activities on university campuses that were supportive of Palestinian rights or critical of Israel.

35.    For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[3]

36.    In the spring of 2024, Trump promised campaign donors that he would deport students advocating for Palestinian rights to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[4]

37.    Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

---

[2] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/.

[3] Andrea Shalal & Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.

[4] Josh Dawsey, Karen DeYoung and Marianne LeVine, *Trump told donors he will crush pro-Palestinian protestors*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[5]

***Respondents Adopt Unlawful Policy to Apprehend, Detain, Transfer, and Deport Noncitizens Whose Speech and Associations It Finds Objectionable***

38.    Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

39.    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

40.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the

---

[5] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), *available at* https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Israeli government and its policies.[6] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you." The fact sheet did not clarify what would result in a noncitizen being categorized as a "Hamas sympathizer." In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

41.    For example, organizations like the Middle East Forum, a rightwing, extremist American conservative think tank, have indicated that they are sharing information with the government based on their investigations into "national security issues."

42.    Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" at U.S. universities that it would like to see deported.

---

[6] Executive Order 14188 refers to Executive Order 13899 for "interpretative assistance" regarding antisemitism. That Executive Order was issued by President Trump in 2019, 84 Fed. Reg. 68779 (Dec. 11, 2019), and it refers to the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism. The IHRA definition of antisemitism includes criticism of Israel that is clearly protected under the First Amendment, such as "drawing comparisons of contemporary Israeli policy to that of the Nazis" or "claiming that the existence of a State of Israel is a racist endeavor." International Holocaust Remembrance Alliance, *Working definition of antisemitism*, available at: https://holocaustremembrance.com/resources/working-definition-antisemitism.

43.    Betar USA, an extremist rightwing group who has claimed credit for sharing information that led to the arrest by ICE of a Columbia student who had engaged in protected expression related to Palestine, has said that it has submitted to the Trump Administration a list of "thousands of names" of students and faculty from various universities whom they believe to be on visas, seeking to target them for detention and deportation.[7]

44.    In March 2025, media reports described widespread fear of retaliation for speech supportive of Palestinian rights among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."[8]

45.    On or before March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Dr. Khan Suri.

46.    On March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups."[9] Respondents would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[10] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

---

[7] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (Mar. 14, 2025), https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump.

[8] Ray Sanchez, CNN, *'Rules aren't clear anymore': Trump crackdown on student protestors send shock waves across US universities* (Mar. 18, 2025) available at https://www.cnn.com/2025/03/16/us/mahmoud-khalil-columbia-protests-free-speech/index.html.

[9] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[10] *Id.*

14

47.     Under the Policy, the Trump Administration, including Respondent Rubio, would identify noncitizen students or faculty who they perceived were supportive of Palestinian rights or critical of Israel, based on their speech, imputed viewpoint, religion, or protected associations. Once identified, Respondent Rubio would purportedly make a determination, under 8 U.S.C. § 1227(a)(4)(C)(i), that he had "reasonable grounds to believe" that a noncitizen's presence or activities in the United States "would have potentially serious foreign policy consequences for the United States" ("Foreign Policy Ground"). Although not required under the Immigration and Nationality Act, e.g., 8 U.S.C. § 1226(c), DHS would apprehend and detain such individuals and transfer them in violation of ICE Policy 11022.1, in an effort to deport them quickly and thwart jurisdiction in states perceived to be less desirable in defending against challenges to the Policy. Under 8 U.S.C. § 1182(a)(3)(C)(iii), the Secretary of State's decision to refuse entry or deport a noncitizen on this ground cannot be based on the noncitizens "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless he "personally determines that" the noncitizens admission or continued presence in the United States "would compromise a compelling United States foreign policy interest."  He then has to notify certain members of Congress regarding this determination. 8 U.S.C. § 1182(a)(3)(C)(iv).[11]

***Application of the Policy and the Foreign Policy Ground to Noncitizens Whose Views the Trump Administration Finds Objectionable***

48.     On the evening of March 8, 2025, DHS agents first implemented the Policy when they arrested Mahmoud Khalil in New York under the Foreign Policy Ground and transferred him

---

[11] These requirements, which appear under the INA section on grounds of inadmissibility, are incorporated into the INA's foreign policy deportability ground by reference. *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

to New Jersey and then to an immigration jail in Louisiana. Khalil is a student at Columbia University in New York who had been involved in the protests at the University against Israel's military actions in Gaza.

49.    The next day, on March 9, Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

50.    On March 10, President Trump issued a social media statement confirming that Khalil was targeted for his activism and vowed that other student protesters would be targeted as well: "ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the Campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."

51.    On March 12, Secretary of State Rubio stated at a press conference, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities . . . we're gonna kick you out."

52.    In the days since Mr. Khalil's arrest, there have been reports of other instances of application of the apprehend, detain, transfer, and deport Policy.

53.    On March 13, Secretary of Homeland Security Kristi Noem announced that Leqaa Kordia, who had also participated in student protests and had been arrested on Columbia's campus in April 2024, was arrested by ICE in New Jersey and transferred to the same immigration jail in Alvarado, Texas where Dr. Khan Suri is being held.

54.    On March 26, 2025, six plainclothes ICE officers arrested Rumeysa Ozturk, a Turkish Ph.D. student at Tufts University, who DHS alleges, "engaged in activities in support of Hamas." Ms. Ozturk co-authored an op-ed in her university's newspaper criticizing the university's response to students' call to divest from companies with ties to Israel's military action in Gaza. She was transferred to an immigration jail in Louisiana.

55.    On March 27, in response to a question about Rumeysa Ozturk, Respondent Rubio said that the State Department may have revoked more than 300 visas, saying "Every time I find one of these lunatics, I take away their visas."

### Dr. Khan Suri's Retaliatory Apprehension, Detention, and Transfer

56.    On the evening of March 17, 2025, Dr. Khan Suri was coming back home from teaching and attending iftar (the evening meal eaten to break the daily fast during the holy month of Ramadan). He noticed a dark-colored vehicle that appeared to be following him and several other black, unmarked cars near his apartment building. As he was about to enter the building, a man wearing a face covering and dark military-like clothing approached him and asked if he was Badar. Dr. Khan Suri answered that he was. He noticed that several other officers were present nearby.

57.    Dr. Khan Suri called his wife and asked her to come downstairs because he was being detained. After his wife arrived and asked the officers who they were, they responded they were from "Homeland Security." When he was in the car, Dr. Khan Suri asked that his wife be allowed to bring his passport and documents from inside the home. Ms. Saleh brought the documents, but the officers did not allow her to hand them to Dr. Khan Suri. Instead, the officers took Dr. Suri's passport and DS-2019 form.

58.     The officers then handcuffed Dr. Khan Suri in front of his wife and put him into one of the unmarked vehicles.

59.     Dr. Khan Suri repeatedly asked why he was being arrested. An officer told him that his student visa had been revoked. Dr. Khan Suri clarified that he had an exchange visa, not a student visa. The officer told him it was the same thing, and that it was also revoked. Once he was in the car, one of the officers stated to Dr. Khan Suri that he was being arrested because of his "social media," and that someone at a very high level at the Secretary of State's office does not want him there. One of the officers told him that he was going to be deported to his country. When Dr. Khan Suri asked when he would be deported, the officer responded: "today."

60.     Dr. Khan Suri was first taken to the ICE Washington Field Office in Chantilly, Virginia, where officers took his fingerprints and DNA swabs and completed paperwork. The ICE officers told Dr. Khan Suri that they were aware that he was not a criminal and had not done anything bad. They informed him that he would be transferred to the detention center in Farmville, Virginia, where he would be held, and that he had a hearing in immigration court in Texas on May 6. They allowed him to call his wife to relay this information.

61.     Dr. Khan Suri was then driven to the Farmville Detention Center, where he arrived in the middle of the night. He was under the impression that he would remain there until he was either deported or released.

62.     He was then moved to the ICE office in Richmond, Virginia, where he arrived around 6:00 a.m. on March 18. There, he was put in a cell and made to sit on a small bench, shackled, and was refused food and water, despite his repeated requests. He was also denied permission to call his wife.

63.     Later that day, Dr. Khan Suri was transported to an airport and loaded on an airplane. He was kept shackled at the hands, waist and ankles. The plane was old, and the flight turbulent. When using the bathroom on the plane, he was not permitted to close the door or remove his shackles. He was distressed and confused, and terrified that the plane might crash. He was not told where he was being flown, and feared he was being deported.

64.     The plane landed in Louisiana, and he was taken to the Alexandria, Louisiana Staging Facility, where he was held for three days. While in Louisiana, he expected to be deported soon, as multiple deportation flights were departing daily from Alexandria. One officer referred to the facility as a "super deportation center" and said that he should expect to be deported at any time.

65.     On the evening of March 20, an officer told Dr. Khan Suri that he would be sent to New York the next day.

66.     On March 21, he was then driven from Alexandria, Louisiana to Texas. He arrived at Prairieland Detention Center in Alvarado, Texas at around 8:00 p.m. Because he had fasted throughout the day in observance of Ramadan, he asked for food, but was denied.

67.     When he arrived in Texas, Dr. Khan Suri was not assigned to a bed in a dorm. Instead, he was housed in the "TV room," a common room where the television is on every day from 5:00 a.m. to 2:00 a.m. He was given a plastic frame that rests on the floor with a thin plastic mattress to sleep on, called a "boat bed," and no pillow. Due to these conditions, Dr. Khan Suri had pain in his ribs and was unable to sleep.

68.     Dr. Khan Suri requested religious accommodations, including Halal food, Ramadan fasting accommodations, a Quran, and a prayer mat. The only book available to him was the Bible. After approximately five days, he finally received Halal food. On April 2, officers came and told

him that he had complained through his lawyer about his religious accommodations and asked him for more details. After Dr. Khan Suri reaffirmed his needs, he was given a prayer mat, a Quran, and provided a space on a bed in the dorm, outside of the TV room.

69.    Dr. Khan Suri was issued a bright red uniform, usually reserved for detained individuals classified as high security based on their criminal history, alleged affiliations to criminal organizations, or institutional record. When he inquired about the reason for this, he was informed that he is classified as high-security based on his association with a known criminal group—presumably based on Respondents' unfounded claims of his connections to Hamas.

70.    Due to his classification and security protocols at the facility, Dr. Khan Suri is only permitted two hours per week of recreation. His movement within the facility is severely limited— he is not permitted to work or spend more time outside his dorm.

71.    Dr. Khan Suri and other individuals detained in Prairieland Detention Center are given used, dirty underclothing to wear and fed inadequate, unhealthy food.

72.    Dr. Khan Suri's detention has had profound negative impacts on his family. His wife and children miss him dearly and suffer every day that he is absent from their home. His children keep asking their mother when their father will come home. Dr. Khan Suri normally holds his older son every night at bedtime, helping him fall asleep. Lately, his son has been crying uncontrollably and has stopped speaking. He is worried especially about his older son.

73.    As a result of his detention, Dr. Khan Suri has been unable to speak freely about matters of public importance, including about Palestinians in Gaza and the federal government's targeting of noncitizens associated with Palestinian advocacy. He has also been prevented from freely associating with his wife and family.

***DHS's Apprehension of Dr. Khan Suri is Part of a Campaign to Suppress Protected Speech Through Arrest, Detention, Transfer, and Deportation***

74.     On March 19, Tricia McLaughlin, the DHS Assistant Secretary for Public Affairs, misleadingly posted on X that "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i)."

75.     She did not specify what social media posts she was referring to; what "close connection" she was referring to; or who the "known or suspected terrorist" was.

76.     The purported Rubio Determination was exclusively motivated by Dr. Khan Suri's protected and imputed speech, viewpoint, religion, national origin, and protected associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. 1227(a)(4)(C)(i), establish that Respondents are punishing and attempting to silence Dr. Khan Suri by apprehending, transferring, and detaining him.

77.     When Dr. Khan Suri was booked at Chantilly, an ICE officer who was involved in his booking informed him that they knew he was not a criminal and did not do anything bad. He was also told by the arresting officer that someone at a very high level at the Secretary of State's office "does not want you here," confirming that Dr. Khan Suri was being targeted in a retaliatory manner pursuant to the Policy. The Foreign Policy Ground expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the

21

individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Dr. Khan Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

78.     Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

79.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794). As an example, the same House Report on the amendment shared the case of the Shah of Iran as an illustration of where his "mere entry into the United States could [have resulted] in imminent harm

to lives or property of United States persons abroad or to property of the United States government abroad." *Id.*

80.    Respondents' failure to follow the procedures specified in the law they relied on to arrest Dr. Khan Suri, along with the statements by Respondents and other government officials, clearly demonstrate that the sole reason for Dr. Khan Suri's apprehension, transfer, and detention is his actual and imputed protected speech, viewpoint, religion, national origin, and protected associations.

***DHS Policies Related to First Amendment Activity and Transfers***

81.    DHS has issued a number of directives and policies that relate to First Amendment-protected activity and to transfers. Upon information and belief, these directives and policies were still operative when Dr. Khan Suri was detained and transferred.

82.    On May 17, 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

83.    On September 30, 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."

84.    ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, inter alia, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

85.    The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

86.    The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours after the transfer occurs."

87.    Additionally, ICE Directive 11064.3, "Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults" requires the Field Office Director to refrain from transferring detained noncitizens outside of the Field Office's area of responsibility where their child or children are located unless dictated by exceptional circumstances or court order. Even when transfer is dictated, the Field Office Director must place the noncitizen as close as practicable to the minor child or children.

88.    At the time of his transfer to Louisiana and then Texas, Dr. Khan Suri had a wife and three young children, and an attorney of record, in Virginia.

89.    Upon information and belief, there was no justification provided for the transfers to Louisiana and Texas, and the transfers were not necessary. Virginia has two large, dedicated ICE facilities, Farmville Detention Center[12] and Caroline Detention Facility,[13] with collectively over 900 beds.

---

[12] ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-content/uploads/2022/06/2021-Annual-Review.pdf. ("The facility has 732 general population housing unit beds").
[13] Caroline Detention Facility, *Home* (2025), https://carolinedf.org/#:~:text=The%20Caroline%20Detention%20Facility%20(CDF,a%20part%

90.    Both facilities were operating nowhere near capacity at the time of Petitioner's apprehension. On March 17, 2025, the day of Dr. Khan Suri's arrest, ICE's bimonthly report to Congress demonstrates that the average daily population at Farmville Detention Center and Caroline Detention Facility was 488 and 284,[14] with capacities of 732 and 336, respectively. Farmville was only using 66% of its capacity and Caroline was only using 84% of its capacity.

91.    Upon information and belief, and contrary to the above directives and policies, DHS has issued a directive that all individuals who are subject to the Policy be transferred to detention centers in the south of the United States to jurisdictions that Respondents perceive will be more favorable to them, and where they will be far away from their families and attorneys, and therefore unable to promptly challenge their detention. Consistent with such a directive, three other individuals – Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk – were transferred under similar rushed circumstances from New York, New Jersey, and Massachusetts, respectively, to Louisiana and Texas.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the First Amendment to the United States Constitution**
***Freedom of Speech and Religious Exercise***

92.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition-Complaint as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . prohibiting the

---

20of%20the%20installation. ("The Caroline Detention Facility (CDF) is a 336-bed correctional facility").

[14] TRAC Reporting, (March 17, 2025) https://tracreports.org/immigration/detentionstats/facilities.html.

free exercise [of religion] . . . or abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

93.     The First Amendment protects past, present, and future speech, including speech by noncitizens. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). Government discrimination against a particular viewpoint on a given subject matter is an "egregious" First Amendment violation that "is presumptively unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (cleaned up). "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). As noted *infra*, the First Amendment, along with the Fifth Amendment, also protects the right to expressive and intimate association.

94.     The purported Rubio Determination and Policy and Dr. Khan Suri's targeting, apprehension, transfer, and ongoing detention violate the First Amendment because they: retaliate against and punish Dr. Khan Suri for his or his wife's past protected speech, or speech imputed to him or his wife as a result of his family relationship, and for his religious exercise as a practicing Muslim; prevent him from freely speaking and exercising his religion now (through detention); attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States; deprive audiences of his present and future speech on matters of public concern; and chill other individuals who express support for Palestinian rights.

95.     These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the purported Determination and the government's subsequent actions against Dr. Khan Suri and those similarly situated, in government officials'

own telling, the result of their disagreement with his religious exercise and his protected speech and the viewpoint it expresses.

## SECOND CLAIM

### Violation of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution
### *Freedom of Association*

96.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

97.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This means "[i]n our jurisprudence guilt is personal" such that "when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct… that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Scales v. United States*, 367 U.S. 203, 224–25 (1961). Simply put, "guilt by association is a philosophy alien to the traditions of a free society." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

98.     Respondents' invocation of the Foreign Policy Ground to apprehend, transfer, and continue detaining Dr. Khan Suri rests largely—and impermissibly—on his association with his wife, her protected speech, her national origin, and her familial background. Respondents are retaliating against and punishing Dr. Khan Suri based on an attenuated chain of familial associations: his marital tie to his wife, her familial tie to her father, and her father's former role in the government of Gaza.

99.     Mere association is insufficient grounds to impart liability precisely because the Fifth Amendment's Due Process clause mandates a deprivation of liberty must be premised on a finding of "personal guilt." *Scales v. United States*, 367 U.S. at 224; *see also United States v. Hammoud*, 381 F.3d 316, 328 (4th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1097 (2005).

100.     The Constitution protects both expressive association—the "right to associate for the purpose of engaging in those activities protected by the First Amendment"—and intimate association—*i.e.*, one's "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Freedom of intimate association is a "fundamental element of personal liberty" guaranteed by the Due Process Clause. *Id*. It also stems from the First Amendment right to freedom of association. *See Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 282 (4th Cir. 1991). Marriage is the paradigmatic example of intimate association. *Obergefell v. Hodges*, 576 U.S. 644, 646 (2015) ("Decisions about marriage are among the most intimate that an individual can make").

101.     DHS' allegation that Dr. Khan Suri maintains "close connections with... Hamas" is premised, if on any facts at all, solely on his intimate association—his marriage—with his wife, and her national origin and parentage. Thus Dr. Khan Suri has no "personal guilt" necessary to deprive him of his rights under the Due Process Clause. To determine that Dr. Khan Suri's fact of marriage establishes a "sufficiently substantial" relationship to his wife's *constitutionally protected* speech—or *any* of his father-in-law's alleged beliefs, statements, activities, or associations—to manifest "personal guilt" justifying his deportation is guilt by association in direct contravention of the First and Fifth Amendments.

## THIRD CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Unlawful Civil Detention*

102.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

103.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

104.    The government's detention of Dr. Khan Suri is wholly unjustified. The government has not demonstrated that Dr. Khan Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Dr. Khan Suri cannot be safely released back to his family.

105.    Moreover, Dr. Khan Suri's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention— the Foreign Policy Ground and the purported Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

106.    The punitive nature of Dr. Khan Suri's detention is compounded by the degrading and harmful conditions in which he is being confined: he has extremely limited access to recreation

and contact with the outside world; he was initially denied the ability to practice his faith; until recently, he was forced to sleep on the floor of an overcrowded TV room, deprived of all but a few hours of sleep; he is being denied clean undergarments and adequate nutrition; and he is being subjected, with no valid basis whatsoever, to more severe restrictions and treatment than other detained individuals despite posing no danger to others.

## FOURTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Void for Vagueness*

107.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

108.    The Policy and the purported Rubio Determination violate Dr. Khan Suri's right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

109.    The government's policy of detaining, transferring to immigration jails in the South, and seeking to deport noncitizens who they perceive to hold views supportive of Palestinian rights or critical of Israeli or U.S. government policy based on those noncitizens' protected speech, imputed viewpoint, religion, or protected association is unconstitutionally vague.

## FIFTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States
### Constitution
### *Equal Protection*

110.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

JA126

111.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Federal Government from denying equal protection of the laws to all persons within its jurisdiction, to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 201 (1995).

112.    Respondents targeted Dr. Khan Suri for apprehension, detention, transfer, and deportation in part because of their discriminatory animus towards his wife's Palestinian origin and her connection to Palestine.

113.    Respondents thereby intentionally discriminated against Dr. Khan Suri on account of the national origin of his wife, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## SIXTH CLAIM

### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

114.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for apprehension, detention, transfer, and removal based on First Amendment-protected speech advocating for Palestinian rights, imputed viewpoint, national origin, religion, and protected association. This policy, and its application to Dr. Khan Suri, is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, including its rules related to First Amendment protected activity and its rules related to transfers. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

115.    In addition, the purported Rubio Determination that Dr. Khan Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United

States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## SEVENTH CLAIM

### Release on Bail Pending Adjudication

116.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

117.    Under 28 U.S.C. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010).

118.    This petition raises numerous substantial constitutional and statutory claims challenging Dr. Khan Suri's retaliatory detention. Extraordinary circumstances exist that make Dr. Khan Suri's release essential for the remedy to be effective. His detention prevents him from adequately litigating his removal proceedings.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Petitioner respectfully requests that this Court:

a.    Assume jurisdiction over this matter;

b.    Enjoin Respondents from applying the unlawful Policy of targeting noncitizens for apprehension, detention, and transfer based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations to Petitioner;

c.      Declare the Respondents' Policy of targeting noncitizens for apprehension, detention, and transfer based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations is unlawful;

d.      Order Respondents to transfer Petitioner back to the jurisdiction of this District pending these proceedings;

e.      Order the immediate release of Petitioner pending these proceedings;

f.      Order the release of Petitioner;

g.      Declare that Respondents' actions to apprehend and detain Petitioner violate the First Amendment, the Due Process Clause of the Fifth Amendment, the Equal Protection protections of the Fifth Amendment, and the APA;

h.      Award reasonable attorneys' fees and costs for this action; and

i.      Grant such further relief as the Court deems just and proper.

Dated: April 8, 2025                            Respectfully submitted,

                                                *s/Eden B. Heilman*
                                                Eden B. Heilman, VSB No. 93554
                                                Sophia Leticia Gregg, VSB No. 91582
                                                Vishal Agraharkar, VSB No. 93265
                                                Geri Greenspan, VSB No. 76786
                                                AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF VIRGINIA
                                                P.O. Box 26464
                                                Richmond, VA 23261
                                                Tel: (804) 523-2152
                                                eheilman@acluva.org
                                                sgregg@acluva.org
                                                vagraharkar@acluva.org
                                                ggreenspan@acluva.org

Hassan Ahmad (VSB #83428)
THE HMA LAW FIRM, PLLC
6 Pidgeon Hill Dr, Suite 330
Sterling, VA 20165
T: 703.964.0245
hma@hmalegal.com

Nermeen Saba Arastu*
THE IMMIGRANT & NON-CITIZEN RIGHTS
CLINIC
MAIN STREET LEGAL SERVICES, INC.
CUNY SCHOOL OF LAW
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel: (202) 246-0124
nermeen.arastu@law.cuny.edu

Diala Shamas**
Astha Sharma Pokharel**
Samah Sisay**
Baher Azmy**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, NY 10012
Tel: (212) 614-6464
dshamas@ccrjustice.org
ssisay@ccrjustice.org
asharmapokharel@ccrjustice.org
bazmy@ccrjustice.org

Jessica Myers Vosburgh**
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 486
Birmingham, AL 35201
Tel: (212) 614-6492
jvosburgh@ccrjustice.org

* admitted *pro hac vice*
** *pro hac vice* application forthcoming

*Counsel for Petitioner*

34

## **VERIFICATION**

Undersigned counsel submits this verification pursuant to 28 U.S.C. § 2242 on behalf of the Petitioner. Undersigned counsel has discussed with Petitioner the events described in this Amended Petition for Writ of Habeas Corpus and Complaint and, on the basis of those discussions, verifies that the statements in the Amended Petition and Complaint are true and correct to the best of our knowledge.

Dated: April 8, 2025                    *s/ Eden B. Heilman*

                                                Eden Heilman

                                                *Counsel for Petitioner Badar Suri Khan*

35

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BADAR KHAN SURI<br><br>     *Petitioner*,<br><br>v.<br><br>DONALD TRUMP, *et al.,*<br><br>     *Respondents.* | Case No. 1:25-cv-480 |

**DECLARATION OF EDITH HINSON, ESQ.**

I, Edith Hinson, do declare under the penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1.      My name is Edith Hinson. I am a licensed attorney in good standing in the state of Virginia.

2.      I am a Program Director for the Detained Adult Program at Amica Center for Immigrant Rights ("Amica Center"), headquartered in Washington, DC.

3.      Amica Center is a Washington, DC-based nonprofit organization dedicated to providing legal services to indigent immigrant adults and children who are detained by Immigration and Customs Enforcement ("ICE"). Amica Center's Detained Adult Program provides free legal assistance to immigrants detained at, among other facilities, the two ICE detention centers in Virginia: Farmville Detention Center ("Farmville") and Caroline Detention Facility ("Caroline"), among other services.

4.      Through our Universal Representation programs, we have a dedicated direct representation intaking team who identifies residents of Washington, DC and Maryland who are eligible for offers of free representation on a recurring basis. I have reviewed our internal Universal

JA132

Representation records and can confirm that between March 16, 2025, and March 22, 2025, our direct representation team identified 18 individuals who are Maryland or DC residents and who were processed for detention at Farmville. Of the 18, three were either deported or released, and one was transferred to Pine Prairie, Louisiana. The rest remain detained at Farmville.

5.    I have also reviewed our internal representation records and out of 28 individuals that we represented at Farmville in 2025, two were transferred to two different facilities for ongoing detention during the course of our representation. Prior to their transfer, one person had been at Farmville for several months, and the other person had been at Farmville for over a year. Furthermore, of 10 individuals we have represented at Caroline this year, one was transferred to another detention center after six months.

6.    Finally, of 14 Amica Center attorneys surveyed who had represented clients at Caroline and Farmville prior to 2025, 13 responded that they've never had a client transferred from those detention centers within 48 hours of their arrival, and one attorney responded that they couldn't remember.

7.    I hereby affirm that the above statements are true and correct to the best of my knowledge.

Executed on April 7, 2025                Edith Clair Hinson
Washington, DC

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BADAR KHAN SURI<br><br>         *Petitioner*,<br><br>v.<br><br>DONALD TRUMP, *et al.*,<br><br>         *Respondents.* | Case No. 1:25-cv-480 |

### DECLARATION OF BADAR KHAN SURI

I, Badar Khan Suri, under the penalty of perjury declare as follows:

1.      I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2.      On Monday, March 17, 2025, I was returning to my apartment in Rosslyn, Virginia around 9:30 pm, after teaching courses and attending iftar, a meal to break my fast during Ramadan, at Georgetown University, where I work.

3.      As I approached my apartment building, I noticed a dark-colored SUV driving dangerously, as well as several other unmarked, black cars driving to my building. As I was about to enter my building, a man wearing grey clothing and a mask covering his nose and mouth emerged from one of the cars and blocked me from entering my building.

4.      The man asked me if I was Badar, and I told him I was. He told me I was under arrest and my student visa had been revoked. I told him I did not have a student visa, but an exchange visa. He said it was the same thing and that it was also revoked.

5.      I was terrified and shocked, and thought there must be some mistake. I repeatedly asked him why I was being arrested, but he did not tell me.

1

6.     At that point, I called my wife, Mapheze Saleh, who came downstairs from our apartment. She and I both asked why I was being arrested, and where I was being taken. Eventually, the man and a fellow officer informed us that I was being taken to Chantilly, Virginia. They told me nothing else about where I would be detained at that time.

7.     The officers then drove me away. During the car ride, when I asked why I was being arrested, an officer told me that I would find out later, but eventually he told me that "someone high up in the Secretary of State's office doesn't want you here" so my visa was being revoked. I asked him, why? He said, it may have had to do with social media.

8.     The agent then told me I was going to be deported from the United States to the country where I am from. When I asked when I would be deported, he said today.

9.     When we arrived at our destination, which I understood to be Chantilly, Virginia, I was taken into a building where I interacted with two officers who took swabs of my cheeks, did my finger scan, and gave me some paperwork. The paperwork included a document that listed the immigration allegations against me and indicated that I had a hearing in immigration court in Texas on May 6, 2025. I asked him why the document had a Texas address and why the hearing was in May. He responded that it was just computer generated, and it might be changed later on.

10.     After a few minutes, they took the paper with my immigration charges and court information away, and I did not see it again until I reached Texas.

11.     As the officers were speaking to me, they were looking at a computer, and at one point one of the agents said, "this is his wife." When I heard that, I responded, "you have her records as well?" His response was, "No, that's not for you." A second later, he pointed at his computer and said to the other office, "that's him."

12.     The officer then told me that they needed to take me to Farmville, Virginia, which was three hours away. I asked them if I could be kept closer to my family, and they told me that that might be possible later on, but that it was late and Farmville was the only option.

13.     The ICE officers allowed me to call my wife to inform her that I was being taken to Farmville and that I had a hearing in an immigration court in Texas on May 6.

14.     I was then driven to the Farmville Detention Center in Virginia, where I was placed in a cell by myself. I asked to call my wife, but I was refused. I was taken to the nurse for tuberculosis testing, and I asked her if I would be staying in my current cell. The nurse told me I would be moving to a dormitory. I believed that I would be living there for some extended period of time, or until I was brought home or closer to home, because I was told so by the officer at Chantilly.

15.     But then, after a few hours, I was taken out of Farmville, and driven to another location that I was told was in Richmond, Virginia. I thought I was going to be placed in detention in Richmond because it was closer to my family. When I arrived at this new location on the morning of March 18, I was made to sit on a small bench in a locked cell, shackled, and was denied food and water, despite repeated requests, and despite informing them repeatedly that I could not eat after sunrise because I was fasting for Ramadan. I was not told why I had been taken to this new location. I asked for a chance to call my wife and update her with my location, but I was denied.

16.     Several hours later, I was removed from my cell and put in a van, still shackled, and driven away again. When the officer removed me from my cell, I asked him where I was going. He said he was not supposed to tell me. No one would tell me where I was going, despite my repeated inquiries.

3

JA136

17.     After an hour or so, we arrived at an airport, and I was put onto an old airplane along with around 300 other people. We were shackled the entire flight, even when we used the bathroom. I did not know which airport we were in or where I was going. I was afraid that I had been put onto a deportation flight and that the flight was leaving the country. Another detainee sitting near me on the airplane said in broken English that he thought we may be flying to Louisiana, but no officer confirmed this.

18.     At some point in the late afternoon or early evening of March 18, the plane landed. I did not know where I was, but I later gathered that I was in Louisiana when I arrived at a large detention center. I was not processed or booked until several hours after landing in Louisiana, either late at night or early morning of March 19. I was brought to a room and made to stand in line until an employee gave me a paper printout containing my photo, A number, and a field for security classification. My security classification field was blank.

19.     While I was at the Louisiana facility, I asked repeatedly to call my wife. In response, the officers just pointed to a phone that was on a wall. But a code was needed to operate it, and I did not have one and did not receive one until I was later brought to Prairieland Detention Center. The system had an option to place a free call for a few seconds, without a code, but when I tried to call my wife, I could hear her voice, but she could not hear mine and I could not communicate with her. There was no option whatsoever to make confidential attorney calls.

20.     While I was in Louisiana, I was sure I was to be deported very soon. I heard a senior officer say that the place I was staying was a "super deportation center." It felt like the officials were trying to get me out of the country quickly before my family could find me or a judge could stop my deportation.

4

21.     On the night of Thursday, March 20, an officer told me and two other men that we were going to be transferred to New York the next day, which I believed meant I was being deported.

22.     Then, on the morning of Friday, March 21, I was told by an officer that I was being sent to Texas by bus. I was not allowed to call my wife to tell her I was being moved again.  I did not learn that the judge in my case had issued an order preventing my deportation until after I was in Texas, when I had my first confidential legal call. At Prairieland Detention Center, I was not given a bed to sleep in, despite requesting one repeatedly, for almost two weeks. Instead, I slept on the floor in a room with a television blaring at all hours except between 2 a.m. and 5 a.m. I understand this is because of capacity problems in the Prairieland Detention Center. The capacity of my current dorm is 36, but there are constantly more than 50 people here. There are always about 15 or more people sleeping on the floors because there aren't enough beds.

23.     I now have a bed and, as of April 9, a pillow, but it is still difficult to sleep because of the constant noise and the lights. Most of the lights turn off at 11, but there is an overhead light with around nineteen bulbs that never turns off, directly over my bed.

24.     We are permitted to go to outdoor recreation for only 2 hours a week. Otherwise, the only fresh air we get is in a fenced-in cage, about 35 by 18 feet or so, that gets extremely crowded. We have been issued old, used undergarments. There is no privacy. The bathrooms are inside the dorm, without any partition between the sleeping area and the bathroom stalls. The stalls themselves are very short so you can see everyone else while using the facilities. We don't have a kitchen, so we clean our dishes in the bathrooms. There is no place for me to pray and I have been denied religious accommodations despite asking. There is no library, except for a bookshelf containing only bibles. I feel like we are living like animals.

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 15th day of April, 2025.                    /s/ Badar Khan Suri
                                                             Badar Khan Suri


I, SOPHIA LETICIA GREGG, declare as follows:

1.  My name is Sophia Gregg. I am a licensed attorney in good standing in the Commonwealth of Virginia. I am an attorney of record in the above-referenced case.

2.  I represent the Petitioner, Badar Khan Suri.

3.  I signed Dr. Khan Suri's declaration on his behalf with his express consent, after reviewing it with him, as reflected in his declaration.

4.  I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.


Executed on the 15th day of April 2025                     /s/ Sophia Gregg
                                                           Sophia Leticia Gregg

6

JA139

# Exhibit 2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| BADAR KHAN SURI<br><br>     *Petitioner*,<br><br>v.<br><br>DONALD TRUMP, *et al.*,<br><br>     *Respondents.* | Case No. 1:25-cv-480 |

## DECLARATION OF ELIZABETH SCHMELZEL, ESQ.

I, Elizabeth Schmelzel, declare under the penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1. I am licensed to practice in New York and am currently a senior supervising attorney at Legal Aid Justice Center ("LAJC") in Falls Church, Virginia. In my role, I direct both the Antonin Scalia Law School's Immigration Field Placement Program and the University of Virgina Immigration Clinic. Across those two programs, I supervise 14 law students working on and litigating immigration cases.

2. I have been practicing immigration law for approximately seven years. Since 2018, I have specialized in immigration law and specifically removal defense. I have represented clients in the Annandale (formerly Arlington), Sterling, and Baltimore immigration courts and at the Board of Immigration Appeals. I have filed merits and amicus briefs before the United States Court of Appeals for the Fourth Circuit. I make this declaration based on my personal knowledge and observations as an immigration practitioner.

3. Throughout my legal career, I have represented individuals in civil immigration detention, including at the Caroline Detention Facility ("Caroline") and Farmville Detention Center

("Farmville"). Since January 2025, I have represented eight detained clients in Virginia, all of whom were arrested by ICE in Virginia and detained in either Caroline or Farmville. My colleagues have represented approximately 10 additional Virgina residents since January 2025, all of whom were arrested by ICE in Virgina.

4. In my experience, people arrested by ICE in Virginia are usually processed at the ICE ERO Washington Field Office and, if not released, are detained at Farmville or Caroline. Of the detained Virginia residents LAJC has represented since January 2025, only one is detained outside the state, and he is currently held at the Moshannon Valley Detention Center. Moshannon is approximately 3.5 hours away from our office by car, just 30 minutes more than Farmville, which is 3 hours away from our office by car.

5. I have reviewed Joseph Simon's declaration. In my seven years of practice at high-volume immigration nonprofits, representing approximately 20 clients per year, I have never seen ICE arrest someone in Virgina and move them as far away as Texas in less than 24 hours. In fact, detainees I have represented in Virginia are far more likely to be transferred between Caroline and Farmville than sent outside the state. Such practice reflects some of ICE's own guidance.[1]

6. I hereby affirm that the above statements are true and correct to the best of my knowledge.

Executed on April 15, 2025,

_Elizabeth Schmelzel, Esq._
Legal Aid Justice Center
6402 Arlington Blvd., Suite 1130
Falls Church, VA 22042

---

[1] *See, e.g.,* ICE Directive 11064.3, available at: https://www.ice.gov/doclib/news/releases/2022/11064.3.pdf

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| _____ )<br>BADAR KHAN SURI )<br>            Petitioner, )<br>   v. )<br>                    )<br>DONALD J. TRUMP, _et al.,_ )<br>                    )<br>            Respondents. )<br>_____) | Civil Action No. 1:25-cv-480 |

## <u>DECLARATION OF JOSEPH SIMON</u>

I, Joseph Simon, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am a Deputy Field Office Director ("DFOD") in Chantilly, Virginia Field Office of Enforcement and Removal Operations ("ERO Virginia") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). I have been employed with ERO since September 2009 as an Immigration Enforcement Agent. In September 2012, I was promoted to Deportation Officer. In March 2020, I was promoted to Assistant Field Office Director. In October 2022, I was promoted to my current role as DFOD.

2. The following declaration is a supplement to my prior April 1, 2025, declaration.

3. Based on DHS internal databases, Suri was booked into the Alexandria Staging Facility ("ASF") at 5:42 PM on March 18, 2025. He was booked out of the ASF at 8:31 AM on March 21, 2025. Suri was then booked into the Prairieland Detention Center at 6:32 PM the same day.

4. Assistant Field Office Director ("AFOD") Ragan Lewis is the officer in charge of the ASF.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April 2025.

Joseph Simon
Deputy Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| BADAR KHAN SURI, | : | |
| | : | |
| | : | |
| Petitioner, | : | Civil Action |
| | : | No. 1:25-cv-00480-PTG-WBP |
| v. | : | |
| | : | |
| DONALD TRUMP, | : | May 1, 2025 |
| | : | 1:00 p.m. |
| Respondent. | : | |
| | : | |
| | : | |
| | : | |
| .......................... | : | |

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Petitioner:      **Vishal Mahendra Agraharkar, Trial Attorney**
ACLU of Virginia
701 E. Franklin Street
Suite 1412
Richmond, VA 23219
(804) 523-2151
Fax: (804) 644-8022
Email: Vagraharkar@acluva.org

**Sophia Leticia Gregg, Trial Attorney**
American Civil Liberties Union of Virginia
P.O. Box 26464
Richmond, VA 23261
804-774-8242
Email: Sgregg@acluva.org

APPEARANCES: (Cont.)

For the Petitioner:

**Hassan Minhaj Ahmad, Trial Attorney**
The HMA Law Firm PLLC
6 Pidgeon Hill Drive
Ste 330
Sterling, VA 20165
703-659-0632
Fax: 703-997-8556
Email: Hma@hmalegal.com

**Eden Brooke Heilman, Trial Attorney**
ACLU of Virginia
701 E. Franklin Street
Suite 1412
Richmond, VA 23219
(804) 523-2152
Fax: (804) 649-2733
Email: Eheilman@acluva.org

**Geri Greenspan, Trial Attorney**
ACLU of Virginia
P.O. Box 26464
Richmond, VA 23261
804-491-8584
Email: Ggreenspan@acluva.org

**Samah Sissay, Trial Attorney**
Center for Constitutional Rights
666 Broadway, 7th Flloor
New York, NY 10012
212-614-6464
Email: Ssisay@ccrjustice.org

For Respondent:

**David J. Byerley, Assistant United States Attorney**
Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
202-532-4523
Email: David.byerley@usdoj.gov

**Elizabeth Anne Spavins, Assistant United States Attorney**
United States Attorney's Office (Alexandria)
2100 Jamieson Avenue
Alexandria, VA 22314

<pre>
                                    703-299-3785
                                    Email: Lizzie.spavins@usdoj.gov
     APPEARANCES:   (Cont.)

      For Respondent:           **Christian James Cooper, Assistant
                                United States Attorney**
                                United States Attorney's Office
                                DOJ-USAO
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-397-7489
                                Email: Christian.cooper@usdoj.gov


      Court Reporter:           **Scott L. Wallace, RDR, RMR, CRR**
                                Official Court Reporter
                                United States District Court
                                401 Courthouse Square
                                Alexandria, VA 22314-5798
                                Cell: 443-584-6558
                                Email: Scottwallace.edva@gmail.com
</pre>

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

<u>**AFTERNOON SESSION, MAY 1, 2025**</u>

(1:00 p.m.)

THE COURTROOM CLERK:  The Court calls *Badar Khan Suri*
*versus Donald Trump, et al.*, Case Number 1:25-cv-480.

May I have appearances, please, first for the petitioner?

MR. AGRAHAKAR:  Good afternoon, Your Honor.  Vishal
Agraharkar on behalf of the petitioner, Badar Khan Suri.

MS. GREGG:  And Sophia Gregg from the ACLU of Virginia on
behalf of Badar Khan Suri.

MS. HEILMAN:  Good afternoon, Your Honor.  Eden Heilman
for the ACLU of Virginia on behalf of petitioner.

MR. GREENSPAN:  Good afternoon, Your Honor.  Geri
Greenspan from the ACLU of Virginia on behalf of petitioner.

MS. SISSAY:  Good morning, Your Honor.  Samah Sissay with
the Center for Constitutional Rights for petitioner.

THE COURT:  Good afternoon to all of you.

MS. SPAVINS:  Good afternoon, Your Honor.  Elizabeth
Spavins, Assistant United States Attorney on behalf of federal
respondents.

With me at counsel's table is Christian Cooper, from the
U.S. Attorney's Office, as well as David Byerley and Yamileth
Davila from Department of Justice Office of Immigration
Litigation.  Mr. Byerley will be handling the argument today.

THE COURT:  Good afternoon to all of you.  And so this is
on my docket for several motions.

1    We have -- first, we have petitioner's motion to compel

2  return, as well as motion for release and for bond.  For the

3  federal respondents we have the motion to dismiss.

4    In the midst of this, there was the filing of the amended

5  petition, and federal respondents are correct in the sense of

6  usually that would moot all of the other motions.  I am

7  construing the motion to dismiss is relating to both the -- that

8  the arguments would be the same with respect to habeas

9  jurisdiction as well as the challenges to subject matter

10  jurisdiction, and so I'm construing them as relating to the

11  amended petition and moving forward with those.

12    We're going to start with the motion to dismiss first

13  because that is something that needs to be resolved before we

14  move on to the other motion.  So I'll hear from you first.

15    MR. BYERLEY:  Good afternoon, Your Honor.  David Byerley

16  on behalf of the government.  The government agrees with the

17  Court's assessment that the motion to dismiss needs to be

18  resolved first.  That is because this Court lacks jurisdiction

19  over Suri's habeas petition.  He is not detained in this

20  district.  His immediate custodian is not and was not in this

21  district, and he was not in this district at the time that his

22  petition was filed.  Under a straightforward routine analysis of

23  the habeas statute, as well as clear Supreme Court precedent in

24  *Rumsfeld versus Padilla*, the Court lacks jurisdiction.  The Court

25  should therefore dismiss this case for lack of jurisdiction

1  without prejudice to re-filing in a proper district.

2        Here, the gravitas of the allegations should not displace

3  a simple routine straightforward analysis of what *Padilla* says on

4  this matter, which is that if he's challenging his physical

5  confinement -- which he is -- that his petition needs to be

6  brought in the district in which he is confined.  In that case

7  this is a Northern District of Texas --

8        THE COURT:  The question is:  At the time of the filing,

9  where was he confined?

10        MR. BYERLEY:  He had touched down in Louisiana at

11  approximately 5:47 p.m. on the day of the petition.

12        THE COURT:  He touched down --

13        MR. BYERLEY:  Sorry, 5:05, Your Honor.

14        THE COURT:  Okay.  In the supplemental declaration from

15  Mr. Simon it said that he was processed or booked into the ASF in

16  Louisiana at 5:40 --

17        MR. BYERLEY:  At 5:42.

18        THE COURT:  5:42.  Is that Eastern?  It doesn't indicate

19  whether that is Eastern time or standard time -- or Central.

20        MR. BYERLEY:  So the declaration was compiled based on

21  Eastern -- Eastern time, so it would have been 4:42 p.m.

22        THE COURT:  That is unusual in the sense of this plane

23  landing and him being processed in within that short period of

24  time.

25        MR. BYERLEY:  So, Your Honor, I think that whether -- when

1    he was booked in is a less relevant question than whether he was

2    not in this district anymore, and in this case --

3         THE COURT: We're going to -- because there are exceptions

4    that they have raised here that we need to address, in terms

5    of -- because your argument is that it is Texas that was -- is

6    the -- was the place of confinement and is where this petition

7    should have been filed, but he wasn't in Texas either.

8         MR. BYERLEY: Yes, Your Honor. Here the notice to appear

9    listed the Prairieland -- indicated that he would be detained at

10   that time, Prairieland Detention Center at three different

11   places. First it listed the residence address as the -- as the

12   residence address as the street address --

13        THE COURT: Is that normal for the detention facility to

14   appear as the currently residing?

15        MR. BYERLEY: So, under -- under recent Supreme Court

16   precedence, notices to appear have to list the time and place of

17   the hearing. And so to list the detention center as the address

18   and then also from the place at which --

19        THE COURT: Listing the time and place of the hearing.

20   I'm asking you about the top portion of the notice of appearance,

21   which lists his address as currently residing at 1209 Sunflower

22   Lane in Alvarado, Texas.

23        MR. BYERLEY: So, Your Honor, I have nothing to indicate

24   that that's been said to me that indicates that's anything

25   abnormal. If anything, it --

```
 1          THE COURT:  I know, that's -- that's a nice way of
 2    phrasing that, in terms of nothing has been said to you that
 3    would make you think otherwise, but I'm asking you the pointed
 4    question is:  What normally goes there?  Is it the address or the
 5    residence of the individual or is it commonplace to put a
 6    detention center down there?  Because I've seen other notices --
 7    notice for appearances where that is redacted, which indicates it
 8    is a private residence, because usually it's a private residence,
 9    not a detention facility address that would be redacted.  And so
10    I'm asking you, and if you don't know just simply state you don't
11    know.
12          MR. BYERLEY:  I don't.  I'm not sure of that information,
13    Your Honor.
14          THE COURT:  Okay.
15          MR. BYERLEY:  But in any event, the fact that it was
16    listed is a plain indicator of where he would be at the time of
17    his notice to appear.
18          THE COURT:  And the question:  Is it plain if there are
19    two different addresses there, even at the bottom half?  There's
20    an address for a facility where he is appearing at, but that's
21    not the same address.
22          MR. BYERLEY:  So, Your Honor, the form requires ICE to
23    list the full address of the immigration court and then it's
24    "comma room," and then they list the Prairieland Detention Center
25    as the room from which he would be appearing.  I can understand
```

1     if that may not be apparent that it's a remote hearing, but

2     nonetheless, that's -- that is what is said on the form.

3         THE COURT:  And even if the notice to appear has this

4     information, that is not the place of his confinement, correct?

5     At the time that this was issued on March 17th, he was still in

6     Farmville or was he in Chantilly?

7         MR. BYERLEY:  So at the time -- so this NTA was issued at

8     the time of his arrest.  I can't say whether that's in the car or

9     whether that was in the field office, but it was issued around

10     the time of his arrest.  And before -- and before his notice to

11     appear was issued, a custody determination was made, and the

12     custody determination was that he would be detained in Texas.

13         THE COURT:  What is the -- what are the records that

14     reflect that?  I saw in the signed declaration that the decision

15     for custody, I believe, was May -- it's listed in the same

16     paragraph as the reference to the March 15th memorandum from

17     Marco Rubio.  Was that at the same time?  And it says a custody

18     determination was also issued.  Was it on that date, March 15th?

19         MR. BYERLEY:  So, I could get -- I can get back to Your

20     Honor about that.  I appreciate that the record isn't exactly

21     clear on that point, but it must have been made prior to the NTA

22     being issued because otherwise there would be no other reason for

23     the NTA to list the facility -- the current address as the

24     facility address.

25         But I would further add that, you know, to the extent that

1    that is something that might be -- that might be unclear from the

2    NTA, it is a pretty clear indicator of where he would be going,

3    and --

4        THE COURT:  But going is not there.

5        MR. BYERLEY:  I appreciate that, Your Honor.  I fully

6    appreciate that.  But at the same time, he is challenging his

7    detention -- his custody with ICE, and that custody was going to

8    take place in Texas and that was said on the NTA, because it

9    listed -- it listed the facility's address as his current

10   address.  It listed the facility's phone number as his phone

11   number, and it listed the Prairieland Detention Center as the

12   place from which he would appear in his immigration proceedings.

13       Under a straightforward analysis of *Padilla*, this is a --

14   this is a habeas challenging physical confinement.  Given that

15   that is what this case is, that case should go forward in Texas.

16       THE COURT:  But at the time of filing, neither he nor his

17   immediate custodian was in Texas, correct --

18       MR. BYERLEY:  That's correct, Your Honor, but --

19       THE COURT:  -- because he's not there?

20       MR. BYERLEY:  That's correct.

21       THE COURT:  So that would suggest that the traditional

22   rules or analysis is really not in play here.

23       MR. BYERLEY:  So, Your Honor, the government would

24   disagree.  First, we'll point out the fact that no matter whether

25   he was in Texas or Louisiana or where his immediate custodian

1    was, what is clear is that it was not here, and that is the only

2    question that the Court needs to resolve today.

3          THE COURT:  The question is:  Was it known?  Because if

4    it's unknown, then we're under a different analysis, are we not?

5          MR. BYERLEY:  So, Your Honor, the government disagrees.

6    So the unknown custodian rule looks at whether the -- whether the

7    petitioner is held in a confidential location that the government

8    has kept confidential, and the Court has determined that it

9    cannot determine where this person is or there is no district of

10   confinement; or the Court has determined they can determine where

11   the custodian is, but it would be inappropriate to do so.

12         Here we don't have that.  The unknown --

13         THE COURT:  But at the time of filing, did you have that?

14   Because at the time of filing, what is clear?  Because what's in

15   the affidavit on Dr. Khan Suri is that he was getting conflicting

16   information as well about where he would be held.

17         MR. BYERLEY:  So, Your Honor, whatever may be sent for

18   whatever information was given to Mr. Suri, the NTA was not

19   ambiguous about where he would be on May 6th and where he would

20   end up for that --

21         THE COURT:  But the writ shall not be suspended.  And what

22   you're saying is that between March 17th, the day of his arrest,

23   and what you just said, on May 6th we know where he has to be.

24   That is a lot of wiggle room, even from March 17th until May 20

25   -- March 21st when he actually ended there -- or actually arrived

1   in Texas, where is he to file, because he is not there.  There is

2   no immediate custodian in Texas.  He is not confined in Texas at

3   the time, and so...

4        MR. BYERLEY:  So, if I understand Your Honor's question

5   correctly, the reason why it should have been filed in Texas is

6   because the NTA is a clear indicator of where he would be

7   spending his ICE detention.  I appreciate that he was not there

8   yet, but also *Padilla* said that it -- the facts known to counsel

9   or what counsel claims to know or whether it was -- whether the

10  information was or was not known to counsel is not what governs

11  here over the facts -- over the facts as they actually were at

12  the time.

13       Here what we have is an NTA identifying the Prairieland

14  Detention Center as the place he would be.  We think in this case

15  it's kind of similar to *Poole*, a Fourth Circuit case from 2008

16  involving a petitioner who was incarcerated in Kentucky, sent to

17  Maryland to provide testimony in another case, didn't like his

18  chances of filing his habeas petition in Kentucky and then filed

19  in Maryland.

20       THE COURT:  That was clear forum shopping there.  Okay?

21  There's a lot of things that were going on in that case I don't

22  think are what are going on here.  You have the blatant forum

23  shopping because you have that attorney asking the judge to keep

24  him, correct?

25       MR. BYERLEY:  Yes, Your Honor.  We agree that it doesn't

provide a perfect analog, but what we here -- what we have here

is hiatuses to other districts when the ultimate place of

confinement is going to be Texas, and here he's challenging ICE's

detention --

THE COURT:  And who also talked about what is original and

what's permanent?  In here I think it's clear that his original

place was here in Virginia, in the sense of this is where he was

arrested.  This is where he was taken to a detention center.  He

was at one point told he would be held in that detention center.

So, it appears very different.

MR. BYERLEY:  So, Your Honor, I think that's a bit of an

over -- an overstatement of what Mr. Suri actually said, is that

he said that a ICE officer told him, "Farmville is the only

option for tonight, and that's where we're going," but there was

no -- even Mr. Suri does not go as far as to say an ICE officer

told him that he would be staying in Virginia permanently, so

that --

THE COURT:  Let me pull up the declaration.

MR. BYERLEY:  Yes.

THE COURT:  He was told that the Texas address was only on

there because it was computer-generated, and that it might be

changed later on.  He was told that they needed to take him to

Farmville, and it was only in response of asking him could he be

kept closer to his family that they told him that that might be

possible later on, but it was late and Farmville was the only

1    option.

2        So that's not giving him any kind of indication that he is

3    not going to be held within this district.

4        MR. BYERLEY:  So, Your Honor, but it also is not an

5    indication that he would be held in this district notwithstanding

6    what was clearly written on his NTA.  Read in the context of what

7    he's saying, it was late, Farmville was the only option, and then

8    from that he believed that he'd be staying in Farmville

9    permanently.

10       THE COURT:  It wasn't his understanding that he would

11   actually be going to Texas, though, at that time.

12       MR. BYERLEY:  So, Your Honor, I --

13       THE COURT:  And looking at what he can also convey to his

14   attorney, we're talking about the writ, which cannot be

15   suspended.  And we're talking about, if I were to accept your

16   reading, there is a period of time where there would be no place

17   where it could be filed, because Texas -- despite everything that

18   you are arguing, the immediate custodian is not in Texas.  He is

19   not there.

20       MR. BYERLEY:  So, Your Honor, first, the -- *Padilla*

21   expressly rejected the idea that the -- that the district

22   confinement rule can be supplanted by the facts known to counsel

23   at the time of filing.  So *Padilla* expressly rejected that

24   theory.

25       *Padilla* also rejected the theory that habeas jurisdiction

1   can lie as a means to punish perceived or actual government

2   misconduct.

3        What we have here is an NTA that listed the detention

4   facility as, again, his residence address, the telephone number,

5   and the place from which he would appear.  In my esteemed

6   colleague's declaration he said that he -- that he had access to

7   that NTA at 2:11 p.m.  I appreciate -- on the day of the habeas

8   petition.

9        I appreciate and I can understand the frustration perhaps

10  if -- if Mr. Suri was told different information, but what we

11  have here is an NTA that everything points to him being and going

12  to Texas.

13       And, nonetheless, the petition was filed here, and it was

14  filed here after he had already left Virginia, and the

15  declarations are con- -- from both sides are consistent with

16  that.

17       THE COURT:  I have some more factual questions for you.

18       In the Simon declaration it indicates that he was removed

19  from Farmville due to potential overcrowding.

20       How many people were removed from that detention facility

21  at the time he was removed?

22       MR. BYERLEY:  So I can check with ICE on exact figures,

23  but in Mr. Suri's declaration he says that he was put on a plane

24  with about 300 others.

25       THE COURT:  That's how many people were on the plane.  I'm

1  asking for how many people left Farmville, because he left

2  Farmville first and then I believe went to Chesterfield and then

3  to Richmond for the plane.  I'm asking a different question.  I'm

4  asking how many people -- these are all of the questions that I

5  want answers on.  Okay?

6        MR. BYERLEY:  Okay.

7        THE COURT:  How many people left Farmville?  How many

8  people were removed from Farmville?  How many beds in Farmville

9  were available?  Because you indicate in your opposition that the

10  information that the gov- -- that the petitioner is relying on

11  regarding bed space is hearsay, but that is information that's

12  within your grasp, and so I want an answer on that.  Okay?

13        MR. BYERLEY:  Okay.  I'll work on getting that information

14  to --

15        THE COURT:  Okay.

16        MR. BYERLEY:  -- Your Honor as soon as possible.

17        THE COURT:  And so how many people -- and then I also want

18  to know how they are typically moved?  Is it typically that

19  people are moved out of the district like that in the middle of

20  the night?  And they're, you know, here for a couple of hours,

21  the next location for a couple of hours, the next location for a

22  few hours, and then on a plane?  Is that normal, too?

23        MR. BYERLEY:  So, Your Honor, I can -- I can get back to

24  you in terms of whether that's typical in this sort of area of

25  operations, but I will say that the place of arrest is frequently

1   not the place of detention.  And frequently individuals have to

2   go to a -- an under -- an under 72-hour facility.  Usually

3   there's medical screening there that takes place, and then

4   they're transferred to other facilities.  Because, I mean, after

5   COVID we want to -- it's best to make sure that you're not

6   putting people -- you know, putting people in detention centers

7   permanent, semi-permanently when, you know, there might be an

8   infectious disease to worry about.  So there's nothing irregular

9   about under 72-hour facilities, but to the extent that the --

10          THE COURT:  Is Farmville typically an under 72-hour

11   facility?

12          MR. BYERLEY:  Farmville is not, Your Honor.

13          THE COURT:  Okay.  Because that's the one I was asking

14   specifically about.  Okay.

15          The other thing I want to -- an answer on is:  When this

16   decision was made that he would be moved to Texas?  The Simon

17   declaration talks about there being a potential for overcrowding,

18   and that there was a communication with a Texas facility that

19   indicated that they would be able to receive him and that they

20   had the bed space, but when he arrived at the Texas facility,

21   there was no bed space.  He was in a TV room on a cot.  And so he

22   went from Farmville, where he had -- was in a cell by himself, to

23   a TV room and a cot.

24          So I want some type of information, additional information

25   on the decision to -- when the decision was made to move him to

1  Texas and whether or not that was ordinary, the idea of someone

2  going from a facility that does have bed space to then a facility

3  that does not.  Okay?

4      MR. BYERLEY:  Okay.  Your Honor, I will ask ICE to provide

5  that information as quickly as they can.

6      But I'll also point out that 1226(e) provides that courts

7  shall not have jurisdiction over any decision or action regarding

8  detention facility -- detention facilities.

9      THE COURT:  I'm not -- I'm not -- we'll get to that later

10 because that's your subject matter jurisdiction argument.  Okay?

11 We'll get there, but these are all -- what they have asserted is

12 that there was abnormal activity here.  And you have asserted in

13 your pleadings that they, petitioner, is forum shopping.  And

14 they in turn have alleged that, no, it is the government that was

15 forum shopping.  So these are the questions I want answered.

16 Okay?

17     MR. BYERLEY:  Okay.  But returning to *Padilla*, I think

18 the -- the -- what the relative levels of detention beds there

19 were at any given facility is not something that really factors

20 into the *Padilla* analysis.  Habeas jurisdiction lies in one

21 district, and that's the district of confinement.

22     He's challenging his detention in an ICE facility.  That

23 detention is taking place in Texas.  His petition should go

24 forward there.  But what is clear is that the petition should not

25 go forward here when he'd already left this district by the time

1    the petition was filed.

2         THE COURT:  Not if I find that the unknown custodian

3    exception applies.

4         MR. BYERLEY:  So, Your Honor, going back to *Demjanjuk*,

5    okay, that was a 1986 case by -- on the habeas petition referred

6    directly to Judge Bork at the D.C. Circuit -- that's Chief Judge

7    Bork of the D.C. Circuit.  What he said was, is that if it -- if

8    it comes to light that there's another -- that -- where he is

9    confined and a judge of that circuit would lose jurisdiction over

10   him, and that the unknown custodian rule and the ultimate -- and

11   the ultimate custodian sort of in lieu of the immediate custodian

12   only comes into play when the custodian is not known.

13        That is not -- from Judge Bork's analysis, that is not a

14   moment in time analysis.  That's not something that is purely

15   based on the moment of filing.

16        THE COURT:  That opinion did not have a lot of analysis.

17   I saw that in his opinion, where he references how the Court

18   could become divested.  That didn't take into consideration --

19   that -- that may not always be accurate.

20        MR. BYERLEY:  Sorry, Your Honor, what --

21        THE COURT:  That the circuit would be divested of

22   jurisdiction.  And I know it's not appropriate, necessarily, on

23   all fours here, but even with respect to an *Endo* analysis in a

24   situation.  If that were the situation, it wouldn't apply,

25   correct?

1     MR. BYERLEY:  So, correct, Your Honor, but the *Endo*

2 situation deals with a very different --

3     THE COURT:  I know it does.

4     MR. BYERLEY:  Right.

5     THE COURT:  I know.  I mean, that's not quite us either

6 because of what you raise, which is this -- he was already in

7 motion at the time that the petition was filed.

8     MR. BYERLEY:  Yes, Your Honor, but if we look at *Padilla*

9 and look at -- it didn't -- it didn't affirm or disparage

10 *Demjanjuk* either way.  It just said that that case isn't helpful

11 because -- because of how it framed the unknown custodian rule.

12 And I think if we're looking at *Padilla* as having adopted or

13 tacitly accepted or implicitly accepted, at least the concept

14 that Judge Bork put forward, that con- -- that *Demjanjuk* opinion,

15 I think we have to look at that as what the Supreme Court was

16 looking at, at the time that it acknowledged that opinion, to

17 extend *Demjanjuk* to say, well, the unknown custodian rule is a

18 moment of time thing that extends permanently throughout the

19 duration of the case, even when it becomes known where the

20 custodian is, or if the Court accepts the government's argument,

21 that he was told tacitly or implicitly, depending on the degree

22 of the Court's acceptance, where he was going to be detained by

23 ICE.

24     In this case the unknown custodian rule doesn't apply, and

25 it doesn't apply to extend throughout the duration of the case.

1    And Chief Judge Bork was pretty clear about that in *Demjanjuk*.  I

2    appreciate that it was among the shorter opinions of Judge

3    Bork's, but that was his view at the time, and then he proceeded

4    to address the merits.

5         I'll also note that the Fourth Circuit's sort of tacit

6    acceptance of *Demjanjuk* was also not necessarily essential to

7    that case.  I'm not going to deny that the Fourth Circuit gave a

8    nod to it, but ultimately that was not dispositive in that case.

9         But even if it were, the *Musawi* case dealt with somebody

10   who was being held in military custody overseas, an Al Qaeda

11   operative held by the military overseas, clearly in no district

12   in the United States.  In that circumstance the unknown custodian

13   rule would apply, too, because the government is not willing to

14   divulge -- it would be inappropriate for the Court to require

15   reports on troop movements or where they're holding Al Qaeda

16   operatives.

17        This case is just very dissimilar from that, where we have

18   an NTA that arguably tells him where he's going to be detained.

19   The Prairieland Detention Facility is -- it's not a -- it's not a

20   secret where it is, and he was in transit there.  And the fact

21   that that was done quickly, I think, is just quickly following

22   through on something the government more or less said that it was

23   going to do in advance.  There's nothing sort of surreptitious or

24   secretive about that.

25        And that's certainly not similar to a situation that was

1     in *Demjanjuk* or the Fourth Circuit's nod to it in *Musawi*.

2          And, again, looking back to *Padilla*, which discussed the

3     *Demjanjuk* rule and looking at the *Demjanjuk* -- the *Demjanjuk*

4     exception, it did not sort of give a nod to that opinion as being

5     something that would extend throughout the duration of the case

6     long after the district confinement has become known.

7          But in any event, what we do know is that his custodian

8     was not in this district, and this district also is not -- does

9     not have in personam jurisdiction over the ultimate custodians

10    either because they would be in DDC.

11         So, either way, no matter what court it should have been

12    filed in, the record is pretty clear that it was not this one,

13    and so that's the government's argument on the motion to dismiss,

14    and that's why we think the Court should dismiss.

15         The question of where the Court should transfer to is

16    somewhere that's downstream from the initial sort of

17    determination that he had left the Eastern District of Virginia

18    at 2:47 p.m., wheels up, and had landed in another district

19    before his petition was filed.  That is the only relevant sort of

20    question to whether where habeas jurisdiction should lie here.

21    It's not this district.  Whether it's in Texas, Louisiana, or

22    elsewhere, it's not this district.

23         THE COURT:  I understand your argument.

24         MR. BYERLEY:  Thank you, Your Honor.  Unless Your Honor

25    has any other questions --

1    THE COURT:  I may circle back.  I may have a few more in

2  rebuttal.  Did you want to take up the subject matter issue or --

3    MR. BYERLEY:  I will allow my friends on the other side to

4  speak their opposition.  Thank you.

5    MR. AGRAHAKAR:  Thank you, Your Honor.  Vishal Agraharkar

6  on behalf of the petitioner.  I will be responding to the

7  government's argument as to venue, motion to dismiss, as well as

8  motion to transfer venue.  And my colleague Sophia Gregg will be

9  addressing the motion for release on bond, as well as the motion

10  to compel return to this district, including the provisions in

11  the INA that the government says -- say bar relief.

12    Your Honor, when we filed Dr. Suri's petition, we didn't

13  know where he was or who his custodian was.  We couldn't have

14  known.  We couldn't have known because of the government's

15  actions, and those actions were intentional misdirection for the

16  purpose of preventing Dr. Suri from accessing federal court.  And

17  they're continuing today, including in the government's arguments

18  and briefing in this case, where they assert the power to dictate

19  jurisdiction by writing it on a piece of paper.

20    If the Court blesses the government's extraordinary

21  actions here by transferring the case to Louisiana or Texas or by

22  dismissing it altogether, it will drastically expand the holding

23  in *Padilla* in ways that we know the majority would not condone,

24  and that would allow the government to greatly diminish access to

25  the great writ.

1    I'd like to make three overarching points in my time, in a

2 long way address the arguments that the government raises and any

3 questions that Your Honor may have.

4    First, I'll touch on the ample reasons why this Court

5 should apply the unknown custodian rule to maintain jurisdiction

6 and venue.

7    Second, I'll respond to the respondent's novel theory of

8 jurisdiction that the Northern District of Texas obtained

9 jurisdiction at the point at which Dr. Suri was served with the

10 notice to appear in this case, which is not only based on a poor

11 understanding of the facts of the NTA itself -- which I'll

12 address -- but also amounts to a rule that the government can

13 manufacture jurisdiction with the stroke of a pen in whatever

14 court it wants.

15    Lastly, I want to reinforce why transfer to Louisiana is

16 also inappropriate in this case.

17    So turning to the unknown custodian rule.  At the time

18 Dr. Suri's petition was filed, this was the only district in the

19 country where his lawyers reasonably could have known or have

20 believed him to be, in large part because the government took

21 affirmative steps to keep him and his counsel in the dark about

22 his location and his movements.

23    ICE officers informed his wife that they were taking him

24 to the Eastern District of Virginia.  They then told Dr. Suri

25 that he would remain in the Eastern District of Virginia, which

1    information they then permitted him to pass along to his wife,

2    which made its way to petitioner's counsel.

3          And then as they covertly and rapidly moved him to

4    Louisiana, they refused to tell him where he was being moved and

5    ensured that his counsel could not possibly have learned of his

6    location until well after the petition was filed.

7          Those facts are undis- --

8          THE COURT:  They say that the face of the notice to

9    appear, which petitioner's counsel had access to, clearly

10   indicated that he would be held in Texas.

11         MR. AGRAHAKAR:  This is a distortion of the facts of that

12   notice to appear.  And, actually, if it -- if I may just point to

13   the notice to appear itself, which is at --

14         THE COURT:  I have it.

15         MR. AGRAHAKAR:  Great.  I'm just pulling it up here.  So,

16   the top of this document says that:  The respondent currently

17   residing at 1209 Sunflower Lane, Alvarado, Texas, ZIP code.  So

18   that is -- that is an area that just says it's -- first of all,

19   that's not his actual current address.  It's not where he lived

20   in Virginia.  It's not where he was at the time.

21         While I am not an immigration lawyer, several members of

22   our team are, and according to them, that is a -- that field is

23   reserved for people's exact address at the time at which they're

24   reserved.

25         THE COURT:  Which is why it's redacted?

1        MR. AGRAHAKAR:  Which is why it's normally redacted.  And

2    so this -- and so this is just confusing, if anything.  It

3    doesn't tell him anything about -- and it doesn't even say here

4    that this is a detention center, much less Prairieland.

5        Then if you go further down on this document, the -- the

6    bottom says that:  You're ordered to appear before an immigration

7    judge of the United States Department of Justice at, quote, 27991

8    Buena Vista Boulevard, Los Fresnos, Texas 78566, Prairieland

9    Detention Center.  So this is -- this is confusing for a couple

10   of reasons.

11       So the listed address here happens to be -- it isn't the

12   Prairieland Detention Center.  It's actually the Port Isabel

13   Detention Center.  That's in the Southern District of Texas.  And

14   then it says Prairieland Detention Center.  That's in the

15   Northern District of Texas.  It doesn't make clear that -- which

16   one he's going to be held at.  It doesn't say that one --

17       THE COURT:  And where -- and then where to file.

18       MR. AGRAHAKAR:  It certainly doesn't say where to file.

19   And so to the extent this tells us anything about his place of

20   confinement -- this document tells us anything about his place of

21   confinement, it's that at some point in the future he may or he

22   may not go to either the Northern or Southern District of Texas

23   for a hearing that might be in person or it might be virtual,

24   because that -- even though respondents say that that's clear,

25   it's not clear in any way to me that this means that the hearing

1    will be virtual or in person.  So he might not need to go to

2    Texas at all.

3         In the meanwhile, of course, the ICE officer who actually

4    gave this document to him told him, "Don't worry about it.  That

5    address is computer-generated and can be changed later on,"

6    insinuating that, you know, he -- and at the same time told him

7    that, "Actually you're going to be in Virginia.  You'll be in

8    Farmville or closer to home."  And my friends on the other side

9    say that that's not made clear in his declaration.

10        But I do want to point to -- I think Your Honor was

11   reading from paragraph 9 in Dr. Suri's declaration, and I think

12   that must be where the government was reading from when they made

13   that claim, but if we go over to paragraph 14 --

14        THE COURT:  Hold on.  Let me get there.  Okay.

15        MR. AGRAHAKAR:  Paragraph 14 Dr. Suri says, "I was then

16   driven to the Farmville Detention Center where I was placed in a

17   cell by myself.  I asked to call my wife, but I was refused," and

18   so forth.  "The nurse told me I'd be moving to a dormitory.  I

19   believed that I would be living there for some extended period of

20   time or until I was brought home or closer to home because I was

21   told so by the officer at Chantilly."  So he made very clear that

22   he was given this information.

23        So, Your Honor, if -- if Dr. Suri's counsel had decided

24   out of caution to somehow obtain local counsel and file a

25   petition in both the Southern and Northern Districts of Texas in

1  addition to the Eastern District of Virginia, the still -- we

2  still would have been wrong about where he would have been at the

3  time of filing because the notice to appear was, if anything,

4  misleading and deceptive about that fact.

5      And, of course, if we had filed in Texas, respondents

6  could have moved to dismiss because that would comport with the

7  habeas statute.

8      And so such a rule that the government is proposing in

9  this case would allow them, at their discretion, to create a

10  situation where petitioners have nowhere in the country where

11  they could seek habeas relief, which is also consistent with

12  other arguments they're making in this case, including that no

13  court in this country has subject matter jurisdiction to hear

14  this petition whatsoever.

15      And even assuming that they had served a different notice

16  to appear that had -- that had made clear when and where they

17  were taking Dr. Suri, under their rule, again, the government

18  could simply manufacture jurisdiction in whatever court it wants

19  by writing it on a piece of paper regardless of where the person

20  is taken in the interim.  That rule it is completely

21  consistent -- inconsistent with *Padilla*.  It also would

22  eviscerate *Endo*, which says that once a court properly takes

23  jurisdiction, the movement of that person to a different

24  jurisdiction doesn't divest that court of jurisdiction.

25      Your Honor, the -- so the facts are undisputed that at the

time of filing we had no idea where he was or -- had no way to

know where he was or who his custodian was, and that on its own

is sufficient to apply the unknown custodian rule in this case,

but there are also several other reasons.

THE COURT:  They also argue they're relying on *Padilla* to

say that it doesn't matter what counsel knew at the time.  Is

that what *Padilla* says?

MR. AGRAHAKAR:  No, Your Honor.  *Padilla* makes very clear

that -- well, it says that the unknown custodian rule applies

when, "A prisoner is held at an undisclosed location by an

unknown custodian."  And that was true at the time of filing,

right?

And they point to, you know, they -- they point to a line

in *Demjanjuk* about a court -- that the Court would be divest of

jurisdiction if it later learns where someone is confined, but it

wouldn't -- first of all, that line was not endorsed by *Padilla*.

That line was a -- kind of a -- a throwaway line of dicta in

that -- in that case, which is a D.C. Circuit case, not a Fourth

Circuit case, even if it were precedent, but it's -- it was dicta

from that case itself.  But it wouldn't make sense to *Padilla* --

to read *Padilla* to require transfer after you later -- if you

later learn the custodian, even if you didn't know it at the

time, because that would allow the government to circumvent *Endo*.

So the government could hold -- theoretically hold someone

incommunicado, wait to see if and where they file a petition, see

how the case is going, and then serve them at some later point
and say we now know where the custodian is, and then so the
court's divested from jurisdiction. That's clearly not what
*Padilla* says. It would clearly be inconsistent with *Endo*, and
it's not the law, and so the Court should not look at that line
in *Demjanjuk* and see that it's binding in this court in any way.

So, keeping jurisdiction in this case and applying the
unknown custodian rule is particularly appropriate in light of
Justice Kennedy's concurrence in *Padilla*, where he and Justice
O'Connor were very clear that if -- if the facts in *Padilla*
itself had indicated that the government has removed Mr. Padilla
from the Southern District of New York to make it difficult for
his lawyers to know where to file his petition or to hide the
identity of the custodian of the location where he's being
detained, then that case itself would have stayed in the Southern
District of New York, even though there was no dispute that
Mr. Padilla's counsel knew exactly where he was at the time of
filing in *Padilla*, that he was in custody of a Naval brig
commander in South Carolina, and that he was in the District of
South Carolina at the time of filing.

Here Dr. Suri's immediate and secretive removal from the
Eastern District of Virginia was extremely unusual. At the very
least, it had the effect of interfering with his counsel's
ability to know where to file, which is sufficient to invoke the
Kennedy exception and invokes all those concerns that Justice

1  Kennedy pointed out, but there's also evidence in this case --

2      THE COURT:  Their response to that is the concurrence is

3  not holding.

4      MR. AGRAHAKAR:  Sure.  Your Honor, the -- so, the --

5  nothing in the *Padilla* majority -- so the -- we know that two of

6  the five justices in the majority invoked these exceptions.

7  Nothing in the majority opinion refuted any of that.  If the --

8  all they did was distinguish it on the facts because, in fact, in

9  Mr. Padilla's case they --

10      THE COURT:  They did know.  They knew.

11      MR. AGRAHAKAR:  Counsel knew exactly where he was.  They

12  actually named the Naval brig commander as the respondent when

13  they filed the petition.  There was a letter I think submitted

14  prior to the filing indicating that they knew he was on that

15  Naval brig.  I think one of the issues in the position -- in the

16  petition itself is that his client was on this Naval brig, so

17  it's a very -- the facts are completely different there.

18      But the majority opinion does not -- doesn't contradict

19  anything that -- all it does is distinguish it on the facts.

20      And the -- so the -- so here, the circumstances of his

21  rapid movement and his arrest in the middle of the night and his

22  movement between locations, the government's withholding of

23  information from Dr. Suri, and its misdirection, including the

24  insinuation that he was going to be remaining in Virginia, their

25  refusal after that to allow him to correct that misimpression,

1    that there was capacity in nearby Virginia detention centers

2    which calls into question their only stated justification for the

3    transfer.

4        So we have declarations from a couple of different

5    attorneys who make clear that at the time that he was at

6    Farmville, Farmville was taking plenty of other detainees for

7    extended stays, that the rapid fire movement of detainees out of

8    Farmville, which is not a 72-hour holding facility, was extremely

9    unusual.  And I think one of the declarations said they had never

10   seen someone moved out within 48 hours.  And not just they had

11   never seen, but none of their attorneys who they supervise had

12   ever seen that.  And that the few detainees who are transferred

13   out of Farmville are only moved only after several months.

14       And the explanation, as Your Honor mentioned, is that --

15   their explanation is that he was transferred not to -- because it

16   was overcrowded, but to prevent the potential for future

17   overcrowding.  And because of that, they transferred him to a

18   facility where a third of the people in his unit still sleep on

19   the floor because there aren't enough beds to accommodate them.

20   And he himself for two weeks after he got there slept on a cot on

21   the floor instead of being given a bed.

22       So the explanation is just not credible, and, you know,

23   they haven't -- I think this Court can also look to other

24   recent -- the government's actions in other recent cases which

25   further suggest a plan in support of our allegation in our

petition about such a plan, of moving persons like Dr. Suri, for

purposes of evading federal jurisdiction, either the jurisdiction

to certain courts or the jurisdiction of federal courts

altogether, and which is consistent with news reports from

credible news sources saying that Homeland Security officials

have acknowledged the existence of such a -- such a scheme.

They call this a conspiracy theory in their briefing, but

notably they never actually deny that such a plan or directive

exists.  So I think this Court can infer that there are at least

indications of a plan.  And I think under the standard that the

Court is operating under, which is whether we've made a prima

facie case at this point, in granting all inferences in our favor

at this point, which the Court is required to do under the

standard, that there are at least indications of a plan to move

Dr. Suri south for the purpose of making it difficult for his

attorney to file this petition, and which raises precisely those

concerns that Justice Kennedy and Justice O'Connor raised in

*Padilla*.

Now, a second reason why the unknown custodian -- a second

additional reason why the unknown custodian rule should apply

here is that not only was there confusion at the time of the

filing, but there continues to be a lack of clarity today as to

who his immediate custodian was at the time of filing.

So according to the government, his flight -- Dr. Suri's

flight landed in Louisiana less than an hour before the

1    petition's filing.  Dr. Suri says he was never booked or

2    processed in any way until several hours later, either late that

3    night or early the next morning, at which point he saw a -- or

4    interacted finally with some government employee for some --

5    receiving some basic paperwork.  And that would have been well

6    after the petition was filed.

7         Now, on reply, Mr. Simon submits a declaration -- a

8    supplemental declaration saying that Dr. Suri was booked into

9    Alexander's staging facility at 5:42, which, as Your Honor --

10        THE COURT REPORTER:  (Requests clarification.)

11        THE COURT:  Admitted.

12        MR. AGRAHAKAR:  Yeah, processed or admitted or booked --

13   booked or processed at 5:42, which was just -- well, as Your

14   Honor made clear, it does not actually say that that was Eastern

15   time.  It leaves that open to interpretation.  Certainly if we're

16   talking about Texas and Texas is in Central time, so taking --

17   drawing the inference in our favor --

18        THE COURT:  But this is Louisiana, and I think Louisiana,

19   isn't that Central time as well?

20        MR. AGRAHAKAR:  Is it Central?  Okay.  Louisiana's

21   apparently Central time as well, and so drawing inferences --

22        THE COURT:  Do you know where the plane lands?  Does it

23   land at the physical facility or is it --

24        MR. AGRAHAKAR:  My understanding is it lands very close,

25   yes.

1          THE COURT:  Okay.

2          MR. AGRAHAKAR:  But there are 300 people apparently on

3     this flight, all shackled, all having to get unshackled and moved

4     off the plane.  And so the -- you know, what we have is our

5     client saying that he wasn't booked until many hours later.  And

6     we have Mr. Simon saying that he was booked at 5:42 maybe Central

7     time.  They now say it's Eastern time.  If it was Eastern time,

8     then that would still be, you know, just 17 minutes before the

9     petition's filing, but it's not clear what records Dr. Simon is

10    looking at, what they mean by booking, and in any event, it's

11    contrary to what the clear testimony that Dr. Suri puts forth

12    that there was no booking of any kind until many hours later.

13         But respondents create additional confusion about

14    Dr. Suri's status in Louisiana because they say he was merely

15    passing through Alexandria on the way to Texas and argue that

16    under Fourth Circuit precedent his temporary transit in Louisiana

17    didn't change the immediate custodian for the district of -- for

18    purposes of -- or the district of confinement for purposes of the

19    habeas statute.

20         So, this further supports Dr. Suri's point that the

21    custodian or district of confinement was not knowable, at a

22    minimum, such that the unknown custodian exception or rule should

23    apply here, because -- even today they're essentially arguing

24    that whoever was Dr. Suri's custodian prior to his movement to

25    Louisiana should remain the custodian -- or it didn't change by

1  virtue of his being brought to Louisiana.

2      So assuming this Court properly rejects their argument

3  that he was already in custody in Prairieland in the Northern

4  District of Texas before he was brought to Louisiana, then it

5  should find that the reasoning in *Poole* doesn't help them, it

6  hurts them, and it's further support for finding the unknown

7  custodian rule.

8      The third additional reason, Your Honor, is that the

9  default rules in -- under the rule is that the default rules in

10  *Padilla* were explicitly intended to prevent forum shopping and to

11  avoid a situation where multiple courts have overlapping

12  jurisdiction.

13      Here, keeping jurisdiction in this court would serve

14  those goals.  It would discourage forum shopping and deceptive

15  conduct by both the government, as well as the petitioners -- by

16  future petitioners, and it would provide clarity to attorneys as

17  to what is the one judicial district where they should file when

18  they don't know where their client is and after they diligently

19  looked.  And, namely, it would be the last place where they

20  reasonably could have known him to be.

21      And to see why -- consider what Dr. Suri's counsel would

22  have had to do at the time of filing if the petition could only

23  be filed in the district in whose territory or over whose air

24  space the petitioner happened to be at that time.

25      So, in addition to filing a petition in Virginia, where

1    counsel reasonably believed that he still was, he would have to

2    speculate if and where he was going to be moved and file in every

3    judicial district in those states potentially, certainly here

4    where -- and then in every judicial district between where they

5    believed him to be and those judicial districts.

6         And then assuming that his counsel -- in this case,

7    assuming that we had speculated that he might have been taken to

8    Texas and had obtained local counsel and filed a petition, as

9    well as a motion for immediate relief in the Northern and

10   Southern Districts of Texas, we still would have been wrong of

11   course because he was taken to Louisiana and not Texas.

12        So you can easily imagine a situation where future

13   petitioners in our situation would weigh the option of filing

14   petitions in courts around the country in this kind of situation.

15   So, that's the kind of -- instead of what we did, which was

16   exercise due diligence, try to locate our client and found the

17   last known location where we believed him to be.

18        And, of course, if we -- if future petitioners are

19   incentivized to file in places where they don't even think their

20   client is just to cover their bases, that also would raise some

21   tensions with their professional obligations.

22        I want to turn now to the theory of -- the novel theory of

23   jurisdiction that was advanced by the government.  So, the

24   government's main response to these concerns is to propose -- and

25   I've covered most of this actually, just this idea that if the

notice to appear -- that once someone is served with a notice to
appear, that that in and of itself would provide notice for where
they're detained.  It doesn't work with the facts here.  It
doesn't work with the law.

        And I would just add that, again, if this Court is
considering the purposes of the unknown custodian rule, the
concerns in Justice Kennedy and Justice -- Justice Kennedy's
concurrence, even this argument suggests the plan that we allege
in our case, which is a plan to prevent federal courts, prevent
this federal court from being able to get jurisdiction, to
prevent our client from being able to access federal courts, is
inconsistent with the ability of courts to adapt or to ensure
that habeas remains an adaptable and accessible remedy, and it
creates a gap in the fabric of habeas if that type of argument is
accepted.

        Finally, I want to reinforce some reasons, in addition to
the ones I've already mentioned, why transfer to Louisiana is not
appropriate.  First of all, we think that transfer -- that by
keeping this case in this jurisdiction is consistent with
*Padilla*.  We think the best reading of the unknown custodian rule
is that, you know, although it is reserved for extraordinary
cases such as this one, when it applies the Court has discretion
to relax both immediate custodian as well as the district
confinement rules, provided that the district court has
jurisdiction over an appropriate respondent or an ultimate

1  custodian who has the authority to release the detainee, and

2  that -- that's not in dispute here.

3     And, in fact, I would note that Justice Kennedy and

4  Justice O'Connor were crystal clear that, you know, they

5  understood the exceptions as applying to the district of

6  confinement rule, too, because in that case Mr. Padilla

7  himself -- there was no dispute that he was already in South

8  Carolina, and they were going to send -- they said that that case

9  would have remained in the jurisdiction from which Padilla was

10  removed if there was evidence that the government was not

11  forthcoming with his location and with the identity of the

12  custodian.

13     And, of course, nothing in the majority opinion

14  contradicted that.  The majority, again, distinguished that kind

15  of scenario.  The dissent was inventing a scenario that didn't

16  exist in that case and so had no occasion to consider whether

17  that would apply in Mr. Padilla's case because it just wasn't the

18  same facts as we have here.

19     Second, Your Honor, transfer to Louisiana in this case

20  would functionally achieve the government's attempt at forum

21  shopping.  So, we -- in our amended petition we allege that the

22  people who are subject to the policy that we're challenging, the

23  policy that Dr. Suri and some other people around the country

24  have been -- have been subjected to, are -- they're being

25  transferred to Louisiana and Texas to frustrate their access to

1  the courts for forum shopping.  And the district court hearing

2  the recent cases in *Khalil* and *Ostrick*, those cases understood

3  this and great -- give -- gave great weight to the reasoning in

4  the Kennedy concurrence.  And in there they noted the

5  transferring -- transferring or keeping the case in New Jersey or

6  Vermont, as the case may be, didn't implicate those concerns.

7      But in both cases the courts declined the government's

8  invitation to transfer the case to Louisiana or dismiss the case

9  and allow petitioner to file in Louisiana, in part because of

10 these concerns and the possibility of forum shopping.

11     Here, of course, the facts are different.  In those cases,

12 the transfer to Louisiana would reward the government for the

13 exact conduct that Justice Kennedy warned about in his

14 concurrence.

15     Finally, all the traditional venue considerations,

16 counsels who are keeping this case in Virginia.  Dr. Suri, his

17 counsel's here.  He lived here.  This is where all the facts

18 giving rise to the petition took place.  His residence was here,

19 and his family is here.  And Louisiana has no connection to this

20 case anymore, other than it's where Dr. Suri happened to be at

21 the time -- well, under the government's reading and

22 Louisiana's -- at best or at worst, their air space was where he

23 happened to potentially be at the time the petition was filed.

24 And respondents themselves acknowledge that he was never in

25 custody there in arguing for an application of *Poole*.

1    So, in every respect, the Eastern District of Virginia is
2    a more appropriate forum for trying this case.
3    Your Honor, this is not a routine case.  From the moment
4    that Dr. Suri was detained outside of his apartment, respondent's
5    have been trying to frustrate his ability -- his attorney's
6    ability to challenge his detention and to manipulate federal
7    jurisdiction -- federal court jurisdiction for their
8    unconstitutional scheme.
9    If ever there were a case for a court to apply the -- or
10   to heed the warnings in Justice Kennedy's concurrence, this is
11   the case.
12   One last point, Your Honor.  If Your Honor finds that
13   petitioner has not made a prima facie case of jurisdiction and is
14   inclined to transfer, that's a decision that we believe may not
15   be reviewable.  And so before making such a decision, we would
16   respectfully ask that in the interest of justice, the Court
17   permit us -- permit us to take some limited discovery before
18   that.  And then that would be for the purpose of establishing
19   exactly where Dr. Suri was on March 17th and 18th and to inquire
20   into the purpose for his transfer, some of the same questions
21   that Your Honor asked of the other side.
22   And if the Court is inclined to transfer without providing
23   petitioner that limited jurisdictional -- limited discovery
24   period, then we would just ask the Court to issue a brief stay so
25   that we may find -- have that time to find some local counsel so

1    we can move quickly in Louisiana.

2           THE COURT:  Thank you.

3           MR. AGRAHAKAR:  Thank you, Your Honor.

4           MR. BYERLEY:  Thank you, Your Honor.  The government here

5    is not impugning anybody's good due diligence.  What we're saying

6    is that Dr. Suri was not in this district at the time the

7    petition was filed.

8           I understand that my friends on the other side argue a lot

9    about what they knew and when they knew it, but *Padilla* expressly

10   rejected that as governing over the facts as they actually were,

11   and --

12          THE COURT:  Did they expressly reject that, because it was

13   much different there because the location was known.  And so

14   while the dissent focused on what matters was the facts available

15   to counsel at the time of the filing, the majority in one of the

16   footnotes talked about that's not really the issue here because

17   here the counsel knew.  It wasn't a question.

18          MR. BYERLEY:  So, Your Honor, in that same footnote,

19   footnote 17 I believe that you're referring to on page 449, the

20   Supreme Court also said it's -- they said even if it were a valid

21   legal argument, which I think doesn't -- that doesn't play into

22   the facts.  That's more about that's not a valid legal argument,

23   and to construct a fiction based on what counsel claims to know

24   or actually knew or claims to not know at the time, it's --

25   you're breaking so far from the facts that then the -- then the

1   district confinement rule doesn't --

2       THE COURT:  But they didn't --

3       MR. BYERLEY:  -- mean anything.

4       THE COURT:  They didn't embrace the argument that you are

5   making now, because what they said was:  That's not our situation

6   here.  We don't even have to go there because here they clearly

7   knew.

8       MR. BYERLEY:  So, I think what -- what we're talking about

9   here is that the -- they were analyzing a specific narrow

10  exception that the *Demjanjuk* court looked at.

11      Here, we -- there is some indication that he would be

12  detained in the Northern District of Texas or, according to my

13  friend on the other side, either the Northern or Southern

14  District of Texas.  And the original petition acknowledges that

15  he would be imminently moved to Texas.  So this is not an

16  indication of -- this is not a case where it's completely

17  unknown.  Plaintiff -- plaintiff's side says we were confused by

18  the NTA, and, you know, be that as it may, the NTA nonetheless

19  indicated where he would be at the time of his immigration

20  hearing.

21      THE COURT:  On May 6th --

22      MR. BYERLEY:  On May 6th, but --

23      THE COURT:  -- but --

24      MR. BYERLEY:  Yes, Your Honor, I understand.  I understand

25  that that may be --

1       THE COURT:  Because it's March 18th when they're filing.

2       MR. BYERLEY:  Yes, Your Honor.  I appreciate that, but on

3   March 18th at the time he filed his petition he was not here.  So

4   we don't need to get into whether a transfer to which district is

5   appropriate if it's clear that the district that is appropriate

6   is not this one.

7       THE COURT:  When it's unknown then it becomes relevant.

8   When we don't know what district, and based on -- because your

9   argument for where we know of how they should know where he is,

10  is the NTA, but the NTA does not say where he is in the moment,

11  and so what they did was file where they knew he was, where he

12  had been arrested, where he resided, where he had been taken to a

13  detention facility, where it had been expressed the only issue

14  would be whether or not he would be moved closer to home.  All of

15  the arguments that you make in terms of forum shopping don't

16  apply here.

17      MR. BYERLEY:  So, Your Honor, I think what we're getting

18  away from is the district of confinement rule, and everybody

19  agrees that the district of confinement is not in this district.

20  Whether it's in Texas or Virginia, Louisiana, somewhere else,

21  it's not in this district.  At 2:47 p.m. he was --

22      THE COURT:  The original district, it --

23      MR. BYERLEY:  -- wheeled off from this district.

24      THE COURT:  -- was.  It was.

25      MR. BYERLEY:  Your Honor, the --

1    THE COURT:  It was.

2    MR. BYERLEY:  Your Honor, the --

3    THE COURT:  Because in *Poole* what they talk about was what

4 was original.  They also talk in terms of permanent.  You focus

5 on it and use it for the discussion of transitory and being why,

6 you know, Louisiana would not be appropriate, and it's -- he's

7 heading to Texas, but who talked about where is the place of

8 what's original?  And here original would have been -- that is

9 where he was.

10    And when we have all we have is what they knew at the

11 time, and then everything else is really unknown here, the

12 custodian, this is one of those extraordinary circumstances; is

13 it not?

14    MR. BYERLEY:  So, Your Honor, the majority expressly

15 rejected the view that -- and I'll quote here.  "If Justice

16 Stevens' view were accepted, district courts would be confined to

17 making ad hoc determinations as to whether circumstances of a

18 given case are exceptional, special, or unusual enough to require

19 from -- to require departure from the jurisdictional rules that

20 this Court has consistently applied.  We do not think congress

21 intended such a result."

22    THE COURT:  When it applies the immediate custodian and

23 the district of confinement, those are the normal rules.

24    MR. BYERLEY:  Those are the normal rules, Your Honor.  But

25 here what we have is a person not challenging their detention in

1    a given place.  They're challenging their detention by the

2    agency.  And here the agency said that the detention would take

3    place in Texas, so this is kind of similar to *Padilla*, which

4    relies on *Braden*, involving an Alabama prisoner who's challenging

5    his Kentucky -- his Kentucky detainer, even though he was

6    detained in Alabama, because he was challenging his detention

7    that would take place in Kentucky upon his release from Alabama.

8         We don't think that this situation is all that dissimilar,

9    particularly given the information of the NTA.  And I appreciate

10   that it may be confusing, that Mr. Suri may have been given

11   information that was not always clear, but the NTA is fairly

12   clear on where he was going, and so we're not relying on

13   speculation here.  All we're saying is that Mr. Suri was not in

14   this district at the time the petition was filed, and to say that

15   I can -- the Court should create a fiction to pretend that he

16   was, based on what counsel knew, the place of arrest, the place

17   of transit from Virginia to eventually to Louisiana and a few

18   days later to Texas, that's -- that would be a broad extension of

19   the *Endo* rule.  And the *Endo* rule says that whenever a habeas

20   petition creates a -- whenever habeas jurisdiction vests in a

21   district court, based on a habeas petition in that district filed

22   by a petitioner in that district, a later transfer does not

23   destroy that.

24        As Your Honor acknowledged earlier, this is not a

25   situation in which the *Endo* rule really applies here because he

1    was moved before the petition was ever filed, and that's really

2    the only thing that the Court needs to look at to determine

3    whether the habeas jurisdiction provision in the statute allows

4    this Court to entertain a petition where, again, he was not

5    detained at the time the petition was filed.  His custodian was

6    not here, and he's not detained here now.  So, this is all that

7    we're looking at.  The relevant data point that's here is when

8    his flight took off, and if that happened before his petition,

9    this district is not the proper one to entertain his habeas

10   petition.  Which district that is need not be decided today.  The

11   Court can dismiss without prejudice to re-filing.

12          Thank you, Your Honor.

13          THE COURT:  What happens with that?  Because their

14   argument with respect to dismissal is that the order that I have

15   put in place that prevents his removal from the United States

16   would disappear.

17          MR. BYERLEY:  So, Your Honor, the -- from what I've heard

18   from my ICE counterparts is that there's no plan to remove him

19   regardless of whether that order existed before removal

20   proceedings have run their course.  If Your Honor would like, I

21   can go back and ask ICE to reconfirm that, but I -- to my

22   knowledge, there's no plan to remove him while his -- his initial

23   appearance hearing hasn't even taken place yet.

24          THE COURT:  I don't know if I'm going to rely on that, but

25   thank you.

1        Let's move on to our -- to the arguments with respect to

2    subject matter jurisdiction.  Are you -- are you making those?

3        MR. BYERLEY:  Oh, yes, Your Honor, sorry.  I thought --

4    since they were plaintiff's motions, I thought the other side was

5    going first.

6        THE COURT:  No, just because I'm taking up all of what

7    is -- I take your point.  If you'd like to hear -- let's take up

8    all of the jurisdictional issues first.

9        MR. BYERLEY:  So, Your Honor, first I'll point out that

10   the -- that there has been -- because our motion to dismiss was

11   based purely on habeas jurisdiction, the Court currently doesn't

12   have in front of it full-throated arguments as to subject matter

13   jurisdiction over the merits.

14       To the extent that the Court would like briefing on that,

15   we'd be happy to provide it.  I can arg- --

16       THE COURT:  But you did make certain subject matter under,

17   I thought, 1226(e).

18       MR. BYERLEY:  Right, Your Honor.  That was in the context

19   of the relief that was being requested.  That was in response to

20   the motions.

21       There's been no motion to dismiss for lack of subject

22   matter jurisdiction as to the complaint as a whole.  We are --

23       THE COURT:  Okay.

24       MR. BYERLEY:  Our oppositions to those motions were saying

25   that the Court doesn't have jurisdiction to order the relief

1    requested, so in that context I'm prepared to argue those today.

2    But I think the Court would benefit from fuller briefing,

3    especially in light of all the decisions plaintiffs have filed

4    over the last few days from other districts.

5        THE COURT:  Okay.

6        MR. BYERLEY:  I think that is a question that can be

7    resolved for either, you know, depending on how the motion to

8    dismiss for habeas jurisdiction goes or whether it's a transferee

9    court, either way, those arguments are down the line just a

10   little bit.

11       But as far as the request to bring him back to this

12   district, under 1226(a), the -- that gives the Secretary of

13   Homeland Security discretion about whether to detain a person

14   pending removal proceedings or to release them on bond.

15       1226(e) says that any decision regarding -- any decision

16   regarding detention or parole under that -- I don't have the full

17   quote in front of me, but under that section is not reviewable.

18       The place of detention is plainly a decision -- any

19   decision regarding detention.

20       Under the Supreme Court's recent decision in *Patel*,

21   interpreting the word "any," Shi Bonn, which interpreted *Patel*

22   interpreting the word "any," that's a broad word.  The place of

23   detention is so inextricably intertwined with the act of

24   detaining that it cannot be divorced from the detention decision

25   itself.  So, to insert the Court into becoming an arbiter of

1    where ICE can and cannot detain runs afoul of 1226(e) because

2    that impinges on the secretary's determinations about whether to

3    detain somebody at all.

4           Likewise, under 1252(g), 1252(b)(9), 1252(a)(5) --

5           THE COURT:  Their response to that is they are challenging

6    the government's authority, not whether or not -- so not the

7    discretionary decision in and of itself, but whether just the

8    government's authority, and that is not precluded under 1226(e).

9           MR. BYERLEY:  So, I think that there's a difference

10   between what we're talking about in terms of whether the Court

11   can transfer and whether the Court has subject matter

12   jurisdiction to trans- -- to entertain challenges to the premise.

13          What we're talking about in these specific motions are

14   about where he will be detained and where he'll be released on

15   bond.  So it's in that context that those arguments are arising

16   at this point in time.

17          Whether the Court can entertain challenges to the -- to

18   the authority upon which USA -- sorry, ICE exercises 1226(a)

19   statutory authority, I don't think anybody's disputing that the

20   statutory authority exists, but whether the Court can challenge

21   the premise is different from whether the Court can entertain

22   challenges to the place of confinement or overruling the

23   secretary's decision to detain.  Those challenges are barred by

24   1226(e).

25          Challenges to the premise, I think we have in a footnote

1   saying -- talking about subject matter jurisdiction generally and

2   how there may be other problems that exist even if the Court

3   finds habeas jurisdiction.  Those are challenges to the -- to the

4   Rubio determination, et cetera.  We would argue that those things

5   are bound up in the decision to commence proceedings and initiate

6   cases.

7        So there are -- there are two separate kind of things

8   going on here.  What we're here today and what we argued in our

9   opposition is that the Court doesn't have jurisdiction to

10  overrule ICE's decision about where to detain or to detain in

11  general because that is barred by 1226(e).

12       THE COURT:  I understand.  Let me hear from the other

13  side.

14       MR. BYERLEY:  Thank you.

15       MS. GREGG:  Thank you, Your Honor.  Sophia Gregg from the

16  ACLU for Dr. Suri.  So we've sent over a couple of supplemental

17  authorities in the past few days on the other cases of students

18  who have been impacted by the government's policy that we're

19  alleging here in this case as well.  And all of those cases at

20  this point in the stage in those cases, the courts have found

21  that there are no INA jurisdictional bars mostly because, like

22  them and like Dr. Suri, he is -- they are not challenging --

23       THE COURT:  Removal.

24       MS. GREGG:  -- removal.  They are challenging detention

25  arrest --

1        THE COURT:  Yes.

2        MS. GREGG:  -- and the policy of retaliation by the

3   government.

4        And as for 1226(e), I think that's blackletter law at this

5   point.  *Denmore v. Kim* and *Miranda v. Garland* in the Fourth

6   Circuit have all said that 1226(a) detention under -- motivated

7   for an impermissible purpose does not preclude review under

8   habeas, even under 1226(a).  There's no discretion to violate the

9   Constitution.  There's no discretion that the government has to

10  do what it has done and what has been alleged here in this case.

11       And for those reasons, you know, we're happy to go through

12  every single section of the INA, but I think it's clear at this

13  point that the Court --

14       THE COURT:  Your argument is that these are not --

15  challenges are not to removal.

16       MS. GREGG:  Correct.

17       THE COURT:  It's to arrest, detention, transfer --

18       MS. GREGG:  Correct.

19       THE COURT:  -- unless it's something different.

20       MS. GREGG:  Yes, Your Honor.  This is something very

21  different, and it would -- we would maintain that the government

22  has no discretion to violate the Constitution in the manner it

23  has here.

24       THE COURT:  Thank you.  Did you have other arguments?

25       MS. GREGG:  We're happy to discuss bond and the motion to

1    compel to this jurisdiction or we can wait for your judge -- for

2    Your Honor's decision on venue, and then move forward today or at

3    some point, but we're ready to discuss them right now.

4           THE COURT:  What I'm going to do is I'm going to take a

5    brief recess, and when I come back I'll let you all know how I

6    want to proceed in terms of separating that out.  Okay?

7           MS. GREGG:  Yes, Your Honor.  Thank you.

8           THE COURT:  The Court's going to take a 15-minute recess.

9           (Thereupon, a recess in the proceedings occurred from

10   2:14 p.m. until 2:52 p.m.)

11          THE COURT:  So, in the course of your argument, I listed

12   out several questions that I wanted the federal respondents to

13   answer for the Court, and I would like to receive those answers

14   no later than 5 p.m. tomorrow.  Okay?  And then thereafter I'll

15   be issuing my decision.

16          I'm sorry.  Did you have a question?  Go ahead.

17          MR. AGRAHAKAR:  Yes, Your Honor.  And if -- Your Honor, if

18   we might also have an opportunity to potentially respond to the

19   answers?

20          THE COURT:  Certainly.  And when would you propose you'd

21   do that by?

22          MR. AGRAHAKAR:  One day would be fine.

23          THE COURT:  So, Saturday, 5 p.m.?

24          MR. AGRAHAKAR:  Yes.  Yes, Your Honor.  Thank you.

25          THE COURT:  All right.  And so, until that time -- after I

```
1   receive that information, I'll be issuing my decision.  That
2   doesn't mean it's going to come over the weekend.  I'm not saying
3   that, but it's going to be after I receive that additional
4   information.  Understood?
5           MR. AGRAHAKAR:  Yes, Your Honor.
6           THE COURT:  Is there anything further from either side?
7   Yes, Mr. Byerley.
8           MR. BYERLEY:  Your Honor, if I may.
9           THE COURT:  Yes.
10          MR. BYERLEY:  While I was up here giving our presentation,
11  I was not able to record sort of word-for-word what your requests
12  were.  Will you be entering an order?
13          THE COURT:  Not -- I'll be entering an order, but not
14  repeating all of my questions.
15          MR. BYERLEY:  Okay.
16          THE COURT:  But I did see Mr. Cooper taking a lot of
17  notes, and so I think he probably has them all.
18          MR. BYERLEY:  Okay.  Thank you, Your Honor.
19          THE COURT:  Okay.  Is there anything further?
20          MS. GREGG:  Would Your Honor like to hear the motion for
21  bond and transfer now or --
22          THE COURT:  I need to decide the jurisdictional issue
23  first.
24          MS. GREGG:  Yes, Your Honor.
25          THE COURT:  If it is necessary for me to hear anything --
```

1    let me decide that first.  There may be another issue I need to

2    take up as well in my decision, but then if we are -- if there's

3    something additional, a supplemental that we need -- that I need,

4    I will let you know.  If it's going to be further proceedings, I

5    will let you know that as well, too, but I need to address the

6    issue of jurisdiction first.

7         MS. GREGG:  Yes, Your Honor.

8         THE COURT:  Anything else from either side?

9         MR. BYERLEY:  No, Your Honor.

10        MR. AGRAHAKAR:  No, Your Honor.

11        THE COURT:  Then we are adjourned.

12        (Proceedings adjourned at 2:55 p.m.)

13                    **C E R T I F I C A T E**

14

15            I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
16       proceedings in the above-entitled matter.

17        /s/ Scott L. Wallace                    5/2/25
         -----------------------------      ----------------
18       **Scott L. Wallace, RDR, CRR**            **Date**
           **Official Court Reporter**

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINA**
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　Petitioner,　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | Civil Action No. 1:25-cv-480 |
| 　　　v.　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| DONALD J. TRUMP, *et al.*,　　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　Respondents.　　　　　　) | |
| _____) | |

**<u>DECLARATION OF MARK GRAHAM</u>**

I, Mark Graham, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.　　　I am an Assistant Field Office Director ("AFOD") in the Richmond, Virginia sub-office of the Washington Field Office of Enforcement and Removal Operations ("ERO Virginia") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). I have been employed with ERO since July 2007 as an Immigration Enforcement Agent. In July 2011, I was promoted to Deportation Officer. In March 2017, I was promoted to Supervisory Detention and Deportation Officer. In April 2023, I was promoted to my current role as AFOD.

2.　　　As the AFOD, I am responsible for the intake and removals portfolios, meaning I am responsible for the officers that process incoming detainees, and the decisions made in the intake process including custody determinations and detention decisions. I am also responsible for efforts to execute final orders of removal. In my role as the AFOD, I have access to records

maintained in the ordinary course of business by ICE, including documentary records concerning ERO Virginia and the alien detainees who fall within its responsibility.

3.      I am aware that Badar Khan Suri ("Suri") has filed a Petition for a Writ for Habeas Corpus before this Court.

4.      I provide this declaration in response to questions posed by U.S. District Court Judge Giles. The information is based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, and other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      As noted in DFOD Simon's April 1 declaration, from March 1, 2025, to March 13, 2025, ICE, in conjunction with other federal, state, and local partners conducted a surge of targeted enforcement actions within the Northern Virginia and Washington D.C. region which resulted in an additional 214 arrests beyond its daily operations. As a result of this operation, ICE was operating its Virginia detention facilities at a high capacity, often referred to within ICE as "high compression," at the time Suri came into ICE custody. Additionally, local jails in the Northern Virginia area are unwilling to hold ICE detainees on short-term contracts.

6.      Homeland Security Investigations Special Agents arrested Suri at approximately 9:30 p.m. on Monday, March 17, 2025, in Arlington, Virginia. The arresting agents transported Suri to the ERO Washington office in Chantilly, Virginia for the purpose of initial processing, including making a decision on a detention location.

7.      Bedspace in ICE facilities is divided between high classification detainees and low classification detainees. A preliminary classification of a detainee is done at the time of processing for bedspace selection purposes; Suri was preliminarily classified as a high classification detainee.

8.    The Farmville Detention Center only houses male detainees and had a total capacity of 317 high classification beds, of which nine (9) were unoccupied, however all 9 were reserved for other arrests. Also at the time, the Farmville Detention Center had a total capacity of 415 low classification beds, of which 10 were unoccupied with each reserved for existing arrests. Similarly, the Caroline Detention Center had a total of 112 high classification male beds and 168 low classification beds. However, at the time Suri was arrested, the Caroline Detention Center had no available beds and only had limited emergency bedspace. This data is based on internal ICE databases and tracking tools that are updated at least daily.

9.    ICE's detention capacity nationwide is strained, notably ICE is operating at approximately 23% more detainees than is appropriated. ICE takes a nationwide approach to utilizing that bedspace. Thus, it is common for arrestees to be transported shortly after being arrested to facilities around the country. As noted above, while some beds in Farmville were empty at the moment Suri was arrested, many of those beds were already reserved for other arrests. Prairieland Detention Facility had bed space available. Because ICE was able to secure bedspace at Prairieland Detention Facility with transport scheduled quickly, use of emergency bedspace in Virginia was unnecessary and was retained for more urgent needs. Temporary use of plastic cots during transitional periods is an expected part of facility practice and does not indicate the facility lacked bedspace for Suri. With those factors in mind, the decision to detain Suri at the Prairieland Detention Facility was made at approximately 10:00 pm on March 17, 2025. Accordingly. Suri was placed on a plastic cot, temporarily, upon arrival at the Prairieland Detention facility.

10.    Notices to Appear (NTAs) are charging documents filed with the U.S. Department of Justice's Executive Office for Immigration Review (EOIR). The detention facility is a vital component of the NTA. NTAs issued for aliens who will be detained are issued listing the

detention facility as the current address. This is required and standard practice as it informs the Immigration Court, operated by EOIR, of the alien's l location which often determines which court and docket, as well as the date and time for initial appearances, which are vital components of the NTA. Additionally, detention facility is often the appropriate address for EOIR to serve the alien correspondence relevant to his removal proceedings. For individuals who are issued NTAs but who are not detained by ICE, their private home address would be listed.

11.    Suri was issued his NTA after the detention facility was decided and the detention facility was included as his address for these standard practice reasons.

12.    On Monday, March 17, 2025, ICE made arrangements to transport Suri to the Prairieland Detention Facility. ICE utilizes a combination of ground and air transportation to transport detainees between detention centers. ICE has dedicated air transportation known as ICE Air Operations (ICE Air) which are chartered flights. ICE Air operates a standard domestic schedule; however, ICE Air charters do not service every U.S. airport. For the efficiency of the government, it is a regular occurrence to use commercial charters for mass movements from one region of high compression to another region where ground transportation can be leveraged for areas of lower compression. Suri was scheduled to do the bulk of his transit via a regularly scheduled ICE Air charter flight that runs from Richmond, VA. That regularly scheduled charter flight stops at the Alexandria Staging Facility in Alexandria, LA. The most efficient means to transport Suri from Virginia to the Prairieland Detention Facility was via this regularly scheduled charter the day after his arrest and then utilize ground transportation to transport from Alexandria, LA to the Prairieland Detention Facility in TX.

13.    ICE's operations run 24 hours a day, 7 days a week.  Suri was arrested in the evening. ICE offices do not have the capacity to house detainees in holding rooms more than 12

hours except in emergency circumstances. Suri was transported as soon as possible after his arrest and processing to an appropriate ICE facility that could appropriately care for him pending his scheduled charter flight. This necessitated transport from the ICE office in Chantilly, VA to the Farmville Detention Center during late hours, over midnight; this is standard practice for aliens coming into custody in the evening given ICE's inability to hold for long durations and local jails in the Northern Virginia area being unwilling to hold ICE detainees on short-term contracts.

14.    Suri departed Virginia aboard the regularly scheduled charter flight on Tuesday, March 18 at 2:47 p.m. Eastern Daylight Time. Forty-four (44) other detainees from the Farmville Detention Facility were on the flight en route to either Louisiana or Texas. The number of available beds referenced above incorporates these departures.

15.    Suri arrived in Alexandria, LA at approximately 5:03 p.m. Eastern Daylight Time (4:03 p.m. Central Daylight Time) on March 18, 2025. He was recorded as booked into the Alexandria Staging Facility shortly after at 6:42 p.m. Eastern Daylight Time (5:42 p.m. Central Daylight Time). The Alexandria Staging Facility is located in the same facility as the Alexandria Airport.

16.    Suri was transported from Alexandria Staging Facility to the Prairieland Detention Facility via regularly running ground transport on Friday, March 21 departing approximately at 9:30 a.m. Eastern Daylight Time (8:30 a.m. Central Daylight Time) and arriving at approximately 7:30 p.m. Eastern Daylight Time (6:30 p.m. Central Daylight Time).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of May 2025.

MARK A GRAHAM

Digitally signed by MARK A GRAHAM
Date: 2025.05.02 15:41:06 -04'00'

Mark Graham
Assistant Field Office Director
Enforcement and Removal Operations

JA204

U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

|  |  |  |
|---|---|---|
| BADAR KHAN SURI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, *in his official capacity* | ) | |
| *as President of the United States;* RUSSELL | ) | Case No. 1:25-cv-480 (PTG/WBP) |
| HOTT, *in his official capacity as Field* | ) | |
| *Office Director of Washington, Immigration* | ) | |
| *and Customs Enforcement;* JEFFREY | ) | |
| CRAWFORD, *in his official capacity as* | ) | |
| *Warden of Farmville Detention Center;* | ) | |
| TODD LYONS, *Acting Director, U.S.* | ) | |
| *Immigration and Customs Enforcement*; | ) | |
| KRISTI NOEM, *in her official capacity as* | ) | |
| *Secretary of the United States Department of* | ) | |
| *Homeland Security;* MARCO RUBIO, *in his* | ) | |
| *official capacity as Secretary of State*; | ) | |
| PAMELA BONDI, *in her official capacity* | ) | |
| *as Attorney General, U.S. Department of* | ) | |
| *Justice,* | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Petitioner Dr. Badar Khan Suri's Motion to Compel

Respondents to Return Petitioner to this District (Dkt. 5), Petitioner's Motion for Release on Bond

(Dkt. 20), and Respondents' Motion to Dismiss or in the Alternative, Motion to Transfer Venue

(Dkts. 24, 25). On March 18, 2025, the Petition for Writ of Habeas Corpus and Complaint was

filed. Dkt. 1. On April 8, 2025, Petitioner filed an Amended Petition for Writ of Habeas Corpus

and Complaint ("Amended Petition"). Dkt. 34. On May 1, 2025, the Court heard oral argument

primarily focused on the issue of jurisdiction, which must be resolved before reaching the other

motions.[1]  At the conclusion of the hearing, the Court directed the parties to submit supplemental filings. Dkt. 55.

Petitioner, an Indian national, is a postdoctoral fellow at Georgetown University and resides in Rosslyn, Virginia, within the Eastern District of Virginia.  On March 17, 2025, Department of Homeland Security ("DHS") agents arrested Petitioner outside of his apartment building.  Within hours of his arrest, Petitioner was moved four times within the District.  On March 18, 2025—less than twenty-four hours after his arrest—Petitioner filed his habeas petition against Donald J. Trump, President of the United States; Russell Hott, Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE"); Jeffrey Crawford, Warden of the Farmville Detention Center; Todd Lyons, Acting Director of ICE; Kristi Noem, Secretary of DHS; Marco Rubio, United States Secretary of State; and Pamela Bondi, Attorney General of the United States (collectively, "Respondents" or "Government").  The Petition alleges that Dr. Khan Suri was arrested and detained in violation of his First Amendment and Fifth Amendment rights and the Administrative Procedure Act ("APA").  At the time of filing, Petitioner was in Alexandria, Louisiana, purportedly en route to Texas.  Petitioner is currently detained in the Prairieland Detention Center in Alvarado, Texas.

The parties dispute whether this Court has proper habeas jurisdiction to review Petitioner's claims.  For the reasons that follow, the Court finds that it has proper habeas jurisdiction to consider the Petition.  Accordingly, Respondents' Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are denied.

---

[1] Typically, the filing of an amended complaint moots a pending motion to dismiss.  Because the Amended Petition would not change the jurisdictional arguments advanced in the pending motion to dismiss, the Court construes the motion as applying to the Amended Petition.

**Factual Background**

The parties dispute some aspects of the factual record. The following facts are taken from declarations filed on the docket and attached to the parties' pleadings as well as admissions made during oral argument.[2]

Petitioner Badar Khan Suri is an Indian national, who was raised in Uttar Pradesh, India. Dkt. 1 ("Pet.") ¶ 10; Dkt. 6, Ex. 1, Declaration of Mapheze Saleh ("Saleh Decl.") ¶ 6. Dr. Khan Suri earned his Ph.D. in Peace and Conflict Studies from the Nelson Mandela Center for Peace and Conflict Resolution at Jamia Millia Islamia. Saleh Decl. ¶ 8. In December 2022, Dr. Khan Suri came to the United States after receiving a J-1 exchange visa to participate in a fellowship at Georgetown University. Pet. ¶¶ 2, 10; Saleh Decl. ¶ 10. As part of the fellowship, Dr. Khan Suri teaches a class on "Majoritarianism & Minority Rights in South Asia" at Georgetown. Pet. ¶ 10; Saleh Decl. ¶ 10. Dr. Khan Suri is married to Mapheze Saleh, a United States citizen, whom he met in Gaza as part of a humanitarian convoy. Saleh Decl. ¶¶ 2, 6. Ms. Saleh lived in the United States until she was five years old, at which point, her family moved to Gaza. *Id.* ¶ 3. Ms. Saleh's father is a former deputy of foreign affairs in Gaza. *Id.* ¶ 4. In November 2023, Ms. Saleh returned to the United States with her three young children whom she shares with Dr. Khan Suri. *Id.* ¶ 10.

In October 2023, Ms. Saleh began sharing posts online detailing events in Gaza and "express[ing] sorrow for the deaths of Gazan people." *Id.* ¶ 11. By February 2025, Ms. Saleh learned that she was being targeted by certain websites because of her posts and her father's former

---

[2] Absent an evidentiary hearing, the Court accepts the non-movants factual assertions. *See Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) ("When determining whether a plaintiff has made the requisite *prima facie* showing [of personal jurisdiction], the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff.").

position in the government of Gaza. *Id.* ¶ 12. Ms. Saleh and Dr. Khan Suri's family were the subject of multiple articles, and the pair were accused of having "ties to Hamas." *Id.*

"On March 15, 2025, Secretary of State Marco Rubio issued a memorandum finding that [Dr. Khan] Suri's presence and activities in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." Dkt. 26, Ex. 1, Declaration of Joseph Simon ("First Simon Decl.") ¶ 6. On that same day, a "custody determination [was issued] indicating that [Dr. Khan Suri] would be detained pursuant to" 8 U.S.C. § 1226(a). *Id.*

On March 17, 2025, between 9:20 and 9:30 p.m., Dr. Khan Suri was returning to his home in Rosslyn, Virginia after breaking his fast at iftar.[3] Dkt. 47, Ex. 1, Declaration of Badar Khan Suri ("Khan Suri Decl.") ¶ 2; Saleh Decl. ¶ 13. Several unmarked cars drove up to Dr. Khan Suri's apartment building. Khan Suri Decl. ¶ 3. A man emerged from one of the vehicles dressed in grey clothes and wearing a mask. *Id.* He proceeded to prevent Dr. Khan Suri from entering his building. *Id.* The officers told Ms. Saleh that they were from Homeland Security and proceeded to arrest Dr. Khan Suri. Saleh Decl. ¶ 13; Khan Suri Decl. ¶¶ 4-6; First Simon Decl. ¶ 7.

At the time of Dr. Khan Suri's arrest, the officers confiscated Dr. Khan Suri's passport and immigration documents. Saleh Decl. ¶ 13. The arresting officers told Ms. Saleh and Dr. Khan Suri that he would be taken to Chantilly, Virginia. *Id.*; Khan Suri Decl. ¶ 6. The arresting officers also told Dr. Khan Suri that his "student visa" had been revoked, that he was being arrested because of social media, and that he would be deported to his country that day.[4] Khan Suri Decl. ¶¶ 7-8.

---

[3] Unless otherwise specified, all references to time are in E.D.T. ("Eastern Daylight Time").

[4] As stated above, the Court notes that Dr. Khan Suri had a J-1 exchange visa, not a student visa. Khan Suri Decl. ¶ 4; Saleh Decl. ¶ 10.

Specifically, Dr. Khan Suri was taken to ICE's Enforcement and Removal Operations ("ERO") Washington Field Office in Chantilly, Virginia. *Id.* ¶ 9; First Simon Decl. ¶ 7.

While at the Chantilly Office, officers told Dr. Khan Suri that he was being transferred to the Farmville Detention Center in Virginia, where he believed he would be held for a longer term and was permitted to tell his wife this information. Khan Suri Decl. ¶¶ 12-14. Dr. Khan Suri called his wife to tell her that he was being transferred to Farmville. *Id.* ¶ 13. Officers showed Dr. Khan Suri the Notice to Appear ("NTA"), which listed a Texas address as his current residence and specified that he had a May 6, 2025 hearing date in immigration court in Texas. *Id.* ¶ 9; Dkt. 26, Ex. 1 at 6 ("NTA"). When Dr. Khan Suri asked about the Texas address and why his hearing was in May, an officer responded that "it was just computer generated, and it might be changed later on." Khan Suri Decl. ¶ 9.

ICE represents that it determined that Dr. Khan Suri would not be detained in Farmville or Caroline Detention Centers in Virginia because they were concerned about "potential overcrowding." First Simon Decl. ¶ 8. ICE also represents that from March 1, 2025 to March 13, 2025, it had "conducted a surge of targeted enforcement actions within the Northern Virginia and Washington D.C. region which resulted in an additional 214 arrests." *Id.* Because ICE detention centers in Virginia were operating at a "high capacity" at the time of Dr. Khan Suri's arrest, and because "detention facilities in Texas and Louisiana had sufficient capacity to house [Dr. Khan] Suri[,]" "ERO Washington determined that [he] would be detained at Prairieland Detention Facility." *Id.* ¶¶ 8-9. ICE also represents it made the decision to detain Dr. Khan Suri at the Prairieland Detention Center at approximately 10:00 p.m. on March 17, 2025. Dkt. 57-1, Declaration of Mark Graham ("Graham Decl.") ¶ 9.

At approximately 10:42 p.m., on March 17, 2025, Dr. Khan Suri's counsel, Hassan Ahmad, learned of Dr. Khan Suri's arrest. Dkt. 21, Ex. 1, Declaration of Hassan Ahmad ("Ahmad Decl.")

¶¶ 1, 3. Meanwhile, Dr. Khan Suri was being processed at the ERO Office in Chantilly. First Simon Decl. ¶ 7; Khan Suri Decl. ¶ 9. Overnight Dr. Khan Suri was driven to the Farmville Detention Center arriving around 2:35 a.m. on March 18, 2025. First Simon Decl. ¶ 11; Khan Suri Decl. ¶¶ 12-14. Later that morning, ICE transferred Dr. Khan Suri to another ERO Washington office in Richmond, Virginia, where he arrived at approximately 7:50 a.m. First Simon Decl. ¶ 11; Khan Suri Decl. ¶ 15. Around 8:34 a.m., other attorneys in North Carolina provided more information to Mr. Ahmad about Dr. Khan Suri and his family. Ahmad Decl. ¶ 5. Shortly thereafter, Mr. Ahmad agreed to help Dr. Khan Suri. *Id.* ¶ 6. Between 9:00 a.m. and 11:00 a.m., Mr. Ahmad and Mr. Ashraf Nubani, a friend of Dr. Khan Suri's family, discussed Dr. Khan Suri and his arrest. *Id.* At 1:52 p.m., Mr. Ahmad spoke to Ms. Saleh, who believed that Dr. Khan Suri would be in the Farmville Detention Center since that was the last thing Dr. Khan Suri shared with her about his location. Ahmad Decl. ¶¶ 6, 8; Saleh Decl. ¶ 14. At 2:11 p.m., Mr. Ahmad formally entered his appearance in Dr. Khan Suri's immigration case. Ahmad Decl. ¶ 7.

After entering his appearance, Mr. Ahmad was able to view Dr. Khan Suri's NTA at 2:11 p.m. *Id.* The NTA indicates that Dr. Khan Suri *currently resides* at "1209 Sunflower Ln, Alvarado, Texas, 760092810." NTA at 1. While not explicitly stated on the NTA, this is the address of the Prairieland Detention Center, which is located in the Northern District of Texas. First Simon Decl. ¶ 9. Based on the electronic signature block of the issuing officer, it appears that the NTA was issued around 9:47 p.m. on March 17, 2025—while Dr. Khan Suri was still in Chantilly, Virginia. NTA at 1; First Simon Decl. ¶ 7; Khan Suri Decl. ¶ 9. Up to that time, Dr. Khan Suri had never been to 1209 Sunflower Lane, Alvarado, Texas. The NTA also ordered Dr. Khan Suri to appear before an immigration judge on May 6, 2025, at a different Texas address: "27991 Buena Vista Blvd, Los Fresnos, Texas, 78566." NTA. This is the address of the Port

6

Isabel Detention Center, which is located in the Southern District of Texas and approximately 500 miles away from the Prairieland Detention Center. First Simon Decl. ¶ 14.

Unbeknownst to anyone, on the afternoon of March 18, 2025, Dr. Khan Suri was taken to an airport in Richmond, Virginia and placed on a flight that departed at 2:47 p.m. *Id.* ¶ 11; Khan Suri Decl. ¶¶ 16-17; Ahmad Decl. ¶ 8. Still, Dr. Khan Suri did not know where he was headed, nor was he permitted to further communicate his whereabouts to his wife or to his counsel, if he had known he had counsel. Khan Suri Decl. ¶¶ 16-17. He boarded a flight with over 300 other people. *Id.* ¶ 17; First Simon Decl. ¶ 11. At this time, Mr. Ahmad was working diligently to file Dr. Khan Suri's habeas petition. Ahmad Decl. ¶¶ 7-8. Around 5:03 p.m. on March 18, 2025, Dr. Khan Suri arrived in Alexandria, Louisiana. Khan Suri Decl. ¶ 18; First Simon Decl. ¶ 11. At 5:59 p.m. on March 18, 2025, Dr. Khan Suri filed his original habeas petition in this Court. Pet.; Ahmad Decl. ¶ 8. Dr. Khan Suri was booked into the Alexandria Staging Facility ("ASF") at 6:42 p.m. (5:42 p.m. Central Daylight Time). Dkt. 49, Ex. 1, Second Declaration of Joseph Simon ("Second Simon Decl.") ¶ 3; Graham Decl. ¶ 15.

Dr. Khan Suri was then detained in the ASF in Alexandria, Louisiana for three nights. Khan Suri Decl. ¶¶ 18-22; First Simon Decl. ¶ 12. On March 19, Dr. Khan Suri attempted to make a free call to his wife, but he was not able to directly communicate with her.[5] Khan Suri Decl. ¶¶ 19-20; Saleh Decl. ¶ 15. On March 20, 2025, Dr. Khan Suri was told he would be transferred to New York the following day, presumably to be deported. Khan Suri Decl. ¶ 21. On the same day, this Court also entered its Order directing that Petitioner not be removed from the United States. Dkt. 7. On the morning of March 21, 2025, Dr. Khan Suri was told that he was no longer going

---

[5] Ms. Saleh's declaration seems to say that she received a call with a recording from Dr. Khan Suri on March 18, but this appears to the Court to be an error. Saleh Decl. ¶ 15.

to New York and would instead be driven to Texas. Khan Suri Decl. ¶ 22. ICE drove Dr. Khan

Suri by bus from the ASF to the Prairieland Detention Center in Texas arriving at 7:30 p.m. on

March 21, 2025, where he remains detained. Second Simon Decl. ¶ 3; Graham Decl. ¶ 16; Khan

Suri Decl. ¶ 22.

Upon his arrival in Prairieland, Dr. Khan Suri was forced to sleep on the floor because

there were not enough beds available. Khan Suri Decl. ¶ 22. As of April 9, 2025, Dr. Khan Suri

had a bed and a pillow, but his requests for religious accommodation had largely been denied. *Id.*

¶¶ 23-24.

### Procedural History

On March 18, 2025, at approximately 5:59 p.m., Petitioner filed his habeas petition

pursuant to 28 U.S.C. § 2241. Dkt. 1. On March 20, 2025, Petitioner filed a Motion to Compel

Respondents to Return Petitioner to this District. Dkt. 5. On March 27, 2025, Petitioner filed a

Motion for Release on Bond. Dkt. 20. The Court initially set the motions for hearing on April 11,

2025. Dkt. 23. On April 1, 2025, Respondents filed a Motion to Dismiss, or in the Alternative,

Motion to Transfer Venue (Dkts. 24, 25), which were noticed for May 1, 2025. Dkt. 27. On April

4, 2025, this Court entered an Order directing Petitioner to address Respondents' jurisdictional

arguments in his reply to Respondents' oppositions. Dkt. 31. At Petitioner's request, the Court

reset the hearing on all motions for May 1, 2025. Dkt. 33. On April 8, 2025, Petitioner filed the

Amended Petition. Dkt. 34.

### Discussion

Section 2241 "broadly grants federal courts the power to award habeas corpus relief to

petitioners who are in custody in violation of federal law." *Joshua M. v. Barr*, 439 F. Supp. 3d

632, 669 (E.D. Va. 2020). "[A]bsent suspension, the writ of habeas corpus remains available to

every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004)

8

(citing U.S. Const., Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it")). The Great Writ is "a vital instrument for the protection of individual liberty" and "freedom from unlawful restraint." *Boumediene v. Bush*, 553 U.S. 723, 739, 743 (2008). Specifically, the writ is "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi*, 542 U.S. at 525. In the United States, "there is no gap in the fabric of habeas --- no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it." *Khalil v. Joyce et al.*, 2025 WL 972959, at \*37 (D.N.J. Apr. 1, 2025) ("*Khalil II*"), *mot. to certify appeal granted*, 2025 WL 1019658 (D.N.J. Apr. 4, 2025).

This Court must decide which court has jurisdiction to hear and decide Dr. Khan Suri's habeas petition. Respondents argue that this Court is not the proper venue for Dr. Khan Suri's habeas petition and does not have jurisdiction to hear his claims because Dr. Khan Suri was not in the Eastern District of Virginia at the time his petition was filed. Dkt. 26 at 4. Instead, Respondents argue that Petitioner's claims can only be heard in the Northern District of Texas—despite the fact that Dr. Khan Suri was not in Texas at the time the petition was filed. *Id.*; Dkt. 49 at 19-20. To come to this conclusion, Respondents purport to rely on the default rules of habeas jurisdiction. Dkt. 26 at 5. In response, Petitioner contends that this case involves extraordinary circumstances that require departure from the default rules of habeas jurisdiction. Dkt. 47 at 11. Based on noted exceptions to the rules of habeas jurisdiction, Petitioner argues that this Court maintains jurisdiction over his claims despite his removal from this District. *Id.* at 9. The Court agrees with Petitioner.

### I.    Habeas Corpus Jurisdiction

Section 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective

jurisdictions." In *Rumsfeld v. Padilla*, the Supreme Court described the contours of habeas jurisdiction. 542 U.S. 426 (2004). Generally, a habeas petition seeking to challenge present physical custody should be filed "in the district of confinement" and "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Padilla*, 542 U.S. at 434, 447 (alteration in original) (quoting 28 U.S.C. § 2242); *see also Kanai v. McHugh,* 638 F.3d 251, 255 (4th Cir. 2011) ("When a petitioner is physically detained . . . the 'district of confinement' necessarily is the location of both the habeas petitioner and the immediate custodian."). These default rules are known as the district of confinement and immediate custodian rules. When applying these rules, courts look to the place where the petitioner was confined when the petition was filed. *See United States v. Little*, 392 F.3d 671, 680 (4th Cir. 2004) (noting that because petitioner was confined in Texas when his petition was filed, the Western District of North Carolina was an improper venue).[6]

When the default rules of habeas jurisdiction have proved untenable, the Supreme Court and Fourth Circuit have recognized exceptions to these default rules. *See Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 499 (1973) (allowing petitioner confined in Alabama to file habeas petition challenging Kentucky indictment in Kentucky); *Strait v. Laird*, 406 U.S. 341, 344-346 (1972) (allowing conscientious objector petitioner to name his ultimate custodian in habeas

---

[6] The *Padilla* Court expressly declined to decide whether the default rules of habeas jurisdiction apply to immigration detention. 542 U.S. 426, 435 n.8 (2004). The Fourth Circuit, however, has applied *Padilla*'s rules to instances of confinement unrelated to incarceration. *See e.g., Kanai v. McHugh*, 638 F.3d 251, 255 (4th Cir. 2011) (applying *Padilla* to a conscientious objector's habeas petition). Further, district courts within the Fourth Circuit have applied *Padilla*'s rules to the immigration context. *See e.g., Ming Hui Lu v. Lynch*, No. 1:15-cv-1100, 2015 WL 8482748, at *3 (E.D. Va. Dec. 7, 2015) (applying *Padilla* to individual detained during immigration proceedings); *Deng v. Crawford*, No. 2:20-cv-199, 2020 WL 6387010, at *3 (E.D. Va. Sept. 30, 2020), *report and recommendation adopted*, No. 2:20-cv-199, 2020 WL 6387326 (E.D. Va. Oct. 30, 2020) (same). Accordingly, this Court is persuaded that the default rules of habeas jurisdiction can apply to the immigration context.

petition); *Ex parte Endo*, 323 U.S. 283, 304-307 (1944) (finding a district court retains jurisdiction over properly filed habeas petition if petitioner is removed from district after filing); *U.S. v. Moussaoui*, 382 F.3d 453, 465 (4th Cir. 2004) (adopting exception to immediate custodian rule allowing petitioner to name ultimate custodian). The Court must consider whether, in line with the Fourth Circuit and Supreme Court's precedent, the context of Dr. Khan Suri's petition warrants exception from the default rules.

In addition to known exceptions to the default jurisdictional rules, Justice Kennedy, in his *Padilla* concurrence, proposed an additional exception. Justice Kennedy noted that

> if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention . . . habeas jurisdiction would be in the district court from whose territory the petitioner had been removed."

*Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

The Court acknowledges Justice Kennedy's concurrence is not the holding of the *Padilla* Court. However, "because Justice Kennedy and Justice O'Connor's votes were 'necessary to the formation of a majority,' Justice Kennedy's opinion is at least 'given particular weight.'" *Ozturk v. Trump et al.*, 2025 WL 1009445, at *6 (D. Mass. Apr. 4, 2025) ("*Ozturk I*") (quoting *Schmitz v. Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994)). In *Vasquez v. Reno*, the First Circuit forecasted the logic of Justice Kennedy's concurrence, explaining that under "extraordinary circumstances," the "normal" rules of habeas jurisdiction may not apply. 233 F.3d 688, 696 (1st Cir. 2000). The First Circuit noted that such extraordinary circumstances may exist if the government "spirited an alien from one site to another in an attempt to manipulate jurisdiction." *Id.*

It is a foundational principle that in all cases "courts take care not to exceed their 'respective jurisdictions' established by Congress." *Padilla*, 542 U.S. at 451. Nevertheless, "the very nature of the writ [of habeas corpus] demands that it be administered with the initiative and flexibility

11

essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Cherrix v. True,* 177 F. Supp. 2d 485, 495 (E.D. Va. 2001) (alteration in original) (quoting *Harris v. Nelson,* 394 U.S. 286, 291 (1969)).

## II.    Jurisdiction is Improper in the Northern District of Texas

Respondents contend that under *Padilla*'s default district of confinement and immediate custodian rules, jurisdiction is only proper in the Northern District of Texas. Dkt. 49 at 17-18. However, a straightforward application of the default rules shows that jurisdiction is not proper in the Northern District of Texas.

The default district of confinement rule instructs the Court to look to the place the individual was confined at the time the petition was filed. *Padilla,* 542 U.S. at 447; *Little,* 392 F.3d at 680. Here, the petition was filed at 5:59 p.m. on the evening of March 18, 2025. Petitioner did not arrive in the Northern District of Texas until March 21, 2025. Despite this, Respondents contend that because Petitioner was served with an NTA that listed his "current" residence address as the Prairieland Detention Facility, the Northern District of Texas is the only appropriate district in which Petitioner's claims can be heard. Dkt. 49 at 18-19. This argument is not persuasive. Any address listed on the NTA is irrelevant because at the time the petition was filed, Petitioner was not in the Northern District of Texas and did not arrive there until three days later.

To avoid this inconvenient outcome, Respondents argue that Petitioner was "in transit" when he was confined in Virginia and Louisiana, vesting jurisdiction in the Northern District of Texas because that is the only district in which Petitioner was "non-transitorily confined." Dkt. 26 at 12. In support, Respondents rely on *United States v. Poole,* 531 F.3d 263 (4th Cir. 2008). That reliance, however, is misplaced. In that case, the Fourth Circuit did not address where jurisdiction lies when a petitioner files their habeas petition while they are being repeatedly moved from one location to the next. Those facts were very different.

Poole was convicted in Maryland federal court and incarcerated, "at *his* request," in Kentucky. 531 F.3d at 265-66 (emphasis added). Poole was detained in Kentucky for approximately *nine years*. *Id.* at 265-67 (noting that he was sentenced in 1997 and filed his first § 2241 motion in 2006). While incarcerated in Kentucky, Poole filed multiple habeas petitions in Maryland and Kentucky federal courts and then filed a motion to amend the judgment against him in the Maryland court. *Id.* at 266-67. In order to permit Poole to attend this hearing, the Maryland court issued a writ of habeas corpus *ad testificandum*, which ordered the warden of the Kentucky facility to bring Poole to Maryland. *Id.* at 267-68. Then, during this hearing, Poole's counsel asked the Maryland court to allow Poole to be detained in Maryland "solely to enable the Maryland federal district court to assert jurisdiction" over a future habeas petition. *Id.* at 268. The Fourth Circuit found this contravened the Supreme Court's explanation "that the immediate custodian rule 'serves the important purpose of preventing forum shopping by habeas petitioners.'" *Id.* at 273 (quoting *Padilla*, 42 U.S. at 447). Accordingly, the Fourth Circuit held that "neither the issuance of the writ of habeas corpus *ad testificandum* nor the retention of [the petitioner in Maryland] conferred jurisdiction on the Maryland federal district court." *Id.* at 274. Instead, Poole should have filed his habeas petition in Kentucky, which was Poole's "original place of incarceration" where he was "permanently confined." *Id.* at 271, 275.

Here, unlike in *Poole*, the Northern District of Texas was not Petitioner's "original place of incarceration" nor is it the district in which Petitioner was permanently confined at the time his habeas petition was filed. When his habeas petition was filed, Petitioner was not and had never been in the Northern District of Texas. Thus, Petitioner's original place of confinement and permanent place of confinement could not have been the Northern District of Texas. On the other hand, Petitioner's original place of detention was Virginia—where he was arrested and taken to

JA218

the Farmville Detention Center. *Poole* does not help Respondents; indeed, *Poole* supports a finding that jurisdiction is proper in this District.

At the time of filing his petition, Petitioner did not have a permanent place of detention. Moreover, the Court questions whether an inquiry into an immigration detainee's permanent place of confinement is prudent because, as evidenced by the facts of this case and others like it, non-citizen detainees may be moved more frequently than those who are criminally incarcerated. Nevertheless, *Poole* does not place jurisdiction in the Northern District of Texas nor the Western District of Louisiana for that matter—which would neither be Petitioner's original nor permanent place of confinement. If *Poole* were to apply, it would place jurisdiction in this District—the original place of Petitioner's detention. Accordingly, the Northern District of Texas does not have jurisdiction to hear Dr. Khan Suri's habeas petition based on the default rules of habeas jurisdiction or after applying *Poole*.

### III. This Court Has Proper Habeas Corpus Jurisdiction

Absent suspension, the writ of habeas corpus must be available to every detainee. The question here is where Dr. Khan Suri's counsel could have filed. Petitioner argues that the Court should apply the unknown custodian exception because at the time his petition was filed, Petitioner's counsel could not have known who Petitioner's immediate custodian was or where he was confined. Dkt. 47 at 16. Respondents claim that because Petitioner's counsel had access to his NTA approximately three hours before the petition was filed, Petitioner's counsel should have known that the proper jurisdiction in which to file the petition was the Northern District of Texas. Dkt. 49 at 6-7. Based on the NTA, Respondents argue that Petitioner's immediate custodian and district of confinement were known at the time the petition was filed and are known today. *Id.* For all of the reasons stated above, neither Petitioner nor his immediate custodian was in Texas.

14

JA219

*A.  The Unknown Custodian Exception Applies*

Petitioner landed in the Western District of Louisiana at 5:03 p.m. on March 18, only fifty-six minutes before his counsel filed his petition.  Although the default rules may appear to place jurisdiction in the Western District of Louisiana, neither party contends that the Western District of Louisiana is the proper jurisdiction to hear the petition.  The Court agrees that this case should not be transferred to the Western District of Louisiana.  At the time the petition was filed, neither Petitioner's presence in Louisiana nor movement through Louisiana was ever disclosed.  Further, because Petitioner was not booked into the facility in Louisiana until 6:42 p.m., it is not clear who Petitioner's immediate custodian was at the time his petition was filed, if he had an immediate custodian at all.

When a petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." *Padilla*, 542 U.S. at 450 n.18.  In this situation, the unknown custodian exception applies.  The unknown custodian exception provides that a habeas writ does not need to be served on "'the individual with day-to-day control over' the prisoner and instead, "the writ is properly served on the prisoner's ultimate custodian." *Moussaoui*, 382 F.3d at 464-65 (quoting *Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998); and then citing *Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986)) (finding that Secretary of Defense is ultimate custodian, and proper respondent, of individuals in military custody).  Here, Petitioner's ultimate custodian is the Secretary of the Department of Homeland Security.[7]

---

[7] During the hearing on this motion, Respondents argued in passing that this Court does not have *in personam* jurisdiction over the Secretary of Homeland Security.  This argument was not made in Respondents' Motion to Dismiss.  Accordingly, the Secretary of Homeland Security's objection to personal jurisdiction was waived, as would be any similar objection from any Respondent other than Warden Crawford. Fed. R. Civ. P. 12(h) ("A party waives any defense listed in Rule 12(b)(2)-(5) by: . . . (B) failing to . . . make it by motion under this rule.").  Moreover, even if this objection

At the time the habeas petition was filed, Petitioner's immediate custodian was unknown. On the evening of March 17, Petitioner was arrested and taken from Rosslyn, Virginia to Chantilly, Virginia. While there, ICE officers told Petitioner that he would be taken to Farmville, Virginia.[8] Petitioner conveyed this information to his wife in the only phone call he was allowed prior to being moved. After being detained in Farmville for only a few hours—in the early morning— Petitioner was taken to a location in or around Richmond, Virginia. ICE officers refused Petitioner's request to call his wife to update her on his location. Then, he was placed on a plane. No official ever informed Petitioner of his imminent movement or that he would be in transit through Louisiana. Nor was Petitioner given the opportunity to update his wife so that she could inform attorneys working on his behalf. Indeed, it is now clear that at 5:59 p.m. on March 18, Petitioner did not have an immediate custodian because he was not yet booked into any detention facility.

Throughout the morning of March 18, Petitioner's counsel worked to understand the circumstances of Petitioner's arrest. At 2:11 p.m., Petitioner's counsel entered his appearance in Petitioner's immigration case and gained access to Petitioner's NTA. In that time, all Dr. Khan Suri's counsel could discover was that Dr. Khan Suri would be taken to the Farmville Detention

---

had not been waived, the Court finds that it can exercise *in personam* jurisdiction over the Secretary of Homeland Security because she regularly transacts business in this district. *See So v. Reno*, 251 F. Supp. 2d 1112, 1128 (E.D.N.Y. 2003) (finding in an immigration habeas case that "[t]here is personal jurisdiction over the Attorney General in New York, since he or she regularly transacts business in New York in an official capacity." (citing *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 495 (1973))).

[8] Respondents contend that statements of officers to Petitioner are inadmissible hearsay. Dkt. 49 at 12. They are not. Statements of ICE Officers are opposing party statements and are therefore excluded from the rule against hearsay. Fed. R. Evid. 801(d)(2). Further, it is not clear to the Court that these statements are being offered for the truth of the matter asserted. To the extent these statements are being offered to show the effect they had on Petitioner, and not for the truth of the matter asserted these statements are not hearsay. Fed. R. Evid. 801(c).

Center, and that he had a hearing in Texas on May 6. In a little over three hours, and while checking the ICE Online Detainee Locator that provided no new information, Dr. Khan Suri's counsel drafted and filed a habeas petition in this Court. In this timeframe, it is not clear how any other diligent attorney could have known that Petitioner was in Louisiana at the time he filed the petition.

At 5:59 p.m. on March 18, Petitioner's counsel, the individual tasked with filing the petition in the proper jurisdiction and naming the proper respondents, had no indication that Petitioner had been moved to Louisiana. The NTA does not reference Louisiana. Petitioner was not told by any officer that he was going to Louisiana. Even if ICE officers provided Petitioner with accurate updates of where he was being moved, Petitioner was not permitted to contact his wife until the evening of March 19, after his petition was already filed. Effectively, at the time the petition was filed, Petitioner was detained in an unknown location by an unknown custodian.

Moreover, even if it were possible for Petitioner's counsel to have discovered he was in Louisiana at 5:59 p.m., Petitioner's counsel would not have known who to identify as Petitioner's immediate custodian. Petitioner was not booked into the ASF until 6:42 p.m. on March 18—almost an hour after the petition was filed. It is ironic that the Government's first declaration specifically described Petitioner's movements in Eastern Daylight Time. The Second Simon Declaration which indicated when Petitioner was booked into the ASF, was silent as to the time zone. This omission led Petitioner, and initially the Court, to believe that Petitioner was booked into the ASF seventeen minutes *before* his petition was filed. However, only in response to questions from the Court was it made clear that the times referenced in the Second Simon Declaration were in Central Time. Thus, the habeas petition was actually filed forty-three minutes *before* Petitioner was booked into the ASF.

17

JA222

To date, Respondents have not identified who Petitioner's immediate custodian was while he was on a plane to Louisiana or while he was in Louisiana before he was booked into the ASF. It is logical to assume that if Respondents could identify the individual Petitioner should have named as his immediate custodian, they would have. Not only was Petitioner's immediate custodian unknown to his counsel at the time of filing his petition, it appears that his immediate custodian at 5:59 p.m. remains unknowable to all, including the Government. In accordance with the unknown custodian exception and ultimate custodian rule, Petitioner named the Secretary of Homeland Security as a respondent in his original and amended petitions. Dkts. 1, 34.

In *Demjanjuk v. Meese*, the D.C. Circuit applied the unknown custodian exception when the petitioner, a suspected war criminal, was held "in a confidential location." 784 F.2d 1114, 1115-16 (D.C. Cir. 1986) (Bork, C.J.).[9] Judge Bork thought "it [wa]s appropriate, in these very limited and special circumstances, to treat the Attorney General of the United States as the custodian" and apply the unknown custodian exception. *Id.* at 1116. The Court recognizes that these are different facts. But what is similar is that the custodian and place of confinement were unknown at the time of filing.

Respondents claim that the Supreme Court in *Padilla* distinguished *Demjanjuk* when the Court declined to apply the unknown custodian exception. Dkt. 49 at 4 (citing *Padilla*, 542 U.S. at 450 n.18). However, in *Padilla*—unlike in *Demjanjuk*—"counsel was well aware of Padilla's presence in South Carolina when she filed the habeas petition." *Id.* at 449 n.17. Further, the Court in *Padilla* found there were no indications of secrecy on behalf of the Government. *Id.* The *Padilla*

---

[9] The Court observes that only Judge Bork heard and decided this case because he "decline[d] to transfer this application" to the district court given that "it [was] absolutely clear from the application that the applicant [was] not entitled to . . . the writ" which obviated the need for hearing and transfer. *Demjanjuk v. Meese*, 784 F.2d 1114, 1115 (D.C. Cir. 1986). In addition, Judge Bork felt transfer was inappropriate "given the imminence of petitioner's extradition to Israel." *Id.*

18

Court did not reject the unknown custodian exception but merely found that it was inapplicable on the facts before the Court at that time. *Id.* Here, at the time Petitioner's counsel filed his habeas petition, Petitioner's location was unknown, and it appears Petitioner did not have an immediate custodian who could have been named.[10] Accordingly, the Court will apply the unknown custodian exception.

Next, Respondents seize on certain language in the *Demjanjuk* opinion to argue that this Court has been divested of jurisdiction over Dr. Khan Suri's habeas petition because he has been removed from this District. Dkt. 49 at 6. In particular, Judge Bork wrote in *dicta* that if it becomes "known that petitioner is held in a jurisdiction other than this one, a judge of this circuit would be divested of jurisdiction." *Demjanjuk*, 784 F.2d at 1116. Judge Bork provides no analysis explaining how he reaches that proposition. Moreover, as Petitioner argues, this language would permit the government to circumvent *Ex parte Endo*, which "stands for the . . . proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Padilla*, 542 U.S. at 441; *see* Dkt. 47 at 15-16. Then, the Government could withhold the location of an individual, wait to see if and where a petition is filed, then disclose their custodian or location, and claim the court in which the petition was filed is divested of jurisdiction. This result would defeat the purpose of the great writ.

---

[10] Respondents try to avoid the application of the unknown custodian exception by arguing that it is clear that Petitioner is held in the Northern District of Texas, so jurisdiction must only be proper there. Dkt. 49 at 6. As discussed *supra*, jurisdiction is not proper in the Northern District of Texas because Petitioner was not and had never been present in the Northern District of Texas at the time the petition was filed. Therefore, this case should not be transferred to the Northern District of Texas.

JA224

### B. An Exception to the District of Confinement Rule Applies

Just as the unknown custodian exception provides an alternative to default habeas rules when a petitioner's immediate custodian cannot be ascertained, there must also be an exception when the petitioner's location cannot be determined. In *Padilla*, the Supreme Court forecasted as much when it noted that when a petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." 542 U.S. at 450 n.18.

An exception to the district of confinement rule must apply when, after reasonably diligent effort, the district in which the petitioner was confined could not have been determined. Respondents claim that *Padilla* rejected the argument that "the facts available to counsel at the time of filing should govern and the facts as they actually existed at the time of filing should not matter." Dkt. 49 at 6 (citing *Padilla*, 542 U.S. at 449 n.17) (internal quotations omitted). But the Supreme Court never opined either way. *Padilla*, 542 U.S. at 449 n.17. Instead, the Court simply noted that the dissent's reasoning was based on its concern about "Government secrecy," despite there being no such allegation. *Id.* In fact, when Padilla's attorney filed the habeas petition, she identified Padilla's location, stating that he was being held "in segregation at the high-security Consolidated Naval Brig in Charleston, South Carolina." *Id.* (quoting Padilla's habeas petition). Thus, Respondents mischaracterize *Padilla*'s reasoning on this point.

The *Padilla* majority does not address whether it would be proper to find jurisdiction based on the facts available to diligent counsel through reasonable effort under the circumstances. Often, as in the situation before the Court, counsel files a habeas petition on behalf of their client. In those situations, counsel is tasked with determining the district in which the petition should be filed and who is the proper respondent to be named. Consequently, habeas jurisdictional rules must be based on discoverable facts regarding where a petitioner was and who was confining him.

Otherwise, courts are left to grapple with jurisdictional questions, manufactured or not, instead of focusing on the merits of the petition. Moreover, limiting the facts to those that could be discovered by diligent counsel constrains the ability of either side to engage in impermissible forum shopping.

To be clear, habeas petitioners do not have a right to be held in a specific place. It strains credulity, however, that a habeas petition that properly named the petitioner's ultimate custodian and was filed in the district where the petitioner resides, was arrested, and was detained cannot be heard in that same district. *See Harris,* 394 U.S. at 291 (emphasizing the importance of flexibility in habeas adjudication). In this case, Petitioner resides in this District, he was arrested in this District, and he was originally detained in this District. The last time Petitioner was permitted to speak to his wife, the only information he had was that he would be detained in this District. Petitioner's counsel worked diligently in less than twenty hours and filed the petition in this District based on the only information that was available to him—that his client was detained in this District. And as stated above, the NTA did not reference Louisiana, nor did the ICE Online Detainee Locator provide information about Petitioner's whereabouts until after the petition was filed. At no point after entering his appearance did Petitioner's counsel receive any notification that Petitioner had been transferred. Although the NTA listed a Texas address as his current residence, it is clear and undisputed that Petitioner was not there and did not arrive there until days later. This is not the forum shopping that habeas jurisprudence seeks to prevent.

The facts before the Court today demand an exception to the district of confinement rule. Justice Kennedy, in his concurrence in *Padilla*, predicted the problem that now faces the Court. There, Justice Kennedy, joined by Justice O'Connor, noted that there should be an exception "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed" or "if the Government

21

JA226

did inform the lawyer where a prisoner was being taken but kept moving him so filing could not catch up to the prisoner." *Padilla*, 542 U.S. at 454 (Kennedy, J. concurring). In these situations, Justice Kennedy believed that "habeas jurisdiction would lie in the district or districts from which [the petitioner] had been removed." *Id.*

At the hearing, the Court posed several questions to Respondents seeking to better understand the circumstances of Petitioner's arrest and detention and clarify the Government's purpose in transporting Petitioner to Texas. The Court asked Respondents: (1) whether it is normal for NTAs to list the address of a detention facility as where the non-citizen currently resides; (2) when the custody determination was made that Dr. Khan Suri would be detained in Texas and which records reflect those facts; (3) how many beds were available in Farmville at the time of Dr. Khan Suri's arrest and how many people were removed from Farmville when Dr. Khan Suri was removed; (4) how and when people are typically moved from Farmville; and (5) to provide any additional information on the decision to move Dr. Khan Suri to Texas—specifically, to explain why Dr. Khan Suri was moved from a facility that had bedspace to a facility that did not. Transcript of May 1 Hearing ("Tr.") at 7:13-14, 8:4-6, 9:13-18, 15:17-21, 16:7-12, 16:17-22, 17:15-16, 17:24-18:3.

Respondents' answers to these questions are either non-responsive or riddled with inconsistencies. First, Respondents appear to make post hoc rationalizations regarding available bedspace in Caroline and Farmville. Respondents originally contended that Petitioner was moved from this District because of "potential overcrowding in Virginia detention facilities." First Simon Decl. ¶ 8.[11] In their supplemental declaration, Respondents represent that there were, in fact, no

---

[11] In response, Petitioner advanced evidence that there was ample bedspace at immigration facilities in Virginia. TRAC Reporting, (March 17, 2025) https://tracreports.org/immigration/detentionstats/facilities.html; ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-

beds for Petitioner in this District because the available beds were either reserved for other arrests, as with Farmville, or only available for emergencies, as with Caroline. Graham Decl. ¶ 8. Was the reason the potential overcrowding or no beds? These representations are plainly inconsistent and are further undermined by the fact that Prairieland Detention Center, where Petitioner is currently held, is overcrowded. Khan Suri Decl. ¶ 22. Moreover, neither representation satisfactorily explains why Dr. Khan Suri would be transferred from a place with, concededly, some bedspace at the time of Petitioner's arrest to a facility that did not have bedspace. It is uncontroverted that Dr. Khan Suri was placed in a dormitory that has a 36-person capacity but has been filled with at least 50 people since he arrived. *Id.* Indeed, Dr. Khan Suri slept on a plastic cot on the floor for two weeks before being moved to a bed. *Id.*

Drawing all inferences in favor of Petitioner, the Court infers that Petitioner's transfer to Texas was not about bedspace. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (acknowledging that a Court is required to make all inferences in favor of a plaintiff when deciding a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing). Indeed, given Respondents' apparent post hoc rationalization that bedspace concerns motivated Petitioner's removal from the District, it appears that Respondents' goal in moving Petitioner was to make it difficult for Petitioner's counsel to file the petition and to transfer him to the Government's chosen forum.

The second issue—Petitioner's NTA—also suggests that Respondents' design was to forum shop and spirit Petitioner away from this District before his counsel could file a petition. The Court asked Respondents whether it was normal for the NTA to list a detention facility as a

---

content/uploads/2022/06/2021-Annual-Review.pdf.; Caroline Detention Facility, *Home* (2025), https://carolinedf.org/. The Court need not rely on this.

non-citizen's current residence. Respondents assert that NTAs "issued for aliens who will be detained are issued listing the detention facility as the current address" because the non-citizen's location determines the "court and docket, as well as the date and time for initial appearances." Graham Decl. ¶ 10. As Petitioner notes, however, an NTA, like an indictment or complaint, is designed to "supply an affected party with a single document highlighting certain salient features of the proceedings against him." Dkt. 58 at 3 (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 163-64 (2021)). By statute, an NTA is sufficient if it includes the non-citizen's "most-recent address." 8 U.S.C §§ 1229(a)(1), 1229a(b)(5)(A). Respondents' statements suggest they were fully aware that listing Petitioner's current residence or place of detention would determine which immigration court would have jurisdiction over his proceedings.[12] *See* U.S. Dep't. of Just., Imm. Ct. Pract. Man. § 4.2 (2022); 8 C.F.R. § 1003.11; U.S. Dep't. of Just., Immigration Court List – Administrative Control, https://www.justice.gov/eoir/immigration-courtadministrative-control-list (last visited May 3, 2025). Respondents also knew that the Prairieland Detention Center was not his most recent residence.

Respondents' assertions with respect to the NTA's listed address also appear to be post hoc rationalizations because Respondents provide inconsistent statements on when the decision to detain Petitioner in Texas was made. The supplemental declaration states that the decision to detain Petitioner was made while he was at the Chantilly Field Office, and that the NTA was issued after the detention facility was decided. Graham Decl. ¶ 6 (stating that Dr. Khan Suri was transported "to the ERO Washington Office in Chantilly for the purpose of . . . making a decision on a detention location"); *id.* ¶ 9 (stating that "the decision to detain Suri at the Prairieland

---

[12] It is worth noting that ICE failed to notify Dr. Khan Suri's counsel of his transfer despite ICE's policy suggesting that notice to counsel in the event of transfer is standard practice. *See* ICE Policy 11022.1, § 5.3 Notifications in the Event of a Detainee Transfer (Jan. 4, 2012).

Detention Facility was made at approximately 10:00 pm on March 17, 2025"); *id.* ¶ 11 (stating that the NTA was issued "after the detention facility was decided"). This conflicts with Respondents' statement at the hearing that the custody determination to detain Petitioner in Texas was made before the NTA was issued. Tr. 9:7-12.

Here, the undisputed facts show that Petitioner was arrested around 9:30 p.m. outside his home in Rosslyn, Virginia. The Chantilly Field Office is at least a 30-minute drive from Petitioner's apartment building. Therefore, Petitioner could not have been at the Chantilly Field Office at 9:47 p.m. when the NTA, stating he currently resides in Texas, was digitally signed. It appears that, despite Respondents' representation that Petitioner was transported to Chantilly *to* determine his detention location, the decision to detain Petitioner in Texas was actually made *before* 10:00 p.m. and before Petitioner arrived at and was processed in the Chantilly Field Office. Graham Decl. ¶ 6. With these inconsistencies, it is still unclear when the decision to detain Petitioner outside of this District was made. Nonetheless, as stated above, the detention decision appears to have little to no relationship to whether there was available bedspace in Farmville or Caroline.

Lastly, such rapid transfers do not appear to be part of the normal course of operations in this jurisdiction. While rapid transfer of immigration detainees may be typical in some jurisdictions, Petitioner's movement across state lines appears atypical for immigration detainees in this jurisdiction. *Cf. Khalil v. Joyce et al.*, 2025 WL 849803, at *9-*10 (S.D.N.Y. Mar. 19, 2025) ("*Khalil I*") (noting that rapid transfer of Manhattan immigration detainees to New Jersey is routine). A qualified immigration attorney with extensive practice experience in Virginia stated that she has "never seen ICE arrest someone in Virginia and move them as far away as Texas in less than 24 hours." Dkt. 47-2, Declaration of Elizabeth Schmelzel, Esq. ("Schmelzel Decl.") ¶ 5. Although Respondents assert that forty-four people were moved from Farmville with Dr. Khan

25

JA230

Suri, they offer no clarifying information to indicate whether they were similarly situated—i.e., whether they were recently arrested like Dr. Khan Suri or whether they had been there for some time and had final orders of removal. Respondents also fail to provide the Court with any additional information regarding the regularity of transfers or the transfer process. Moreover, ICE's own guidance and policies with respect to transfers suggest that Petitioner's movement and Respondents' actions in this case do not conform to the normal course. *See* ICE Directive 11064.3 (2022), available at: https://www.ice.gov/doclib/news/releases/2022/11064.3.pdf; ICE Policy No. 11022.1, §§ 5.2, 5.3 (Jan. 4, 2012).

Accordingly, the fashion in which Petitioner was transferred appears exceptional for immigration detainees who are arrested in Virginia, if not in general. This atypical movement would make it difficult for any diligent lawyer's filings to "catch up" to their client's location. Indeed, it took Petitioner's counsel only three-hours and forty-eight minutes to file the original habeas petition, and yet, he was too slow. Ahmad Decl. ¶¶ 7-8. No diligent lawyer who routinely practices immigration law in this District could have predicted the shepherding of Petitioner from Virginia to Louisiana.[13] The facts at hand demand that the default habeas jurisdictional rules adjust accordingly.

Respondents claim that Petitioner was only in Louisiana transitorily and on his way to his ultimate destination of Texas. Dkt. 26 at 12. It is not readily apparent to the Court that the Government intended to take Petitioner to Texas to be held there awaiting his May 6 hearing. Petitioner was in Louisiana from the evening of March 18 until the evening of March 21. Second

---

[13] Additionally, the Court does not premise its jurisdictional finding on this hypothetical but queries the application of habeas jurisdictional rules if Petitioner's counsel filed the petition just fifty-seven minutes earlier—at 5:02 p.m. on March 18. At that point, Petitioner's plane was in the air. First Simon Decl. ¶ 11.

Simon Decl. ¶ 3. Petitioner stated that on the evening of March 20, two days after his habeas petition was filed in this District, he was told he would be leaving Louisiana to be transferred to New York to be deported. Khan Suri Decl. ¶ 21. Notably, on the same day, the Court entered its order that Petitioner not be removed from the United States until the Court issues a contrary order. Dkt. 7. Only on the following day was Petitioner transferred to Texas.

The Court notes that there has been a pattern of similar movement of immigration detainees in similar cases. *Mahdawi v. Trump et. al.*, 2025 WL 1243135, at *3 (D. Vt. Apr. 30, 2025) (recounting that on the same day he was arrested and served with an NTA, Homeland Security Investigations agents attempted to put Mr. Mahdawi on a plane bound for Louisiana); *Ozturk v. Trump, et al.*, 2025 WL 1145250, at *2-*3 (D. Vt. Apr. 18, 2025) ("*Ozturk II*"), *appeal filed*, *Ozturk v. Hyde et al.*, No. 25-1019 (2nd Cir. Apr. 24, 2025) (detailing that within 24 hours of her arrest, Ms. Ozturk was taken to Methuen, Massachusetts, then to Lebanon, New Hampshire, then to St. Albans, Vermont, then to Burlington, Vermont, and then put on a plane to Louisiana); *Khalil I*, 2025 WL 849803, at *3-*4 (describing that within 48 hours of his arrest, Mr. Khalil was taken to another facility in Manhattan, before being transported to Elizabeth, New Jersey, and then flown to Dallas, Texas, before finally reaching Jena, Louisiana). Each petitioner was arrested on different days and in different regions. What is similar? Each was charged with removability under 8 U.S.C. §1227(a)(4)(C), and the Government attempted to move each outside of their jurisdictions to Louisiana or Texas.

Based on these facts the Court adopts the reasoning of Justice Kennedy's concurring opinion in *Padilla*. Respondents' myriad contradictory explanations combined with the inability for Petitioner's exceptionally diligent counsel to keep up with Petitioner's abnormal and rapid movement across state lines demands more flexible jurisdictional rules. *See Harris*, 394 U.S. at 291. Therefore, the Court finds that jurisdiction should lie in the district from which Petitioner

27

was removed—the Eastern District of Virginia. *See Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

The Court declines to transfer Dr. Khan Suri's petition to the Western District of Louisiana for the additional reason that doing so would ratify an attempt at forum shopping. When it is possible to apply the immediate custodian rule, that rule "serves the important purpose of preventing forum shopping by a habeas petitioner." *Poole*, 531 F.3d at 273 (quoting *Padilla*, 542 U.S. at 447). Just as a habeas petitioner should not be permitted to forum shop, neither should the United States Government. *See Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1258 (D.C. Cir. 1973) (warning against "the Kafkaesque specter of supplicants wandering endlessly from one jurisdiction to another in search of a proper forum"). In fact, the D.C. Circuit's warning in *Eisel v. Secretary of the Army* is particularly prescient considering the United States Government continues to dispute the jurisdictional findings of other district courts in an attempt to force the petitioners to re-file habeas petitions in new jurisdictions. *See Ozturk II*, 2025 WL 1145250; *Khalil II*, 2025 WL 972959. It is not an exercise in forum shopping for Petitioner to file and seek review of his habeas claims in this District—the jurisdiction in which he resides, was arrested, and was originally detained. Instead, forcing Petitioner to litigate his case in Louisiana or Texas for that matter, many states away from his lawyers and family, would meaningfully deprive him of their ability to aid in his representation for the duration of these habeas proceedings.

Moreover, because Petitioner has strong connections to this District, this District has an interest in the adjudication of Petitioner's habeas claims, whereas the Northern District of Texas and the Western District of Louisiana do not. Although it involved different circumstances than the ones before this Court, the Supreme Court's reasoning in *Braden v. 30th Judicial Circuit Court of Kentucky* supports this conclusion. 410 U.S. at 499. There, the Supreme Court found that the default rules of habeas jurisdiction were unworkable for a petitioner who was presently confined

28

in Alabama but seeking to challenge a detainer lodged against him by the Commonwealth of Kentucky. *Id.* The *Braden* Court made an exception and allowed the petitioner to sue the individual with legal control over his future confinement in Kentucky. *Padilla*, 542 U.S. at 438 (describing the holding of *Braden*). The Court reasoned that "the Western District of Kentucky is almost surely the most desirable forum for the adjudication of [the petitioner's claim]" because the relevant events occurred there, and it would be "no less convenient for the respondent and the Commonwealth of Kentucky" to litigate the petitioner's claims in Kentucky. *Braden*, 410 U.S. at 493-94.

Just as the Court in *Braden* applied "traditional venue considerations" when the default rules became untenable, so too does this Court. *Id.* at 493. First, the Eastern District of Virginia is where Petitioner resides with his wife and children, it is where Petitioner was arrested, and it was where Petitioner was detained from the evening of March 17 until the evening of March 18. *See Poole*, 531 F.3d at 271 (holding that habeas jurisdiction remains in the "original place of incarceration" despite temporary movement to another district). Therefore, the Eastern District of Virginia has a strong interest in hearing Petitioner's claims. Additionally, it works no prejudice to Respondents to litigate in the Eastern District of Virginia. For these reasons, the Court declines to transfer the instant habeas petition to the Western District of Louisiana.

Accordingly, for the foregoing reasons, the Court finds that this Court has jurisdiction to hear Dr. Khan Suri's habeas petition. Respondents' Motion to Dismiss or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are denied.

A separate Order will issue.

Entered this 6th day of May, 2025
Alexandria, Virginia

/s/

**Patricia Tolliver Giles**
**United States District Judge**

29

JA234

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI,                              ) | |
| )  | |
| *Petitioner,*                                 ) | |
| )  | |
| v.                                            ) | |
| )  | |
| DONALD TRUMP, *in his official capacity*      ) | Case No. 1:25-cv-480 (PTG/WBP) |
| *as President of the United States;* RUSSELL  ) | |
| HOTT, *in his official capacity as Field*     ) | |
| *Office Director of Washington, Immigration*  ) | |
| *and Customs Enforcement;* JEFFREY            ) | |
| CRAWFORD, *in his official capacity as*       ) | |
| *Warden of Farmville Detention Center;*       ) | |
| TODD LYONS, *Acting Director, U.S.*           ) | |
| *Immigration and Customs Enforcement;*        ) | |
| KRISTI NOEM, *in her official capacity as*    ) | |
| *Secretary of the United States Department of* ) | |
| *Homeland Security;* MARCO RUBIO, *in his*    ) | |
| *official capacity as Secretary of State;*    ) | |
| PAMELA BONDI, *in her official capacity*      ) | |
| *as Attorney General, U.S. Department of*     ) | |
| *Justice,*                                    ) | |
| )  | |
| *Respondents.*                                ) | |
| )  | |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Respondents' Motion to Dismiss, or in the Alternative, Motion to

Transfer Venue (Dkts. 24, 25) are **DENIED**; it is further

**ORDERED** that the Court will set a hearing on Petitioner's Motion to Compel

Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on

Bond (Dkt. 20) for May 14, 2025, at 10:00 a.m.; and it is further

**ORDERED** that the parties shall file any supplemental filings related to Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20) to the extent necessary to address any additional claims in the Amended Petition and Complaint (Dkt. 34) on or before May 12, 2025, at 12:00 p.m.

Entered this 6th day of May, 2025
Alexandria, Virginia

/s/
Patricia Tolliver Giles
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BADAR KHAN SURI, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, *in his official capacity* | ) | Case No. 1:25-cv-480 (PTG/WBP) |
| *as President of the United States;* RUSSELL | ) | |
| HOTT, *in his official capacity as Field* | ) | |
| *Office Director of Washington, Immigration* | ) | |
| *and Customs Enforcement;* JEFFREY | ) | |
| CRAWFORD, *in his official capacity as* | ) | |
| *Warden of Farmville Detention Center;* | ) | |
| TODD LYONS, *Acting Director, U.S.* | ) | |
| *Immigration and Customs Enforcement*; | ) | |
| KRISTI NOEM, *in her official capacity as* | ) | |
| *Secretary of the United States Department of* | ) | |
| *Homeland Security*; MARCO RUBIO, *in his* | ) | |
| *official capacity as Secretary of State*; | ) | |
| PAMELA BONDI, *in her official capacity* | ) | |
| *as Attorney General, U.S. Department of* | ) | |
| *Justice,* | ) | |
| | ) | |
| *Respondents.* | ) | |
| | ) | |

## ORDER

This matter comes before the Court on Petitioner's Motion to Compel Respondents to
Return Petitioner to this District (Dkt. 5) and Petitioner's Motion for Release on Bond (Dkt. 20).
On May 14, 2025, the Court heard argument. For the reasons stated in open court, it is hereby

**ORDERED** that Petitioner's Motion for Release on Bond (Dkt. 20) is **GRANTED** and
Petitioner's Motion to Compel Respondents to Return Petitioner to this District (Dkt. 5) is
**DENIED** as moot; it is further

**ORDERED** that Petitioner Dr. Khan Suri is to be immediately released on his personal recognizance during the pendency of his habeas proceedings subject to the following conditions: (1) Petitioner will reside in Virginia; (2) Petitioner will attend all court hearings in this case in person unless excused by order of the Court; and (3) Petitioner will participate in his removal proceedings. Petitioner is **not** required to submit to any GPS monitoring; it is further

**ORDERED** that Respondents shall not attempt to re-detain Petitioner without providing 48-hours notice to the Court and Petitioner's counsel; and it is further

**ORDERED** that Respondents' request to stay this Court's decision pending appeal is **DENIED**.

Entered this 14th day of May, 2025
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

2

JA238

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| BADAR KHAN SURI, | : | |
| | : | |
| | : | |
| | : | |
| Petitioner, | : | Civil Action |
| | : | No. 1:25-cv-00480-PTG-WBP |
| v. | : | |
| | : | |
| DONALD TRUMP, | : | May 14, 2025 |
| | : | 10:04 a.m. |
| Respondent. | : | |
| | : | |
| | : | |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF BOND HEARING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Petitioner:     **Sophia Leticia Gregg, Trial**
                        **Attorney**
                        American Civil Liberties Union of
                        Virginia
                        P.O. Box 26464
                        Richmond, VA 23261
                        804-774-8242
                        Email: Sgregg@acluva.org

                        **Eden Brooke Heilman, Trial**
                        **Attorney**
                        ACLU of Virginia
                        701 E. Franklin Street
                        Suite 1412
                        Richmond, VA 23219
                        (804) 523-2152
                        Fax: (804) 649-2733
                        Email: Eheilman@acluva.org

APPEARANCES:   (Cont.)

For the Petitioner:          **Astha S. Pokharel, Trial Attorney**
Center for Constitutional Rights
666 Broadway
7th Flloor
New York, NY 10012
212-614-6464
Email:
Asharmapokharel@ccrjustice.org

**Hassan Minhaj Ahmad, Trial
Attorney**
The HMA Law Firm PLLC
6 Pidgeon Hill Drive
Ste 330
Sterling, VA 20165
703-659-0632
Fax: 703-997-8556
Email: Hma@hmalegal.com

**Geri Greenspan, Trial Attorney**
ACLU of Virginia
P.O. Box 26464
Richmond, VA 23261
804-491-8584
Email: Ggreenspan@acluva.org

**Nermeen Saba Arastu, Trial
Attorney**
Main Street legal, Inc.
CUNY School of Law
2 Court Square
Long Island, NY 11101
202-246-0124
Email: Nermeen.arastu@law.cuny.edu

For Respondent:          **David J. Byerley, Assistant United
States Attorney**
Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
202-532-4523
Email: David.byerley@usdoj.gov

APPEARANCES:   (Cont.)

For Respondent:                    **Elizabeth Anne Spavins, Assistant**
                                   **United States Attorney**
                                   United States Attorney's Office
                                   (Alexandria)
                                   2100 Jamieson Avenue
                                   Alexandria, VA 22314
                                   703-299-3785
                                   Email: Lizzie.spavins@usdoj.gov

                                   **Tom Benjamin Scott-Sharoni**
                                   **DOJ-CIV, Assistant U.S. Attorney**
                                   Office of Immigration Litigation
                                   P.O. Box 868 Ben Franklin Station
                                   Washington, DC 20044
                                   202-538-3554
                                   Email:
                                   Tom.scott-sharoni2@usdoj.gov


Court Reporter:                    **Scott L. Wallace, RDR, RMR, CRR**
                                   Official Court Reporter
                                   United States District Court
                                   401 Courthouse Square
                                   Alexandria, VA 22314-5798
                                   Cell: 443-584-6558
                                   Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, MAY 14, 2025**</u>

1

2      (10:04 a.m.)

3           THE COURTROOM CLERK:  The Court calls *Badar Khan Suri*

4      *versus Donald Trump*, et al., Case Number 1:25-cv-480.

5           May I have appearances, please, first for the Petitioner?

6           MS. GREGG:  Good morning, Your Honor.  Sophia Gregg from

7      the ACLU of Virginia on behalf of Petitioner.  I'm here with Eden

8      Heilman, Astha Sharma Pokharel, Hassan Ahmad, Naureen Arastu,

9      Geri Greenspan, Vishal Agraharkar, and Celine Zhu.

10          THE COURT:  Good morning to all of you.

11          MS. SPAVINS:  Good morning, Your Honor.  Elizabeth

12     Spavins, Assistant United States Attorney.  With me at counsel's

13     table is my colleague, Christian Cooper, and then presenting for

14     the Respondents today will be David Byerley of the Office of

15     Immigration Litigation at Main Justice, and next to him is Tom

16     Scott-Sharoni, also from OIL.  Thank you.

17          THE COURT:  Good morning to all of you.  So, we are on

18     today on Petitioner's pending motions, the motion for return, as

19     well as the motion for bail.

20          MS. GREGG:  That's correct, Your Honor.

21          THE COURT:  So I'll hear from you first.

22          MS. GREGG:  Yes, Your Honor.  If there's no preliminary

23     matters, we'll start with our motion for bail.

24          We're here today because Dr. Khan Suri is being unlawfully

25     detained for his wife -- his and his wife's lawful expression in

1  support of Palestinian rights and his ties through their marriage

2  to her father.

3      About two months ago, after celebrating Ramadan with his

4  Georgetown community, Dr. Khan Suri came home to armed masked men

5  who handcuffed him and drove him away from his wife, children,

6  and the life he had.  He is now over a thousand miles away from

7  his home, the people he cherishes most, his lawyers, and this

8  court, packed into an overcrowded detention center and subjected

9  to the most severe restrictions usually reserved for people

10 convicted of violent crimes awaiting deportation.

11     The impact of the unlawful actions on Dr. Khan Suri and on

12 the millions of lawful residents, students, professors, and visa

13 holders of all kinds is hard to overstate.  Their speech isn't

14 just chilled.  They are afraid.  They are afraid to exercise

15 their core constitutional rights to write an op-ed, to post on

16 social media, and to dare to criticize the government.

17     This fear is profound.  And what is shocking is that the

18 government doesn't deny it.  The government announced it would do

19 this in advance, and they have doubled down at every opportunity,

20 and they've had ample opportunity to respond to Dr. Khan Suri's

21 claims in this case before this hearing.

22     In response that he is being imprisoned and retaliated

23 against for speech, the government says nothing.  In response to

24 the claim that the government targeted Dr. Khan Suri because of

25 his wife's speech, her Palestinian origin, or family ties, the

1   government says nothing.

2       In response to the claim that the government targeted

3   Dr. Khan Suri because of his wife -- I'm sorry.  The government

4   does not claim that Dr. Khan Suri was imprisoned due to any

5   illegal conduct or for any other constitutionally sound basis.

6       We're asking this Court to release Dr. Khan Suri pending

7   his habeas petition, after which this Court can fully examine the

8   constitutional violations of the government's actions.

9       THE COURT:  Do we even know the exact statements that are

10   at issue?  Have they identified the alleged statements that he

11   made?

12       MS. GREGG:  The government has not put forth any evidence

13   so far in this case regarding any statements or any other reason

14   for his detention.

15       THE COURT:  Okay.

16       MS. GREGG:  Courts considering bond pending immigration

17   habeas petitions use the *Mapp* -- use the *Mapp v. Reno* standard,

18   which requires a court to evaluate two things:  Whether or not

19   there are substantial claims in the case and whether or not there

20   are extraordinary circumstances.  There are both here.

21       While the government argues that Petitioner must meet a

22   heightened standard in *Eliely*, which requires both a substantial

23   constitutional claim upon which he has a high likelihood of

24   success, and extraordinary circumstances, that standard is for

25   habeas petitioners already tried and convicted by a court of law.

1    Here, Dr. Suri is being detained on unproven civil

2    immigration charges challenging the unconstitutionality of his

3    detention.

4    Release on bail here under the standard articulated in

5    *Mapp* is reasonably similar to pretrial release in a criminal

6    case.

7    Dr. Khan Suri brings several substantial claims, but most

8    predominantly is the claim that he has been detained solely for

9    the content of his speech, which must be afforded the highest

10   protection under the First Amendment.

11   The government doesn't deny this.  The government has

12   targeted him in retaliation for exercising his right to free

13   speech under the First Amendment.  And, again, the government

14   doesn't deny this.

15   That must be a substantial claim.  Likewise, there is no

16   evidence that the government has targeted and detained Dr. Khan

17   Suri except in retaliation for exercising his lawful speech and

18   associations.

19   The evidence submitted by Petitioner, namely the

20   government's own statements, supports the fact that the

21   government's objectives in detaining Dr. Khan Suri is punitive in

22   purpose and violates the due process.

23   In considering exceptional circumstances, the

24   courts consider what *Mapp* calls unusual cases.  Except for the

25   handful of current cases that we've brought to the attention of

1   the Court and the Court is aware, in nearly identical

2   circumstances there have been no cases in which the government

3   has used this particular provision to detain someone for lawful

4   speech.

5        That is exceptional.  What is also exceptional is the fact

6   that there is no evidence that Dr. Khan Suri is a danger or a

7   flight risk.  The government was given ample opportunity by this

8   Court in advance of this hearing to present any evidence in

9   opposition to this motion for release, and it provided none.

10       Dr. Khan Suri, however, has demonstrated through an

11  abundance of letters of support from people who know him that he

12  is a kind, caring friend and colleague who leads with a

13  commitment to peace.

14       He's supplemented with even more letters that pour in

15  every day from people of the Georgetown community and people who

16  have known him --

17       THE COURT:  I've read them all.

18       MS. GREGG:  Yes.  If released, he would return to his home

19  in Roslyn, Virginia where he lives with his wife and children.

20       If he's able to, his Georgetown dean and director fully

21  support Dr. Khan Suri's return to work and teaching.

22       The director of the Alleywood Center is here today in

23  support of Dr. Khan Suri's release as well, as are many members

24  of his community.

25       Finally, release is necessary to make the habeas remedy

1  effective because Dr. Khan Suri's attention necessarily

2  constitutes a continued infringement on his First Amendment and

3  due process rights.

4       An infringement on those rights may be justified if the

5  government had presented a legitimate case, but it has not done

6  so.

7       In the meantime, with every passing day, his detention

8  chills the speech of millions and millions of noncitizens who may

9  now not exercise their First Amendment rights for fear of being

10 whisked away to a detention center thousands of meals away from

11 their home.

12      For these reasons and the many other reasons articulated

13 in our motions and supplemental briefing, we ask this Court to

14 release Dr. Khan Suri so that his habeas remedy can be effective.

15      THE COURT:  One issue that they raised in their

16 supplemental, and I don't know if it's necessary for me to reach

17 it in order to rule today, is with regard to your void for

18 vagueness challenge.  Do you have any authority where a void for

19 vagueness challenge has been made as to a policy or regulation?

20      MS. GREGG:  Well, Your Honor, the -- I think the cases

21 that, first, that the government cited don't necessarily say that

22 it doesn't apply to a policy, per se, but here the issue is that

23 there is not just the law that he's being charged under that is

24 void for vagueness, but it's implementation through the executive

25 orders themselves.  That, as a whole, would -- are void because

1   the void of vagueness standard basically requires that due

2   process make the policy or the law clearly defined.

3        And if it doesn't provide the kind of notice that will

4   enable a person or people to understand what the conduct

5   prohibits, it would be -- or if it would authorize or even

6   encourage arbitrary discrimination or enforcement, as it has done

7   here, it would -- it would not satisfy the void for vagueness

8   standards that are articulated in the cases.

9        We don't have -- even if the Court is not inclined to

10  consider the void for vagueness argument or claims in this case

11  as being a substantial claim, there are many substantial claims

12  in this case that would be sufficient for the standard under

13  *Mapp*.  It doesn't say that all the claims must be substantial so

14  much that a substantial claim would be sufficient.

15       THE COURT:  Okay.  So it's your position that, either

16  under your First Amendment claim or under your Fifth Amendment

17  claim, either of those would be sufficient?

18       MS. GREGG:  Correct, Your Honor.

19       THE COURT:  Thank you.

20       MR. BYERLEY:  Good morning, Your Honor.

21       THE COURT:  Good morning.

22       MR. BYERLEY:  As the Court's opinions have shown, ample

23  attention has been paid to the brief, so I'm not going to repeat

24  a lot of what's been said in the brief.

25       THE COURT:  Thank you.

1    MR. BYERLEY:  But, briefly, the Court should deny the

2    pending motions because the standards set by the *United States*

3    *verus Eliely*, which is the Fourth Circuit's, granted it's

4    unpublished, but it's the Fourth Circuit's equivalence of whether

5    habeas release pending a determination on an ultimate habeas

6    petition should be granted, is pretty high.  It requires

7    substantial constitutional claims on which he has a high

8    probability of success.

9        THE COURT:  Haven't they created sustained claims, though?

10       MR. BYERLEY:  Your Honor, the Government does not believe

11   that they have because of many of the jurisdictional bars that we

12   talked about in our briefing, including 1252(a)(5) and (g).

13   Those jurisdictional issues, even maybe not, perhaps, directly at

14   issue, even in the context of determining whether *Eliely* release

15   is appropriate, but it does present an obstacle to their claims

16   on the merits.  And then furthermore --

17       THE COURT:  How so?

18       MR. BYERLEY:  So, what Mr. Suri is challenging in his

19   petition is the decision to institute removal proceedings against

20   him.

21       THE COURT:  That's not what he's challenged.

22       MR. BYERLEY:  Yes, Your Honor.

23       THE COURT:  He's challenged specifically his detention and

24   his transfer.  I agree, like, there was a shift from the original

25   petition and what we have clearly stated in the amended petition,

and they're clear.  It's very focused.  It's only -- the removal

proceedings can continue.  Those are separate.  But what they're

speaking to now, what they are challenging and the prayer for

relief that they are seeking directly addresses detention,

detention/transfer.

MR. BYERLEY:  Yes, Your Honor.  The government agrees that

this petition challenges detention, but the decision regarding

detention is inextricably bound up in the decision to institute

removal proceedings in the first place.

So, here we have a case that's somewhat similar to AADC,

the anti- -- the anti-Arabic discrimination -- I'm sorry.  It's a

mouthful.

THE COURT:  That's okay.

MR. BYERLEY:  Where they were challenging their removal --

the basis of their removal proceedings.  And while some of them

may have been detained and some of them may not have been, what

we're dealing with here is Mr. Suri's challenging his detention,

which is attendant to and directly tied into the decision to

institute removal proceedings in the first place.

THE COURT:  No court -- I mean -- and this is not on

you -- but the government has consistently made the same argument

in several jurisdictions at this stage in similar -- similarly

situated cases, and no one has adopted that reading.

MR. BYERLEY:  So, granted, Your Honor, many of those cases

are out of circuit and are not binding.  At least one court did

find our way. That was *Taal versus Trump* out of the Northern

District of New York earlier this year. But, granted, courts --

there are reasonable grounds to disagree, and we understand that

there are decisions disagreeing with those positions.

The government disagrees with those decisions and is

considering or actively pursuing appellate recourse. But,

granted, yes, I acknowledge that there are other decisions that

do not go our way, but what I want to emphasize here is that

under *Jennings* and under *AADC*, the government disagrees with

those conclusions because what it did --

THE COURT: But *AADC* was -- you know, it only reaches --

1252(g) only reaches three discrete actions: The decision to

commence proceedings, adjudicate cases, or execute removal

orders.

MR. BYERLEY: Yes, Your Honor, but under 1252(a)(5) and

(b)(9), what we also have is review of questions that arise in

removal proceedings. Here, Mr. Suri is challenging the basis of

his detention, the basis of the determination under 12.7.

THE COURT: But the detention decision was made prior to

the NTA, right, and removal proceedings actually initiating?

MR. BYERLEY: No, Your Honor. The deportability

determination was made prior to the decision to -- the issuance

of the NTA, but it forms the basis of the NTA, and so they're

inextricably tied up with one another such that (a)(5) and (b)(9)

apply, as well as 1252(g).

1     THE COURT:  But even if those were to -- you know, even

2  with those statutes, the courts are clear that they do not

3  preclude challenges to the extent of the government's authority.

4     MR. BYERLEY:  Your Honor, I think you may be referring to

5  *Demore versus Kim*, which held that 1226(e) did not prohibit

6  constitutional challenges to the legislation.  I don't think

7  that --

8     THE COURT:  I'm looking at *Miranda v. Garland*, the Fourth

9  Circuit case.

10    MR. BYERLEY:  I'm sorry?

11    THE COURT:  Miranda --

12    MR. BYERLEY:  Miranda.

13    THE COURT:  -- v. Garden, the Fourth Circuit case.

14    MR. BYERLEY:  Yes, Your Honor.  But the government's

15 position here is that (a)(5) and (b)(9), it applies here because

16 he is challenging his detention, which is inextricably bound up

17 with the 1227(a)(4)(C) determination.

18    And so the government believes that those provisions apply

19 to bar review in this case and that the proper forum for which

20 Dr. Suri to bring his challenges is an immigration court before

21 an immigration judge, and then appeal to the BIA, if necessary,

22 and then appeal to the Fourth Circuit as necessary -- or Fifth

23 Circuit.  I'm sorry.

24    THE COURT:  I understand your argument.  I'm not saying I

25 agree with it, but I understand.

1    MR. BYERLEY:  Yes, Your Honor.

2    THE COURT:  You can move on.

3    MR. BYERLEY:  So, furthermore, under the *Eliely* standard,

4    I think, as Your Honor correctly identified, the void for

5    vagueness challenge suffers from fatal flaws.  First is that the

6    Fourth Circuit says that the void for vagueness doctrine focuses

7    on legislation, not policies or actions.

8    THE COURT:  But I don't even have to reach that.

9    MR. BYERLEY:  Yes, Your Honor, that's correct.  We also

10   agree with that proposition as well.  Because, under the *Eliely*

11   standard, it's only constitutional claims which are at issue on

12   these sorts of motions.

13   Furthermore, the government posits that, to the extent

14   that the Court is considering granting interim release, the Court

15   also has to look at whether the interim release is necessary to

16   render the habeas -- render the habeas remedy effective, to the

17   extent the Court grants the habeas petition in his favor.

18   Over the 17 years since *Eliely* was decided, not a single

19   court on an opposed motion has granted release pending a

20   determination of habeas -- on a habeas petition.

21   The two cases on which Petitioners rely, *Brooks versus*

22   *Wilson* and *Young versus Antonelli*, Eastern District of Virginia,

23   2018; District of South Carolina, 2021, respectively; both of

24   those decisions came on unopposed motions.  And in that context,

25   what the Court was looking at was that in each of those cases the

1   Fourth Circuit had recently adopted the petitioner's argument in

2   terms of improper -- improperly elevated mandatory minimums.

3        And so, if the habeas would have been granted in their

4   favor on the merits, then they would have served the full time

5   that they wouldn't have needed to serve had the Court been able

6   to rule on the habeas petition instantaneously.  So that's not a

7   similar situation to what we have here.  The court's habeas

8   remedy would still be effective even if --

9        THE COURT:  How so?

10       MR. BYERLEY:  Because the Court is -- because it's, one,

11  again going back to the jurisdictional issues; but, two, if the

12  Court grants the habeas petition on the merits, there's --

13  he's -- the authority exists for his detention.  It's not a

14  similar situation in *Young* and *Brooks* where the sentence was

15  invalid -- would have been found invalid if -- the elevated

16  sentence would have been found invalid if the Court had -- if he

17  had needed to await the entire resolution of the habeas

18  proceedings.

19       But, again, bringing this back to 1252(a)(5), (b)(9), and

20  g), he's challenging underlying decisions which are inextricably

21  tied up with the --

22       THE COURT:  I don't accept that reading.  I don't think

23  it's inextricably intertwined.  I don't.

24       MR. BYERLEY:  Yes, Your Honor.  Well, that's the

25  government's primary argument on this.  And then, to the extent

1    that the Court is inclined to grant the motion, the government

2    requests that the conditions set out in our supplemental briefing

3    filed on Monday be imposed on any release that the Court may

4    provide.  And, as well, we would ask for a stay of seven days

5    pending the government's determination on appellate recourse..

6        THE COURT:  Let's go through those.  In your supplemental,

7    you indicate that the Court should treat this as -- or approach

8    this as it does with respect to a preliminary injunction and

9    impose a bond.  That -- you rely on a Third Circuit case.  You

10   don't have any Fourth Circuit case that's done that, right?

11       MR. BYERLEY:  So, Your Honor, the -- it's widely

12   recognized, and I think, even in the recent *Ozturk* opinion from

13   the Second Circuit, recognized that granting this sort of release

14   early is tantamount to a preliminary injunction reviewable order,

15   as well as there's a recent Supreme Court case, I think,

16   recognizing that as well.

17       THE COURT:  But bond in a preliminary injunction context

18   is, you put -- you impose a bond so the person who the

19   injunction -- who has been enjoined, that there is something in

20   place that would make them whole if it was found out that the

21   injunction was issued in error.

22       But here, there is nothing that would be needed,

23   necessarily, to make the government whole, is there?

24       MR. BYERLEY:  Well, there would be the cost of redetaining

25   him.  The conditions that the government proposes in our --

1      THE COURT:  The cost of what?

2      MR. BYERLEY:  The cost of sort of redetaining him and

3  making a rearrest, in the event that that becomes necessary.

4      But, in any event, the Court can tailor its remedy to

5  adequately balance the needs of both sides, and we believe that

6  these conditions as we've suggested are reasonable, to the extent

7  the Court is inclined to grant release on Petitioner's motion.

8      THE COURT:  Many of the conditions that you would seek

9  seem to go to a risk of flight or they would be ones that the

10 Court would impose if there was a risk of flight.  What evidence

11 do you have that he poses a risk of flight?

12     MR. BYERLEY:  So, Your Honor, these are just generic --

13 these are just generic conditions that would be imposed by an

14 immigration judge if -- in the event that the immigration judge

15 was deciding this issue.

16     In terms of -- in terms of flight risk and danger to the

17 community, those things are not in the record.  But what we --

18 what the government would say is that Secretary Rubio made this

19 determination under 1227(a)(4)(C)(1), and so there is a

20 consideration about whether his -- whether his presence in the

21 community does cause potential serious foreign affairs

22 consequences that should also be considered kind of separate and

23 apart from flight risk and danger to the community.

24     THE COURT:  That determination has never been really

25 presented to this Court.  I haven't seen that memorandum.

1      MR. BYERLEY:  Yes, Your Honor, that's correct.  It's not

2  in the record yet, and I do not believe it's been filed in the

3  immigration court yet either at this point.

4      THE COURT:  Okay.  Do you have more?

5      MR. BYERLEY:  Your Honor, no.  Your Honor's reviewed the

6  briefing.  For the reasons stated in the government's briefing

7  and also as presented here today, the Government requests that

8  the Court deny the pending motions.  Thank you.

9      MS. GREGG:  Thank you, Your Honor.  As the Court already

10  addressed, I won't go through all the issues with the

11  government's argument as to the INA bars in this case, but it's

12  just notable that the *AADC* case is speaking to one provision in

13  the INA, and the government is using it to show that there's some

14  bar through 1252(b)(9), which Miranda clearly says that the

15  government does not have discretion to violate the

16  Constitution -- its discretion to detain does not include the

17  discretion to violate the Constitution, which is exactly what's

18  at issue here.

19      And, as the Court already adequately addressed, all the

20  other cases have gone the other way, cases that are dealing

21  specifically with students who are being targeted for their

22  speech under the same foreign policy bar.

23      The government brought up the case of Mr. Tall.  However,

24  Mr. Taal was not challenging his detention because he was not

25  detained at the time that he brought his case.  He was seeking an

1    injunction from being detained and, therefore, challenging the

2    underlying immigration charges, and so we would put that forth,

3    but all the other courts in this country that have looked at

4    these cases and situations identical to the one here for --

5    impacting Dr. Suri, they've all said that the INA doesn't -- no

6    provision of the INA bars consideration of their claims.

7         We've already gone over why habeas remedy is effective,

8    and I think that that's been sufficient, but for the *Eliely*

9    cases, the government talks about how we've cited other -- no

10   other case has been decided in this manner in the Fourth Circuit,

11   and that is specifically because this type of remedy is for

12   unusual cases.  There hasn't been a situation that has risen to

13   this level, and the government's conduct has not been so

14   egregious as it has in this case, but that shouldn't preclude the

15   Court from considering the same standard under *Mapp* that all the

16   other circuits -- or that many other circuits consider to be the

17   standard for immigration habeas cases.

18        Likewise, the government's contention that he should have

19   conditions placed on him, if he is to be released, we think that

20   that is inappropriate, since they have conceded that he is not a

21   flight risk or a danger to the community.

22        We have presented ample evidence that he is neither of

23   those things.  In fact, he is a well-respected and well-loved

24   member of his community with very strong ties to this Northern

25   Virginia area.

1       If the Court would like further assurances, we are happy
2  to consider any sort of location specific restrictions in the DMV
3  area, but we would ask that the Court not subject him to any
4  body-worn GPS because we find that is inappropriate, and the
5  government has not presented any reason that that should be the
6  case.
7       Additionally, Your Honor, we ask that, although -- we ask
8  that if the government seeks a stay on any potential grant of
9  release in Dr. Khan Suri's case, we ask that we be allowed to
10  address that as well.  We think that's not appropriate.
11       THE COURT:  Well, I think you should address that now,
12  their arguments with respect to the stay, because there's a
13  certain -- there's a test that must be satisfied before the Court
14  would grant a stay.
15       MS. GREGG:  Right.
16       THE COURT:  And the first is whether there would be
17  a -- is whether the applicant has shown a likelihood or strong
18  likelihood of succeeding on the merits.
19       MS. GREGG:  Correct, Your Honor.  And I think, by virtue
20  of a grant on this motion, we would have shown that they do
21  not -- they are not likely to succeed on the merits because of
22  the substantial claims in this case.
23       We don't believe that the -- the government hasn't
24  presented any evidence here for any lawful authority in detaining
25  Dr. Khan Suri.  We've demonstrated, on the other hand, that there

1   is evidence, sufficient evidence that his detention is currently

2   unlawful and violates his First Amendment and Fifth Amendment

3   rights.

4          Therefore, we would say that they would not likely succeed

5   on the merits.  They also cannot demonstrate any irreparable

6   harm, because, again, he is neither a flight risk or danger to

7   the community, and release will not interfere with his removal

8   proceedings.

9          As we've laid out in other motions, his removal

10  proceedings are remote, so even if he's in a detention center or

11  he's out free in the world, his immigration removal proceedings

12  are not impeded in any way.

13         He, however, will suffer irreparable harm.  The separation

14  from his family, from his community, from his studies, all

15  suggest -- all go to show that he would suffer if he is -- if a

16  stay was put in place.  Every day that he is detained, his rights

17  are being violated.

18         And also, his release will enable him to participate

19  meaningfully in the rest of these proceedings.

20         A stay would preclude that and continue to harm him in

21  that way.  The third factor relates to other parties' interests.

22  There are no other parties in this case.

23         And fourth is in public interest, and we would argue that

24  Dr. Khan Suri's release is very much in the public interest.  His

25  continued detention would likely continue to have a chilling

effect on protected speech, which is squarely in the public

interest because, you know, his release would signal to the rest

of the country, to noncitizens, that they will not be impacted

for exercising their First Amendment rights as well.

The community will benefit, and those who deeply care and

value him will benefit from his release as well.

And for all those reasons, Your Honor, we would say that

the government cannot prove any one of those factors that are

required for a stay.  Thank you.

THE COURT:  Anything else from either side?  I'm going to

take a brief recess, and then I'm going to come back.  I'll take

15 minutes.

(Thereupon, a recess in the proceedings occurred from

10:34 a.m. until 11:28 a.m.)

THE COURT:  Okay.  When there was a government's motion to

dismiss, I issued a memorandum opinion.  I'm not going to do that

in this case.  I plan on ruling from the bench.

In this case, Petitioner has moved for two forms of

relief:  One, to be returned to the Eastern District of Virginia,

and two, to be released on bond pending adjudication of his

habeas petition.

For the purposes of my ruling, I adopt the facts that I

laid out in my memorandum opinion that I previously issued, and

I'm first going to turn to the jurisdictional arguments raised by

the Respondents before I turn to the merits of Petitioner's

1    motion.

2         And first, Respondents argue that since Petitioner is

3    discretionarily detained under Section 1226(a) and 1226(e), that

4    restricts judicial review because the Secretary's discretionary

5    decisions or actions regarding the detention of alien or

6    revocation or denial of bond or parole, that, essentially, this

7    Court has no authority to review ICE's decision to detain the

8    Petitioner in Texas.

9         The Supreme Court clearly stated in the case of *Demore*

10   *versus Kim* that any provision said to bar review in habeas

11   requires a particularly clear statement of Congressional intent,

12   and that Section 1226(e) contains no explicit provision barring

13   habeas review.

14        And then, in *Miranda v. Garland,* the Fourth Circuit

15   further concluded that Section 1226(e) only forbids review of the

16   Attorney General's actions and decisions in individual

17   proceedings.

18        And with respect to the Petitioner's challenge to his

19   detention, the *Miranda* court also observed that, in *Jennings v.*

20   *Rodriguez*, the Supreme Court concluded that "the extent of the

21   government's detention authority is not a matter of discretionary

22   judgment, action, or decision, and is thus outside the scope of

23   1226(e)."

24        And, indeed, many circuits have reasoned that 1226(e) does

25   not limit habeas jurisdiction over constitutional claims or

1    questions of law or challenges to officials' statutory authority.

2         And so I find that here 1226(e) does not bar this Court's

3    review because this Petitioner does not challenge a specific

4    decision or action of the Attorney General regarding bond or

5    parole, and because he raises a constitutional challenge to the

6    secretary's authority, which is not a discretionary judgment.

7         Now, with respect to the claims that they -- or the bar

8    that they allege exists under 1252(g), in the *AADC* case, the *Reno*

9    *versus AADC*, the Supreme Court was clear that 1252(g) is to be

10   narrowly construed, and it only reaches three discrete actions of

11   the Attorney General, and that is the decision or action to

12   commence proceedings, adjudicate cases, or to execute removal

13   orders.

14        And, you know, there is a circuit split on whether

15   1252(b)(9) can even apply before a final order of removal is

16   issued, but -- and the Fourth Circuit hasn't definitively

17   answered the question.

18        But in looking at the cases in the Fourth Circuit, it's

19   clear that those rulings indicate that 1252(b)(9) would not bar

20   review here, because in *Miranda*, as I just stated -- well, there,

21   the Court found that, to the extent that it's a challenge to the

22   government's authority, then 1252(b)(9) does not bar the Court's

23   review.  And Respondents have relied on the case of *Johnson v.*

24   *Whitehead*.  That's another Fourth Circuit case to support their

25   position that review here would be precluded, but that case is

1     very different than the case before me, because there the

2     Petitioner was trying to, in the habeas case, was trying to

3     relitigate claims that he had made in his removal proceedings,

4     and that's not the case here.  The proceedings before me are

5     totally separate from the removal proceedings.

6          And finally, I turn to their allegation of the

7     jurisdictional bar because of 1252(a)(2)(B)(ii).  That statute

8     does not deprive this Court of jurisdiction because the statute

9     that they point to, 1231(g), is not a specified grant of

10    discretionary authority for the Attorney General to authorize

11    transfers.  It's just not, and that's clear when looking at the

12    *Reno* case, which is a Fourth Circuit case, 2019.

13         And so, for these reasons, I find that there is no

14    jurisdictional bar to the Court reaching or deciding this habeas

15    petition, and, therefore, I turn to the merits of the

16    Petitioner's motion, and I'm going to start with the motion for

17    bond release.

18         And here, the parties don't agree whether or not *Mapp v.*

19    *Reno* or *Eliely* provide the standard, and I don't think this Court

20    definitively has to decide that because, under *Mapp*, it requires

21    that the Petitioners raise substantial constitutional claims and

22    that there are exceptional circumstances that exist that makes

23    the grant of bail necessary to make the habeas remedy effective.

24    And in *Eliely*, the standard is very similar.  The only exception

25    is that it requires the prisoner to show substantial

constitutional claims on which he has a high probability of
success.  And the reason why I say it's not necessary for the
Court to reach that is because I find here that Dr. Khan Suri
would meet either.

And I also would like to point out, I'm not entirely sure
that *Eliely* does apply, because in that context it was a
petitioner who had been held mandatorily after having committed a
crime, and that's not the case here.

And so now I'm going to turn to those constitutional
claims.  And I don't think I need to reach all of it.  Petitioner
raises first a Fifth Amendment challenge to the lawfulness of his
detention, the Rubio determination, and their policy.

And, essentially, he alleges that he's being retaliated
against for his religious exercise, his speech, and for his
association.  Essentially, he alleges that he was targeted,
apprehended, and detained in order to retaliate against him and
punish him based on his or his wife's protected speech and his
association with his wife and his father-in-law.  And here, the
First Amendment extends to noncitizens, as it makes no
distinction between citizens and noncitizens.

Now, in order to make out a First Amendment retaliation
claim, a plaintiff or petitioner must show that he has a right
protected by the First Amendment; the Defendant's or Respondent's
actions were motivated or substantially caused by the exercise of
that right; and that the Defendant's actions caused the Plaintiff

some injury. Now, what's uncontroverted before me in this record, because I gave the government multiple opportunities to submit any type of filing to controvert these claims or to support their opposition to this motion, and they have declined.

And so what I have before me as uncontroverted is that the plaintiff made posts, and these allegations are -- these statements that I am outlining come from both the amended petition, which was verified, as well as the declaration of his wife, and that is that he made posts expressing support for the Palestinian people criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's support in Gaza.

Additionally, his wife began posting on social media about the war in Gaza, after losing family and friends in the war, and she shared information about developments in Gaza.

Statements expressing support for the Palestinian people criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support do not appear to qualify as incitement, defamation, obscenity, or true threats of violence, and thus they are unlikely to fall into any exceptions for protected speech.

Indeed, I join several other courts that have found on similar facts that speech regarding the conflict there and opposing Israel's military campaign is likely protected political speech.

1          Thus, the Court finds that Petitioner was likely engaging

2    in protected speech.

3          Now, with respect to his freedom of association claim that

4    is part of his First Amendment claim, he alleges that he is being

5    punished for his wife's Palestinian origin or speech or her

6    father's past as an advisor in the government in Gaza.

7          The First Amendment similarly restricts the ability of the

8    state to impose liability on an individual solely because of his

9    association with another.  That's the *Clayborne* case from the

10   Supreme Court.

11         Courts recognize a First Amendment freedom of intimate

12   association.  That's the *Roberts versus USJCs* case, also from the

13   Supreme Court.

14         And here, again uncontroverted, Petitioner has offered

15   evidence that he is being retaliated against and punished for his

16   marital relationship and his wife's familial relationship.  And

17   these concern his freedom of intimate association.  Relationships

18   such as family and marriage often want First Amendment protection

19   because of -- because such protections safeguard the ability

20   independently to define one's identity that is essential to any

21   concept of liberty.  That's the *Roberts* case.

22         And so I find that the Petitioner has satisfied the first

23   element as to his freedom of association claim because

24   Petitioner's marriage to his wife and association with her and

25   her father is protected by the First Amendment.

1     Now, with respect to the second element, Petitioner has

2     offered evidence sufficient for this Court to infer that

3     Respondent's detention and apprehension of Petitioner was caused

4     by his speech, his wife's speech, or his association with his

5     wife and his wife's father.

6         As evidence of the respondent's retaliatory motive,

7     Petitioner points to several statements of Respondents' or their

8     representatives.  First, he identifies statements made by

9     Secretary of State Marco Rubio on Twitter calling student

10    protesters Hamas supporters and indicating that "the United

11    States should cancel the visa of every foreign national out there

12    supporting Hamas and get them out of America."

13        Also, "We will be revoking the visas and/or green cards of

14    Hamas supporters in America so they can be deported."  These are

15    the statements that I am quoting -- I am referencing based on the

16    allegations in the petition.  I'm not indicating that Dr. Khan

17    Suri is a Hamas supporter.  Let me be clear about that.  I'm

18    recounting the statements here.

19        There was also a statement that they referenced by

20    President Trump, and it is, "We will terminate the visas of all

21    those Hamas sympathizers and will get them off our college

22    campuses, out of our cities, and get them the hell out of our

23    country".  And there was another statement.  "One thing I do is,

24    any student that protests, I throw them out of the country.  You

25    know, there are a lot of foreign students.  As soon as they hear

1    that, they're going to behave."

2         Additionally, the petition, as well as the -- it's docket

3    number 62, I believe, that was the supplemental filing by

4    Petitioner in this case, attaches additional statements or

5    postings made by DHS officials that specifically appear to

6    reference Dr. Khan Suri because he's referred to as a Georgetown

7    scholar, a Georgetown foreign exchange student.

8         I note for the record that, although officials -- and

9    these posts, I believe, were all after the filing of this

10   petition, and those statements were made publicly on Twitter or

11   in other forms.  There was no evidence submitted to this Court

12   regarding statements that he made.  The government did not submit

13   any statements to this Court in this regard, but yet these

14   statements were made out on social media.

15        So, Respondents have declined to dispute the merits of

16   Petitioner's claims that he is being retaliated against for his

17   speech or his association.  Essentially, in the opposition, they

18   rest on three propositions, and, one, that the challenges to

19   Petitioner's removability are more appropriately channeled to his

20   removal proceedings.  But, as I said earlier, this habeas

21   petition is not about the removal proceedings.  Those are

22   separate.  They are not being challenged here.

23        So I reject that argument.

24        They also argue that Respondents do not have to disclose

25   their reasons in cases concerning foreign affairs, which are

committed to the Secretary's discretion, and that the Secretary's
determination is a facially legitimate justification for his
determination and removal, and thus they are not required to show
or prove anymore.

As I noted earlier, I haven't even received evidence of
his determination because that memorandum was never submitted to
this Court, although it could have been.

But in any event, those arguments appear to rest on the
notions of deference and a presumption of regularity on the part
of the executive.

While there are many contentions in which courts should
take care to respect the prerogatives of the political branches,
whatever deference may be appropriate, concerns of national
security and foreign relations do not warrant abdication of the
judicial role.  That's the *Holder* case, *Holder v. Humanitarian
Law Project,* another Supreme Court case from 2010.

So, in no case do courts simply accept without more
government handwaving at deference and discretion.

And so, even in *Holder*, because Respondents rely on that
case, too, the *Holder v. Humanitarian Law Project* case, it
discusses the need for caution when faced with substitute courts
substituting their judgment for those of the political branches.

It also stated that, even when national security and
foreign relations are at stake, the Court does not defer to the
government's reading of the First Amendment.

1    Also, at no point is the government relieved of any duty

2 to adequately substantiate its determination.  And even in the

3 *Humanitarian Law Practice* case, the Court noted that, "the

4 judgment of Congress and the executive is entitled to significant

5 weight," but that statement alone, that concept alone does not

6 mean that it predetermines the outcome.

7    And finally, as to the First Amendment claim, the

8 Plaintiff or Petitioner has sufficiently demonstrated an injury

9 in terms of his continued detention.

10    Now, moving to the Fifth Amendment claim, under the due

11 process clause of the Fifth Amendment, "No person shall be

12 deprived of life liberty or process without due process of law."

13 And freedom from imprisonment, from government custody,

14 detention, or other forms of physical restraint lies at the heart

15 of liberty the clause protects."  That's *Zadvydas*, a Supreme

16 Court case.

17    Under *Zadvydas*, subsequent due process claims are

18 cognizable in civil immigration cases, and detention is not

19 designed to be punitive.  That's the *Demore* case and the *AADC*

20 case, both from the Supreme Court.

21    Now, detention is permissible to ensure the appearance of

22 noncitizens at future immigration proceedings and preventing

23 danger to the community, and I agree with other courts in

24 immigration-related cases who have found the Fifth Amendment due

25 process challenges to the detention to be substantial.  Here,

1    Petitioner alleges that his detention is unjustified because it

2    serves no lawful purpose and may be punitive.  And at this time

3    Respondents offer no other lawful purpose for Petitioner's

4    detention, nor directly refute that Petitioner's detention is

5    punitive.

6         In addition, Respondents have provided no other evidence

7    of Petitioner's activities, actions, or statement regarding

8    any -- that would consist of any Hamas propaganda or demonstrate

9    that he has done anything in support of Hamas.

10        To the extent Petitioner's apprehension and detention is

11   based on a chain of familial association, his marital tie to his

12   wife, and his familial tie to her father, these actions would

13   violate the due process clause in the Fifth Amendment as well as

14   the First Amendment.

15        And given Petitioner's uncontroverted evidence, I find

16   that he has shown a substantial likelihood -- or a likelihood, a

17   high probability of prevailing on those substantial

18   constitutional claims he has raised.

19        Now I'll turn to the second requirement, and that is the

20   exceptional circumstances that exist that would grant -- which

21   would make the grant of bail necessary to make the habeas remedy

22   effective.

23        Okay.  Now, considering the traditional bail factors, we

24   look to the risk of flight or danger to society.  And here,

25   there's no evidence to suggest that Petitioner is a flight risk

or poses a danger to society.  He is a professor at Georgetown University.  He is married to an American citizen.  He has three young children, all who reside in Virginia.  Respondents have offered no reason to suggest that he would have any incentive to flee.

In addition, I received letters from many colleagues, community members, and even family written on Dr. Khan Suri's behalf, emphasizing his personal and scholarly commitments to peace and conflict resolution.

What those letters also evidence, though, are very strong ties to community here.  And so, additionally, the Court has seen no credible evidence supporting that he is a danger to the community.  He has not been accused of any crime, and he's not been convicted of any crime.  No criminal record was presented to this Court or any facts from which this Court could conclude that he would be any sort of danger.

I also find that his release is necessary to make habeas remedy effective.  It's the only remedy that could make habeas remedy effective, and that's for many reasons.  One is that it would disrupt the chilling effect of retaliation for protected political speech or intimate associations, but, more importantly for him, having been confined for this amount of time for what the record before this Court is punitive reasons.

As the Supreme Court explained, the loss of First Amendment rights for even minimal periods of time unquestionably

1    constitutes irreparable harm.

2         And so, because I find that Petitioner has raised

3    substantial constitutional claims for which he has a high

4    probability of success and that extraordinary circumstances exist

5    which make the grant of bail necessary to make the habeas remedy

6    effective, this Court grants Petitioner's motion for bond

7    release, and so I will deny the motion for return as moot.

8         In terms of conditions, I'm going to impose the following:

9    And that is that he reside in the -- in Virginia; that he attend

10   all court hearings in this case in person, unless excused by

11   order of the Court; and that he participate in his -- the

12   separate removal proceedings.

13        I'm not going to impose any of the other suggested

14   conditions proposed by the government because I don't find that

15   they are necessary in this case because they typically speak to

16   situations where there is the concern about flight, and I just

17   don't find that here.

18        I also do not think it is necessary to impose any bond in

19   this case, because that's also not necessary to assure his

20   appearance.  Your exceptions are preserved.

21        Mr. Byerley, did you want to be heard separately as to

22   your motion to stay, or did you already raise everything that you

23   wanted to raise?

24        MR. BYERLEY:  No, Your Honor.  The only -- the only basis

25   for our request for a stay is to allow the government to seek

1  appellate recourse -- to consider seeking appellate course, which

2  involves consultation with multiple agencies, as well as OC, a

3  process that takes time.  A week to seven days is an appropriate

4  amount of time, but the reason for that is stated in our papers.

5  Thank you.

6      THE COURT:  Okay.  I understand.  Okay.  And so, in order

7  to determine whether a grant of stay is appropriate, and I listed

8  this out earlier when I gave Petitioner's counsel the opportunity

9  to respond or to address it in advance, the first prong is

10  whether there has been a strong showing of likelihood to succeed

11  on the merits, and based on my ruling in regards to Petitioner's

12  high probability of succeeding on the merits, you have not met --

13  or the government has not met the first prong.

14      Additionally, I find that there isn't any irreparable harm

15  here by me ordering release.  In making that finding, I'm

16  saying -- because there -- there's no showing that he's a risk of

17  flight or danger to the community, so he will be here and

18  available to still continue his participation in his removal

19  proceedings, which, from what I understand, are remote anyway.

20      Third, there does not appear to be any other parties

21  interested in the proceedings that would be injured by the stay.

22      And fourth and finally, I find that his release is in the

23  public interest in order to disrupt the chilling effect on

24  protected speech.

25      And so I'm going to decline to stay my ruling pending

1    appeal.  Exceptions are preserved.  Is there anything further?

2        MS. GREGG:  Yes, Your Honor.  We would just like to

3    discuss a little bit of the logistics, since this is an oral

4    order given.

5        THE COURT:  Well, I'll have a -- I'm going to issue an

6    order, a written order granting your motion.

7        MS. GREGG:  I appreciate that, Your Honor.

8        THE COURT:  Okay.

9        MS. GREGG:  And I would just draw the Court's attention to

10   issues that were presented in Ms. Ozturk's case when she was

11   given an order that didn't specify exactly the conditions.

12       THE COURT:  Okay.

13       MS. GREGG:  Namely, that ICE -- there was a large lag time

14   between the ordering of her release and her actually being

15   released because ICE attempted to put GPS monitoring on her.

16       THE COURT:  Well, I've already --

17       MS. GREGG:  Outside of --

18       THE COURT:  Said that I was not going to -- one of their

19   requests here was the GPS monitoring, and I have refused that,

20   because I said that it is not necessary here.  You usually put

21   that on when there's a flight risk, and I said there's no flight

22   risk.

23       MS. GREGG:  Of course, Your Honor.  I agree with that, as

24   well.  I just wanted to make it clear that that is something that

25   has come up in another case, and so that it -- if the Court would

1    be willing to make that explicit in the written order, in case

2    there are any issues in Prairieland, we have an attorney there

3    waiting for the Court's decision here.

4         THE COURT:  Okay.

5         MS. GREGG:  And if the Court is amenable to any other

6    clarifications to the order, we would ask that it make clear that

7    he cannot be redetained or that he shouldn't be redetained by ICE

8    without giving sufficient notice to the Court and to counsel so

9    that we can look into the basis for redetention, given that he

10   needs to travel from Prairieland to here, which would require him

11   to go through TSA or make a long drive.  Redetention under the

12   current environment in this country is of concern for us, as well

13   as to the issues that -- redetention, which the government

14   alluded to, and so we would just, you know, ask the Court --

15        THE COURT:  Okay.  You said could not be redetained

16   without giving sufficient notice to the Court and counsel; 48

17   hours?

18        MS. GREGG:  Yes, Your Honor, so that we can appear before

19   the Court and have an opportunity to hear the government's

20   reasoning.

21        THE COURT:  Okay.  Anything else?

22        MS. GREGG:  That's all, Your Honor.

23        THE COURT:  So no -- explicitly state "no GPS monitoring,"

24   and then include this -- you're requesting that the Court include

25   this requirement that he not be redetained without notice to the

1    Court and counsel.

2         Mr. Byerley, do you want to be heard on these?

3         MR. BYERLEY:  Your Honor, I would need to confer with my

4    client based on the order.  I don't want to say anything out of

5    turn at this point without --

6         THE COURT:  I understand that.  I understand that.  Okay.

7    But just know I'm going to enter this order as requested.  I find

8    that reasonable, and so I am, but -- I know you all will be

9    taking all steps as soon as I leave the bench.  So, if there's

10   nothing -- if there's nothing further, then we are adjourned.

11        (Proceedings adjourned at 12:07 p.m.)

12

13                    **C E R T I F I C A T E**

14

15             I, Scott L. Wallace, RDR-CRR, certify that
          the foregoing is a correct transcript from the record of
16        proceedings in the above-entitled matter.

17        /s/ Scott L. Wallace                5/15/25
          ----------------------------       ----------------
18        **Scott L. Wallace, RDR, CRR**        **Date**
             **Official Court Reporter**

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| BADAR KHAN SURI, | Case No. 1:25-cv-00480 (PTG/WBP) |
| *Petitioner*, | |
| v. | **RESPONDENTS' NOTICE OF APPEAL** |
| DONALD J. TRUMP, *et al.*, | |
| *Respondents*. | |

Notice is hereby given that Donald J. Trump, et al., hereby appeal to the United States Court of Appeals for the Fourth Circuit from the orders entered in this action on the 20th day of March 2025 and the 14th day of May 2025.

1

DATE: May 15, 2025

ERIK S. SIEBERT
*United States Attorney*

By: _____/s/_____
ELIZABETH SPAVINS
*Assistant U.S. Attorney*
CHRISTIAN COOPER
*Special Assistant U.S. Attorney*
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3785
Fax: (703) 299-3983
Lizzie.Spavins@usdoj.gov
Christian.Cooper@usdoj.gov

Respectfully Submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*
Civil Division

DREW C. ENSIGN
*Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court National Security Section

YAMILETH G. DAVILA
*Assistant Director*

BRANDON D. ZELLER
TOM SCOTT-SHARONI
*Trial Attorneys*

*/s/ David J. Byerley*
DAVID J. BYERLEY
*Trial Attorney* (DC Bar #1618599)
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court National Security Section
P.O. Box 868, Benjamin Franklin Station
Washington, D.C. 20044
202-532-4523 | David.Byerley@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

Badar KHAN SURI,

    *Petitioner-Plaintiff,*

v.

Donald J. TRUMP, in his official capacity
as President of the United States;

Russell HOTT, in his official capacity as
Field Office Director of Washington,
Immigration and Customs Enforcement;

Jeffrey CRAWFORD, in his official
capacity as Warden of Farmville Detention
Center;

Todd LYONS, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement;

Kristi NOEM, in her official capacity as
Secretary of the United States Department
of Homeland Security;

Marco RUBIO, in his official capacity as
Secretary of State; and

Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

    *Respondents-Defendants.*

Case No. 1:25-cv-480

## SECOND AMENDED[1] PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT

---

[1] Petitioner-Plaintiff files this Second Amended Petition and Complaint pursuant to Fed. R. Civ. P 15(a)(2).

JA282

## **INTRODUCTION**

1.       This case concerns the government's targeted, retaliatory apprehension, detention, transfer, and attempted deportation of a postdoctoral fellow at Georgetown University based on his family connections, constitutionally protected speech, imputed speech, religion, and national origin. Petitioner-Plaintiff Dr. Badar Khan Suri ("Dr. Khan Suri") is a citizen and national of India and was in the United States in lawful status as a visiting scholar. The Trump administration has openly expressed its intention to weaponize immigration authorities to punish noncitizens whose views are deemed critical of U.S. policy as it relates to Israel. In this case, Respondents-Defendants are targeting Dr. Khan Suri due in part to his protected speech on this issue, but also because of his U.S. citizen wife's Palestinian origins, her constitutionally protected speech, her familial associations, and his and his wife's Muslim religion, culminating, without reason or process, in Dr. Khan Suri's apprehension, arrest, detention, and status termination.

2.       On March 17, 2025, Dr. Khan Suri, a J-1 visa holder, was arrested, detained, and charged with removability under 8 U.S.C. § 1227(a)(4)(C), a rarely used provision of immigration law that allows the government to seek the deportation of an individual "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."

3.       This was done pursuant to a federal government policy ("the Policy") to retaliate against and punish noncitizens like Dr. Khan Suri who Respondents perceive to be supportive of Palestinian rights or critical of Israel because of their actual or imputed protected speech, viewpoint, religion, national origin, or associations—including associations with Palestinians.

4.       Under the Policy, Respondents, including Respondent Marco Rubio, the Secretary of State, identify such noncitizens. Once identified, the Department of Homeland Security

("DHS") apprehends and detains them, then transfers them to immigration jails far away from their families and attorneys to jurisdictions that Respondents perceive to be more favorable to them, and seeks to deport them from the United States.

5.       In this instance, pursuant to the Policy, Respondent Rubio identified Dr. Khan Suri and sought to apprehend, detain, transfer, and deport him. Respondent Rubio made a determination (the "Rubio Determination") that Dr. Khan Suri's presence or activities in the United States would compromise a compelling United States foreign policy interest ("Foreign Policy Ground"). Upon information and belief, Respondent Rubio made this determination based on Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, or protected associations, as well as his wife's protected speech, familial relationships, religion, and national origin. Based on the Rubio Determination, DHS agents arrested and detained Dr. Khan Suri, although not required to under immigration law. They then almost immediately transferred him to far-away immigration jails and placed him in removal proceedings.

6.       On March 18, the day following Dr. Khan Suri's arrest, the United States Department of State unilaterally and unlawfully terminated Dr. Khan Suri's J-1 exchange visitor status in the Student and Exchange Visitor Information System ("SEVIS") without notifying him or his qualifying program at Georgetown University. Georgetown University has never suspended or terminated Dr. Khan Suri's J-1 exchange visitor status based on non-compliance with its terms or for any other reason. Rather, the State Department unlawfully terminated Dr. Khan Suri's status as part of the Policy to target and retaliate against Dr. Khan Suri based on his protected speech and association.

7.       The Rubio Determination and the government's subsequent actions, including its detention of Dr. Khan Suri 1,300 miles away from his home from March 18, 2025 until May 14,

2025 (when this Court ordered his release pending adjudication of this Petition), in the same manner as the government did in the cases of Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk, isolating him from his wife, children, community, and legal team, constitute retaliation and punishment for Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, and associations, all in violation of the First and Fifth Amendments. Indeed, contemporaneous and subsequent statements by administration officials expressly confirm that Respondents targeted Dr. Khan Suri on these unlawful bases.

8.    The Rubio Determination and Dr. Khan Suri's unjustified detention and transfer also violate his due process rights by targeting him pursuant to an unconstitutionally vague Policy and Determination and subjecting him to unlawfully punitive civil detention.

9.    Respondents' targeting of Dr. Khan Suri based on their discriminatory animus towards his wife's national origin constitutes intentional discrimination in violation of the Equal Protection guarantee of the Fifth Amendment.

10.    The government's unlawful Policy of targeting noncitizens, including Dr. Khan Suri, is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act ("APA"), and carried out in violation of DHS's own policies in violation of the *Accardi* doctrine.

11.    The government's unilateral termination of Dr. Khan Suri's J-1 record in SEVIS is unauthorized, arbitrary and capricious, and contrary to a constitutional right in violation of the APA.

12.    Accordingly, this Court should enjoin the government's implementation of its unlawful Policy, reinstate Dr. Khan Suri's SEVIS record so that he may return to his program at

Georgetown, and enjoin Respondents from detaining Dr. Khan Suri based on his protected speech and association.

## PARTIES

13.    Petitioner Badar Khan Suri is a citizen and national of India, and was in the United States in J-1 status as a visiting scholar and postdoctoral fellow. He was duly admitted to the United States on this visa in December 2022. He is married to a U.S. citizen, with whom he has three children: a nine-year-old son and five-year-old twins—a boy and a girl. He and his wife are practicing Muslims. At the time of his arrest, he was teaching a course as an adjunct professor on Majoritarianism & Minority Rights in South Asia at Georgetown University. He hopes to become a university professor and embark on a career in academia and teaching.

14.    Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, DC 20500.

15.    Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations within the Washington Field Office's area of responsibility, including overseeing decisions to apprehend, detain, release, and transfer individuals in ICE custody. Respondent Hott was, upon information and belief, Petitioner's custodian at the time he filed his original habeas petition. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

16.    Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner was detained when Petitioner's initial Petition for Writ of Habeas Corpus and Complaint was filed. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

17.    Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

18.    Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

19.    Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i). In addition to his legal

responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, DC 20520.

20.    Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA; and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

### JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

22.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id*. §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

23.    Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. The Washington Field Office directed Dr. Khan Suri's arrest and detention in Rosslyn, Virginia; told Dr. Khan Suri and his wife that he was being taken to the ICE Washington Field Office located in Chantilly, Virginia and then told Dr. Khan Suri that he was being taken to the Farmville Detention Center in Farmville, Virginia. Farmville Detention Center

is Dr. Khan Suri's "original place of incarceration," *see United States v. Poole*, 531 F.3d 263, 275 (4th Cir. 2008), and his last known location at the time this habeas action was filed. To the extent the Washington Field Office and Respondents moved Dr. Khan Suri to Richmond, Virginia, and then to an airport and across the country to Louisiana around the time the original petition was filed, the Washington Field Office prevented Dr. Khan Suri from communicating this information to his wife and counsel.

## FACTS

### *Dr. Khan Suri's Background*

24.    Dr. Khan Suri is an Indian national who grew up in Uttar Pradesh, India. He obtained his undergraduate degree in Humanities, Geography, History and English from Jamia Millia Islamia in New Delhi, India, and his master's degree in Peace and Conflict Studies from the same university. In 2020, he completed his Ph.D. in Peace and Conflict Studies at the Nelson Mandela Center for Peace and Conflict Resolution at the same university.

25.    During the time he was in his master's program, Dr. Khan Suri traveled with a group of fellow students and prominent members of civil society to Gaza in 2011 as a humanitarian aid convoy. There, he met his future wife, Mapheze Saleh, who was volunteering along with other college students as a translator for foreign delegations. Dr. Khan Suri returned to India after this trip, but continued to communicate with Ms. Saleh.

26.    Ms. Saleh is a United States citizen of Palestinian descent who was born in Missouri. She lived in the United States until she was five years old. At that time, she moved to Gaza with her mother, but returned to the United States every summer to visit her father, who continued to reside in the United States.

27.     Ms. Saleh's father is Ahmed Yousef, who is the director of the House of Wisdom for Conflict Resolution and Governance and is a Professor of International Relations at the Islamic University of Gaza. Mr. Ahmed Yousef is an academic. Between 2006 and until he retired from civil service in 2010, he worked as a political advisor to the Prime Minister of Gaza and as deputy foreign minister in Gaza. The House of Wisdom for Conflict Resolution and Governance works towards peace and conflict resolution in Gaza.

28.     In 2013, Dr. Khan Suri returned to Gaza to ask for Ms. Saleh's hand in marriage. At that time, Dr. Khan Suri met Ms. Saleh's father for the first time, and asked for his blessing to marry Ms. Saleh. The couple became engaged, and Dr. Khan Suri again returned to India. He has not traveled to Gaza since, or seen his father-in-law in person since.

29.     Since marrying Ms. Saleh, Dr. Khan Suri would speak by phone with his father-in-law every once in a while about family matters and his academic pursuits. They would usually speak annually on Eid—the two main annual Islamic holidays—to exchange pleasantries. Since Dr. Khan Suri's wife and children arrived in the United States in 2023, he has not spoken directly with his father-in-law.

30.     In 2013, Ms. Saleh moved to New Delhi, India and she and Dr. Khan Suri were married. They remained in New Delhi, where they had three children, until Dr. Khan Suri moved to the United States in late 2022, and his wife and children reunited with him there in 2023.

31.     After completing his Ph.D., Dr. Khan Suri applied for and received a postdoctoral fellowship at Georgetown University at the Alwaleed Bin Talal Center for Muslim-Christian Understanding. Dr. Khan Suri and his wife wished to move to the United States because it ensures religious freedom for all, and they wanted to raise their children in a society that values religious tolerance.

32.     On December 10, 2022, Dr. Khan Suri arrived in the United States on a J-1 exchange visa to begin his fellowship at Georgetown, which began in January 2023. His wife and children arrived in the United States in November 2023. His children were admitted to the United States on derivative J-2 visas, and thus are dependent on their father's status to enter and remain in the country. He fears that his detention and threatened removal, as well as his SEVIS record termination, could put them at risk as well. The family lives together in Rosslyn, Virginia.

33.     After the war in Gaza began in October 2023, Ms. Saleh lost several family members and friends and she began posting on social media, sharing information about the events occurring in Gaza.

34.     On not more than a handful of occasions, Dr. Khan Suri also made social media posts expressing support for the Palestinian people, criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's war in Gaza.

35.     Because of Ms. Saleh's identity as a Palestinian, her father's former role in the Gazan government, and the couple's social media posts, both Dr. Khan Suri and his wife have recently been doxxed. In particular, prior to Dr. Khan Suri's detention, at least three private groups had published information about them: Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a lobbying and media monitoring group that highlights and criticizes the pro-Palestine speech of American Muslims; Canary Mission, an anonymously run website that creates profiles of individuals who support Palestinian rights; and the Campus Watch project of the Middle East Forum, a pro-Israel think tank. Ms. Saleh is featured on the Canary Mission website with her photograph, academic affiliation, and former volunteer work, and the site identifies Dr. Khan Suri as her husband. The couple has also been the subject of several Campus Watch articles.

***The Trump Administration's Hostile Campaign Against Noncitizens It Perceives as Supporting Palestinian Rights***

36.     Respondents' retaliation against Dr. Khan Suri is one application of Respondents' Policy to apprehend, detain, transfer, and deport noncitizens whom Respondents perceive are supportive of Palestinian rights or critical of Israel, because of their actual or imputed speech, viewpoint, religion, national origin, or protected associations, including associations with Palestinians.

37.     In the fall of 2023, thousands of students across the United States from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the U.S. government for Israel's policies in Gaza. Like Dr. Khan Suri and Ms. Saleh, these students expressed concern about the death toll in Gaza as a result of Israel's military operations.

38.     These campus protests resulted in opponents of these students' messages— including President Donald J. Trump—mischaracterizing campus speech in favor of Palestinian rights or critical of Israel as inherently supportive of Hamas and antisemitic. For example, in several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[2]

39.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing activities on university campuses that were supportive of Palestinian rights or critical of Israel.

---

[2] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur.

40.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[3]

41.     In the spring of 2024, Trump promised campaign donors that he would deport students advocating for Palestinian rights to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[4]

42.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[5]

***Respondents Adopt Unlawful Policy to Apprehend, Detain, Transfer, and Deport Noncitizens Whose Speech and Associations It Finds Objectionable***

43.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public

---

[3] Andrea Shalal & Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29.

[4] Josh Dawsey, Karen DeYoung and Marianne LeVine, *Trump told donors he will crush pro-Palestinian protestors*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors.

[5] @marcorubio, *X* (Oct. 15, 2023, 4:24 p.m.), https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

44.      Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

45.      Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[6] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

---

[6] Executive Order 14188 refers to Executive Order 13899 for "interpretative assistance" regarding antisemitism. That Executive Order was issued by President Trump in 2019, 84 Fed. Reg. 68779 (Dec. 11, 2019), and it refers to the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism. The IHRA definition of antisemitism includes criticism of Israel that is clearly protected under the First Amendment, such as "drawing comparisons of contemporary Israeli policy to that of the Nazis" or "claiming that the existence of a State of Israel is a racist endeavor." International Holocaust Remembrance Alliance, *Working definition of antisemitism*, https://holocaustremembrance.com/resources/working-definition-antisemitism.

The fact sheet did not clarify what would result in a noncitizen being categorized as a "Hamas sympathizer."

46.    In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

47.    For example, organizations like the Middle East Forum, Canary Mission, and Betar USA have identified and/or submitted to the Trump Administration the information of students, faculty, and others who have advocated for Palestinian rights, calling for their deportation. Many of those identified by these groups have then been arrested and detained by ICE.

48.    In March 2025, media reports described widespread fear of retaliation for speech supportive of Palestinian rights among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."[7]

49.    On or before March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Dr. Khan Suri.

50.    On March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who

---

[7] Ray Sanchez, CNN, *'Rules aren't clear anymore': Trump crackdown on student protestors send shock waves across US universities* (Mar. 18, 2025) available at https://www.cnn.com/2025/03/16/us/mahmoud-khalil-columbia-protests-free-speech/index.html.

appear to support Hamas or other designated terror groups."[8] Respondents would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[9] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

51.    Under the Policy, the Trump Administration, including Respondent Rubio, would identify noncitizen students or faculty who they perceived were supportive of Palestinian rights or critical of Israel, based on their speech, imputed viewpoint, religion, or protected associations. Secretary of State Rubio would then revoke the visas or green cards of the identified individuals, including by making a determination, under 8 U.S.C. § 1227(a)(4)(C)(i), that he had "reasonable grounds to believe" that a noncitizen's presence or activities in the United States "would have potentially serious foreign policy consequences for the United States" ("Foreign Policy Ground"). Although not required to mandatorily detain such individuals under the Immigration and Nationality Act, e.g., 8 U.S.C. § 1226(c), DHS would apprehend and detain such individuals and transfer them in violation of ICE Policy 11022.1, in an effort to deport them quickly and thwart jurisdiction in states the government perceived to be less favorable to it in defending against challenges to the Policy.

52.    Under 8 U.S.C. § 1182(a)(3)(C)(iii), the Secretary of State's decision to refuse entry or deport a noncitizen on this ground cannot be based on the noncitizens "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless he "personally determines that" the noncitizens admission or

---

[8] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[9] *Id*.

continued presence in the United States "would compromise a compelling United States foreign policy interest." The Secretary then has to notify certain members of Congress regarding this determination. 8 U.S.C. § 1182(a)(3)(C)(iv).[10]

***Application of the Policy and the Foreign Policy Ground to Noncitizens Whose Views the Trump Administration Finds Objectionable***

53.     On the evening of March 8, 2025, DHS agents first implemented the Policy when they arrested Mahmoud Khalil in New York under the Foreign Policy Ground and transferred him to New Jersey and then to an immigration jail in Louisiana. Khalil is a student at Columbia University in New York who had been involved in the protests at the University against Israel's military actions in Gaza.

54.     The next day, on March 9, Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

55.     On March 10, President Trump issued a social media statement confirming that Khalil was targeted for his activism and vowed that other student protesters would be targeted as well: "ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the Campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."

56.     On March 12, Secretary of State Rubio stated at a press conference, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your

---

[10] These requirements, which appear under the INA section on grounds of inadmissibility, are incorporated into the INA's foreign policy deportability ground by reference. *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities . . . we're gonna kick you out."

57.     In the days after Mr. Khalil's arrest, there were reports of other instances of application of the apprehend, detain, transfer, and deport Policy.

58.     On March 13, Secretary of Homeland Security Kristi Noem announced that Leqaa Kordia, who had also participated in student protests and had been arrested on Columbia's campus in April 2024, was arrested by ICE in New Jersey and transferred to an immigration jail in Alvarado, Texas.

59.     On March 26, 2025, six plainclothes ICE officers arrested Rumeysa Ozturk, a Turkish Ph.D. student at Tufts University, who DHS alleges, "engaged in activities in support of Hamas." Ms. Ozturk co-authored an op-ed in her university's newspaper criticizing the university's response to students' call to divest from companies with ties to Israel's military action in Gaza. She was transferred to an immigration jail in Louisiana.

60.     On March 27, in response to a question about Rumeysa Ozturk, Respondent Rubio said that the State Department may have revoked more than 300 visas, saying "Every time I find one of these lunatics, I take away their visas."

61.     And on April 14, 2025, DHS arrested and detained Mohsen Mahdawi, a Palestinian lawful permanent resident who co-founded Columbia University's Palestinian Student Union and organized campus protests against Israel's military actions in Gaza. Mr. Mahdawi was arrested at his naturalization interview, after which DHS attempted to put him on a plane to Louisiana almost immediately—within only a couple of hours of his arrest. Mr. Mahdawi remained in the district only because the government agents with custody of him arrived at the airport too late for him to

board a scheduled flight and a district court entered an order restricting his transfer out of the district before a new flight could be arranged.

***Dr. Khan Suri's Retaliatory Apprehension, Detention, and Transfer***

62.     On the evening of March 17, 2025, Dr. Khan Suri was coming back home from teaching and attending iftar (the evening meal eaten to break the daily fast during the holy month of Ramadan). He noticed a dark-colored vehicle that appeared to be following him and several other black, unmarked cars near his apartment building. As he was about to enter the building, a man wearing a face covering and dark military-like clothing approached him and asked if he was Badar. Dr. Khan Suri answered that he was. He noticed that several other officers were present nearby.

63.     Dr. Khan Suri called his wife and asked her to come downstairs and bring his passport and documents because he was being detained. The officers then handcuffed Dr. Khan Suri and put him into one of the unmarked vehicles.

64.     After his wife arrived and asked the officers who they were, they responded they were from "Homeland Security." When he was in the car, Dr. Khan Suri asked that his wife be allowed to give him his passport and documents. Ms. Saleh brought the documents from inside the home, but the officers did not allow her to hand them to Dr. Khan Suri. Instead, the officers took Dr. Suri's passport and DS-2019 form.

65.     Dr. Khan Suri repeatedly asked why he was being arrested. An officer told him that his student visa had been revoked. Dr. Khan Suri clarified that he had an exchange visa, not a student visa. The officer told him it was the same thing, and that it was also revoked. Once he was in the car, one of the officers stated to Dr. Khan Suri that he was being arrested because of his "social media," and that someone at a very high level at the Secretary of State's office does not

want him there. One of the officers told him that he was going to be deported to his country. When Dr. Khan Suri asked when he would be deported, the officer responded: "today."

66.     Dr. Khan Suri was first taken to the ICE Washington Field Office in Chantilly, Virginia, where officers took his fingerprints and DNA swabs and completed paperwork. The ICE officers told Dr. Khan Suri that they were aware that he was not a criminal and had not done anything bad. They informed him that he would be transferred to the detention center in Farmville, Virginia, where he would be held, and that he had a hearing in immigration court in Texas on May 6. They allowed him to call his wife to relay this information.

67.     Dr. Khan Suri was then driven to the Farmville Detention Center, where he arrived in the middle of the night. He was under the impression that he would remain there until he was either deported or released. He was refused pre-dawn food and water at Farmville Detention Center despite his repeated requests.

68.     He was then moved to the ICE office in Richmond, Virginia, where he arrived around 6:00 a.m. on March 18. There, he was put in a cell and made to sit on a small bench, shackled. He was also denied permission to call his wife.

69.     Later that day, Dr. Khan Suri was transported to an airport and loaded on an airplane. He was kept shackled at the hands, waist and ankles. The plane was old, and the flight turbulent. When using the bathroom on the plane, he was not permitted to close the door or remove his shackles. He was distressed and confused, and terrified that the plane might crash. He was not told where he was being flown, and feared he was being deported.

70.     The plane landed in Louisiana, and he was taken to the Alexandria, Louisiana Staging Facility, where he was held for three days. While in Louisiana, he expected to be deported soon, as multiple deportation flights were departing daily from Alexandria. One officer referred to

the facility as a "super deportation center" and said that he should expect to be deported at any time.

71.    While in the Alexandria Staging Facility, Dr. Khan Suri was denied food and water in accordance with his Ramadan fasting accommodation needs. He was also punched in the back of the knee by guards removing his ankle shackles causing him ongoing pain.

72.    On the evening of March 20, an officer at the Alexandria Staging Facility told Dr. Khan Suri that he would be sent to New York the next day.

73.    On March 21, he was then driven from Alexandria, Louisiana to Texas. He arrived at Prairieland Detention Center in Alvarado, Texas at around 8:00 p.m. Because he had fasted throughout the day in observance of Ramadan, he again asked for food, but was denied.

74.    When he arrived in Texas, Dr. Khan Suri was not assigned to a bed in a dorm. Instead, he was housed in the "TV room," a common room where the television is on every day from 5:00 a.m. to 2:00 a.m. He was given a plastic frame that rests on the floor with a thin plastic mattress to sleep on, called a "boat bed," and no pillow. Due to these conditions, Dr. Khan Suri had pain in his ribs and was unable to sleep.

75.    Dr. Khan Suri requested religious accommodations, including Halal food, Ramadan fasting accommodations, a Quran, and a prayer mat. The only book available to him was the Bible. After approximately five days, he finally received Halal food. On April 2, officers came and told him that he had complained through his lawyer about his religious accommodations and asked him for more details. After Dr. Khan Suri reaffirmed his needs, he was given a prayer mat, a Quran, and provided a space on a bed in the dorm, outside of the TV room.

76.    Dr. Khan Suri was issued a bright red uniform, usually reserved for detained individuals classified as high security based on their criminal history, alleged affiliations to

criminal organizations, or institutional record. When he inquired about the reason for this, he was informed that he is classified as high-security based on his association with a known criminal group.

77.    Due to his classification and security protocols at the facility, Dr. Khan Suri was only permitted two hours per week of recreation. His movement within the facility was severely limited—he was not permitted to work or spend more time outside his dorm.

78.    Dr. Khan Suri and other individuals detained in Prairieland Detention Center were given used, dirty underclothing to wear and fed inadequate, unhealthy food.

79.    Dr. Khan Suri's detention has had profound negative impacts on his family. His wife and children missed him dearly and suffered every day that he was absent from their home. His children kept asking their mother when their father would come home. Dr. Khan Suri normally holds his older son every night at bedtime, helping him fall asleep. During his detention, his son cried uncontrollably and stopped speaking. He was worried especially about his older son. These harms would recur if Dr. Khan Suri is re-detained.

80.    As a result of his arrest, detention, and loss of status, Dr. Khan Suri has been unable to speak freely about matters of public importance, including about Palestinians in Gaza and the federal government's targeting of noncitizens associated with Palestinian advocacy. He was also prevented from freely associating with his wife and family during his detention (and would be again if re-detained).

**DHS's Apprehension of Dr. Khan Suri is Part of a Campaign to Suppress Protected Speech Through Arrest, Detention, Transfer, and Deportation**

81.    On March 19, Tricia McLaughlin, the DHS Assistant Secretary for Public Affairs, misleadingly posted on X that "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close

connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i)."[11]

82.    She did not specify what social media posts she was referring to; what "close connection" she was referring to; or who the "known or suspected terrorist" was.

83.    On April 29, DHS's Office of Public Affairs sent an email update to subscribers with the subject line "100 Days of Making America Safe Again," citing Dr. Khan Suri's arrest as an example of "returning common sense to our legal immigration system and national security by revoking visas of terrorist sympathizers." The email noted, "ICE arrested Badar Khan Suri, a Georgetown foreign exchange student whose father-in-law is a senior advisor to Hamas."[12]

84.    On May 8, DHS posted on its official X account that "[t]he media's 'Georgetown scholar' is the son-in-law of a senior advisor to the Hamas terrorist group and was actively spreading Hamas propaganda and antisemitism on social media."[13]

85.    The Rubio Determination was exclusively motivated by Dr. Khan Suri's protected and imputed speech, viewpoint, religion, national origin, and protected associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. § 1227(a)(4)(C)(i), establish that Respondents are punishing and attempting to silence Dr. Khan Suri by apprehending, transferring, and detaining him.

---

[11] @TriciaOhio, *X* (March 19, 2025), https://x.com/TriciaOhio/status/1902524674291966261.

[12] Press Release, 100 Days of Making America Safe Again (April 29, 2025), https://www.dhs.gov/news/2025/04/29/100-days-making-america-safe-again.

[13] @DHSgov, *X* (May 8, 2025), https://x.com/DHSgov/status/1920461965744357656.

86.     When Dr. Khan Suri was booked at Chantilly, an ICE officer who was involved in his booking informed him that they knew he was not a criminal and did not do anything bad. He was also told by the arresting officer that someone at a very high level at the Secretary of State's office "does not want you here," confirming that Dr. Khan Suri was being targeted in a retaliatory manner pursuant to the Policy. The Foreign Policy Ground expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Dr. Khan Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

87.     Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

88.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794). As an example, the same House Report on the amendment shared the case of the Shah of Iran as an illustration of where his "mere entry into the United States could [have resulted] in imminent harm to lives or property of United States persons abroad or to property of the United States government abroad." *Id.*

89.     Respondents' failure to follow the procedures specified in the law they relied on to arrest Dr. Khan Suri, along with the statements by Respondents and other government officials, clearly demonstrate that the sole reason for Dr. Khan Suri's apprehension, transfer, and detention is his actual and imputed protected speech, viewpoint, religion, national origin, and protected associations.

### *DHS Policies Related to First Amendment Activity and Transfers*

90.     DHS has issued a number of directives and policies that relate to First Amendment-protected activity and to transfers. Upon information and belief, these directives and policies were still operative when Dr. Khan Suri was detained and transferred.

91.     On May 17, 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

92.     On September 30, 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."

93.     ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, inter alia, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

94.     The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

95.     The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours after the transfer occurs."

96.     Additionally, ICE Directive 11064.3, "Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults" requires the Field Office Director to refrain from transferring detained noncitizens outside of the Field Office's area of responsibility where their child or children are located unless dictated by exceptional circumstances or court order. Even when transfer is dictated, the Field Office Director must place the noncitizen as close as practicable to the minor child or children.

97.     At the time of his transfer to Louisiana and then Texas, Dr. Khan Suri had a wife and three young children, and an attorney of record, in Virginia.

98.     Upon information and belief, there was no justification provided for the transfers to Louisiana and Texas, and the transfers were not necessary. Virginia has two large, dedicated ICE facilities, Farmville Detention Center[14] and Caroline Detention Facility,[15] with collectively over 900 beds.

99.     Both facilities were operating nowhere near capacity at the time of Petitioner's apprehension. On March 17, 2025, the day of Dr. Khan Suri's arrest, ICE's bimonthly report to Congress demonstrates that the average daily population at Farmville Detention Center and Caroline Detention Facility was 488 and 284,[16] with capacities of 732 and 336, respectively. Farmville was only using 66% of its capacity and Caroline was only using 84% of its capacity.

100.    Upon information and belief, and contrary to the above directives and policies, DHS has issued a directive that all individuals who are subject to the Policy be transferred to detention centers in the south of the United States to jurisdictions that Respondents perceive will be more favorable to them, and where they will be far away from their families and attorneys, and therefore unable to promptly challenge their detention. Consistent with such a directive, three other individuals – Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk – were transferred under

---

[14] ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-content/uploads/2022/06/2021-Annual-Review.pdf ("The facility has 732 general population housing unit beds").

[15] Caroline Detention Facility, *Home* (2025), https://carolinedf.org/#:~:text=The%20Caroline%20Detention%20Facility%20(CDF,a%20part%20%20of%20the%20installation ("The Caroline Detention Facility (CDF) is a 336-bed correctional facility").

[16] TRAC Reporting, (March 17, 2025) https://tracreports.org/immigration/detentionstats/facilities.html.

similar rushed circumstances from New York, New Jersey, and Massachusetts, respectively, to Louisiana and Texas, and a fourth individual—Mohsen Mahdawi—was scheduled to depart Vermont on a plane to Louisiana within a few hours of his arrest.

***SEVIS Termination***

101.    Generally, a citizen of a foreign country who wishes to enter the United States for a temporary stay must be first granted a nonimmigrant visa. Exchange visitor (J) visas are nonimmigrant visas for individuals to participate in exchange visitor programs in the United States.

102.    Congress established a statutory basis for exchange visas under 8 U.S.C. § 1101(a)(15)(J), requiring that the noncitizen's entry be for the purpose of activities such as teaching, instructing or lecturing, studying, observing, or conducting research. The J-1 visa program is designed to promote the interchange of people, knowledge, and skills, in the fields of education, arts, and science.

103.    While the J-1 visa *document* itself grants a recipient the right to enter the United States for the specific purposes articulated in statute, an individual's J-1 *status* is a different concept. An individual's status refers to the exchange visitor's general classification within the immigration system and the set of regulations that govern the visitor's basis for being in the United States.

104.    Recipients of J-1 status must be sponsored by an exchange program that has been approved and designated as such by the State Department. To obtain formal approval as a J-1 sponsor program, an institution must first file an application through the SEVIS system. *See* 22 C.F.R. § 62.5.

105.    SEVIS is a centralized database maintained by the Student Exchange Visitor Program ("SEVP") within ICE and used to manage information on nonimmigrant students and exchange visitors and track their compliance with the terms of their status.

106.    An approved J-1 sponsor program must designate a "Responsible Officer," who is responsible for, in part, "all official communications" with DHS and the State Department relating to the program. 22 C.F.R. § 62.11(c). Under 22 C.F.R. § 62.45, the "Responsible Officer" must report through SEVIS to SEVP when an exchange visitor fails to maintain insurance coverage, engages in unauthorized employment, or is involuntarily suspended or terminated from an exchange program. SEVIS termination is governed by SEVP policy and regulations.

107.    Once admitted in J-1 status, an individual is granted permission to remain in the United States for the duration of status as long as they continue to meet the requirements established by the regulations governing their visa classification in 8 C.F.R. § 214.2(j) and 22 C.F.R. § 62.45, such as avoiding unauthorized employment. This status is reflected in the person's SEVIS record. The use of SEVIS is mandatory. 8 C.F.R. § 214.2(j)(1)(vii).

108.    DHS regulations distinguish between two separate ways an exchange visitor may fall out of status: (1) an exchange visitor who "fails to maintain status," and (2) an agency-initiated "termination of status."

109.    The first category, failure to maintain status, involves circumstances where an individual voluntarily or inadvertently falls out of compliance with the J-1 visa requirements, for example by completing the program early, engaging in unauthorized employment, or other violations of their status requirements under 22 C.F.R. § 62.45. In addition, 8 C.F.R. §§ 214.1(e)-(g) outlines specific circumstances where certain conduct by *any* nonimmigrant visa holder, such as engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence with a potential sentence of more than a year, "constitutes a failure to maintain status."

110.    The second category, termination of status, can occur only under the limited circumstances set forth in 8 C.F.R. § 214.1(d), which only permits the government to terminate status when: (1) a previously granted waiver under 8 U.S.C. §§ 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence on the individual is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination of the exchange visitor's status. DHS and the State Department cannot otherwise unilaterally terminate the exchange visitor's status. *See Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019); *see also* 9 FAM 403.11-3(B).

111.    Because the termination of J-1 exchange visitor status is distinct from the revocation of a J-1 visa, even if DHS or the State Department revokes a J-1 visa, this does not constitute failure to maintain J-1 status and cannot therefore be a basis for SEVIS termination. An individual who has not been determined to have violated their J-1 status, even if their visa is revoked, cannot have a SEVIS record terminated based on 8 U.S.C. § 1227(a)(1)(B) (revocation of nonimmigrant visa) or 8 U.S.C. § 1227(a)(4)(C)(i) (foreign policy grounds), or any deportability ground for that matter.

112.    Dr. Khan Suri was participating in the J-1 exchange visitor program as a "research scholar" which is "a foreign national whose primary purpose is conducting research, observing, or consulting in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar types of institutions. A research scholar may also teach or lecture where authorized by the sponsor." 22 C.F.R. § 62.4(f).

113.    On the morning of March 18, 2025, within hours of Dr. Khan Suri's arrest, the State Department unilaterally and unlawfully terminated his SEVIS record as part of its Policy to target and retaliate against Dr. Khan Suri based on his protected speech and association. Dr. Khan Suri remained in active J-1 status at all times until his SEVIS record was terminated.

114.    Neither DHS nor the State Department ever provided Dr. Khan Suri or Georgetown University any notice that his SEVIS record or J-1 status had been terminated. Instead, after hearing about Dr. Khan Suri's arrest, Georgetown's Responsible Office viewed Dr. Khan Suri's SEVIS record on the morning of March 18, 2025, and saw that it had been terminated by the State Department earlier that same morning. The first reason given for the termination at 8:52 AM was "No Show" but that was amended at 9:19 AM to "Other – Failure to Maintain Status." Dr. Khan Suri's SEVIS record also showed that the J-2 status of his three children was terminated on March 15, 2025, three days prior to Dr. Khan Suri's status termination, for the stated reason "Terminated When J-1 Was Terminated."

115.    While a program sponsor, such as Georgetown University, may terminate an exchange visitor's participation in its program for certain reasons, 22 C.F.R. § 62.40, Georgetown did not terminate Dr. Khan Suri's participation in its program and made no alterations to his SEVIS record around the time of his arrest and detention. Georgetown's Responsible Officer did not provide any notification to either DHS or the State Department that would have led to the revocation of Dr. Khan Suri's visa or the termination of his SEVIS record.

116.    The termination of his SEVIS record reflected the government's unilateral termination of Dr. Khan Suri's exchange visitor status. Without his status, Dr. Khan Suri can no longer participate in his post-doctoral program, pursue his research and writing, or teach his course at Georgetown. Not being able to work and participate in his post-doctoral program upon his pretrial

release on bond has placed him and his family in an extremely difficult financial position, as his salary is the family's primary source of income. It has also hindered his professional development as an academic and may negatively impact his future employment opportunities. And it has resulted in the termination of his children's J-2 status.

117.    The immigration court has no ability to review Dr. Khan Suri's SEVIS termination because the process is collateral to his removal. *See Nakka v. United States Citizenship & Immigr. Servs.*, 111 F.4th 995, 1007 (9th Cir. 2024); *Fang*, 935 F.3d at 183. There is also no administrative appeal of a denial to reinstate J-1 status. The termination of his SEVIS record constitutes final agency action for purposes of the APA. *Id*. at 185.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the First Amendment to the United States Constitution**
***Freedom of Speech and Religious Exercise***

118.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition-Complaint as if fully set forth herein.

119.    The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . or abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

120.    The First Amendment protects past, present, and future speech, including speech by noncitizens. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). Government discrimination against a particular viewpoint on a given subject matter is an "egregious" First Amendment violation that "is presumptively

unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (cleaned up). "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). As noted *infra*, the First Amendment, along with the Fifth Amendment, also protects the right to expressive and intimate association.

121.    The Rubio Determination and Policy and Dr. Khan Suri's targeting, apprehension, transfer, detention, and SEVIS record termination violate the First Amendment because they: retaliate against and punish Dr. Khan Suri for his or his wife's past protected speech, or speech imputed to him or his wife as a result of his family relationship, and for his religious exercise as a practicing Muslim; prevent him from freely speaking and exercising his religion (through detention and SEVIS record termination); attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States; deprive audiences of his present and future speech on matters of public concern; and chill other individuals who express support for Palestinian rights.

122.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Dr. Khan Suri and those similarly situated, in government officials' own telling, the result of their disagreement with his religious exercise and his protected speech and the viewpoint it expresses.

## SECOND CLAIM

**Violation of the First Amendment and the Due Process Clause of the Fifth Amendment
to the United States Constitution**
*Freedom of Association*

123.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

124.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This means "[i]n our jurisprudence guilt is personal" such that "when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct… that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Scales v. United States*, 367 U.S. 203, 224–25 (1961). Simply put, "guilt by association is a philosophy alien to the traditions of a free society." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

125.     Respondents' invocation of the Policy and Rubio Determination to apprehend, transfer, and detain Dr. Khan Suri, as well as to terminate his SEVIS record, rests largely—and impermissibly—on his association with his wife, her protected speech, her national origin, and her familial background. Respondents are retaliating against and punishing Dr. Khan Suri based on an attenuated chain of familial associations: his marital tie to his wife, her familial tie to her father, and her father's former role in the government of Gaza.

126.     Mere association is insufficient grounds to impart liability precisely because the Fifth Amendment's Due Process clause mandates a deprivation of liberty must be premised on a finding of "personal guilt." *Scales v. United States*, 367 U.S. at 224; *see also United States v. Hammoud*, 381 F.3d 316, 328 (4th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1097 (2005).

127.    The Constitution protects both expressive association—the "right to associate for the purpose of engaging in those activities protected by the First Amendment"—and intimate association—*i.e.*, one's "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Freedom of intimate association is a "fundamental element of personal liberty" guaranteed by the Due Process Clause. *Id*. It also stems from the First Amendment right to freedom of association. *See Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 282 (4th Cir. 1991). Marriage is the paradigmatic example of intimate association. *Obergefell v. Hodges*, 576 U.S. 644, 646 (2015) ("Decisions about marriage are among the most intimate that an individual can make").

128.    DHS' allegation that Dr. Khan Suri maintains "close connections with . . . Hamas" is premised, if on any facts at all, solely on his intimate association—his marriage—with his wife, and her national origin and parentage. Thus Dr. Khan Suri has no "personal guilt" necessary to deprive him of his rights under the Due Process Clause. To determine that Dr. Khan Suri's fact of marriage establishes a "sufficiently substantial" relationship to his wife's *constitutionally protected* speech—or *any* of his father-in-law's alleged beliefs, statements, activities, or associations—to manifest "personal guilt" justifying his deportation is guilt by association in direct contravention of the First and Fifth Amendments.

### THIRD CLAIM

**Violation of the Due Process Clause of the Fifth Amendment
to the United States Constitution
*Unlawful Civil Detention***

129.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

130.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

131.    The government's detention of Dr. Khan Suri, prior to his pretrial release on bond on May 14, 2025, was wholly unjustified, as would be his re-detention on the same basis. The government has not demonstrated that Dr. Khan Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Dr. Khan Suri cannot be safely released back to his family.

132.    Moreover, Dr. Khan Suri's detention was punitive as it bore no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Policy and the Rubio Determination—is unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention [was] not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring). The same would be true of his re-detention on the same basis.

133.    The punitive nature of Dr. Khan Suri's detention was compounded by the degrading and harmful conditions in which he was confined: he had extremely limited access to recreation and contact with the outside world; he was initially denied the ability to practice his faith; he was forced to sleep on the floor of a TV room in an overcrowded dorm, deprived of all but a few hours of sleep; he was denied clean undergarments and adequate nutrition; and he was subjected, with

no valid basis whatsoever, to more severe restrictions and treatment than other detained individuals despite posing no danger to others.

## FOURTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution
*Void for Vagueness*

134.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

135.    The Policy and the Rubio Determination violate Dr. Khan Suri's right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

136.    The government's policy of detaining, transferring to immigration jails in the South, seeking to deport, and terminating the SEVIS records and statuses of noncitizens who they perceive to hold views supportive of Palestinian rights or critical of Israeli or U.S. government policy based on those noncitizens' protected speech, imputed viewpoint, religion, or protected association is unconstitutionally vague.

## FIFTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution
*Equal Protection*

137.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

138.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Federal Government from denying equal protection of the laws to all persons within

its jurisdiction, to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 201 (1995).

139.    Respondents targeted Dr. Khan Suri for apprehension, detention, transfer, termination of SEVIS record and status, and deportation in part because of their discriminatory animus towards his wife's Palestinian origin and her connection to Palestine.

140.    Respondents thereby intentionally discriminated against Dr. Khan Suri on account of the national origin of his wife, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## SIXTH CLAIM

### Violation of the Administrative Procedure Act and the *Accardi* Doctrine
### *Policy of Targeting Noncitizens*

141.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

142.    The government has adopted a policy of targeting noncitizens for apprehension, detention, transfer, and removal based on First Amendment-protected speech advocating for Palestinian rights, imputed viewpoint, national origin, religion, and protected association. This policy, and its application to Dr. Khan Suri, is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, including its rules related to First Amendment protected activity and its rules related to transfers. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

143.    In addition, the Rubio Determination that Dr. Khan Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious,

an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

## SEVENTH CLAIM

### Violation of the Administrative Procedure Act
### *SEVIS Termination*

144.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

145.    Under § 706 of the APA, the court shall hold unlawful and set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B).

146.    Respondents' actions in terminating Dr. Khan Suri's SEVIS record are arbitrary and capricious under § 706(2)(A). A final agency action is arbitrary and capricious if it fails to make a rational connection between the facts found and the decision made.

147.    Respondents failed to articulate the facts and relevant authority that provided a basis for their decision to terminate Dr. Khan Suri's SEVIS status in violation of the APA, let alone any rational connection between the facts found and the decision made.

148.    Respondents' termination of Dr. Khan Suri's SEVIS record is also not "in accordance with law" under § 706(2)(A). DHS and State Department regulations set out the exclusive bases under which the government is authorized to terminate an exchange visitor's J-1 status and SEVIS record, and visa revocation is not one of the permissible reasons.

149.    Respondents' actions are "contrary to constitutional right" under § 706(2)(B). Respondents terminated Dr. Khan Suri's SEVIS record in retaliation for his constitutionally

protected speech and association in violation of the First and Fifth Amendments to the Constitution.

150.    Accordingly, Respondents' actions violate the APA and should be held unlawful and set aside.

## EIGHTH CLAIM

### Continued Release on Bail Pending Adjudication

151.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

152.    Under 28 U.S.C. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010).

153.    This petition raises numerous substantial constitutional and statutory claims challenging Dr. Khan Suri's retaliatory detention. Extraordinary circumstances exist that make Dr. Khan Suri's continued pretrial release essential for the remedy to be effective.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

a.    Assume jurisdiction over this matter;

b.    Enjoin Respondents from applying the unlawful Policy of targeting noncitizens for apprehension, detention, transfer, and status termination based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations to Petitioner;

c.      Declare the Respondents' Policy of targeting noncitizens for apprehension, detention, transfer, and status termination based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations is unlawful;

d.      If re-detained, order Respondents to transfer Petitioner back to the jurisdiction of this District pending these proceedings;

e.      Order the continued release of Petitioner pending these proceedings;

f.      Order the release of Petitioner;

g.      Declare that Respondents' actions to apprehend and detain Petitioner violate the First Amendment, the Due Process Clause of the Fifth Amendment, the Equal Protection protections of the Fifth Amendment, and the APA;

h.      Declare that Respondents' termination of Petitioner's SEVIS record and J-1 status violates his rights under the First and Fifth Amendments and the APA;

i.      Order Respondents to set aside their termination of Petitioner's and his children's SEVIS records;

j.      Order Respondents to reinstate, retroactive to March 18, 2025, Petitioner's J-1 exchange visitor status and his corresponding SEVIS record and Petitioner's children's J-2 status and corresponding SEVIS records;

k.      Enjoin Respondents from terminating Petitioner's SEVIS records and his children's SEVIS records pending these proceedings, unless Respondents become aware of a newly discovered, independent legal ground to terminate the records, and requiring Respondents to provide at least 21 days advance notice to Petitioner and his counsel

of any intent to terminate Petitioner or his children's SEVIS records based on newly

discovered, independent legal grounds;

l.      Enjoin Respondents from directly or indirectly enforcing, implementing, or

otherwise imposing any consequence, including adverse immigration action,

arising out of the termination of Petitioner's or his children's SEVIS records or J-1

or J-2 status;

m.      Award reasonable attorneys' fees and costs for this action; and

n.      Grant such further relief as the Court deems just and proper.


Dated: June 30, 2025                              Respectfully submitted,

                                                  /s/ *Eden B. Heilman*
                                                  _____

Hassan Ahmad (VSB No. 83428)                      Eden Heilman (VSB No. 93554)
THE HMA LAW FIRM, PLLC                            Sophia Leticia Gregg (VSB No. 91582)
6 Pidgeon Hill Dr, Suite 330                      Geri Greenspan (VSB No. 76786)
Sterling, VA 20165                                Vishal Agraharkar (VSB No. 93265)
(703) 964-0245                                    AMERICAN CIVIL LIBERTIES UNION
hma@hmalegal.com                                  FOUNDATION OF VIRGINIA
                                                  701 E. Franklin St., Suite 1412
Diala Shamas*                                     Richmond, VA 23219
Astha Sharma Pokharel*                            (804) 644-8022
Samah Sisay*                                      eheilman@acluva.org
Baher Azmy*                                       sgregg@acluva.org
CENTER FOR CONSTITUTIONAL RIGHTS                  vagraharkar@acluva.org
666 Broadway, 7th floor                           ggreenspan@acluva.org
New York, NY 10012
(212) 614-6464
dshamas@ccrjustice.org                            Scarlet Kim*
asharmapokharel@ccrjustice.org                    Brian Hauss*
bazmy@ccrjustice.org                              Noor Zafar**
ssisay@ccrjustice.org                             Sidra Mahfooz**
                                                  Michael K.T. Tan*
                                                  Brett Max Kaufman*
Jessica Myers Vosburgh*                           AMERICAN CIVIL LIBERTIES UNION
CENTER FOR CONSTITUTIONAL RIGHTS                      FOUNDATION
P.O. Box 486

Birmingham, AL 35201
(212) 614-6492
jvosburgh@ccrjustice.org

Nermeen Saba Arastu*
IMMIGRANT & NON-CITIZEN RIGHTS CLINIC
MAIN STREET LEGAL SERVICES, INC.
CUNY SCHOOL OF LAW
2 Court Square, 5th Floor
Long Island City, NY 11101
(202) 246-0124
Nermeen.arastu@law.cuny.edu

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
bhauss@aclu.org
nzafar@aclu.org
smahfooz@aclu.org
m.tan@aclu.org
bkaufman@aclu.org

*Admitted pro hac vice
** Pro hac vice application forthcoming

Counsel for Petitioner

**<u>VERIFICATION</u>**

I, Badar Khan Suri, declare as follows:

1.  I am the Petitioner-Plaintiff in the above-captioned case, and a resident of the Commonwealth of Virginia.

2.  I have personal knowledge of my activities as described in the foregoing Second Amended Petition for Writ of Habeas Corpus and Complaint, and if called on to testify I would competently testify as to the matters stated herein.

3.  I verify under penalty of perjury under the laws of the United States that the factual statements in this Second Amended Petition and Complaint concerning myself and my activities are true and correct to the best of my knowledge.

Dated: June 20, 2025

_____
        Badar Khan Suri

**<u>CERTIFICATE OF SERVICE</u>**

I, Geri Greenspan, hereby certify that on this date, I uploaded a copy of Petitioner's Second Amended Petition for Writ of Habeas Corpus and Complaint and any attachments using the CM/ECF system, which will cause notice to be served electronically to all parties.

Date: June 30, 2025                          Respectfully submitted,


<u>/s/ *Geri Greenspan*</u>
Geri Greenspan, VSB No. 76786
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
Tel: (804) 523-2152
ggreenspan@acluva.org