**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-1560**

─────────────

BADAR KHAN SURI,

       Petitioner - Appellee,

         v.

DONALD TRUMP, in his official capacity as President of the United States; ROBERT GUADIAN, in his official capacity as Field Office Director of Washington, Immigration and Customs Enforcement; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as Secretary of the United States Department of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; TODD BLANCHE, in his official capacity as Acting Attorney General, U.S. Department of Justice,

       Respondents - Appellants,

and

JEFFREY CRAWFORD, in his official capacity as Warden of Farmville Detention Center,

       Respondent,

THE INTERCEPT MEDIA, INC,

       Movant.

------------------------------

IMMIGRATION LAWYERS, LAW PROFESSORS, AND SCHOLARS; HABEAS SCHOLARS; FREE SPEECH FOR PEOPLE,

       Amici Supporting Appellee.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Patricia Tolliver Giles, District Judge.  (1:25-cv-00480-PTG-WBP)

Argued:  March 17, 2026                                    Decided:  July 23, 2026

Before WILKINSON, HARRIS, and BENJAMIN, Circuit Judges.

Affirmed by published opinion.  Judge Benjamin wrote the opinion, in which Judge Harris joined.  Judge Wilkinson wrote a dissenting opinion.

**ARGUED:**  Drew Curtis Ensign, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Noor Zafar, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Geri Greenspan, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Brett Shumate, Assistant Attorney General, William C. Peachey, Director, Yamileth G. Davila, Assistant Director, David J. Byerley, Brandon D. Zeller, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Erik S. Siebert, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellants.  Hassan Ahmad, THE HMA LAW FIRM, PLLC, Sterling, Virginia; Astha Sharma Pokharel, Baher Azmy, New York, New York, Jessica Myers Vosburgh, CENTER FOR CONSTITUTIONAL RIGHTS, Birmingham, Alabama; Nermeen Saba Arastu, Immigrant & Non-Citizen Rights Clinic, CUNY SCHOOL OF LAW, Long Island City, New York; Eden Heilman, Sophia Leticia Gregg, Vishal Agraharkar, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Brett Max Kaufman, Scarlet Kim, Brian Hauss, Esha Bhandari, Sidra Mahfooz, Michael K.T. Tan, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellee.  Amber Qureshi, LAW OFFICE OF AMBER QURESHI, LLC, Columbia, Markyland; Elora Mukherjee, COLUMBIA LAW SCHOOL, New York, New York; Fatma Marouf, TEXAS A&M SCHOOL OF LAW, Fort Worth, Texas; Ahilan Arulanantham, UCLA SCHOOL OF LAW, Los Angeles, California, for Amici Immigration Lawyers, Law Professors, and Scholars.  Jennifer Brooke Condon, Jon Romberg, Jonathan Hafetz, Center for Social Justice, SETON HALL UNIVERSITY SCHOOL OF LAW, Newark, New Jersey; Lawrence S. Lustberg, Madhulika Murali, GIBBONS P.C., Newark, New Jersey, for Amici Habeas Scholars Marc D. Falkoff, Eric M. Freedman, Paul Halliday, Randy A. Hertz, Aziz Z. Huq, Lee Kovarsky, Nancy Morawetz, Jessica Rofé, Stephen I. Vladeck, and Larry Yackle.  Suparna Reddy, John Bonifaz, Ben Clements, Courtney Hostetler, FREE SPEECH FOR PEOPLE, Sharon, Massachusetts, for Amicus Free Speech for People.

2

DEANDREA GIST BENJAMIN, Circuit Judge:

Dr. Badar Khan Suri came to the United States after receiving a J-1 exchange visa for a postdoctoral fellowship at Georgetown University. He and his wife reside in Rosslyn, Virginia, and have publicly opposed the war in the Gaza Strip on social media. As a result of their social media posts and associations, Suri was detained outside of his home by masked Immigration and Customs Enforcement (ICE) officers and was informed that he would be deported from the country. After detaining him, the Government—unbeknownst to Suri's family and counsel—moved him from state to state and detention center to detention center over the span of just a few days.

Suri filed a habeas petition in the United States District Court for the Eastern District of Virginia, where he lived, was first detained, and where the first three detention facilities holding him were located. The Government sought to dismiss Suri's habeas petition, contending that the district court lacked habeas jurisdiction because Suri was no longer detained in Virginia. The district court denied the Government's motion, finding that it had jurisdiction.

The Government appeals, asserting that habeas jurisdiction was not established, and even if it was, certain provisions of the immigration code stripped the district court of subject matter jurisdiction.

We disagree with the Government and affirm the district court in full. The district court had jurisdiction to hear Suri's habeas petition, and no provision within the immigration code deprived it of subject matter jurisdiction.

3

# I. Background

## A. Dr. Suri & His Arrest by ICE

Dr. Badar Khan Suri is an Indian national. He earned a Ph.D. in Peace and Conflict Studies at Jamia Millia Islamia, a university in New Delhi. After Suri completed his Ph.D., he applied for and received a postdoctoral fellowship at Georgetown University in Washington, D.C.

In 2022, Suri arrived in the United States on a J-1 exchange visa[1] to begin the fellowship. At Georgetown, Suri taught a course on Majoritarianism and Minority Rights in South Asia. His wife, Mapheze Saleh, and his three children arrived in the United States soon after he began his fellowship. His children were admitted to the United States on derivative J-2 visas and thus are dependent on their father's status to enter and remain in the country. At the time of Suri's arrest, he and his family resided in Rosslyn, Virginia.

Saleh is a United States citizen of Palestinian descent; her father and some of her family still live in Gaza. During the war in Gaza, Saleh lost several family members and friends and often publicly voiced her opposition to the war on social media. On "a handful of occasions," Suri also made social media posts "expressing support for the Palestinian

---

[1] Suri was participating in the J-1 exchange visitor program as a "research scholar," which is "a foreign national whose primary purpose is conducting research, observing, or consulting in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar types of institutions. 22 C.F.R. § 62.4(f). "A research scholar may also teach or lecture where authorized by the sponsor." *Id.*

4

people, criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's war in Gaza." J.A. 105.[2]

In early March 2025, the United States Department of State announced a new program called "Catch and Revoke," where it would use artificial intelligence to review "tens of thousands of student visa holders' social media accounts" for evidence of "alleged terrorist sympathies." J.A. 110. The goal was to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups." *Id.* Once identified, Secretary of State Marco Rubio would issue a determination, finding that the noncitizen's presence in the United States compromises American foreign policy interests. The United States Department of Homeland Security (DHS) would then work to locate, apprehend, detain, and, ultimately, seek to deport these individuals. The government proceeded to put its program into action, detaining students and scholars like Mahmoud Khalil, Rümeysa Öztürk, and others on the stated basis of their political speech and associations. *See Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025).

Suri became one of the government's first targets under this program. DHS Assistant Secretary for Public Affairs Tricia McLaughlin announced on the social media platform X, that:

> Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him

---

[2] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers refer to the "J.A. #" pagination.

deportable under INA [Immigration and Nationality Act] section 237(a)(4)(C)(i).

J.A. 302–03.[3]

DHS then made a custody determination that Suri would be detained pursuant to 8 U.S.C. § 1226(a), which provides that a noncitizen "may be . . . detained pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a); J.A. 84.

On March 17, 2025, at approximately 9:30 p.m.,[4] Suri was returning home after teaching and observing iftar, the evening meal that ends the daily Ramadan fast. He noticed several black, unmarked cars near his apartment building. Before he could enter his apartment building, a man wearing a face covering and dark clothing approached him and asked if he was Badar. He responded that he was. Suri then called his wife to come downstairs. The masked officers told Suri and his wife that they were from DHS; that Suri's "student visa" had been revoked; and that he was being arrested because of his

---

[3] McLaughin mistakenly wrote that Suri was a foreign exchange student, as he was a J-1 research scholar. And the Government has yet to disclose Rubio's March 15 determination memorandum on the record in this case. That said, the court takes judicial notice that this memo appears to have been disclosed as part of litigation in the District of Massachusetts, and it states that Suri was designated removable as a foreign policy threat solely based on what Secretary Rubio determined to be his "direct connection to Hamas leadership," his "involvement in antisemitic activities" on campus, and his "actively spread[ing] [Hamas] propaganda and promot[ing] antisemitism on social media." Certified Administrative Record, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685-WGY (D. Mass. Jan. 22, 2026), ECF No. 315 at 56–57.

[4] Unless otherwise specified, all references to time are in Eastern Daylight Time ("EDT").

6

"social media." J.A. 113–14. Suri clarified that he had a J-1 exchange visa, but the officer told him that "it was the same thing, and that it was also revoked." J.A. 114. Suri was then escorted into the dark-colored SUV. During the transport, officers informed him that "someone high up in the Secretary of State's office doesn't want you here," and that he would be deported "today." J.A. 135.

## B. Movement Between States and Detention Centers

Over the first 11 hours after Suri's arrest, he was moved to three different detention centers.

Suri was first taken directly to ICE's Enforcement and Removal Operations ("ERO") Washington Field Office in Chantilly, Virginia. At the ICE field office in Chantilly, officers presented Suri with his notice to appear ("NTA").[5] The NTA listed "1209 Sunflower Ln, Alvarado, Texas 760092810" as his current residence—an address Suri had neither lived at nor been to. That address turned out to be the address of the Prairieland Detention Center in Texas. Suri asked about the incorrect Texas address, and an officer explained to him that it "was just computer generated, and it might be changed later on." J.A. 135. The NTA also listed a hearing date for May 6, 2025, before an immigration judge at "27991 Buena Vista Blvd, Los Fresnos, Texas 78566, Prairieland Detention Center." However, that address is not the Prairieland Detention Center but the Port Isabel Detention Center, which is approximately 500 miles away from the Prairieland

---

[5] The NTA was issued around 9:47 p.m. on March 17, 2025—while Suri was still in Chantilly, Virginia. *Suri v. Trump* (*Suri II*), 785 F. Supp. 3d 128, 135 (E.D. Va. 2025).

Detention Center. Soon after, Suri was told that he would be transferred to Farmville, Virgina. He was allowed to call Saleh to inform her that he was being taken to Farmville, and that he had an immigration hearing in Texas on May 6, 2025.

The next day, March 18, at approximately 2:30 a.m., Suri arrived at the Farmville Detention Center. After only a few hours in Farmville, he was transferred again, this time to Richmond, Virginia. Suri reached the ERO Washington Office near Richmond, Virginia at 7:50 a.m. The officers did not allow him to call his wife to inform her of his new location. They also did not explain the reason for his transfer. Suri's stay in Richmond, however, was brief.

Suri was removed from his cell in Richmond, shackled, put in a van, and driven away. When he asked an officer where they were going, the officer replied that he was not supposed to tell. After about an hour, Suri arrived at an airport and was put onto an airplane, along with several other shackled detainees. The airplane departed for Louisiana at 2:47 p.m.

On March 18 at 5:03 p.m., Suri arrived in Alexandria, Louisiana. At 6:42 p.m., he was booked into the Alexandria Staging Facility—a "super deportation center" where he could be "deported at any time." Suri was detained in Louisiana for three nights. After his first transfer from Chantilly to Farmville, Suri was unable to contact his wife or anyone else regarding his rapid transfers across state lines.

On March 20, Suri was told that he would be transferred to New York the next day, presumably to be deported. But on the morning of March 21, Suri was told that he instead would be driven to Texas. That evening at approximately 7:30 p.m., Suri arrived at the

8

Prairieland Detention Center.  It would be Suri's longest stop, as he was held there until his release on May 14, 2025.

### C. Suri's Representation & Habeas Petition

On the evening Suri was arrested by ICE officers, Saleh's friend, Ashraf Nubani, notified attorney Hassan Ahmad of what had occurred.  The next morning, Ahmad formally agreed to represent Suri.  Ahmad discussed the details of Suri's arrest and detention with Saleh.  She believed that Suri was being held in the Farmville Detention Center, since that was the last thing Suri shared with her about his location.

On March 18 at 2:11 p.m., Ahmad entered his appearance in Suri's immigration proceedings, which allowed him to view Suri's NTA.  Although the NTA listed a Texas address as Suri's current residence, Ahmad did not rely on it (as Suri had never lived there) and continued to believe Suri was detained in Virginia, based on Saleh's information.  Ahmad, working with other counsel, immediately began drafting a habeas petition.  The team repeatedly checked the ICE online detainee locator, but Suri did not appear in the system.  Unbeknownst to Ahmad, on the afternoon of March 18, Suri was in Richmond but en route to board a flight to Alexandria, Louisiana.  At 5:59 p.m.—after Suri had landed in Alexandria, Louisiana, but before he was booked into the Alexandria detention facility— his habeas petition was filed in the United States District Court for the Eastern District of Virginia.

Suri's petition claimed that Secretary Rubio's determination and Suri's "targeting, arrest, transfer, and ongoing detention" violated the First Amendment and his Fifth Amendment right to due process.  J.A. 21–24.  As to his detention specifically, Suri alleged

9

that he was detained "not to facilitate deportation, or to protect against risk of flight or dangerousness," but instead solely to retaliate against him for his speech. J.A. 23. And his detention, he further alleged, was an "attempt to chill" his future speech and that of others "who express support for Palestinian rights." J.A. 22. Suri requested that the district court, *inter alia*, enjoin his transfer to another jurisdiction, order his immediate release, and "[d]eclare that [the Government's] actions to arrest and detain [him] violate the First Amendment and Due Process Clause of the Fifth Amendment." J.A. 25. Moreover, in an amended petition filed after he was detained for multiple weeks, Suri claimed that he was being held in "degrading and harmful conditions" in which he was "forced to sleep on the floor of an overcrowded TV room, deprived of all but a few hours of sleep," "denied clean undergarments and adequate nutrition," and "subjected, with no valid basis whatsoever, to more severe restrictions and treatment than other detained individuals despite posing no danger to others." J.A. 125–26.

On March 19, two days after Suri was taken and moved without explanation through four detention centers, his name finally appeared in ICE's online detainee locator. It showed that he was being held at the Alexandria Staging Facility in Louisiana. Suri's counsel then filed a motion requesting the district court to direct the Government to return him to the Eastern District of Virginia and to bar Suri's removal from the United States while his petition was pending.

10

## II. Procedural History

On March 20—the same day the Government notified Suri that he would be transferred to New York for deportation and the same day Suri's counsel filed the motion to bar his removal—the district court entered an order prohibiting the Government from removing Suri from the United States "unless and until the [c]ourt issues a contrary order." *Suri v. Trump* (*Suri I*), 2025 WL 914757, at *1 (E.D. Va. Mar. 20, 2025). The district court issued its order pursuant to its authority to preserve its jurisdiction under the All Writs Act ("AWA"), 28 U.S.C. § 1651. *Id.*

The Government moved to dismiss Suri's habeas petition, or in the alternative, to transfer venue.

The district court issued an opinion and order denying the Government's motion. *See Suri v. Trump* (*Suri II*), 785 F. Supp. 3d 128, 133–49 (E.D. Va. 2025). The district court explained that although habeas jurisdiction is usually conferred where a petition is filed in the district of confinement and the respondent has custody over the petitioner, there are well-recognized exceptions. *See Suri II*, 785 F. Supp. 3d at 137–38. It found that the circumstances here fit within two exceptions to the default habeas jurisdiction rules: the unknown custodian exception, and the exception borne out of Justice Kennedy's concurrence in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004) (Kennedy, J., concurring). *See id.* at 140–48.

The district court found that the unknown custodian exception applied because Suri was "held in an undisclosed location by an unknown custodian." *Id.* at 141 (quoting *Padilla*, 542 U.S. at 450 n.18). It stated that no "diligent attorney could have known that

11

[Suri] was in Louisiana at the time he filed the petition." *Id.* at 142. The district court noted that Suri's NTA did not reference Louisiana, the ICE online detainee locator had no information on him, and Suri was not permitted to contact his wife until the evening of March 19, after his petition was already filed. *See id.* at 142, 144. Further, "even if it were possible for [Suri's] counsel to have discovered he was in Louisiana at 5:59 p.m., [his] counsel would not have known who to identify as [Suri's] immediate custodian." *Id.* at 142. Suri was not booked at the Alexandria Staging Facility until 6:42 p.m.—"almost an hour after the petition was filed." *Id.* The district court specifically noted that even the Government could not identify Suri's immediate custodian. *Id.*

The district court also found that the exception borne out of Justice Kennedy's concurrence in *Padilla* applied. *Id.* at 144–48. Justice Kennedy wrote that there should be an exception "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed" or "if the Government did inform the lawyer where a prisoner was being taken but kept moving him so filing could not catch up to the prisoner." *Id.* at 144–45 (citing *Padilla*, 542 U.S. at 454 (Kennedy, J. concurring)). "In these situations, Justice Kennedy believed that 'habeas jurisdiction would lie in the district or districts from which [the petitioner] had been removed.' " *Id.* at 145 (quoting *Padilla*, 542 U.S. at 454 (Kennedy, J. concurring)). The district court found that the Government's NTA was "design[ed] to forum shop and spirit [Suri] away from this [d]istrict before his counsel could file a petition," as the Government was "fully aware that listing [Suri's] current residence . . . would determine which immigration court would have jurisdiction over his

12

proceedings." *Id.* at 146. And the Government's "myriad contradictory explanations combined with the inability for [Suri's] exceptionally diligent counsel to keep up with [Suri's] abnormal and rapid movement across state lines demands more flexible jurisdictional rules." *Id.* at 148.

Lastly, the district court declined to exercise its discretion to transfer Suri's petition to Louisiana or Texas. *Id.* It stated that doing so would ratify the Government's "attempt at forum shopping," and would force Suri to litigate his case "many states away from his lawyers and family," which would "meaningfully deprive him of their ability to aid in his representation for the duration of these habeas proceedings." *Id.*

Suri's counsel filed a motion for release on bail. The district court held a bail hearing and subsequently ordered for Suri "to be immediately released." *Suri v. Trump* (*Suri III*), 2025 WL 1392143, at *1 (E.D. Va. May 14, 2025). The district court conditioned his release, expressly requiring Suri to "participate in his removal proceedings." *Id.*

The Government appealed the district court's order not to remove Suri and the bail release order. It also petitioned for a stay of the release order pending appeal and for mandamus.[6]

---

[6] While not relevant to the Government's appeal here, it requested this court to issue a writ of mandamus "because the district court's order amounts to judicial usurpation of the Executive's exclusive statutory powers and preeminent constitutional powers over immigration." *Suri v. Trump* (*Suri IV*), 2025 WL 1806692, at *9 (4th Cir. July 1, 2025). This court denied the request, as the Government's "only substantive argument is that the district court lacked jurisdiction over Suri's habeas petition," and it already concluded that "the district court did possess habeas jurisdiction." *Id.*

This court issued an opinion denying the Government's requests for stay and mandamus. *See Suri v. Trump* (*Suri IV*), 2025 WL 1806692, at *1 (4th Cir. July 1, 2025). The court held that "the equities lie firmly in Suri's favor," as it agreed with the district court that "the unknown-custodian exception squarely applies." *Id.* at *4, *6; *see also id.* at *6 n.6 (adopting Justice Kennedy's reasoning from his *Padilla* concurrence as an alternative basis for holding that the district court had habeas jurisdiction). The court also held that the Government's argument that certain provisions of the immigration code deprived the district court of jurisdiction over Suri's habeas petition were unlikely to succeed. *See id.* at *7.

The Government now appeals, arguing that the district court lacked jurisdiction to enter its order to bar removal and its order granting release on bail. Appellant's Br. (ECF No. 36) at 10[7] (hereinafter "Opening Br."). The Government raises four main arguments. First, it asserts that Suri failed to satisfy the default habeas requirements of naming an immediate custodian and filing his petition in the district of confinement. *Id.* at 8. It further doubts whether any exception to the normal habeas rules exists. *Id.* at 8–9. Second, the Government argues that the district court abused its discretion in refusing to transfer Suri's habeas petition to Texas or Louisiana. *Id.* at 37–41. Third, even if the district court had habeas jurisdiction, the Government believes three provisions of the INA stripped the district court of authority to address Suri's claims regarding his detention. Those

---

[7] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

14

provisions, the Government says, preclude district court review of the Executive's authority to *initiate* removal proceedings, and that decision is inextricably intertwined with the decision to detain. *Id.* at 9; 8 U.S.C. §§ 1252(a)(5), (b)(9), (g). Finally, the Government contends that the district court erred in invoking the AWA because it "was not at risk of losing jurisdiction (assuming it had any to begin with)." Opening Br. at 9–10. As discussed below, we hold that none of these arguments withstand scrutiny. We address each in turn.

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

### III. Analysis

This case is one of several that have arisen over the past year and a half presenting the same basic fact pattern: A student or scholar, in the United States on a valid student or exchange visa, is detained by DHS on the stated basis of his or her political speech, beliefs, or associations; shuttled across jurisdictions rapidly and often in secret; and detained for allegedly unconstitutional reasons and under allegedly unconstitutional conditions pending removal. And in each case, the Government insists that judicial review of the allegedly unconstitutional detention can come only after removal proceedings that can last for months or years. Until then, according to the Government, a detained noncitizen has no judicial recourse.

We disagree. For the reasons explained below, Congress' habeas jurisdiction statutes and Supreme Court case law permitted Suri to file a habeas petition in the district from which he was removed. And no provision of the INA deprived the district court of subject-matter jurisdiction to hear Suri's challenges to his allegedly unconstitutional

15

detention.  Our holding today aligns with this court's ruling on the Government's stay motion, *see Suri IV*, 2025 WL 1806692, as well as the Second Circuit's rulings on stay motions in two similar cases, *see Öztürk v. Hyde*, 136 F.4th 382 (2d Cir. 2025); *Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025).  We recognize that it diverges from the Third Circuit's determination in *Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026).  But in our view, denying judicial review of detention claims like Suri's misreads Congress' statutes and undermines the protections guaranteed all persons on American soil by the writ of habeas corpus.  *See Lochnar v. Thomas*, 517 U.S. 314, 324 (1996) (identifying writ of habeas corpus as the Constitution's "best and only sufficient defen[s]e of personal freedom" (internal quotation marks omitted)).

## A. Habeas Jurisdiction[8]

We review "the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

### 1. The Default Habeas Rules

For centuries, the writ of habeas corpus has been understood as a vital instrument to secure "freedom from unlawful restraint as a fundamental precept of liberty."  *Boumediene*

---

[8] The questions before us dually concern whether the district court had personal and subject-matter jurisdiction over Suri's habeas petition.  *See Kanai v. McHugh*, 638 F.3d 251, 258 (4th Cir. 2011) (recognizing habeas jurisdiction as a matter of personal or venue jurisdiction); *see also Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 482, 492 (1999) (describing 8 U.S.C. § 1252(g) as a "narrow" jurisdictional bar that may deprive a federal court of jurisdiction over a respondent's claims).  Because there is (Continued)

*v. Bush*, 553 U.S. 723, 739 (2008). The writ's protections are at their peak where a petition challenges " 'the legality of Executive detention,' " rather than incarceration following criminal conviction. *Rasul v. Bush*, 542 U.S. 466, 474 (2004) (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001), *superseded by statute as recognized in Nasrallah v. Barr*, 590 U.S. 573, 580–81 (2020)). And "[t]he very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969). 28 U.S.C. § 2241(a) provides district courts with the authority to grant writs of habeas corpus "within their respective jurisdictions."

In *Rumsfeld v. Padilla*, the Supreme Court explained the contours of habeas jurisdiction. 542 U.S. 426, 434–36 (2004). Generally, a habeas petition seeking to challenge present physical custody should be filed "in the district of confinement" and "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].' " *Id.* at 434, 447 (alteration in original) (quoting 28 U.S.C. § 2242). Petitioners are generally required to name "some person who has the immediate custody of the party detained"[9] rather than "the Attorney General or some other remote supervisory official." *Id.* at 435. When applying these rules, we generally look to where the petitioner

---

no mandatory "sequencing of jurisdictional issues," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), we begin with whether the district court had habeas jurisdiction.

[9] The Supreme Court has described an immediate custodian as a person that has "the ability to produce the prisoner's body before the habeas court." *Padilla*, 542 U.S. at 435; *see also Wales v. Whitney*, 114 U.S. 564, 574 (1885).

17

was confined when their petition was filed.  *See United States v. Little*, 392 F.3d 671, 680 (4th Cir. 2004) (noting that because petitioner was confined in Texas when his petition was filed, the Western District of North Carolina was an improper venue).

Even where these default habeas rules appear to be unsatisfied, those rules are not absolute.  Two exceptions to the default habeas rules apply in this case: the unknown custodian exception and the exception borne out of Justice Kennedy's concurrence in *Padilla*.  542 U.S. at 454 (Kennedy, J., concurring).  Below, we discuss and apply each in turn.

### 2. The Unknown Custodian Exception[10]

When a detainee is held in a secret location, their attorneys "cannot be expected to file in the jurisdiction where [they are] held" as it "is impracticable to require the attorneys to file in every jurisdiction."  *Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (Bork, J., in chambers) (allowing suspected war criminal held in confidential location to file a habeas petition in the D.C. Circuit).  Thus, "it is essential that [the] petitioner not be denied the right to petition for a writ of habeas corpus" because they are in an unidentifiable location.  *Id.*

The Government wrongly asserts that this "so-called unknown custodian exception" in *Demjanjuk* was "never actually recognized by the Supreme Court."  Opening Br. at 25. The Supreme Court in *Padilla* expressly recognized the unknown custodian exception,

---

[10] While the exception is commonly known as the "unknown custodian exception," it also encompasses the exception to the default "district of confinement" rule.  *See Suri IV*, 2025 WL 1806692, at *4.

stating that when "a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." 542 U.S. at 45 n.18. It seems the Supreme Court took the exception as a given, explaining that there, the "identity of the immediate custodian" was not "shrouded . . . in secrecy." *Id.* at 449 n.17. Additionally, this court has previously applied the unknown custodian exception in *United States v. Moussaoui*, 382 F.3d 453, 465 (4th Cir. 2004). There, the court held that because the petitioner's immediate custodian was unknown, it was proper to name "Secretary of Defense Donald Rumsfeld" as the ultimate custodian. *Id.* at 465. The Government ignores *Moussaoui*—binding circuit precedent—underscoring the weakness of its position. We refuse to indulge the Government's invitation to disregard both the Supreme Court's express recognition of the unknown custodian exception and our precedent applying it. It is firmly established, and "[t]his case is a prime example for why the unknown-custodian exception exists." *Suri IV*, 2025 WL 1806692, at *5.

As explained below, the exception applies here because both Suri's district of confinement and immediate custodian were unknown.

### a. Suri's District of Confinement was Unknown

First, "it is impossible" to apply the district of confinement rule because Suri was "held in an undisclosed location." *Padilla*, 542 U.S. at 45 n.18. Immediately after Suri's arrest, he was rapidly moved to three locations in Virginia over eleven hours. J.A. 209–12. While officers allowed Suri to inform his wife of his first move from Chantilly to Farmville, Suri's requests to inform his wife about the subsequent transfers from Farmville to Richmond and Richmond to Louisiana were denied. *See* J.A. 136–37 ¶14 (requesting

19

to call his wife in Farmville but "was refused"); *id.* ¶ 15 (requesting to call his wife in Richmond but "was denied"); *id.* ¶ 19 (explaining that when he requested to call his wife in Louisiana, officers told him to use a phone that required an access code, which they did not give him). At one point, even Suri did not know where he was going to be transferred. *Id.* ¶ 16 (noting that when he was on a van to Louisiana, "[n]o one would tell me where I was going, despite my repeated inquiries"). Further, ICE's online detainee tracker did not provide any location information for Suri until the day *after* the petition was filed. J.A. 36. And Suri's NTA offered no indication where he might be located, as it contained no reference to Louisiana. The only information available to Suri's counsel came from Saleh's last conversation with Suri, when Suri said he was being held in Farmville. J.A. 53. We agree with the district court that "it is not clear how any other diligent attorney could have known that [Suri] was in Louisiana at the time he filed the petition." *Suri II*, 785 F. Supp. 3d at 142. Based on the information known to Suri's counsel, the Eastern District of Virginia was the *only* logical place to file the petition.[11]

---

[11] The Government insists that, under *Padilla*, what matters for the unknown custodian analysis are "the facts as they actually existed," or perhaps the facts known to the petitioner himself, rather than "the facts available to [the petitioner's] counsel at the time of filing." Opening Br. at 18 (internal quotation marks omitted). So as long as *someone* knew where Suri was, the government's logic goes, the exception does not apply. That claim is entirely unsupported by *Padilla*, whose analysis of the unknown custodian exception turned precisely on the *counsel*'s knowledge: The Court found the unknown custodian exception not to apply because, in the majority's view, Padilla's counsel in fact knew where Padilla was detained. *See* 542 U.S. at 449 nn.17, 18. As Judge Bork's opinion makes clear, what matters for this analysis is the ability of the "petitioner's attorneys . . . to file in the jurisdiction where petitioner is held." *Demjanjuk*, 784 F.2d at 1116. If a petitioner's attorneys do not know his location, Judge Bork commonsensically concluded, they "cannot be expected to file in the jurisdiction where petitioner is held." *Id.*

20

Such opaque and unpredictable conduct by the Government left Suri's counsel with no meaningful way to comply with the district of confinement rule. We hold that these circumstances warrant the use of the exception to the default district of confinement rule.

### b. Suri's Immediate Custodian was Unknown

Second, applying the immediate custodian rule is also "impossible" because Suri was held "by an unknown custodian." *Padilla*, 542 U.S. at 45 n.18. The habeas pleading statute expressly requires that a petitioner's custodian only be named "if known." 28 U.S.C. § 2242. Setting aside the fact that Suri's counsel could not have known Suri was in Louisiana when they filed the habeas petition, they also could not have known *who* to identify as Suri's immediate custodian. As a reminder, at 5:59 p.m., when Suri's petition was filed, he had recently landed in Louisiana from Richmond by plane, but had not yet been booked into the Alexandria Staging Facility. J.A. 36. It was not until 6:42 p.m.—43 minutes after his petition was filed—that Suri was booked into the Alexandria Staging Facility. J.A. 204. Accordingly, at 5:59 p.m., it is uncertain whether Suri even had an immediate custodian—that is, a warden or individual "with day-to-day control over" him. *Moussaoui*, 382 F.3d at 465. It is telling that the Government itself could not identify who Suri's "immediate custodian was while he was on a plane to Louisiana or while he was in Louisiana before he was booked" into the Alexandria Staging Facility. *Suri II*, 785 F. Supp. 3d at 142. Thus, we hold that the uncertainty surrounding Suri's immediate custodian places this case within the "limited and special circumstance[]" where it is proper to name an ultimate custodian, such as then-secretary of the Department of Homeland Security Kristi Noem. *Demjanjuk*, 784 F.2d at 1116; *see* Brian R. Means, Federal Habeas

21

Manual § 1:93 (2025) ("[W]here the immediate custodian is unknown, the writ may be served on the prisoner's ultimate custodian.").

In sum, the unknown custodian exception is valid and squarely applies. Thus, we affirm the district court and hold that "[j]urisdiction is therefore proper in Suri's last-known location, and the only place his attorney reasonably could have filed a petition: the Eastern District of Virginia." *Suri IV*, 2025 WL 1806692, at *6.

### 3. Justice Kennedy's Exception

Given the district court's exceptional and uncontested factual findings of governmental secrecy and forum-shopping, we also hold that the exception borne out of Justice Kennedy's concurrence in *Padilla* applies.[12]

---

[12] The application of Justice Kennedy's concurrence in *Padilla* is not novel. Its principles were recognized and applied by the First Circuit in *Vasquez v. Reno*, and by this court in *Suri IV*. *See* 233 F.3d 688, 696 (1st Cir. 2000) (holding that the default rules do not apply in the "extraordinary circumstance" where the government "spirited a[] [noncitizen] from one site to another in an attempt to manipulate jurisdiction"); *see also* 2025 WL 1806692, at *6 n.6 ("As an alternative basis for our conclusion, we adopt Justice Kennedy's reasoning from his concurrence in *Padilla*.").

Application of this exception also follows from the reasoning of *Padilla* itself. After all, six of the nine justices in *Padilla* were concerned about the risk of government efforts to "shroud [the petitioner's location] in secrecy" in order to evade jurisdiction. *Padilla*, 542 U.S. at 459 n.3 (Stevens, J., dissenting); *see id.* at 454 (Kennedy, J., concurring). The concurrence disagreed with the dissent only as to the factual predicate—whether the government had in fact "refused to tell Padilla's lawyer where he had been taken." *See id.* at 454 (Kennedy, J., concurring). Indeed, Justice Kennedy's concurrence made clear that, had the government refused to share Padilla's location with his counsel, or told his counsel but then moved him "so a filing could not catch up to the prisoner," Justices Kennedy and O'Connor would have sided with the dissent and found jurisdiction. *See id.* Thus, far from mere "dicta," as the government tries to label it, Justice Kennedy's proposed exception was a decisive issue in the case.

22

In *Padilla*, Justice Kennedy wrote separately and acknowledged another exception where:

> [T]here is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention. In cases of that sort, habeas jurisdiction would be in the district court from whose territory the petitioner had been removed.

542 U.S. at 454 (Kennedy, J., concurring).

Justice Kennedy gave specific examples of when or how this exception may apply:

> In this case, if the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken, the District Court would have had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in my view, habeas jurisdiction would lie in the district or districts from which he had been removed.

*Id.*

His reasoning and provided examples proved strikingly predictive—prescient even—as it almost perfectly parallels the circumstances of Suri's arrest and detention. In the first 11 hours after Suri's arrest, he was moved to three different detention centers. While the district court noted a recent pattern of swift transfers of immigration detainees that filed First Amendment detention petitions, "such rapid transfers do not appear to be a part of the normal course of operations in this jurisdiction." *Suri II*, 785 F. Supp. 3d at 147; *see also id*. (quoting Virginia immigration attorney declaration stating that she has "never seen ICE arrest someone in Virginia and move them as far away as Texas in less than 24 hours"). Suri's counsel formally agreed to represent Suri, discussed the details of

Suri's detention with Suri's wife, entered his appearance in the immigration proceedings, and filed a writ of habeas corpus in the district court, all within 21 hours of Suri's arrest. Remarkably, Suri's counsel expeditiously drafted and filed his habeas petition within three hours and 48 minutes of entering his notice of appearance in Suri's immigration proceedings, yet that was still too slow. *Id.* And because Suri was repeatedly denied the chance to update his wife or lawyer, and ICE's online detainee tracker offered no updates, we think that this would make it highly difficult (or impossible) for any diligent lawyer to "catch up" on their client's location. *Id.*

The district court also made several factual findings—which the Government does not dispute or challenge—that support the application of this exception. Those factual findings, which we hold are free from "clear error," *Velasco*, 370 F.3d at 398, were based in part on the Government's answers that were "either non-responsive or riddled with inconsistencies" and further support use of this exception. *Suri II*, 785 F. Supp. 3d at 145.

First, the district court found that the Government's "goal in moving [Suri] was to make it difficult for [Suri]'s counsel to file the petition and to transfer him to the Government's chosen forum." *Id.* at 146. The Government rationalized to the district court that it was actually "bedspace concerns" that motivated Suri's removal from Virginia. *Id.* at 145. Yet the Government concedes that Suri was transferred out of a facility with "some bedspace" to "a facility that did not have bedspace." *Id.* In Louisiana, Suri was not

24

assigned to a bed in a dorm. J.A. 115. He slept in the "TV room"[13] on a plastic frame with a thin plastic mattress and no pillow. *Id.* And in Texas, Suri was "placed in a dormitory that ha[d] a 36-person capacity but ha[d] been filled with at least 50 people since he arrived," leaving Suri to sleep "on a plastic cot on the floor for two weeks before being moved to a bed." *Suri II*, 785 F. Supp. 3d at 145. If the Government were truly concerned about "potential overcrowding" and "bedspace," it would have kept Suri in Virginia. The factual findings here actually seem to be more severe than the circumstances Justice Kennedy contemplated in *Padilla*, as the Government rapidly and continuously moved Suri while denying his requests to inform his wife of his detention transfer developments.

Second, the district court found that the Government's "design was to forum shop and spirit [Suri] away from this District before his counsel could file a petition." *Id.* at 146. The district court asked the Government "whether it was normal for the NTA to list a detention facility as a non-citizen's current residence." *Id.* The Government responded that it did so "because the non-citizen's location determines the 'court and docket, as well as the date and time for initial appearances.' " *Id.* (quoting Declaration of Mark Graham (D. ECF No. 57-1) at 4). Yet the record reflects that Suri was not located in Texas at the time he was served his NTA.[14] And because the Government "also knew that the

---

[13] "The 'TV room' is a common room where the television is on every day from 5:00 a.m. to 2:00 a.m." J.A. 115.

[14] The district court reviewed the Government's supplemental declaration where it expressly stated that the "the decision to detain [Suri] was made *while he was at the Chantilly Field Office*, and that the NTA was issued after the detention facility was decided." *Suri II*, 785 F. Supp. 3d at 146 (emphasis added). But this directly contradicted (Continued)

Prairieland Detention Center was not [Suri's] most recent residence," the district court found that the Government sought to shop for a more favorable forum. *Id.* Notably, the Government "doesn't contest the district court's finding that it apparently intended to deport Suri on March 21." *Suri IV*, 2025 WL 1806692, at *5. "Without that order, Suri may well have been deported without the reasonable notice and opportunity for judicial review that 'all nine Justices agree[]' is due." *Id.* (quoting *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025)). These undisputed factual findings demonstrate the Government's lack of candor regarding Suri's place of detention and its deliberate attempt to manipulate venue.

"[C]ommon-law habeas corpus was, above all, an adaptable remedy." *Boumediene*, 553 U.S. at 779. "Its precise application and scope changed depending upon the circumstances." *Id.* Drawing on the writ's flexible application, and the district court's thorough and uncontested factual findings, we adopt Justice Kennedy's exception in *Padilla* as another reason why habeas jurisdiction was proper where Suri was removed from—the Eastern District of Virginia. *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

---

the Government's later testimony that "the custody determination to detain [Suri] in Texas was made before the NTA was issued." *Id.* What's more, the Government's initial statement that the decision to detain Suri was made at the Chantilly Detention Center could not have been true. Suri was arrested at 9:30 p.m. Since his apartment was at least 30 minutes away and his NTA was signed at 9:47 p.m., the decision to detain him in Texas— which had nothing to do with bedspace—must have been made before he arrived at the Chantilly Detention Center. This inconsistency further supports the finding that the Government was not forthcoming with respect to its preferred ultimate place of detention for Suri.

## B. Transfer

The Government argues that even if the Eastern District of Virginia "initially" had jurisdiction, the district court "should have transferred the case once it became aware that Suri had been removed from the district before the filing of the habeas petition." Opening Br. at 37–38.

We review a district court's denial of a request to transfer to a new venue for abuse of discretion. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993). We hold that the district court did not abuse its discretion by declining to transfer Suri's petition.

To begin, jurisdiction in the habeas statute does not refer to a district court's subject matter jurisdiction. *See Padilla*, 542 U.S. at 434 n.7. Rather, it is better "understood as a question of personal jurisdiction or venue." *Id.* at 451 (Kennedy, J., concurring); *see also Kanai v. McHugh*, 638 F.3d 251, 257–58 (4th Cir. 2011) (same). This distinction matters because a lack of subject matter jurisdiction typically requires dismissal, while issues of personal jurisdiction or venue are subject to waiver and may, at a district court's discretion, be addressed through transfer.

Here, there are only three places where this case could arguably be heard: Virginia, Louisiana, or Texas. The Government thinks this case should be heard in Louisiana or Texas. Opening Br. at 24. But interestingly, it does not commit to a position on whether the transfer should have occurred to Louisiana or Texas. *See id.* at 37–41. Suri thinks that this case is properly heard in Virginia.

We think this decision can be made through simple process of elimination. First, Louisiana is out because the Government never sought transfer to Louisiana in the district

27

court. *See Berg v. Kingdom of the Neth.*, 24 F.4th 987, 998 (4th Cir. 2022) (holding that the appellant's transfer request to the District of Columbia was forfeited because he failed to request the district court to transfer his case to the District of Columbia in the first instance); *see also Kanai*, 638 F.3d at 258 (similar). We can't hold that the district court abused its discretion in failing to transfer the case to Louisiana when it was never asked to transfer the case to Louisiana. *Suri II*, 785 F. Supp. 3d at 140 (noting that "neither party contends that the Western District of Louisiana is the proper jurisdiction to hear the petition"). And second, any argument for Texas is unavailing, as there is no reason to think—and the Government points to no case indicating—that a habeas petition challenging present confinement could be filed in a district to which a petitioner had not yet been. *See* 28 U.S.C. § 1406(a) (allowing transfer to a district where the case "could have been brought"); *id.* § 1631 (same). It is undisputed that Suri's habeas petition was filed three days before he was moved to Texas.

Accordingly, we cannot say that the district court abused its discretion in refusing to transfer Suri's habeas petition out of Virginia. Frankly, Virginia is the only plausible and reasonable venue. The district court astutely looked to the Supreme Court's reasoning in *Braden v. 30th Jud. Circuit Court of Kentucky*, where it applied "traditional venue considerations" when the default habeas rules "became untenable." *Suri II*, 785 F. Supp. 3d at 148–49 (citing 410 U.S. 484, 493–94, 499 (1973) (weighing where "the relevant events occurred" and whether it would be "no less convenient for the respondent and the Commonwealth of Kentucky" to litigate the petitioner's claims in Kentucky)). In applying those traditional venue considerations, the district court found that the Eastern District of

28

Virginia would be the most suitable venue for four distinct reasons. First, because the Eastern District of Virginia was the jurisdiction in which Suri "resides, was arrested, and was originally detained." *Id.* at 148. Next, it recognized that forcing Suri to litigate in Louisiana or Texas, "many states away from his lawyers and family, would meaningfully deprive him of their ability to aid in his representation for the duration of these habeas proceedings." *Id.* Third, there was "no prejudice" for the Government "to litigate in the Eastern District of Virginia." *Id.* at 149. And finally, the district court found that Suri "ha[d] strong connections to this District" whereas to Texas and Louisiana, he "d[id] not," *id.* at 148–49. All those considerations squarely support the district court's refusal to transfer the case from the Eastern District of Virginia.

The Government provides two arguments in response to the district court's application of traditional venue considerations.

First, the Government cites three recent out-of-circuit district court cases to assert that "other courts faced with situations similar to Suri's have concluded that transfer would be appropriate." Opening Br. at 38. But those decisions support—rather than undermine— that the district court acted within its discretion by keeping this case in the Eastern District of Virginia.

We start with *Öztürk v. Trump*, 777 F. Supp. 3d 26 (D. Mass. 2025), and *Khalil v. Joyce*, 771 F. Supp. 3d 268 (S.D.N.Y. 2025). As here, the *Öztürk* and *Khalil* petitioners were rapidly moved from detention center to detention center, with Louisiana as the government's target jurisdiction. *Öztürk*, 777 F. Supp. 3d at 30–32; *Khalil*, 771 F. Supp. 3d at 275–77. But a fundamental difference in *Öztürk* and *Khalil* from this case is that the

29

petitioners in both cases consented to transfer, *requesting* their petitions be transferred to neighboring states. *Öztürk*, 777 F. Supp. 3d at 33, 43 (requesting to be transferred from Massachusetts to Vermont); *Khalil*, 771 F. Supp. 3d at 286–87 (requesting to be transferred from New York to New Jersey). And in both cases, the district courts *denied* the government's requests to transfer the cases across the country to Louisiana and *granted* the petitioners' requests to transfer to a neighboring state. *Öztürk*, 777 F. Supp. 3d at 43; *Khalil*, 771 F. Supp. 3d at 287. What's more, the district court in *Khalil* expressly found that forcing the petitioner to litigate in Louisiana would be prejudicial, as it would mean "litigating far from his lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place." 771 F. Supp. 3d at 287. So despite the Government's contention that these cases support discretionary transfer, these cases in fact support Virginia as the appropriate venue here. The reasoning in *Öztürk* and *Khalil* mirror the district court's reasoning as to why transferring Suri's case across the country would be unjust. *See Suri II*, 785 F. Supp. 3d at 149.

Additionally, Suri's petition was filed *before* he was booked into the Alexandria Staging Facility in Louisiana, unlike in *Öztürk* and *Khalil* where their petitions were filed *after* the petitioners were undisputably already booked in the neighboring states' detention center. 777 F. Supp. 3d at 43 (finding that "Ozturk was confined overnight in Vermont when the Petition was filed [in Massachusetts]"); 771 F. Supp. 3d at 276–77 (finding that Khalil was already booked in New Jersey when his petition was filed in New York).

The Government also relies on *Dvortsin v. Noem*, 2025 WL 1751968 (D. Colo. June 12, 2025), but that case is equally unavailing. In *Dvortsin*, the government sought to

30

transfer a habeas petition filed by a Colorado family from Colorado to Texas. *Id.* at *3. There, the district court applied the default habeas rules because it found that both the unknown custodian exception and the exception out of Justice Kennedy's concurrence in *Padilla* did not apply. *See id.* at *4–5. The district court reasoned that there was no evidence of concealment, as the detainee "likely had multiple telephone calls" after arriving at the Texas facility; the Texas facility was apparently designed to house families; and the family was only "moved once, to Texas." *Id.* at *5. And importantly, the district court found that transferring the case to Texas would be at "the convenience of [the] parties and witnesses." *Id.* at *6. Here, the factual findings were starkly different, as the district court found that it would be in the interest of justice for Suri's case to be heard in Virginia, Suri was moved to multiple detention centers, he was not allowed to contact his wife or attorney for most of the moves, and the Government's purpose in moving Suri "was to forum shop and spirit [him] away from this District before his counsel could file a petition." *Suri II*, 785 F. Supp. 3d at 146.

Second, the Government clings to dicta in Judge Bork's in chambers opinion in *Demjanjuk*, where he wrote that if it becomes "known that petitioner is held in a jurisdiction other than this one, a judge of this circuit would be divested of jurisdiction." 784 F.2d at 1116. At the outset, the Supreme Court in *Padilla* only endorsed the unknown custodian exception from *Demjanjuk*, not the entirety of the opinion. *See* 542 U.S. at 450 n.18. And *Demjanjuk*'s brief statement in dicta contains no analysis or support. If we were to follow it, it would conflict with the Supreme Court's holding in *Ex Parte Endo*, which stands for the proposition that "when the Government moves a habeas petitioner after she properly

31

files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Padilla*, 542 U.S. at 441. *Endo* also held that the "objective" of habeas relief "may be in no way impaired or defeated by the removal of the prisoner . . . from the district since the suit was begun." 323 U.S. 283, 307 (1944). Under the unknown custodian exception, Suri's petition was properly filed in the Eastern District of Virginia; the Government's behavior that would potentially strip the original district court of jurisdiction conflicts with the motivation for *Endo*'s rule.

The Government states that *Endo*'s rule does not apply here, "where [Suri]'s counsel *knew* that [he] was not detained in the Eastern District [of Virginia] *before* filing the habeas petition." Reply Br. (ECF No. 88) at 14. But this is plainly wrong and a misrepresentation of the facts. As the district court found, Suri was taken to an airport in Richmond, Virginia "[u]nbeknownst to anyone" and placed on a flight that departed to Louisiana. *Suri II*, 785 F. Supp. 3d at 136. Meanwhile, Suri's counsel was working diligently to file Suri's habeas petition that day, relying on Saleh's statement that Suri was being held at the Farmville Detention Center. *Id.* at 135–36.

Accordingly, we hold that the district court did not abuse its discretion by declining to transfer Suri's habeas petition.

### C. Jurisdiction-Stripping Statutes

Next, the Government asserts that "[e]ven if the district court had jurisdiction over Suri's habeas petition," three provisions of the INA—8 U.S.C. §§ 1252(g), 1252(b)(9), and 1252(a)(5)—"separately stripped the district [court] of jurisdiction to order relief."

Opening Br. at 41.  We disagree and hold that none of the pertinent INA provisions deprive the district court of habeas jurisdiction.

We review "the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *Velasco*, 370 F.3d at 398.

Before addressing each statutory provision, some background is necessary to understand the interplay between the INA provisions and judicial review here.  The Supreme Court has required both a " 'clear statement of congressional intent to repeal habeas jurisdiction' " and a " 'clear indication' of congressional intent . . . when a proposed [statutory] interpretation would push 'the outer limits of Congress' power.' "  *DHS v. Thuraissigiam*, 591 U.S. 103, 137 (2020) (quoting *St. Cyr*, 533 U.S. at 298–300).  There is a " 'strong presumption in favor of judicial review of administrative action,' " *id.*, and the Supreme Court instructs that we should interpret " 'statutes [to] allow judicial review . . . absent [a] clear statement."  *Kucana v. Holder*, 558 U.S. 233, 237 (2010) (first alteration in original & citation omitted).  That "presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review."  *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (quoting *Reno v. Cath. Social Servs., Inc.*, 509 U.S. 43, 64 (1993)).  As explained below, there is "no indication at all that Congress intended to strip district courts of jurisdiction over habeas challenges to unconstitutional immigration detention."  *Suri IV*, 2025 WL 1806692, at *7.  In fact, Congress' intent here aligns with the strong presumption favoring judicial review.  Congress expressly confirmed that there would be no "preclu[sion of] habeas review over challenges to detention that are independent of challenges to removal orders."  H.R. Rep.

33

No. 109-72, at 175 (2005) (Conf. Rep.).  Rather than broadly foreclosing review, Congress intended that any "eliminat[ion of] habeas review [would] only [be] over challenges to removal orders."  *Id.*

It comes as no surprise, then, that each and every time the Government has tried to invoke these *removal*-focused jurisdiction-stripping provisions to foreclose challenges to immigration *detention*, the Supreme Court has balked.  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001); *Clark v. Martinez*, 543 U.S. 371 (2005); *Jennings v. Rodriguez*, 583 U.S. 281, 292–295 (2018) (plurality); *id.* at 355 (Breyer, J., dissenting); *Nielsen v. Preap*, 586 U.S. 392, 401–02 (2019); *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021); *Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022).  This unbroken line of caselaw also accords with common sense: if a noncitizen is challenging their detention pending removal, then waiting for their removal proceedings does them no good.  They have already been detained, allegedly in violation of the Constitution.  This "absurd" reading of the INA would make such detention claims "effectively unreviewable," and the Supreme Court has repeatedly refused to embrace it.  *Jennings*, 583 U.S. at 293 (plurality).

With the presumption in favor of judicial review, Congress' intent, and Supreme Court precedent in mind, we address each INA provision in turn.

### 1. 8 U.S.C. § 1252(g)

The Government first points to § 1252(g), which provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any [noncitizen] *arising from* the decision or action by the Attorney General to [(1)] commence proceedings, [(2)] adjudicate

34

cases, or [(3)] execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added).

The Supreme Court has held that § 1252(g) is a "narrow[]" bar on judicial review that is cabined "to three discrete actions": a decision "to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. American-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)). Section 1252(g) is "directed against a particular evil: attempts to impose judicial restraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9. Since *AADC*, the Supreme Court has reaffirmed § 1252(g)'s narrow ambit, expressly "reject[ing] as 'implausible'" any interpretation of § 1252(g)'s "arising from" language that would "cover[] 'all claims arising from deportation proceedings' or impose[] 'a general jurisdictional limitation.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *AADC*, 525 U.S. at 482). Instead, the "arising from" language should be read "to refer to just those three specific actions themselves." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (citing *AADC*, 525 U.S. at 482–83).

The § 1252(g) action at issue here is the decision to "commence proceedings" against a noncitizen. The Government contends that Suri, by challenging his initial detention, is also challenging "the Attorney General's decision to commence removal proceedings against him." Opening Br. at 45. In other words, it views Suri's unlawful detention claims as "inextricably intertwined" with—and thus arising from—"the decision to commence removal proceedings." *Id.* at 45, 47.

35

We disagree for two main reasons. First, Suri's habeas claims challenging his detention are legally separate from the Government's decision to begin removal proceedings against him. And second, § 1252(g) cannot be read to reach claims that are wholly independent of the removal process.

### a. Suri's Detention Challenge is Legally Separate from the Government's Decision to Commence Removal Proceedings

At the outset, Suri's habeas petition does not challenge the Government's decision to commence removal proceedings against him. *See* J.A. 10–25; 97–129.[15] As noted above, his petition alleges that the decision to *detain* him and the conditions of his detention —as distinct from the decision to seek removal—were made in order to retaliate against him for First-Amendment protected activities and associations and to chill his speech and that of others. Suri, in other words, challenges his detention and the policy that produced that detention. *See id.* And further, the district court's order granting Suri's release on bond specifically requires Suri to "participate in his removal proceedings" as a condition of his release. *Suri III*, 2025 WL 1392143, at *1 (E.D. Va. May 14, 2025).

This distinction of *what* Suri is challenging matters, because challenges to detention proceedings do not fall within the "particular evil" § 1252(g) narrowly targets—namely, the attorney general's decision to commence removal proceedings. *AADC*, 525 U.S. at 485 n.9. Section 1252(g) notably "does not speak to detention *at all.*" *Öztürk v. Hyde*, 155

---

[15] Suri's original petition separately sought to enjoin his "targeting . . . for removal," J.A. 25, but his amended petition (the one the district court preliminarily granted below) challenged only his "targeting . . . for apprehension, detention, and transfer," not removal. J.A. 128–29.

36

F.4th 187, 208 (2d Cir. 2025) (Nathan, J., concurring with five judges in denial of en banc review).

Section 1252(g) does not speak to detention because the decision to detain a noncitizen and the decision to remove one are legally separate. Removal proceedings are commenced by the filing of an NTA with an immigration court. *See* 8 C.F.R. § 1239.1. The decision to detain is not commenced with the filing of an NTA, and may occur before or after the filing of an NTA. It follows that detention is not a necessary predicate to or consequence of the government's decision to commence removal proceedings against a noncitizen. *See Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999) (holding that a habeas petition "concern[ing] detention while the administrative process lasts . . . may be resolved without affecting pending [removal] proceedings"). Importantly, the Government was not legally required to detain Suri to adjudicate his case.[16] Indeed, the government routinely initiates removal proceedings against individuals without detaining them. *See, e.g.*, Brief for Petitioners at *8–9, *United States v. Texas*, 2022 WL 4278395 (Sep. 12,

---

[16] At oral argument, the Government represented to this court that Suri's "detention is mandatory under the foreign policy charge." Oral Argument at 00:25:58–00:26:01, *Badar Suri v. Donald Trump*, No. 25-1560 (4th Cir. argued Mar. 17, 2026), https://www.ca4.uscourts.gov/OAarchive/mp3/25-1560-20260317.mp3. We asked the Government if it was "sure of that," *id.* at 00:26:03, to which it responded that it was "80% sure" Suri's detention was mandatory, *id.* at 00:26:07. As it turns out, Suri's detention was *not* mandatory but permissive, as the Government later conceded in a 28(j) letter that the statutory source for Suri's detention was 8 U.S.C. § 1226(a). *See* ECF No. 126 at 1; *see also id.* § 1226(a) (providing that a noncitizen "*may* be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." (emphasis added)). We caution that representations to this court—particularly representations on matters as significant as whether Suri's detention was mandatory—must be correct, not "80% sure" or what counsel believes might be correct.

2022) (No. 22-58) (noting that "perennial constraints on detention capacity" prevent the Executive from detaining everyone subject to removal).

The INA's statutory framework further supports that the Government's decision to detain and its decision to remove are legally distinct. The INA treats detention and removability as separate, each governed by different provisions and justified on different grounds. *Compare* 8 U.S.C. § 1226 (detention statute) *with* 8 U.S.C. § 1227 (removability statute).

Courts also "routinely exercise jurisdiction over such [detention] challenges." *Suri IV*, 2025 WL 1806692, at *7 (citing *Castaneda v. Perry*, 95 F.4th 750, 762 (4th Cir. 2024) (exercising jurisdiction over a habeas challenge to present immigration confinement)); *Kong v. United States*, 62 F.4th 608, 620 (1st Cir. 2023) (holding that "§ 1252(g)'s jurisdictional bar for claims 'arising from' the government's decision to "execute removal orders" does not preclude jurisdiction over Kong's challenges to the legality of his detention"); *Madu v. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (holding that Madu brought a constitutional detention challenge and did not challenge the government's exercise of discretion); *Parra*, 172 F.3d at 957 (holding that Parra's claims concerned detention and that he did not request the district court to block one of the three governmental actions set out in § 1252(g)). Recently, the Second Circuit (twice) and this court in *Suri IV* rejected the government's argument that § 1252(g) precluded a district court's jurisdiction. The Second Circuit specifically held that § 1252(g) did not strip the district court of jurisdiction because the habeas petitioner's "claims of unlawful and retaliatory detention [were] independent of, and collateral to, the removal process," so the

38

petitioner's "detention [did] not arise from the government's 'commence[ment] [of] proceedings.' " *Öztürk v. Hyde*, 136 F.4th 382, 397–98 (2d Cir. 2025)); *see also Mahdawi v. Trump*, 136 F.4th 443, 449–51 (2d Cir. 2025) (same).

Accordingly, detention challenges lie outside § 1252(g)'s three narrow limits on judicial review.

The Government's insistence that *AADC* changes this outcome is misplaced. The Government claims that *AADC* is persuasive because "the Supreme Court held that a previous version of § 1252(g) precluded jurisdiction over claims similar to Suri's." *See* Opening Br. at 43 (citing 525 U.S. at 474, 487–92). We are unpersuaded for a couple of reasons.

In *AADC,* the Supreme Court held that because the respondents challenged "the Attorney General's decision to 'commence proceedings,' " Section 1252(g) "deprive[d] the federal courts of jurisdiction over respondents' claims." *Id.* at 486, 492. The Government correctly points out some similarities between *AADC* and this case, such as the *AADC* respondents' allegations that the government "was selectively enforcing immigration laws against them in violation of their First and Fifth Amendment rights." *Id.* at 474. That said, the Government fails to note a key difference: the *AADC* petitioners sought "to prevent the initiation of deportation proceedings," *id.* at 474,—i.e., the "commence[ment] [of removal] proceedings," *id.* at 482. And further, the *AADC* petitioners' habeas claims were not like Suri's because they "did not sound in unlawful

39

detention at all"—another reason why *AADC* is "of no help to the [G]overnment." *Suri IV*, 2025 WL 1806692, at *8 (quoting *Öztürk*, 136 F.4th at 398).[17]

### b. Section 1252(g) Does Not Reach Suri's Detention Claims

The Government urges us to take a broad reading of § 1252(g), contending that Suri's detention claims "arise from" the decision to commence removal proceedings because resolving Suri's unlawful detention claims on free speech retaliation grounds "may [also] be determinative" in Suri's removability proceedings. *See* Opening Br. at 52–53.

---

[17] Nor do we find the Government's use of *Gupta v. McGahey*, 709 F.3d 1062 (11th Cir. 2013) or *Alvarez v. U.S. ICE*, 818 F.3d 1194 (11th Cir. 2016) persuasive. The Eleventh Circuit in *Gupta* held that § 1252(g) barred the plaintiff from bringing certain claims under *Bivens* because the challenged "actions were taken in an effort to secure Gupta and prevent potential danger to Disney World while he awaited a determination of his removal." 709 F.3d at 1065. And in *Alvarez*, the Eleventh Circuit held that while § 1252(g) did not strip the court of jurisdiction, the plaintiff lacked an available remedy under *Bivens*. 818 F.3d at 1205, 1212–13. As a preliminary matter, *Alvarez*'s holding seems to cut against the Government. *See id.* at 1204–05. Further, both cases are appeals of *Bivens* actions, where ICE officials were sued after the plaintiffs were released from detention, rather than here, where Suri filed a habeas petition for current unlawful detention. *Gupta*, 709 F.3d at 1063–64; *Alvarez*, 818 F.3d at 1195–96. Neither decision demonstrates that § 1252(g) divests the district court of jurisdiction to adjudicate Suri's habeas detention challenge.

To the extent *Gupta* or *Alvarez* could be read to foreclose habeas review of unlawful immigration detention, that reading cannot be reconciled with *AADC*'s narrow construction of § 1252(g)'s "arising from" language, 525 U.S. at 482, or *Jennings*' reaffirmation that § 1252(g) targets only the three discrete acts. *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) ("[W]e read the language [in § 1252(g)] to refer to just those three specific actions themselves." (citing *AADC*, 525 U.S. at 482–83)). Courts have accordingly either confined *Alvarez* and *Gupta* to their facts or refused to follow them outright as they run headlong into Supreme Court precedent. *Gonzalez Cortes v. Holt*, 2025 WL 4666433, at *5 n.6 (W.D. Okla. Nov. 5, 2025) (collecting cases); *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1144 (D. Minn. 2025); *Rivero v. Mina*, 817 F. Supp. 3d 1278, 1283 (M.D. Fla. 2026); *Villa v. Normand*, 2025 WL 3188406, at *4–5 (S.D. Ga. Nov. 14, 2025).

"But overlap, *even substantial substantive overlap*, does not make one claim arise out of the other, or necessitate that one claim controls the outcome of the other." *Öztürk*, 136 F.4th at 400 (emphasis added). And regardless, the Government has yet to "point[] to a single case holding that § 1252(g) strips jurisdiction over" a First Amendment retaliation challenge to unlawful detention. *Suri IV*, 2025 WL 1806692, at *8. We are persuaded by the Second Circuit's conclusion in *Öztürk*'s that "jurisdiction will turn" not on the legal basis of the claim, but instead "on the substance of the relief that a plaintiff is seeking," i.e., relief from detention versus relief from removal. 136 F.4th at 400 (quoting *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011)) (addressing a similar argument as to review under 1252(b)(9)). *Öztürk*'s explanation of this distinction makes practical sense. While removal challenges "can be heard in a petition for review after an order of removal has been entered by an immigration judge and affirmed by the Board of Immigration Appeals," *id.*, constitutional challenges (like the ones raised by Suri) have no place and cannot be heard in removal proceedings. *See Matter of C-*, 20 I. & N. Dec. 529, 532 (BIA 1992) (noting that "it is settled that the immigration judge and this Board lack jurisdiction to rule upon the constitutionality of the Act and the regulations").

What's more, Suri raises due process challenges to his detention—claims that are wholly independent of his First Amendment retaliation claim. *See* J.A. 123–27; s*ee also Mahdawi*, 136 F.4th at 450 n.3 (holding that "[s]o long as part of his challenge to his detention falls outside of § 1252(g), his petition survives, as does the district court's authority to order his release"). Accepting the Government's position would mean that, by simply asserting a First Amendment retaliation claim in his removal proceedings,

41

§ 1252(g) would foreclose Suri from bringing: (1) any related detention claims, including his First Amendment retaliation detention claim, as well as (2) any independent claims such as his due process claims or challenges to the conditions or duration of his present confinement. In other words, if a petitioner files a habeas petition that includes multiple detention claims and just *one* of those claims has some substantive overlap with his separate ongoing removal proceedings, his entire detention petition would be barred by § 1252(g). That result would be "staggering," *Jennings*, 583 U.S. at 293, and would "eviscerate habeas corpus for noncitizens whenever the government detains them and also seeks to remove them," *Öztürk*, 155 F.4th at 208 (Nathan, J., concurring in denial of en banc). Any potential risk of "systemic damage" "from allowing parallel adjudications," *Suri IV*, 2025 WL 1806692, at *12 (Wilkinson, J., dissenting), is far outweighed by the deprivation of liberties held by all who reside in the United States.[18]

Time and time again, the Supreme Court has stressed that § 1252(g) is a "narrow" bar to judicial review on three very specific actions. *Regents*, 591 U.S. at 19; *see also Jennings*, 583 U.S. at 294 (citing *AADC*, 525 U.S. at 482–83). Yet the Government asks

---

[18] The dissent further contends that our holding today has created a "loophole" for parallel proceedings, which would require the government to litigate a noncitizen's removability in two forums. Diss. Op. at 84, 85. But that is not true. Under § 1252(g), regardless of whether there is an order of removal, jurisdiction would be stripped if a petitioner, explicitly or in substance, challenged the government's decision to commence removal proceedings. That provision thus forecloses the "conclusory" detention challenges that the dissent fears: the argument that the noncitizen "cannot be detained pending removal *because* [he] cannot be removed." *Id.* (internal quotation marks omitted). Suri's detention challenge does not fit that mold. As we have explained, he brings challenges to the Government's decision to detain him, and the conditions of his detention, that are independent of and do not turn on the decision to commence removal proceedings against him.

us to wave away explicit Supreme Court commands by giving one of § 1252(g)'s discrete actions a new broad and unnatural reading.  We refuse to do so.

## 2. 8 U.S.C. § 1252(b)(9)

We turn next to 8 U.S.C. § 1252(b)(9), which provides that, "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove [a noncitizen] . . . shall be available only in judicial review of a final order."  But § 1252(b)(9) cannot be read in isolation.  Section 1252(b)(9) is a subsection within § 1252(b), which is titled "Requirements for review of orders of removal."  *Id.* § 1252(b). Section 1252(b) sets out that the "following requirements apply" "[w]ith respect to review of an order of removal under subsection (a)(1)."  *Id.* § 1252(b).  So, the provisions that follow § 1252(b)—§ 1252(b)(1) through (9)—are requirements that apply only to the review of an order of removal.

Here, Suri is not seeking judicial review of an order of removal.  Thus, § 1252(b)(9) (or any of § 1252(b)'s subsections) does not apply.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (determining a statute's meaning requires reviewing "the specific context in which that language is used, and *the broader context of the statute as a whole*" (emphasis added)).  This straightforward reading is well established, as this court has twice held that § 1252(b)(9) applies only with respect to review of an order of removal.  In *Casa De Maryland v. United States Department of Homeland Security*, this court held that § 1252(b)(9) "doesn't help the government . . . because it 'applies *only* with respect to review of an *order of removal* under [8 U.S.C. § 1252(a)(1)].' "  924 F.3d 684, 697 (4th

43

Cir. 2019) (alteration in original).[19]  And in *Miranda v. Garland*, the court again held that § 1252(b)(9) does not preclude jurisdiction over a challenge to the legality of detention and bond procedures.  34 F.4th 338, 353 n.6 (4th Cir. 2022).  Multiple circuit courts have also read § 1252(b)(9) to only apply when an order of removal is at issue[20], as have more recent

---

[19] The dissent contends that our precedent in *Casa de Maryland* does not, in fact, confine § 1252(b)(9) to review of final orders of removal.  Instead, it argues that *Casa de Maryland* holds only that § 1252(b)(9) does not apply when the government has not even commenced removal proceedings against the plaintiff.  Diss. Op. at 75.  We read *Casa de Maryland* differently.  There, the government insisted that § 1252(b)(9) barred review of the administration's decision rescinding the Deferred Action for Childhood Arrivals program not because it thought removal proceedings had commenced, but because the Executive's decision to defer action on a removal is a "question[] of law or fact arising from any action taken to remove a[] [noncitizen]" that could be brought, if anywhere, only in the petition-for-review process.  United States Opening and Response Br., *Casa de Maryland v. DHS*, No. 18-1521(L) (4th Cir. Aug. 1, 2018), ECF No. 33, at 28–30.  Under the dissent's reading of the statute—like the government's there—review in that case would thus have been "with respect to review of an order of removal," 8 U.S.C. § 1252(b)(9), whether or not removal proceedings had commenced, because it necessarily "relat[ed] to" such a (potential) order.  Diss. Op. at 73–74.  But *Casa de Maryland* rejected that expansive reading of the statute.  And it did so, by its terms, not based on whether removal proceedings had commenced—which would not have resolved the dispute as the government presented it, or as anyone in that case or this one construes the statute—but rather whether there was an actual "order of removal" at issue.  *Casa de Maryland*, 924 F.3d at 687.

[20] *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006) (holding that "[b]y its terms, [§ 1252(b)(9)] does not apply to federal habeas corpus petitions that do not involve final orders of removal"); *Singh v. Gonzalez*, 499 F.3d 969, 978 (9th Cir. 2007) (explaining that "[b]y virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal"); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006) (holding that § 1252(b)(9) does not apply to cases that do not "involve review of an order of removal").

decisions addressing challenges analogous to the one here[21]. This alone could end our § 1252(b)(9) analysis.

Taking a different tack, our dissenting colleague argues that the legislative history alters the text's apparent plain meaning. Diss. Op. at 65–67. While we appreciate the dissent's reliance on legislative history, we disagree with the dissent's reading and its ability to overcome the force of the statutory text and our precedent. Quoting from a House Conference Report, the dissent rightly notes that Congress amended 8 U.S.C. § 1252(b)(9) in the REAL ID Act of 2005 to overturn the main holding in *Immigration & Naturalization Services v. St. Cyr*, 533 U.S. 289 (2001). But that fact does little to aid the dissent's argument, because Congress' essential problem with *St. Cyr* was that it allowed a district court, sitting in habeas, to review certain noncitizens' final orders of removal issued by the BIA. H.R. Rep. No. 109-72, at 173 (2005); *see St. Cyr*, 533 U.S. at 311–13. And what Congress did in response was to make clearer that such orders of removal may not be reviewed in habeas proceedings. *See* REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, 311 (2005). To be sure, the Conference Report also discussed concerns with review of issues that arise in removal proceedings, even before a final order of removal issues. But it did *nothing* in the REAL ID Act to address that issue. Quite to the contrary, the Conference Report makes crystal clear that its revisions were intended "to eliminate habeas

---

[21] *See Suri IV*, 2025 WL 1806692, at *9 ("There is no such order here, so these provisions don't apply."); *Öztürk v. Hyde*, 136 F.4th 382, 399 (2d Cir. 2025) (rejecting the government's argument because "[n]o such order of removal is at issue here"); *Mahdawi*, 136 F.4th 443, 451–52 (2d Cir. 2025) (same).

review *only over challenges to removal orders*," and not to "preclude habeas review over challenges to detention that are independent of challenges to removal orders." H.R. Rep. No. 109-72, at 175 (emphasis added). That legislative history cannot remotely bear the weight our dissenting colleague asks it to. In fact, it supports Suri's reading of the text.

The Government contends that *Jennings v. Rodriguez*, 583 U.S. 281 (2018) and *Khalil v. President, U.S.*, 164 F.4th 259 (3d Cir. 2026), alter the plain reading of § 1252(b)(9) adopted by this court and many others. We disagree.

### a. *Jennings v. Rodriguez*, 583 U.S. 281 (2018)

In *Jennings*, noncitizens in ongoing removal proceedings brought habeas corpus petitions that challenged the length of their detention. 583 U.S. at 290–91. There, six Justices agreed that § 1252(b)(9) did not strip federal courts of jurisdiction over the habeas petitions. *Id.* at 294–95 (Alito, J., plurality opinion, joined by Chief Justice Roberts and Justice Kennedy) ("Under these circumstances § 1252(b)(9) does not present a jurisdictional bar."); *id.* at 355 (Breyer, J., dissenting opinion, joined by Justice Ginsburg and Justice Sotomayor) ("Jurisdiction also is unaffected by 8 U.S.C. § 1252(b)(9)."). Those Justices did not agree on the exact scope of § 1252(b)(9)—just that § 1252(b)(9) did not strip jurisdiction over the *Jennings* detainees' habeas petitions.

In times where the Supreme Court cannot agree on a single rationale for a decision, courts must engage in a *Marks* analysis. *See Marks v. United States*, 430 U.S. 188, 193 (1977). *Marks* provides that the holding of a divided Supreme Court "may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Id.* (cleaned up). "This analysis must account for any dissenting opinions that

46

were necessary to the holding with respect to a given legal question." *Khalil*, 164 F.4th at 283 (Freeman, J., dissenting) (citing *United States v. Jacobsen*, 466 U.S. 109, 116–17 & n.12 (1984)).  Much of the disagreement on § 1252(b)(9) stems from what *Jennings* actually holds—and in turn, *when* § 1252(b)(9) is understood to strip jurisdiction.  Below, we apply *Marks* to identify the narrowest grounds of *Jennings*' jurisdictional implications.

The relevant portion of the *Jennings*' plurality opinion is Part II (583 U.S. at 292–95), where Justice Alito discusses whether the Court had "jurisdiction to entertain respondents' claims" under § 1252(b)(9), *id.* at 292.  Justice Alito held that § 1252(b)(9) did "not present a jurisdictional bar," but found it "not necessary . . . to attempt to provide a comprehensive interpretation" of § 1252(b)(9).  *Id.* at 294–95.  Instead, Justice Alito made a case-specific decision, writing that:

> For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar.

*Id.* at 294–95.

Justice Breyer, writing separately, agreed with Justice Alito that jurisdiction was unaffected by § 1252(b)(9).  To Justice Breyer, § 1252(b)(9) would have no effect outside of challenges to orders of removal.  *Jennings*, 583 U.S. at 355 (Breyer, J., dissenting).  Justice Thomas, however, disagreed with Justice Alito and Justice Breyer's opinions on § 1252(b)(9).  In his view, because "a majority of the Court ha[d] decided to exercise jurisdiction," the judgment "should have [been] vacated" "[b]ecause § 1252(b)(9) deprives

47

courts of jurisdiction."  *Id.* at 326 (Thomas, J., concurring in part, joined by Justice Gorsuch).

Thus, a majority agreed that § 1252(b)(9) did not strip jurisdiction over the *Jennings* detainees' habeas petitions.  While Justice Alito found it unnecessary to comprehensively interpret § 1252(b)(9), whereas Justice Breyer did, together, their opinions garnered a majority that concluded § 1252(b)(9) did not "present a jurisdictional bar."  *Id.* at 295 (Alito, J., plurality opinion); *see also id.* at 355 (Breyer, J., dissenting in part).

Having identified the "position taken by those Members who concurred in the [§ 1252(b)(9)] judgment," we turn to determining the "narrowest grounds" as required by *Marks*.  430 U.S. at 193.  Considering both Justice Alito and Justice Breyer's opinions, Justice Alito's opinion is the narrower holding under *Marks* because it adopts a case-specific application of § 1252(b)(9), rather than adopting an exact interpretation.

So contrary to the Government's contention, the *Marks* holding in *Jennings* does not abrogate or overrule our precedent interpreting § 1252(b)(9) because it deliberately declined to "provide a comprehensive interpretation [of § 1252(b)(9)]."  583 U.S. at 294.  Six Justices in *Jennings* agreed that whatever the exact scope of § 1252(b)(9) may be, it did not strip jurisdiction over the *Jennings* detainees' habeas petitions.  A case-specific holding that deliberately declines to say what § 1252(b)(9) means cannot be taken to overrule this court's precedent saying what it does mean.[22]  Accordingly, *Casa De*

---

[22] Put another way, the *Jennings* plurality did not decide—as the dissent and Government insist—that a challenge to "the decision to detain [petitioners] in the first place" would be barred.  583 U.S. at 294; *see* Diss. Op. at 76.  It merely decided the inverse: (Continued)

*Maryland* and *Miranda* continue to guide our analysis. And we could, again, end our analysis on § 1252(b)(9) here.

But even if we treated the *Marks* holding in *Jennings* as having abrogated *Casa De Maryland* and *Miranda*, applying that case-specific holding to the facts here would yield the same result. Justice Alito held that irrespective of § 1252(b)(9)'s precise scope, it "does not present a jurisdictional bar" when a petitioner is not seeking review of: (1) "an order of removal"; (2) "the decision . . . to seek removal"; or (3) "the process by which . . . removability will be determined." *Regents*, 591 U.S. at 19 (quoting *Jennings*, 583 U.S. at 293, 294).[23] The pertinent question is "whether the legal questions" arise from an action taken to remove a noncitizen—not "whether *detention* is an action taken to remove [a noncitizen]." *Jennings*, 583 U.S. at 295 n.3. Here, Suri is not challenging Justice Alito's first or third listed characteristic. He does not request review of an order of removal or any part of the process by which his removability will be determined.

---

that a claim that did *not* constitute such a challenge was *not* barred. *See Khalil*, 164 F.4th at 284 (Freeman, J., dissenting). The Government's reliance on *Jennings* thus rests on a basic logical fallacy and cannot overcome the force of this circuit's binding precedent.

[23] The *Jennings* plurality opinion's reasoning on § 1252(b)(9) was reaffirmed and applied by a majority of the Supreme Court in *Regents*. *See* 591 U.S. at 19 (quoting *Jennings*, 583 U.S. at 294–95 (plurality opinion), and citing *id.* at 355 (Breyer, J., dissenting)). We note that *Regents*' quotation of the critical language from *Jennings* omitted any reference to a "decision to detain," and that *Regents* favorably cited Justice Breyer's *Jennings* dissent and its narrow construal of § 1252(b)(9). *Öztürk*, 155 F.4th at 209 (Nathan, J., concurring in the denial of rehearing en banc). Further, *Regents* expressly held that § 1252(b)(9) "is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Id.*

49

Further, Suri's detention claims regarding due process, *see* J.A. 123–26, are independent from and do not implicate the second listed characteristic: the Government's " 'decision . . . to seek removal.' " *Regents*, 591 U.S. at 19 (ellipsis in original) (quoting *Jennings*, 583 U.S. at 294). Specifically, Suri alleges that the Government has not shown that "a husband to a U.S. citizen, a father of three young children, and with no criminal history [] needs to be detained." J.A. 125. Suri seeks relief from a "punitive" detention that bore "no 'reasonable relation' to any governmental purpose," *id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)), such as "preventing flight," or "protecting the community." *Zadvydas*, 533 U.S. at 690; *see also id.* at 690–91 (indicating that civil detention violates due process if it is punitive in its intent or excessive in relation to the goals of appearance of noncitizens at immigration proceedings and preventing danger to the community). These claims are specific to his detention. Further, the dissent is wrong to say that cases like Suri's "will grind removal proceedings to a halt." Diss. Op. at 64; *see also id.* at 85. Suri's custody release does not negate any order of removal that may ultimately be issued against him, and he is specifically required to "participate in his removal proceedings" as a condition of his release. *Suri III*, 2025 WL 1392143, at *1. And considering Justice Alito's inquiry on *where* the legal questions arise from, it is evident that Suri's due process claims arise from whether his detention was justified, not the Government's decision to seek removal.

To the extent there is substantive overlap in the First Amendment legal questions that are to be answered in his habeas and removal proceedings, those questions still arise from two separate governmental actions. The Government's act of detaining Suri to

50

prevent speech with which it disagrees is "a violation of the Constitution—quite separate from the removal procedures followed by immigration courts." *Öztürk*, 136 F.4th at 399.[24] Suri's detainment raises constitutional questions—legal questions that are to be decided here, in federal court. And for the reasons stated in our discussion of § 1252(g) in Section III.C.1.b., the same is still true: "overlap, even substantive overlap, does not make one claim arise out of the other, or necessitate that one claim controls the outcome of the other." *Öztürk*, 136 F.4th at 400. "The Constitution does not yield to administrative convenience, and due process is not suspended merely because two courts may be asked similar questions." *Suri IV*, 2025 WL 1806692, at *1 n.1. Whatever concern about piecemeal litigation in detention and removal proceedings—where petitioners may potentially be granted two chances to argue their claims—is no match for the far more troubling reality of petitioners who are afforded no opportunity for a hearing at all.

The distinction mentioned in *Öztürk* is practically significant because immigration judges and the Board of Immigration Appeals (BIA) lack jurisdiction to decide constitutional challenges. Immigration judges handling analogous adjacent removal proceedings have already found that they lack jurisdiction to do so. *See Khalil*, 164 F.4th

---

[24] Judge Krause, dissenting from the Third Circuit's denial of rehearing en banc in *Khalil v. Trump*, questioned that if courts lack jurisdiction to hear detention-specific claims with some constitutional implications, "what principled reason would [the court] have to review habeas claims alleging detention on account of race, religion, or other protected grounds, so long as the noncitizen is in removal proceedings?" 176 F.4th 295, 299 n.6 (3d Cir. 2026) (Krause, J., dissenting from denial of rehearing en banc). We find that concern and observation compelling—and the implication unavoidable: under the Government's position, such claims would be effectively foreclosed altogether.

51

at 291 (Freeman, J., dissenting). If an immigration judge cannot develop a factual record on constitutional claims, then a court of appeals reviewing a final order of removal will have a deficient factual record before it. And courts of appeals are obligated to decide such petitions for review "only on the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A). The Government's stance would effectively ensure that, in cases like this, courts of appeals would have no factual record to assess its conduct at all.

The Government's stance on § 1252(b)(9) yields the exact type of results that the Supreme Court would find "absurd." *Jennings*, 583 U.S. at 293. The Government asserts that judicial review would be proper once a final order of removal has been issued. *See* Reply Br. at 34. But here, no final order of removal has been issued in Suri's adjacent removal proceedings. Indeed, a "final order of removal might never come." *Khalil*, 164 F.4th at 291 (Freeman, J., dissenting) (citing *E.O.H.C. v. Sec'y, U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 186 (3d Cir. 2020)). Further, Suri's "core argument is that his free speech and due process rights are being violated, *now*." *Mahdawi*, 136 F.4th at 452. As was the case in *Jennings*, "[b]y the time a final order of removal [would be] eventually entered, the allegedly excessive detention would have already taken place." 583 U.S. at 293. Even if Suri prevails in his removal proceedings, the Government's reading of § 1252(b)(9) would leave him with no recourse for his unlawful detention.

Accordingly, we decline to interpret § 1252(b)(9) in a manner that would deprive Suri "of any meaningful chance for judicial review." *Id.*

### b. *Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026)

The Third Circuit departed from both of the Second Circuit's decisions on stay motions and this court in *Suri IV* because it read *Jennings*' analysis on § 1252(b)(9) differently. *See Khalil*, 164 F.4th at 274, 277–79. We respectfully disagree with its interpretation.[25]

To begin, the *Khalil* majority entirely omits any mention of the Supreme Court's strong default presumption that absent a clear statement, statutes should be interpreted to allow judicial review of administrative action. *See Thuraissigiam*, 591 U.S. at 137; *see also Kucana*, 558 U.S. at 237. That presumption can only be overcome "by clear and

---

[25] On July 21, 2026, the Second Circuit held that § 1252(b)(9) deprived a district court of jurisdiction over a similar habeas petition. *See Mahdawi v. Trump* (*Mahdawi II*), 2026 WL 2090981 (2d Cir. July 21, 2026). *Mahdawi II* largely reiterates the Third Circuit's reasoning in *Khalil*. Thus, for the reasons set forth in our discussion of § 1252(b)(9), and those developed below through distinguishing *Khalil*, we remain unpersuaded that § 1252(b)(9) strips jurisdiction over Suri's habeas petition that challenges the constitutionality of his detention.

But there is one particular point worth addressing. The Second Circuit stated that Mahdawi was not deprived of any meaningful opportunity for review of his detention because, per the Government's representation in that case, he "could have sought release pending his removal through the administrative process" pursuant to *Matter of Joseph*, 22 I. & N. Dec. 799 (B.I.A. 1999). *Mahdawi II*, 2026 WL 2090981, at *11. But the Government has made no such representation before this court. In fact, the Government here said the opposite—that "once the decision to detain pending removal proceedings was made, an immigration judge has no authority to redetermine that custody decision." ECF No. 126 at 1. And even if such a hearing were available, we see no authority (besides, again, Government representations in other courts that were not made here) indicating that Suri could use such a hearing to challenge the constitutionality of his detention or removal. Still, it is telling that the Second Circuit did not embrace our dissenting colleague's position that Suri would have no way to bring constitutional challenges to his detention and seek release pending his removal, or that the Constitution would permit such an outcome.

convincing evidence of congressional intent to preclude judicial review." *Guerrero-Lasprilla*, 589 U.S. at 229 (cleaned up). *Khalil*'s failure to grapple with that presumption substantially undermines its reasoning overall. *See Khalil v. Trump*, 176 F.4th 295, 297 (3d Cir. 2026) (Krause, J., dissenting from denial of rehearing en banc) (writing that the panel majority "jettisons" the default presumption of judicial review and gives § 1252(b)(9) "its most expansive scope").

With that strong presumption left unaddressed, *Khalil* turned to *Jennings*. *Khalil* held that under *Marks*, the *Jennings* plurality opinion "strongly suggested that § 1252(b)(9) *would* strip jurisdiction over claims with closer connections, like 'challeng[es] [to] the decision to detain them in the first place or to seek removal,' challenges to 'any part of the process by which . . . removability will be determined,' and requests to 'review . . . an order of removal.' " 164 F.4th at 277 (quoting *Jennings*, 583 U.S. at 294). And based off that "strong implication," *id.* at 278, the Third Circuit concluded that *Jennings* abrogated its precedent, *Chehazeh v. Att'y Gen.*, 666 F.3d 118 (3d Cir. 2012), which is analogous to our circuit's precedent *Casa De Maryland* and *Miranda*.

But, for the reasons we just explained, the Third Circuit overreads the *Marks* holding of *Jennings*. Again, under *Marks*, we look to the position of the concurring Justices on the narrowest grounds. *See* 430 U.S. at 193. Justice Alito expressly declined "to provide a comprehensive interpretation" of § 1252(b)(9). *Jennings*, 583 U.S. at 294. Thus, it is an overstatement to understand the language in *Jennings* as "strongly suggest[ing] that § 1252(b)(9) *would* strip jurisdiction over claims with closer connections," *Khalil*, 164 F.4th at 277, when it declined to provide an interpretation of the statute, opting instead for

54

a case-specific holding "[f]or present purposes." *See Jennings*, 583 U.S. at 294.  The Third Circuit thus "read[] Justice Alito's opinion to say more" than it does.  *Khalil*, 164 F.4th at 284 (Freeman, J., dissenting).  In light of *Jennings'* express refusal to provide a comprehensive interpretation of § 1252(b)(9), it cannot be read to require us to overrule our precedent—something we "do not lightly" do.  *Hulburt v. Black*, 925 F.3d 154, 161 (4th Cir. 2019) (en banc).

Additionally, even though Justice Alito did not adopt Justice Breyer's interpretation of § 1252(b)(9) (which also accords with *Casa De Maryland*, *Miranda*, and *Chehazeh*), he also did not reject it; he simply declined to get to the merits of a § 1252(b)(9) interpretation.  *See Jennings*, 583 U.S. at 294.  This avoidance is notable, given that Justice Alito *did* directly engage with Justice Thomas' opposing view on § 1252(b)(9).  *See id.* at 295 n.3 (holding that "[w]e do not follow [Justice Thomas'] logic.").

What's more, the *Khalil* majority's *Marks* holding "is incompatible with the views of the remaining five Justices who participated in *Jennings*."  *Khalil*, 164 F.4th at 284 (Freeman, J., dissenting).  Six Justices agreed that § 1252(b)(9) did not strip jurisdiction over the *Jennings* detainees' habeas petitions.  *Jennings*, 583 U.S. at 294–95 (plurality opinion), and *id.* at 355 (Breyer, J., dissenting).  As mentioned above, Justice Thomas recognized that he was in the minority on the jurisdictional question, and he joined only the portions of Justice Alito's opinion that addressed the merits of the claims.  *Id.* at 314 (Thomas, J., concurring in part) ("But because a majority of the Court believes we have jurisdiction, and I agree with the Court's resolution of the merits, I join Part I and Parts III-VI of the Court's opinion.").  And beyond that, *Khalil*'s reading of *Jennings* seems

55

incompatible with the Supreme Court's characterization of *Jennings* two years later. *Compare Khalil*, 164 F.4th at 277 (holding that the "plurality *strongly suggested that* § 1252(b)(9) would strip jurisdiction over" "challenges to the decision to detain them in the first place or to seek removal," "challenges to 'any part of the process by which removability will be determined,' and requests to 'review an order of removal'" (emphasis added) (cleaned up)) *with Regents*, 591 U.S. at 19 ("§ 1252(b)(9) does not present a jurisdictional bar where those bringing suit 'are not asking for review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be determined.'" (cleaned up)).  Accordingly, we decline to follow *Khalil*'s reading of *Jennings* and decline to overturn our precedent limiting the application of § 1252(b)(9) to review of final orders of removal.

We also remain unpersuaded by the other arguments the Third Circuit embraced in *Khalil*.  Even if § 1252(b)(9) were not limited to review of final orders of removal, we disagree that it would preclude judicial review here because some of Suri's detention claims raise "legal questions" that may also arise in his removal proceedings. *Khalil*, 164 F.4th at 275.  Suri's First Amendment challenges to his detention are distinct from his First Amendment challenges to his removal; whether the Government has chosen to *detain* Suri to punish his speech and associations and to chill and deter future speech, and whether it constitutionally may do so, are different questions from whether the Government has and may seek to *remove* Suri because of his speech and associations.  Suri is not arguing that he may not be detained pending removal because he may not be removed. *See* Diss. Op. at 85.  His argument is that even if he *can* be removed, the decision to detain him pending

56

removal is independently constitutionally flawed. *See, e.g.*, J.A. 124. Moreover, Suri also raises challenges to his conditions of confinement and restrictions on his speech and religious practice in detention that are entirely unrelated to any legal claim he might advance in removal proceedings. We thus depart from the Third Circuit's suggestion that Suri's detention challenges necessarily "rise[] or fall[] with" his removal challenges. *Khalil*, 164 F.4th at 277.

The Third Circuit also agreed with our colleague Judge Wilkinson that challenging unconstitutional immigration detention in a habeas court " 'circumvent[s] the usual immigration process' "—and thereby both disregards Congress' desire for streamlined, efficient immigration proceedings and risks conflicting orders from different tribunals. *Khalil*, 164 F.4th at 279 (quoting *Suri IV*, 2025 WL 1806692, at *10 (Wilkinson, J., dissenting)). We are not convinced that postponing Suri's challenges to his allegedly unconstitutional detention—"cramming judicial review of those questions into the review of" a final order of removal, assuming one ever issues, *Jennings*, 583 U.S. at 293—would do much for administrative efficiency. As mentioned earlier, and as the Third Circuit acknowledged, immigration courts typically cannot hear constitutional claims of the kind Suri brings. *Khalil*, 164 F.4th at 280–81. So during administrative removal proceedings— which, as far as the record reflects, are still pending in Suri's case after more than a year— there is no risk of duplicative proceedings or conflicting orders on Suri's constitutional challenge. And while courts of appeals on a petition for review of a final order of removal may hear such constitutional claims, *id.*, they cannot engage in the fact-finding that claims of this kind will often require—and must instead remand to a different district court or rely

57

on some other, unspecified special "mechanism" for factfinding, *id.* at 280.  That is hardly a model of streamlined administrative efficiency.  And § 1252(b)(9)'s text does not command it.  Rather, § 1252(b)(9) reasonably confines "questions of law and fact" "arising from" removal to removal proceedings in immigration court and petitions for review therefrom, and it leaves the doors of habeas courts open to questions of law and fact arising from detention.

Finally, we disagree with the Third Circuit's suggestion that barring Suri, Khalil, and others like them from challenging their detention by way of habeas presents no constitutional concerns because it merely "delay[s]" judicial review (until review of final orders of removal) and does not entirely "foreclose" it.  *Id.* at 275–76, 279.  It is true, as the Third Circuit emphasized, that defendants must exhaust the direct appeal process before petitioning a district court in habeas.  *Id.* at 275 (citing 28 U.S.C. § 2254(b)(1)(A)).  But that is not the same thing at all.  A prisoner challenging his criminal conviction has already been found guilty by a neutral tribunal, after a process replete with constitutional safeguards and protections.  Suri, by contrast, was picked up on the street by masked ICE agents, and no court or other tribunal—apart from the district court whose jurisdiction the Government rejects—has tested the alleged grounds for his detention or heard his constitutional challenges.  That difference matters.  *See, e.g.*, *Rasul*, 542 U.S. at 476.

Moreover, we think the Third Circuit failed to give the appropriate weight to the "delay" in question.  Suri's claim is that his detention pending removal is itself unconstitutional.  Contrary to the view of the Third Circuit, *Khalil*, 164 F.4th at 274, that is a "now or never" injury; if it is not redressed until after removal proceedings, then it

cannot be redressed at all. Put differently, because Suri's injury is "here-and-now," and any ruling on his detention claims during the petition for review "would come too late to be meaningful," he has the right to have those detention claims heard now. *Cf. Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191–92 (2023); *see Khalil*, 164 F.4th at 286 (Freeman, J., dissenting) ("[T]o assess whether a claim is now-or-never, we ask whether a court of appeals can meaningfully redress the alleged injury when that court reviews a final order of removal. If not, the noncitizen need not wait for the final order to seek redress.").

### 3. 8 U.S.C. § 1252(a)(5)

The Government's final provision is § 1252(a)(5), which provides that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal." The Government argues that like § 1252(b)(9), § 1252(a)(5) "channel[s] all challenges to removal proceedings into the federal circuit courts under the petition for review process." Opening Br. at 54. But for the same reasons stated in Section III.C.2., § 1252(a)(5) does not bar the district court's review of Suri's habeas petition. It only applies to an order of removal, and no order of removal is at issue here.

\*      \*      \*

Accordingly, we reject the Government's contention that §§ 1252(g), (b)(9), or (a)(5) stripped the district court of jurisdiction to hear Suri's habeas petition.

### D. All Writs Act

Lastly, the district court ordered that Suri not "be removed from the United States unless and until the Court issues a contrary order." *Suri I*, 2025 WL 914757, at \*1. It did

59

so pursuant to its "authority to preserve its jurisdiction under the All Writs Act." *Id.* The Government contends that the district court's use of the AWA was "overbroad." Opening Br. at 63. The Government is wrong.

We review the district court's entry of injunction under the AWA for abuse of discretion. *See In re March*, 988 F.2d 498, 500 (4th Cir. 1993).

The AWA provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court "consistently has construed the All Writs Act to authorize a federal court 'to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in the exercise of jurisdiction otherwise obtained.' " *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985) (ellipsis in original) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977)). The Government first asserts that "the district court offered no reason for its assertion that the order was necessary to preserve its jurisdiction." Opening Br. at 63. But that argument is quickly disposed of by just looking at the statute's text: a court "may issue all writs necessary *or appropriate* in aid of their respective jurisdictions." *Id.* § 1651(a) (emphasis added).

Further, the Supreme Court has stated that courts have an "inherent authority to protect [its] proceedings," *Degen v. United States*, 517 U.S. 820, 823 (1996), to "meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944). The district court would have been unable

to preserve its jurisdiction and "protect its proceedings" as the Government has already taken the position in other cases that a court would lack jurisdiction over "already-removed" noncitizen plaintiffs. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 391 (D. Mass. 2025) (acknowledging DHS' argument "that this [c]ourt has no jurisdiction over already-removed [non-citizens]"). But for the district court's March 20 order, Suri "may well have been deported without the reasonable notice and opportunity for judicial review that 'all nine Justices agree[]' is due." *Suri IV*, 2025 WL 1806692, at *5 (quoting *A.A.R.P.*, 605 U.S. at 95); *see also id.* (noting that the Government "doesn't contest the district court's finding that it apparently intended to deport Suri on March 21"). To preserve the status quo, the district court did not abuse its discretion by invoking its authority under the AWA. *See F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (holding that judicial power to preserve the court's jurisdiction or maintain status quo " 'has been deemed merely incidental to the courts' jurisdiction to review final agency action' " (quoting *Arrow Transp. Co. v. S. Ry. Co.*, 372 U.S. 658, 671, n.22 (1963))).

Next, the Government contends that the district court's order barring removal is "overbroad" because it lacked a "nexus" or "reasonable connection between the relief ordered and Suri's claims." Opening Br. at 64. But no such constraint appears in the statutory text of the AWA.[26] The Supreme Court has held that "[u]nless appropriately

---

[26] In support of its "nexus" arguments, the Government cites *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997), and *Las Americas Immigrant Advocacy Center v. Trump*, 451 F. Supp. 3d 1191, 1193 (D. Or. 2020). Neither persuade. *Omega World Travel, Inc.* is an antitrust case that has nothing to do with the AWA, nor does it mention the statute. And *Las Americas Immigrant Advocacy Center* is an out-of-
(Continued)

confined by Congress, a federal court may avail itself of *all* auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it." *N.Y. Tel. Co.*, 434 U.S. at 173 (emphasis added) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942)).

Lastly, the Government argues that "the district court's order arrogated to itself the very authority that Congress has denied it to review final orders of removal." Opening Br. at 65 (citing, *inter alia*, 8 U.S.C. § 1252(a)(5) & (b)(9)). While creative, the Government's argument can't withstand scrutiny. It conflates the authority to review a claim that in theory could be barred by the INA, with the district court's separate authority under the AWA to preserve its own jurisdiction and proceedings.

Here, the district court was presented with a "new situation[] which demanded equitable intervention." *Hazel-Atlas Glass Co.*, 322 U.S. at 248. We hold that it did not abuse its discretion by invoking its "merely incidental," *Dean Foods Co.*, 384 U.S. at 604, power under the AWA to "protect [its own] proceedings." *Degen*, 517 U.S. at 823.

---

circuit district court case on a set of facts much grander in scale and different than here. *See* 451 F. Supp. 3d at 1192–93 (denying plaintiffs' emergency order—with respect to immigration courts nationwide for the duration of the national COVID-19 emergency—requesting to enjoin the government from compelling any respondent to appear in immigration court, toll all court deadlines, and enjoin holding any attorney in contempt for failing to appeal because of COVID-19 concerns). And anyway, even that case suggests that the requisite "nexus" can just be that the "failure to [issue the order] would extinguish [the petitioner's] underlying claims," a nexus clearly met here. *Id.* at 1193 (internal quotation marks omitted).

## IV. Conclusion

For the reasons stated above, we hold that the district court had habeas jurisdiction and that it did not abuse its discretion in denying transfer of Suri's petition. We further hold that 8 U.S.C. §§ 1252(g), 1252(b)(9), and 1252(a)(5) did not strip the district court of jurisdiction, and that the district court did not abuse its discretion by invoking its authority under the AWA to protect its proceedings.

The scope of habeas corpus "must not be subject to manipulation by those whose power it is designed to restrain." *Boumediene*, 553 U.S. at 766. Specifically, the writ is "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). "To hold [that] the political branches have the power to switch the Constitution on or off at will," *Boumediene*, 553 U.S. at 765, would lead to a regime in which Congress and the President declare "what the law is"—"a striking anomaly in our tripartite system of government," *id.* (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

The district court's orders are

*AFFIRMED.*

63

WILKINSON, Circuit Judge, dissenting:

The Immigration and Nationality Act (INA) strips district courts of subject matter jurisdiction over nearly all claims "arising from" removal proceedings. *See* 8 U.S.C. §§ 1252(b)(9), (g). When an alien challenges the government's decision to detain him at the start of those proceedings, his claim arises from them. That means a district court sitting in habeas may not hear it. Instead, the alien must wait and raise his arguments—however meritorious—before a court of appeals in a petition for review (PFR) of a final order of removal.

This conclusion follows straightforwardly from the words "arising from," which are broad. In reaching the opposite conclusion, the majority saps them of all meaning, construing them so narrowly that nothing will arise from anything. Further, the majority breezes past such emphatic statutory terms as "any," "all," "sole and exclusive," "only," and "no," designed to denote unmistakable congressional intent.

In short, the majority rips an irreparable hole in the INA's jurisdiction-channeling scheme. Every alien who is detained pending removal will now have a pathway into district court for a thinly veiled habeas challenge to his removability. Each such suit will grind removal proceedings to a halt, invite a district court to take control of them, and require the government to prove the alien's removability a second time. This medley of duplication and delay is precisely what Congress intended to avoid when it channeled nearly all claims arising from removal proceedings into the PFR process.

Today's holding may be a victory for Suri, but it is a loss for the immigration system Congress carefully designed. I respectfully dissent.

64

I.

The origins of the INA's jurisdiction-channeling scheme lie in 1961. That year, Congress "eliminat[ed] . . . the previous initial step in obtaining judicial review" of a deportation order: "a suit in a District Court." *Foti v. INS*, 375 U.S. 217, 225 (1963). Without a district court suit, "the sole and exclusive procedure for[] the judicial review of all final orders of deportation" would be a PFR filed in a court of appeals. Act of Sep. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 650, 651. The "basic purpose" of the new PFR process was to "expedite the deportation [process] by preventing successive dilatory appeals to various federal courts." *Foti*, 375 U.S. at 226.

The scheme, however, did not work exactly as planned. Some "courts construed the 1961 amendments as channeling review of final orders to the courts of appeals, but still permitting district courts to exercise their traditional jurisdiction over claims that were viewed as being outside of a 'final order.'" *INS v. St. Cyr*, 533 U.S. 289, 313 n.37 (2001). In other words, these courts held that "various decisions and actions leading up to or consequent upon final orders of deportation" could be challenged directly in a district court outside the PFR process. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 485 (1999). The result was more dilatory suits.

Congress responded in 1996 with the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which made the INA's judicial review provisions "significantly more restrictive." *Id.* at 475. Whereas the 1961 law had designated the PFR process as the exclusive forum for "judicial review of all final orders of deportation," Act of Sep. 26, 1961, § 5(a), 75 Stat. at 651, the 1996 law made the PFR process the exclusive

65

forum for "[j]udicial review of *all questions of law and fact* . . . arising from *any action taken or proceeding brought* to remove an alien," IIRIRA, Pub L. No. 104-208, § 306(a)(2), 110 Stat. 3009, 3009-610 (1996) (codified as amended at 8 U.S.C. § 1252(b)(9)) (emphasis added). The revised language was broad enough to foreclose district court review not just of final orders, but of most actions leading up to those orders.

For good measure, Congress placed another provision in IIRIRA that bolstered the exclusivity of the PFR process: district courts were prohibited from hearing "any cause or claim by or on behalf of any alien arising from the decision or action by the [government] to commence proceedings, adjudicate cases, or execute removal orders." *Id.* at 3009-612 (codified as amended at 8 U.S.C. § 1252(g)). This addition was "clearly designed" to ensure that the government's "discretionary determinations" would "not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress ha[d] designed." *AADC*, 525 U.S. at 485. Like the 1961 law before it, it was "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." *Id.* at 487.

An additional IIRIRA provision prohibited courts from "set[ting] aside any action or decision by the [government] . . . regarding the detention or release of any alien." IIRIRA, § 303(a), 110 Stat. at 3009-586 (codified at 8 U.S.C. § 1226(e)). And another prohibited courts from reviewing "any other decision or action of the [government] the authority for which is specified . . . to be in the discretion of the [government]." *Id.* at § 306(a)(2), 110 Stat. at 3009-607 (codified as amended at 8 U.S.C. § 1252(a)(2)(B)).

66

"[P]rotecting the Executive's discretion from the courts" could "fairly be said to be the theme of the legislation." *AADC*, 525 U.S. at 486.

Once again, however, courts interpreted the law narrowly. In *St. Cyr*, the Supreme Court held that IIRIRA did not strip district courts of *habeas* jurisdiction even though it stripped them of regular jurisdiction. 533 U.S. at 314. Congress responded soon after by adding the words "habeas corpus" to the law's jurisdiction-stripping provisions, clarifying that habeas should not be treated differently. REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a), 119 Stat. 231, 310–11. Its conference report explained that "[d]espite Congress's efforts to limit judicial review in 1996, the Supreme Court [had] expanded it," leading to "bifurcated and piecemeal litigation." H.R. Rep. No. 109-72, at 173–74 (2005) (Conf. Rep.). By adding references to habeas to the law, Congress "intended to preclude *all* district court review of *any* issue raised in a removal proceeding." *Id.* at 173 (emphasis added).

Today's INA is the product of this 65-year back and forth between Congress and the courts. When courts found exceptions in the INA's broad language, Congress repeatedly pushed back, clarifying that it meant what it said. It used sweeping language because it had a sweeping vision.

The present statutory scheme is blanketed with emphatic terms. In explaining what is stripped from district court jurisdiction, the scheme refers to "any cause or claim" and "all questions of law and fact." 8 U.S.C. §§ 1252(g), (b)(9); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[T]he word 'any' has an expansive meaning, that is, 'one . . . of whatever kind.'" (citation omitted)); *Norfolk & W. Ry. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) ("'[A]ll . . .' indicates no limitation."). It refers to "any

67

action or decision" and "any action taken or proceeding brought." 8 U.S.C. §§ 1226(e), 1252(b)(9). And it refers to a "sole and exclusive" procedure, *id.* § 1252(a)(5), that is to be the "only" means of review, *id.* § 1252(b)(9), outside of which "no court shall have jurisdiction," *id.* § 1252(g). Between "any," "all," "sole and exclusive," "only," and "no," it is difficult to imagine how Congress could have expressed its intentions more forcefully.

By channeling into the PFR process any and all claims "arising from" removal proceedings, Congress meant to send a clear message. To repeat: habeas claims that challenge removal orders are the province of the system specifically designed by Congress for removal proceedings. That includes petitions that are no more than artfully pled as "independent" of removal disputes. What Congress did not want to happen is exactly what has happened here. Any fair reading of the history makes clear that the attempts of the legislative branch to channel removal claims into the removal process have been repeatedly rebuffed by the courts. The frustration has been compounded by the fact that the Supreme Court has articulated what Congress intended. *Foti*, 375 U.S. at 232; *AADC*, 525 U.S. at 487; *Nasrallah v. Barr*, 590 U.S. 573, 580 (2020). But the Court's pronouncements too have been consigned along with statutory text to an ineffectual state. The result has been, all too predictably, "successive dilatory appeals," *Foti*, 375 U.S. at 226, "bifurcated and piecemeal litigation," H.R. Rep. No. 109-72, at 174, and "the deconstruction, fragmentation, and hence prolongation of removal proceedings," *AADC*, 525 U.S. at 487.

68

II.

Moving from the panoramic to the particular, at least two INA provisions stripped the district court of subject matter jurisdiction over Suri's habeas petition. The first is 8 U.S.C. § 1252(b)(9). This provision reads:

> Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order. Except [via the PFR process], no court shall have jurisdiction, by habeas corpus . . . or by any other provision of law . . . to review such an order or such questions of law or fact.

The government's decision to initiate removal proceedings against Suri was an "action taken or proceeding brought to remove an alien," and Suri's challenge to his detention "aris[es] from" that decision. *Id.* As a result, "no court" outside the PFR process may hear his challenge. *Id.*

A.

The majority's main contention is that the government's decision to detain an alien does not arise from its decision to initiate removal proceedings against him. This argument fails to comprehend immigration detention.

The Department of Homeland Security (DHS) does not have freewheeling authority to detain aliens whenever it wishes. Instead, Congress permits DHS to detain an alien only "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). In the same vein, DHS regulations instruct that an alien may be arrested only when (or after) the alien is served with a "notice to appear"—the document that initiates

69

removal proceedings. 8 C.F.R. § 236.1(b)(1). The initiation of removal proceedings is both a necessary and sufficient predicate to detention.

Detention also makes removal possible. It "necessarily serves the purpose of preventing . . . aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore v. Kim*, 538 U.S. 510, 528 (2003). Removal proceedings "would be vain" if aliens "could not be held in custody pending the inquiry into their true character." *Wong Wing v. United States,* 163 U.S. 228, 235 (1896). In this sense, deportation is "detention's goal." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

Detention has become an ordinary "aspect of the deportation process." *Demore*, 538 U.S. at 523. During the most recent time period for which data is readily available, between 30 and 40 percent of aliens were detained during their removal proceedings. U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Statistics Yearbook: Fiscal Year 2018*, at 19 (2018) (data from fiscal year 2014 through fiscal year 2018). This means detention was an aspect of the removal process for tens of thousands of people each year. *Id.*

It is true, as the majority points out, that detention does not invariably follow whenever the government initiates removal proceedings. Majority Op. at 36–37. But the decision *whether* to detain does. The government must choose "detain" or "do not detain" before it serves an alien with a notice to appear. 8 C.F.R. § 236.1(b). Regardless of which option it picks, its choice is bound up in its decision to seek removal.

Most importantly, the government's detention decision and its removal decision are connected exercises of prosecutorial discretion. The INA provides that the government

70

"may" detain an alien during removal proceedings, 8 U.S.C. § 1226(a), and "the word 'may' *clearly* connotes discretion," *Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) (quoting *Biden v. Texas*, 597 U.S. 785, 802 (2022)). When an alien believes the government has exercised its discretion against him in violation of a constitutional guarantee, there is no principled basis on which he can distinguish detention from removal. As a result, the legal questions are the same. *See Johnson v. Whitehead*, 647 F.3d 120, 124 (4th Cir. 2011) ("Congress has specifically prohibited the use of habeas corpus petitions as a way of obtaining review of *questions arising in* removal proceedings." (emphasis added)).

Indeed, Suri's arguments in this case emphasize the point. His habeas petition contends that his detention and his attempted removal violate the First Amendment for the same reason: both are intended "to retaliate against and punish" him for being "supportive of Palestinian rights or critical of Israel." J.A. 283. If a court sitting in habeas were to hold that his detention was unlawful, his attempted removal would likely also be unlawful.

The majority is assuredly right, as the Supreme Court has already suggested, that the words "arising from" in § 1252(b)(9) require a tighter causal nexus than simple but-for causation. *Jennings v. Rodriguez*, 583 U.S. 281, 292–94 (2018) (plurality opinion); Majority Op. at 35. The nexus must be "more than [] weak or tenuous." *Aguilar v. ICE*, 510 F.3d 1, 10 (1st Cir. 2007). But all the features of immigration detention discussed above make the nexus between the decision to remove and the decision to detain quite tight indeed. *Accord Jennings*, 583 U.S. at 316–19 (Thomas, J., concurring in part and concurring in the judgment); *Öztürk v. Hyde*, 155 F.4th 187, 191–94 (2d Cir. 2025) (Menashi, J., concurring in the denial of rehearing en banc).

71

If a decision, i.e. detention, this bound up in the commencement of removal proceedings does not "aris[e] from" the proceedings, then what does? The majority's construction of "arising from" is so strained that the words will divert from the PFR process the very things that Congress wished to channel into it.

These features of immigration detention also help explain why it is an altogether different scenario when an alien challenges "assault [by] a guard or fellow detainee" or seeks recovery for personal injury because "a truck hits the bus transporting aliens to a detention facility." *Jennings*, 583 U.S. at 293 (plurality opinion). Although the government's decision to initiate removal proceedings is the but-for cause of both claims, it has a tight causal nexus with neither. The same may be true when an alien challenges "inhumane conditions of confinement" in immigration detention or brings a claim of prolonged confinement. *Id.*

Suri also presents due process claims related to the conditions and duration of his detention which he asserts are distinct from his First Amendment arguments. But the claims all "aris[e] from" his removal proceeding just the same. 8 U.S.C. § 1252(b)(9). The First Amendment and due process claims are all part of the same petition. There would be no reason for Suri to raise his due process contentions if he were not detained pursuant to the initiation of removal proceedings. But-for causation may not conclusively establish the requisite nexus between detention and removal, but it surely bears materially upon the question.

To find Suri's due process claim to be "independent" suggests a boilerplate "conditions/duration" add-on to every single habeas petition and opens the prospect of

72

habeas involvement in every case of an immigration-related detention. Indeed, Suri gives us no reason to believe that the same contentions would not be available as a matter of course to every future habeas applicant. Yet the majority suggests that these additional claims, standing by themselves, are enough to establish jurisdiction in federal court. Majority Op. at 41–42. This simply leaves the statute in tatters. It is one more circumvention device, which the Supreme Court must once more eliminate.

B.

Next the majority contends that even if the decision to detain arises from the decision to remove, § 1252(b)(9) is inapplicable in Suri's case because no final order of removal has yet been issued. Majority Op. at 43. It justifies this conclusion because § 1252 is titled "[j]udicial review of orders of removal" and the first sentence of § 1252(b) says "[w]ith respect to review of an order of removal . . . the following requirements apply."

This interpretation imposes more weight on the title and prefatory clause than they can bear. As far as the title is concerned, "the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947). As for the prefatory clause, "with respect to" simply means "in relation to." *With Respect to*, Merriam-Webster Online Dictionary (last visited June 26, 2026); *see also Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, at *7 (U.S. June 25, 2026) (noting that Congress's use of the phrase "with respect to" supports a "broad understanding" of its intent to strip federal courts of jurisdiction over other INA claims).

Section 1252(b)(9) does relate to final orders, since it channels a wide range of questions into review of "a final order." But the provision relates to final orders by

73

"deferring issues" until there is a final order, not by meaning nothing until there is a final order. *AADC*, 525 U.S. at 495 (Ginsburg, J., concurring in part and concurring in the judgment).

In fact, the majority's construction makes no sense of the provision's text and structure. The last sentence of § 1252(b)(9) refers to review of "such an order or such questions of law and fact." If the provision applied only to final orders, then "or such questions of law and fact" would be wholly unnecessary. *See Jennings*, 583 U.S. at 320 (Thomas, J., concurring in part and concurring in the judgment). Similarly, a nearby provision—§ 1252(a)(5)—already says that a PFR "shall be the sole and exclusive means for judicial review of an order of removal." If § 1252(b)(9) applied only to final orders, then it would be entirely redundant. *See id.*

The majority's construction disregards the provision's history and purpose too. As detailed above, the 1961 immigration law already provided that a PFR was the exclusive procedure for "judicial review of all final orders of deportation." Act of Sep. 26, 1961, § 5(a), 75 Stat. at 651. When Congress amended the law in 1996, it changed "all final orders of deportation," *id.*, to "all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien," IIRIRA, § 306(a)(2), 110 Stat. at 3009-610. It made this change for the purpose of sweeping into the PFR process the "various decisions and actions leading up to . . . final orders." *AADC*, 525 U.S. at 485. In holding that § 1252(b)(9) applies only after a final order has been issued, the majority erases the 1996 law in favor of the 1961 one.

74

The majority tries to minimize the novelty of its pronouncement by relying on Fourth Circuit case law, Majority Op. at 43–44, but it lends no support. Our decision in *Casa de Maryland v. U.S. Department of Homeland Security* simply declared that § 1252(b)(9) "applies only with respect to review of an order of removal"—a nearly exact quote of the statute's prefatory clause. 924 F.3d 684, 697 (4th Cir. 2019) (emphasis omitted) (quoting *St. Cyr*, 533 U.S. at 313). And *Casa de Maryland* was a generic Administrative Procedure Act challenge to a federal policy, detached from any specific alien's removal proceedings. *Id.* at 690–91. Since "the government ha[d]n't moved to remove any of the Plaintiffs," there was never going to be a PFR into which questions could be channeled. *Id.* at 696. That is hardly similar to an alien's challenge to an aspect of his ongoing removal proceedings.

Moreover, the majority's construction of § 1252(b)(9) runs counter to the one suggested by two Supreme Court decisions. In *AADC*, several aliens brought selective enforcement claims shortly after their removal proceedings began, long before there were any orders of removal. 525 U.S. at 473–74. The Court held that § 1252(g) barred a district court from reviewing their claims, and in the process noted that "§ 1252(b)(9) channels judicial review of *all*" the "decisions and actions" also channeled by § 1252(g). *Id.* at 483. The Court did not apply § 1252(b)(9) in *AADC* for a separate reason having to do with the rules for cases that were pending on the date IIRIRA became law. *Id.* But the unmistakable implication of the Court's discussion is that § 1252(b)(9), by its own terms, covered a selective enforcement claim brought before there was a final order.

75

Next consider *Jennings*, 583 U.S. 281. In that case, a three-Justice plurality suggested that the provision would strip jurisdiction if an alien sought to challenge legal issues arising from "the decision to detain them in the first place or to seek removal" or "any part of the process by which their removability will be determined"—quintessentially pre-final order challenges. *Id.* at 294–95 (plurality opinion). Two Justices in concurrence said as much explicitly. *Id.* at 317–18 (Thomas, J., joined by Gorsuch, J., concurring in part and concurring in the judgment). Implications, of course, do not make a holding. But a court of appeals should think carefully before it comes to a conclusion on which five individual Justices in one case (*Jennings*) and a majority opinion in another case (*AADC*) recently cast doubt. All the more so when the appellate court's conclusion, like this one, contravenes the relevant statute's text, structure, history, and purpose.

C.

Finally, the majority indicates that even if Suri's detention arises from his removal proceedings, and even if § 1252(b)(9) applies before a final order of removal has been issued, the provision still does not strip jurisdiction over his challenge to immigration detention. Majority Op. at 49–52. This is because the *Jennings* plurality warned against construing § 1252(b)(9) in a way that would make some claims "effectively unreviewable," *id.* at 293 (plurality opinion), and Suri's detention claim would, according to the majority, be insufficiently reviewable on a PFR. The majority's view is in direct conflict with the Third Circuit's decision in *Khalil v. President, U.S.*, 164 F.4th 259 (3d Cir. 2026) (per curiam) and the Second Circuit's decision in *Mahdawi v. Trump*, No. 25-1113 (2d Cir. July 21, 2026).

76

The majority also misunderstands the *Jennings* plurality's warning. A claim is "effectively unreviewable" when there is no "meaningful chance for judicial review." *Jennings*, 583 U.S. at 293 (plurality opinion). Suri, like the petitioners in *Khalil* and *Mahdawi*, *will* have a meaningful chance. If he receives a final order of removal and files a PFR in a court of appeals, the court will have explicit authority to consider his "constitutional claims." 8 U.S.C. § 1252(a)(2)(D). And if the factual record before the court of appeals is insufficient to facilitate constitutional consideration, that court may initiate special factfinding procedures. *Khalil*, 164 F.4th at 280–81 (discussing the options of appointing a special master or remanding under the Hobbs Act for district court factfinding). Review by a court of appeals on a PFR will feature hallmarks of due process similar to review by a district court in habeas.

It is true that review on a PFR may happen months later than review in habeas. But Congress knew that when it decided to channel almost all removal-related claims into the PFR process. Indeed, the fact that a PFR occurs near the end of the road is the *reason* Congress chose it as the vehicle for consolidated review. Providing earlier opportunities for review would invite "bifurcated and piecemeal litigation." H.R. Rep. No. 109-72, at 174. In prioritizing efficiency and consolidation over immediate redress, Congress accepted the risk that an alien with a meritorious claim might have to wait months before receiving relief. To hold, as the majority does now, that Congress could not have intended Suri to wait so long is to turn Congress's scheme on its head.

77

Outside the immigration system, our law often prioritizes efficiency and finality over immediate relief. As the Third Circuit pointed out in *Khalil*, for example, an innocent defendant who is wrongfully convicted and sent to prison due to ineffective assistance of counsel must exhaust his direct appeal before pursuing habeas relief. *See, e.g.*, 28 U.S.C. § 2254(b)(1)(A); *Khalil*, 164 F.4th at 275–76. The same is true of a defendant who sits in prison because his counsel failed to object to a selective prosecution. The "delay does not foreclose meaningful review. It just streamlines the process for seeking it." *Khalil*, 164 F.4th at 275.

The Second Circuit's decision in *Mahdawi* is of a piece with *Khalil*. It also reinforces the points made throughout this dissent. The petitioner in *Mahdawi* filed a habeas petition challenging the Government's decision to detain him upon the commencement of removal proceedings. *Mahdawi*, slip op. at 8. The petition is indistinguishable from Suri's and Khalil's. The Second Circuit agreed with the Third in *Khalil*: the detention claim was "inextricably intertwined with the claim that removal itself is unlawful," and therefore is barred by § 1252(b)(9). *Id.* at 24. To hold otherwise would "undo [the] scheme" Congress codified and "produce the very proliferation of parallel proceedings . . . that this statutory provision was designed to avoid." *Id.* at 40. The walls are closing in on the majority's analysis, and I regret that my friends diverge from the gathering force of pertinent authority.

The majority expresses special concern about what would happen if no final order of removal is ever issued against Suri. Majority Op. at 52. But if the government sought to detain him indefinitely without resolving his case one way or another, he could bring a

prolonged detention claim in habeas. *See Jennings*, 583 U.S. at 293. Since the causal nexus between the government's decision to initiate removal proceedings and a claim of indefinitely prolonged detention is weak, the INA would not strip district courts of jurisdiction over it. If, alternatively, no final order were ever issued because an Immigration Judge dismissed Suri's case, then he would not need to present his arguments in a PFR. That is what happened in two recent cases raising many of the same concerns as this one. *See* Press Release, ACLU, Immigration Judge Terminates Removal Proceedings Against Child Development Scholar Rümeysa Öztürk (Feb. 9, 2026); Press Release, ACLU, Mohsen Mahdawi's Removal Proceedings Terminated by Immigration Judge (Feb. 17, 2026).[*]

## D.

The majority next leans on the presumption against jurisdiction-stripping. Majority Op. at 33, 53–54. But the Supreme Court has repeatedly counseled against treading that ground when the statutory text is clear. *See Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, at *8 (U.S. June 25, 2026); *Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024). When it is "clear and convincing" that Congress intended to preclude judicial review, "we have no reason to resort to the presumption of reviewability." *Bouarfa*, 604 U.S. at 19 (quotation omitted).

---

[*] I am aware that there is an active circuit split about whether Section 1225(b)(2)(A) of the IIRIRA may be construed to deny bond hearings to noncitizens mandatorily detained after entering the country without authorization. *Compare Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026), *with Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026). The case at bar has no bearing on that question as it implicates different immigration statutes and different factual circumstances.

To insist upon reviewability in the face of plain statutory language to the contrary would deprive Congress of its longstanding control over federal court jurisdiction. *See Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448–49 (1850) (emphasizing Congress's control over the jurisdiction of the federal courts).

Lurking in the majority's analysis is the implication that barring habeas review of Suri's claim would violate the Constitution's Suspension Clause. *See* U.S. Const., art. I, § 9, cl. 2. It is well settled, however, that Congress may bar habeas when it makes an "adequate and effective" substitute available, *Swain v. Pressley*, 430 U.S. 372, 381 (1977), and that "judgments about the proper scope of the writ are 'normally for Congress to make.'" *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)).

The PFR process is an adequate and effective substitute for habeas. *See, e.g.*, *Mahdawi*, slip op. at 34; *Khalil*, 164 F.4th at 279; *Mohamed v. Gonzales*, 477 F.3d 522, 526 (8th Cir. 2007); *Iasu v. Smith*, 511 F.3d 881, 888 (9th Cir. 2007); *Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1278–79 (10th Cir. 2018); *Alexandre v. U.S. Att'y Gen.*, 452 F.3d 1204, 1206 (11th Cir. 2006) (per curiam). Suri's entire argument to the contrary consists of a single conclusory paragraph. *See* Response Br. at 46. Our job is to put the choice of Congress into effect.

I do not for a moment minimize the harm experienced by someone who spends more time detained than he should. But within the bounds of the Constitution, it is Congress's job to balance that harm against other considerations. The balance it struck in § 1252(b)(9) is one that prioritizes orderly adjudication. Our job is to honor its choice.

III.

If that were not enough, an additional INA provision—8 U.S.C. § 1252(g)—also stripped the district court of subject matter jurisdiction over Suri's habeas petition. This provision reads:

> Except [via the PFR process] and notwithstanding any other provision of law . . . including section 2241 of title 28, or any other habeas corpus provision, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [government] to commence proceedings, adjudicate cases, or execute removal orders.

Suri's challenge to his detention "aris[es] from" the government's "decision" to "commence proceedings" against him. *Id.* As a result, "no court" outside the PFR process may hear his challenge. *Id.*

The majority's § 1252(g) analysis leans heavily on the Supreme Court's *AADC* decision. Majority Op. at 34–35. It is true enough that *AADC* says § 1252(g) is "narrow[]" and "applies only to [the] three discrete actions" it mentions: commencing proceedings, adjudicating cases, and executing removal orders. 525 U.S. at 482. It is not a "general jurisdictional limitation" and does not apply, for example, to "the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." *Id.*

The Court in *AADC* also acknowledged, however, that several steps may be involved in commencing proceedings, and that some—such as "issu[ing] a show cause order"—should "be considered a mere specification of the decision to 'commence

81

proceedings' which . . . § 1252(g) covers." *Id.* at 485 n.9. So it is not true that § 1252(g) covers literally only challenges to the decision to commence proceedings. The question when applying § 1252(g), as when applying § 1252(b)(9), is how closely intertwined the challenged act is to the commencement of proceedings.

For all the reasons explained above, the decision to detain is inextricable from the commencement of proceedings. It is not at all like the decision to reschedule a hearing or even the decision to open an investigation, which are multiple steps away along the causal chain. An initial immigration arrest is so closely bound up in the decision to remove that it is fair to characterize it not only as an action arising from the commencement of proceedings, but also as "an action taken *to* commence proceedings." *Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016) (emphasis added) (quoting *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013)). In holding otherwise, the majority places us in direct conflict with the Eleventh Circuit's decision in *Alvarez* and in near conflict with two other circuits. *See Tazu v. Att'y Gen., U.S.*, 975 F.3d 292, 297 (3d Cir. 2020) (characterizing post-order arrests as "action[s] . . . to . . . execute removal orders") (quoting 8 U.S.C. § 1252(g)); *Sissoko v. Rocha*, 509 F.3d 947, 949–50 (9th Cir. 2007) (holding that "§ 1252(g) applies" to a detention claim when the INA requires the alien be detained at the start of proceedings).

Reading § 1252(g) to bar Suri's challenge to his detention is consonant with *AADC* in another way too. *AADC* explained that "[§] 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." 525 U.S. at 485 n.9. The government's decision to detain Suri was an exercise of the same prosecutorial discretion as its decision to seek his removal, and if one violates the First Amendment, then

so does the other. There is no way a district court can adjudicate the lawfulness of Suri's detention without committing the evil that § 1252(g) was directed against.

## IV.

Either 8 U.S.C. § 1252(b)(9) or § 1252(g), considered alone, would strip the district court of jurisdiction over Suri's petition. But "[i]n reading a statute we must not look merely to a particular clause, but consider in connection with it the whole statute." *Kucana v. Holder*, 558 U.S. 233, 245 (2010) (quoting *Dada v. Mukasey*, 554 U.S. 1, 16 (2008)). And when considering § 1252(b)(9) and § 1252(g) together, the combined force they exert exceeds even the sufficient force each exerts on its own.

So too when we consider § 1226(e) and § 1252(a)(2)(B). Recall that § 1226(e) prevents courts from "set[ting] aside any action or decision by the [government] . . . regarding the detention of any alien," and § 1252(a)(2)(B) prevents courts from reviewing "any other decision or action of the [government] the authority for which is specified under this subchapter to be in the discretion of the [government]." The decision to detain an alien at the start of removal proceedings is of course a discretionary decision regarding detention. The government has not based its argument in this appeal on either provision, and there may be reasons why one or both do not apply here. But their presence in the INA reinforces the conclusion reached in the case at bar. The statute contains a phalanx of provisions intended to prevent district courts from interfering in removal proceedings.

"Customarily," federal courts address subject matter jurisdiction "first" and other jurisdictional issues second. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999). Since the foregoing discussion is sufficient to conclude that the district court lacked subject

83

matter jurisdiction, I would not venture beyond it. The other issues in this appeal—the district of confinement and immediate custodian rules—present questions of personal jurisdiction and venue that would best be left for another day. *See Kanai v. McHugh*, 638 F.3d 251, 258 (4th Cir. 2011).

V.

Having applied the particulars, it is time to return to the larger perspective. The story has been one of courts too often ignoring the clear and repetitive gravamen of Congress's wishes to unfortunate effect. Whether looking at the jurisdiction-stripping provisions or the related enactments threaded throughout Title 8, Congress's intention has been plain. It has sought to preserve the essence of due process and judicial oversight without, at the same time, surrendering the system of immigration to the paralysis of duplicative process epitomized in redundant PFR and habeas review.

It is dispiriting to observe that the courts have, over a period of time, often attempted to tease ill-conceived and unpersuasive loopholes out of strong, affirmative legislative language. Courts have the crucial mission of ensuring that due process is accorded to those individuals facing removal. But the precise route by which due process is achieved is preeminently a matter for democratic selection, as evidenced in legislative ground rules and the executive enforcement thereof. It may well be that our system could be more efficient on the one hand or more humane on the other, but compromises are by their nature imperfect, and those struck here do not strike me as unconstitutional.

The majority's decision subverts these compromises. Under its new rules, any alien who is detained pending removal may access the district court by filing a habeas petition

84

that makes a conclusory allegation that his detention is unlawful. If the allegation is a thinly disguised attempt to challenge his removal ("I cannot be detained pending removal *because* I cannot be removed"), no matter. The district court will enjoin his removal to preserve its jurisdiction over his detention claim, as the district court did here. The government will be required to litigate the alien's removability in two forums and win in both.

The sequence is all too predictable. If the claim against detention has arguable merit, the district court will issue orders that effectively determine the outcome in the alien's removal proceedings, as the district court did here. And if the claim has no merit, the alien will still have bought himself time in which his removal was stayed. It is hard to say which outcome is more antithetical to Congress's streamlined jurisdiction-channeling scheme: the one in which a district court exerts control over removal proceedings by fiat, or the one in which dilatory tactics succeed in stretching removal proceedings for many months without securing a change in ultimate outcome.

Multiply this set of problems by the many thousands of aliens who are detained pending removal, and the scope of the majority's folly becomes clear. The duplication and delay that will result from its holding is immeasurable. All this in the face of a statute Congress has amended multiple times over 65 years for the purpose of reducing duplication and delay.

The majority's analysis is imbued throughout with sympathy for Suri's plight and for his First Amendment arguments. The majority's sympathy is both understandable and humane in the very best sense of that word. But the questions in this appeal are jurisdictional, not substantive, and the rules we craft for Suri are the rules that will govern

85

everyone else too. Congress has made its own clear judgment about how removal proceedings should go forward and how the immigration system is supposed to work. Those judgments too are not without weight. Courts cannot neuter Congress's jurisdiction-channeling scheme without damage to the constitutional structure and ultimately to the rule of law itself.

With all respect to my friends and colleagues in the majority, I would direct the dismissal of the habeas petition in this case.